**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re the Application of                                    :

Kayat Trading Limited,                                     :

               Petitioner,             :            05 MBD 10147-GAO

For an Order To Take Discovery of              :

Genzyme Corporation,                               :

               Respondent,           :

Pursuant to 28 U.S.C. § 1782.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## RENEWED MOTION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

      Petitioner Kayat Trading Limited ("Kayat") respectfully prays for an order, in the form attached to its petition (Paper #1, copy attached hereto as Exhibit 1), pursuant to 28 U.S.C. § 1782 requiring respondent Genzyme Corporation ("Genzyme") to produce documents and provide testimony for pending legal proceedings between them in Nicosia, Cyprus. In its papers and at the May 23, 2005 hearing before this Court, Genzyme opposed the petition on only two grounds: (1) "timing"; and (2) "parity" (Transcript of May 23, 2005 Hearing ["Tr.", copy attached hereto as Exhibit 2] at 11) or "scope" (*id.* at 12). At the same hearing, this Court granted a stay of consideration of the petition, citing what it was persuaded to be uncertainty in the "contours of the litigation." (*Id.* at 19-20.)

      Neither timing nor parity (nor scope) is a 28 U.S.C. § 1782 consideration under the

Supreme Court precedent of *Intel Corp. v. Advanced Micro Devices, Inc.*[1]  To the contrary,

based on Congress's extension of 28 U.S.C. § 1782 to support "proceedings" not yet initiated,

the Court expressly rejected a foreign-discoverability rule previously applied by the First

Circuit[2] that looked to such issues as the timing and scope of discovery.

After the May 23 hearing, on June 14, 2005, the Supreme Court of Cyprus removed the

issues of jurisdiction and of *forum non conveniens* raised by Genzyme as an impediment to the

proceedings in the Cypriot trial court.[3]  Kayat has offered to make certain witnesses available

for deposition.[4]  This removes any reason not to exercise 28 U.S.C. § 1782 powers here to

achieve Congress's aims of efficient discovery conducted as an example to foreign tribunals:

> Enactment of the proposed bill into law will constitute a major step in bringing the
> United States to the forefront of nations adjusting their procedures to those of sister
> nations and thereby [1] providing *equitable and efficacious procedures* for the benefit of
> tribunals and litigants involved in litigation with international aspects.

> The Commission hopes that the initiative taken by the United States in improving its
> procedures will *invite foreign countries* similarly *to adjust their procedures*. . . .
> Enactment of the proposed bill should [2] *encourage foreign nations to follow the
> example of the United States.*

S. Rep. No. 1580, 88th Cong., 2d Sess. (1964*), reprinted in* 1964 U.S. Code Cong. & Admin

News 3782, 3793-94 (emphasis added).[5]

---

[1] 542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004).
[2] 542 U.S. at ___, 124 S. Ct. at 2476, 159 L. Ed. 2d at 370, rejecting *In re Asta Pharmaceutical S.A.*, 981 F.2d 1, 6 (1st Cir. 1992).
[3] July 20, 2005 Third Affidavit of Andreas G. Ladas ("Ladas Aff."), Ex. AGL7B, attached hereto as Exhibit 3.
[4] July 28, 2005 Affidavit of Konstantin Meshkov ("Meshkov Aff") ¶ 11, submitted herewith.  The list was offered to Genzyme's counsel on August 10, 2005 as part of an attempt to narrow the issues herein.
[5]          . . . . Enactment of the bill into law will constitute a major step in bringing the United States to the forefront of nations adjusting their procedures to those of sister nations and thereby providing [1] *equitable and efficacious procedures* for the benefit of tribunals and litigants involved in litigation with international aspects.

         It is hoped that the initiative taken by the United States in improving its procedures will [2] *invite foreign countries* similarly *to adjust their procedures*.

S. Rep. No. 1580, 88th Cong., 2d Sess. (1964*), reprinted in* 1964 U.S. Code Cong. & Admin. News at 3783 (emphasis added).  These "twin aims" are often cited by courts of the Second Circuit, which, by far, have the most extensive experience with 28 U.S.C. § 1782.  *E.g., In re Schmitz*, 376 F.3d 79, 83-84 (2d Cir. 2004); *In re*

**Argument**

## I. ANY CONSIDERATION OF TIMING IN THIS CASE FAVORS EARLY DISCOVERY.

Genzyme's argument that discovery is premature is not only contrary to the construction of 28 U.S.C. § 1782 by the *Intel* Court, but is false from an efficiency point of view. The discovery requested here is more efficiently made sooner than later, after memories have faded and employees have moved on.

Genzyme argued "two reasons why this petition is premature" (Tr. At 12): "The pleadings are not complete." (*Id.*) However, this is not an impediment to 28 U.S.C. § 1782 discovery, which the *Intel* Court recognized was extended by Congress to proceedings in which proceedings had not yet been initiated.[6] As a reason for this Court not to exercise its discretion to achieve Congress's aims of efficient and exemplary discovery, it is specious because the issues of the litigation have already been clearly defined. *See* Point III *infra*.

Genzyme argued at the May 23 hearing that "*[m]ore importantly*, . . . there is a very live issue in the courts of Cyprus whether this case is going to remain in [the Cypriot] court." (Tr. At 12 [emphasis added].) However, on June 14, 2005, the Supreme Court of Cyprus unanimously held non-appealable the Cypriot trial court's denial of Genzyme's motion to dismiss for lack of jurisdiction or to stay for *forum non conveniens*. (Ladas Aff. Ex. AGL7B.) This assures that the case *will* remain in the Cypriot court through trial and

---

*Metallgesellschaft,* 121 F.3d 77, 78 (2d Cir. 1997); *In re Application of Grupo Qumma, S.A. de C.V.,* 2005 U.S. Dist. LEXIS 6898 at 11 (S.D.N.Y. 2005); *In re Servicio Pan Americano de Proteccion, C.A.,* 2004 U.S. Dist. LEXIS 24430 (S.D.N.Y. 2004) (expressly considering the "twin aims"); *In re Letter Rogatory from the Nedenes District Court, Norway,* 216 F.R.D. 277, 279, 280 (S.D.N.Y. 2003) (same).

[6] "[W]e reject the view. . . that *§ 1782* comes into play only when adjudicative proceedings are 'pending' or 'imminent.' . . . Instead, we hold that *§ 1782(a)* requires only that a dispositive ruling . . . reviewable by the . . ., be within reasonable contemplation." *Intel,* 542 U.S. at ___, 124 S. Ct. at 2480, 159 L. Ed. 2d at 374.

that discovery allowed here under 28 U.S.C. § 1782 will not be mooted by the Cypriot

court's rejection of the case.

Accordingly, Genzyme's argument that discovery is premature, unsupported by

law, also has no practical weight.


## II.    THE SCOPE OF THE REQUESTED DISCOVERY IS REASONABLE, AND, ALTHOUGH NOT REQUIRED, KAYAT OFFERS PARITY OF DISCOVERY.

Genzyme also objected to the "scope" of the requested discovery and to an alleged

lack of "parity".  Genzyme dwelled on the fact that Cypriot law only provided for

discovery of documents (Tr. at 13-14), again ignoring that the *Intel* Court expressly

rejected reference to the discoverability standards of the foreign tribunal.  An aim of

Congress was to provide an example to the foreign tribunal; which assumes that some

discovery available under 28 U.S.C. § 1782 is not available in the foreign tribunal.[7]

Genzyme mischaracterized the discovery requested as "*all* of the documents *related*

to its *entire* melatonin business worldwide over an eight-year period." (Tr. at  14

[emphasis added].)  To the contrary, Kayat's requested discovery is reasonably drawn to

specific subsets of Genzyme's document universe in a way calculated to lead to the

discovery of admissible evidence in a case alleging breach of contract, fraud and unfair

competition due to (a) Genzyme's misrepresentations, beginning in 1996, about its

commitment to the melatonin business in order to induce Kayat's development of the

markets in the former Soviet republics and (b) Genzyme's non-conforming shipments of

melatonin product as it left the melatonin business:

1.  Documents setting forth Genzyme's unit and dollar volume of melatonin product sales

---

[7] The few post-*Intel* decisions that denied 28 U.S.C. § 1782 discovery did  so because the discovery was expressly rejected by the foreign tribunal, making it pointless – not efficacious – to allow.  Here there is no issue that the Cyprus court would accept admissible documentary or deposition evidence.  {E.g., Ladas Aff. ¶ 8.)

for each market into which it sold such product for each month from January 1, 1995, through December 31, 2003. *[These documents are required to provide a context for Genzyme's fraudulent promotion of the market for melatonin and its retreat from that market.]*

2.  Documents setting forth Genzyme's forecasts of unit and dollar volume of melatonin product sales for each market into which it sold such product for each month from January 1, 1995, through December 31, 2003. *[These documents are required to establish Genzyme's intentions relative to the melatonin marketplace.]*

3.  All documents concerning Genzyme's plans for sales of melatonin product into any country formerly part of the Soviet Union for any period including any portion of the period from January 1, 1995, through December 31, 2003. *[These documents are required to establish Genzyme's specific assessment of the market it encouraged Kayat to develop.]*

4.  All documents concerning the regulation of MelaPure as a medicine in any country formerly part of the Soviet Union. *[These documents are required to establish Genzyme's commitment to the market and its knowledge of the quality requirements for its product.]*

5.  All documents concerning Genzyme's cessation or transfer to another entity of its melatonin business. *[These documents are required to establish the time and reasons for Genzyme's retreat from the melatonin market that damaged Kayat.]*

6.  All documents concerning Kayat or any person who purported to act for Kayat. *[These documents are required to establish Genzyme's knowledge of Kayat's reliance on Genzyme's misrepresentations.]*

7.  All communications by or with Roger Sparrow concerning any aspect of Genzyme's melatonin business. *[These documents, specifically referencing a key Genzyme executive, are required to establish Genzyme's misrepresentations to Kayat and others relating to Genzyme's melatonin market strategy and Genzyme's knowledge of market conditions and its internal plans for the market.]*

8.  All communications by or with Frank Ollington concerning any aspect of Genzyme's melatonin business. *[These documents, specifically referencing a key Genzyme executive, are required to establish Genzyme's misrepresentations to Kayat and others relating to Genzyme's melatonin market strategy and Genzyme's knowledge of market conditions and its internal plans for the market.]*

9.  All communications by or with Mara Aspinall concerning any aspect of Genzyme's melatonin business. *[These documents, specifically referencing a key Genzyme executive, are required to establish Genzyme's misrepresentations to Kayat and others relating to Genzyme's melatonin market strategy and Genzyme's knowledge of market conditions and its internal plans for the market.]*

10. All communications by or with Carol Greve-Phillips concerning any aspect of

Genzyme's melatonin business. *[These documents, specifically referencing a key Genzyme executive, are required to establish Genzyme's misrepresentations to Kayat and others relating to Genzyme's melatonin market strategy and Genzyme's knowledge of market conditions and its internal plans for the market.]*

(Ex. 1 at i-ii.)

On its mischaracterization of the overbreadth of Kayat's discovery requests, Genzyme complained that, although Kayat had offered reciprocal discovery, Kayat had not guaranteed testimony from its trading partners in the Ukraine alleged by Genzyme to be "at the absolute core of this case" (Tr. at 15), and therefore had not guaranteed "meaningful reciprocal discovery" (*id.* at 16).

Reciprocity is not a requirement of 28 U.S.C. § 1782, which Congress enacted unilaterally to provide an example to foreign tribunals who were not in a position to provide the same kind of discovery.[8]  Indeed, the first of the factors identified by the *Intel* Court for consideration in exercising the discretionary 28 U.S.C. § 1782 power, focused on the inability of the foreign tribunal to provide the evidence.[9]  The fourth and fifth factors, related to the receptivity of the foreign tribunal to the evidence and circumvention of the foreign tribunal's rule – which involve the efficacy (or mootness) of the procedure – not reciprocity.

Nonetheless, Kayat herewith offers the parity that Genzyme claims it seeks – in two

_____

[8] *See John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 135 (3d Cir. 1985) (section 1782 an ". . . example of *unilateral, nonreciprocal, internal legislation*, . . . which other countries may wish to follow," *quoting* Amram, "Public Law No. 88-619 of October 3, 1964 -- New Developments in International Judicial Assistance in the United States of America," 32 D.C. Bar J. 24, 33 (1965) (emphasis added by court)).

[9] The *Intel* Court identified several factors that "bear consideration" by a district court in ruling on a section1782(a) request: [1] whether the person from whom discovery is sought is a participant in the foreign proceeding, [2] the nature of the foreign tribunal, [3] the character of the proceedings underway abroad, [4] the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance, [5] whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States, and [6] whether the discovery sought is "unduly intrusive or burdensome." 124 S. Ct. at 2483, 159 L. Ed. 2d at 377-78.  In suggesting that "the need for § 1782(a) generally is not as apparent" when the person from whom discovery is sought is a participant in the foreign proceeding, the *Intel* Court was concerned for non-participants, "[whose] evidence, available in the United States, may be unobtainable

ways.  First, Kayat, in the Affidavit of Konstantin Meshkov and exhibits, herewith provides the discovery that it would provide as automatic discovery had Kayat brought the underlying suit in this court, which would then allow it to avail itself of the forms of discovery available under Fed. R. Civ. P. 26.  Second, having identified the material witnesses in that disclosure, Kayat offers to make available those witnesses, either in the Ukraine, as would be the case for the Ukrainian governmental witnesses, or in Cyprus, which is possible for the Ukrainian commercial witnesses, although it may be more economical to schedule the depositions all in the Ukraine.[10]  Genzyme, of course, may have its own Ukrainian or other former Soviet republic witnesses that it could make available.

Thus, not only is it manifestly efficient to have Genzyme provide now in its own headquarters city the documents related to and the witnesses to its strategic decisions and commercial representations made there, but Kayat offers to make available the Ukrainian witnesses that Genzyme has professed an interest in deposing.  Although parity is not required, it is provided.

## III.   THE CONTOURS OF THE LITIGATION AND REQUIRED DISCOVERY ARE CLEAR ON THE RECORD, AND THE STAY OF DISCOVER SHOULD BE TERMINATED.

In granting Genzyme a stay of consideration of the petition, the Court expressed a concern not for whether discovery should be allowed, but what discovery and "its contours and limits" in light of the "contours of the litigation" (Tr. 19-20).  Kayat respectfully submits that, contrary to the Court's impression that "this arises earlier than, for example,

---

absent *§ 1782(a)* aid."  *Intel*, 124 S. Ct. at 2483, 159 L. Ed. 2d at 377.

[10] One witness, the retired founder of Kayat, now resides in Montreal, Quebec, Canada, and would be made available there.

the *Intel* case where the controversy had developed more fully between the parties and what was and was not available elsewhere was more fully understood" (*id.* at 19), the *Intel* case was still in administrative investigation at the time of the Court's decision.  By contrast, the issues here were drawn with the filing in the Cypriot trial court of Kayat's Statement of Claims on November 24, 2004.[11]  That Genzyme has not yet answered in Cyprus, but has only delayed through a motion to strike portions of Kayat's claims (Ladas Aff. ¶ 5[12]), does not hide the contours of the litigation.  Those contours were drawn in Kayat's Statement of Claims: Genzyme's breach of the distribution agreement through non-conforming deliveries and its fraud in promoting that agreement while concealing its knowledge that it would get out of the melatonin business.  Genzyme's expected denials would not change the contours.  This much should be addressed by allowing the requested discovery.  If Genzyme raises new issues outside these contours, that is for another day.

Indeed, Genzyme has admitted that "the underlying facts and circumstances generating this petition are undisputed" (Tr. at 11), and has itself asserted that the Ukrainian distribution "is at the absolute core of this case" (*id.* at 15).  Kayat has further defined the contours of its case by providing the automatic discovery perquisite and is offering to make available witnesses to the Ukrainian distribution; it seeks Genzyme's knowledge of its own decision to leave the melatonin business, as well as its knowledge of the Ukrainian marketplace and its efforts to qualify melatonin as a drug there (unlike the food supplement it promoted here) and its failure to deliver goods meeting its own standards.  These provide as precise a contour as available in most litigation in United States district courts.

---

[11] March 23, 2005 Affidavit of Andreas G. Ladas, Ex. AGL4B (Paper #4).
[12] Genzyme has challenged the formality of Kayat's citation of authority within Kayat's Statement of Claims.

**Conclusion**

Kayat meets all of the statutory requirements to obtain discovery pursuant to 28 U.S.C. § 1782(a) and, in light of the "twin aims" of § 1782(a) and upon consideration of the factors identified by the Supreme Court in *Intel*, reviewed in the memorandum supporting the original petition and supplemented here, discretion should be exercised to provide the discovery requested in the proposed order.

Dated:  August 19, 2005

Respectfully submitted,
KAYAT TRADING LIMITED
By Its Attorneys


/s/ Michael P. Twohig
Stephen Y. Chow (BBO# 082990)
Michael Twohig (BBO#648079)
PERKINS SMITH & COHEN LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 854-4000


**RULE 7.1 CERTIFICATION**

I certify that counsel for the parties have conferred in a good faith effort to resolve or narrow the dispute which is the subject of this motion, to no avail.

/s/ Michael P. Twohig
Michael P. Twohig

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re the Application of                                  :

Kayat Trading Limited,                                :

                   Petitioner,           :      Misc. Docket _____

For an Order To Take Discovery of           :

Genzyme Corporation,                          :      ***ORDER PURSUANT TO
28 U.S.C. § 1782***

                 Respondent,           :

Pursuant to 28 U.S.C. § 1782.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

      Having considered the evidence and arguments presented by petitioner Kayat

Trading Limited ("Kayat") and respondent Genzyme Corporation ("Genzyme"), and

sufficient cause having been alleged therefor, it is hereby

      ORDERED that Genzyme produce, on or before _____, 2005,

pursuant to Fed. R. Civ. P. 34, including, if in electronic form, all metadata such as time

stamps, authors, addressees, and revisions:

1. Documents setting forth Genzyme's unit and dollar volume of melatonin product
   sales for each market into which it sold such product for each month from
   January 1, 1995, through December 31, 2003.

2. Documents setting forth Genzyme's forecasts of unit and dollar volume of
   melatonin product sales for each market into which it sold such product for each
   month from January 1, 1995, through December 31, 2003.

3. All documents concerning Genzyme's plans for sales of melatonin product into
   any country formerly part of the Soviet Union for any period including any
   portion of the period from January 1, 1995, through December 31, 2003.

4. All documents concerning the regulation of MelaPure as a medicine in any
   country formerly part of the Soviet Union.

i

5. All documents concerning Genzyme's cessation or transfer to another entity of its melatonin business.

6. All documents concerning Kayat or any person who purported to act for Kayat.

7. All communications by or with Roger Sparrow concerning any aspect of Genzyme's melatonin business.

8. All communications by or with Frank Ollington concerning any aspect of Genzyme's melatonin business.

9. All communications by or with Mara Aspinall concerning any aspect of Genzyme's melatonin business.

10. All communications by or with Carol Greve-Phillips concerning any aspect of Genzyme's melatonin business.

ORDERED that Genzyme produce between one month and three months after completion of the production of the above-mentioned documents witnesses for deposition upon oral examination pursuant to Fed. R. Civ. P. 30 authorized to authenticate the documents, provide access information, if not previously provided, and designated to speak for Genzyme on the subject matter of the documents; and it is further

ORDERED that any disputes relating to the above discovery may be presented to United States Magistrate _____ for resolution in accordance with the Federal Rules of Civil Procedure.

SO ORDERED.

Dated:  Boston, Massachusetts
        April ___, 2005

_____
United States District Judge

ii

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


```
*  *  *  *  *  *  *  *  *  *  *  *  *
In re:  Application of              *
Kayat Trading Limited, Petitioner,  *
                                    *
for an Order to Take Discovery of   *   CA 05-MBD10147-GAO
                                    *
Genzyme Corporation,                *
                Respondent          *
*  *  *  *  *  *  *  *  *  *  *  *  *
```

Before the Honorable
United States District Court Judge O'Toole

APPEARANCES:

Perkins, Smith & Cohen,
        By Attorney Stephen Y. Chow and Michael P. Twohig,
        One Beacon Street, 30th floor,
        Boston, Massachusetts  02108-3106, 617-854-4000
        for the Petitioner.

Palmer & Dodge,
        By Attorney Scott P. Lewis
        111 Huntington Avenue,
        Boston, Massachusetts  02199-7613
        for the Respondent.

                        Courtroom 9 - 3rd Floor
                        One Courthouse Way
                        Boston, Massachusetts 02210
                        Monday, May 23, 2005
                        2:05 PM to 2:36 PM


            Nancy L. Eaton - Per Diem Court Reporter
            13 Short Street, Reading, MA  01867-1014
                        617-633-5178

            Proceedings recorded by mechanical stenography
                transcript produced by computer.

<u>INDEX</u>

2          Oral Argument on Motion                    3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE CLERK:   First up for an order to show cause,

2    Kayat versus Genzyme, MBD 05-10147.  Would counsel please

3    identify yourself for the record.

4           MR.  CHOW:   Stephen Chow and Michael Twohig for

5    the petitioner, Kayat Trading.  With us also is Brooks Savage

6    from the -- as a member of the Virginia bar here on behalf of

7    Kayat.

8           MR.  LEWIS:   Scott Lewis for Genzyme, your Honor.

9           THE COURT:   All right.  This is Kayat's petition.

10          MR.  CHOW:   May it please the Court, we are here

11   under 28 USC 1782 to seek a discovery order based upon a pending

12   action in the Cyprus court as to Genzyme's promotion and

13   abandonment of melatonin product in the late 1990s.  Kayat

14   complains that Genzyme supported its exclusive distributorship

15   into eastern Europe and then participated in getting melatonin

16   approved as a drug in eastern Europe and abruptly discontinued

17   that product and that resulted in nonconforming shipments under

18   the distribution agreement and resulted in significant damage to

19   Kayat.  Kayat's suspects that Genzyme management in Boston knew

20   of its plan to discontinue melatonin products and at the same

21   time it was encouraging Kayat to enter into the eastern European

22   market.

23          Genzyme president at the time, Doctor Frank

24   Arlington, had directly encouraged Kayat to engage in the

25   distribution and clearly knew that there was some plan to

1   discontinue the product.  The proposed order of discovery we've

2   given, your Honor, is calculated to efficiently determine

3   whether there is evidence to support our thinking with respect

4   to what Genzyme did or it may prove that it is not the case.

5           I should be clear from Genzyme's opposition it just

6   seeks delay and this is in fact having filed an opposition to

7   jurisdiction in Cyprus, they have now appealed that decision and

8   it may take some time before that is cleared up.  Nonetheless,

9   the only object here seems to be to delay.  It is ironic that

10  Genzyme is saying it is Cyprus, that we ought to be doing the

11  litigation here; and yet when we offer the opportunity to do the

12  discovery here, they say it should wait until the Cyprus court

13  decides what to do.

14          Does this court have the power?  There is clearly

15  no objection.  It is not in the papers of the respondent.  There

16  are three cases of the Second Circuit which sees a lot of these

17  cases, has found that since Genzyme is headquartered in Boston,

18  clearly it is within the district.  The request for discovery is

19  for use in an actual proceeding in Cyprus and Kayat is clearly

20  an interested party.  Beyond that, this court does have

21  discretion and the discretion is to be exercised according to

22  the Supreme Court and the Supreme Court overruled the first

23  district in 1782 cases and addresses two items of section 1782.

24  One is the efficient conduct of discovery.  And in this case

25  clearly the discovery would be more efficiently done here than

1    it would be done in Cyprus, for example, to Genzyme's -- or it

2    sought a lot of information from Genzyme's corporate

3    headquarters and what witnesses can be produced within this

4    district, it is clearly more efficiently done here.

5              The other aim, the other twin aim is to try to

6    encourage other countries to use a discovery system such as

7    ours, and the thought there was to try to encourage the use of

8    American style discovery so that there are no trials by surprise

9    and other things like that that have been a problem in the

10   United States two centuries ago.

11             The only time that courts have really denied

12   discovery under 1782 and were affirmed by an appellate court has

13   been where the foreign country has been steadfast against

14   American discovery.  And that in fact happened in the Intel case

15   because in the European Union, its tradition, the traditional

16   German tradition of having blocking laws and otherwise, came

17   into the court to object to that discovery.  We don't have that

18   situation here.  In fact, all that is said here is that Cyprus

19   may not have these procedures to enforce discovery, but there is

20   nothing said, and in fact in our supplemental affidavit, it says

21   that Andreas Ladas, the counsel in Cyprus, swears that it was

22   likely that the Cyprus court would find admissible this

23   evidence.  In fact, as recently as a month ago in the in re:

24   Grupo Qumma case -- and if your Honor would like me to hand up

25   that case, I can do that now.

1                    THE COURT:   I am not sure, what is that case

2    again?

3                    MR.  CHOW:   The case is Southern District of New

4    York case decided under the same -- essentially the same facts.

5    It is a Mexican action and the court, the District Court there

6    went through the analysis using the Intel decision and so forth.

7    I have it here.

8                    THE COURT:   Do you have a copy?

9                    (Document handed to petitioner counsel and the

10   court).

11                   And the analysis there was there was, there are

12   affidavits going on both ways saying the evidence would not be

13   admissible or it would be admissible but the court found if

14   admissibility is an issue, then the court in the Mexican

15   jurisdiction in that case could decide admissibility at that

16   time.

17                   Unlike the court's disposition in LTX Dao Woo, the

18   trial court did not send his case here for want of jurisdiction

19   or for lack of convenience.  In fact the District Court decide

20   specifically that Genzyme's own distributorship agreement called

21   for concurrent jurisdiction both here and in Cyprus.  So it is,

22   again, it is we have here some current procedural maneuvers both

23   in Cyprus and here in the opposition to the petition for

24   discovery or these are simply to extend the time that judgment

25   on the merits would come about or in fact some extra judicial

1  resolution of the matter.

2          There is little required for the framing of issues

3  here.  We've set forth the statement of claims and that has a

4  number of theories of the case and essentially we expect that

5  Genzyme will deny some of these and the issues are framed and

6  the discovery requests are very much keyed to basically the

7  activities of Genzyme with respect to melatonin and its specific

8  plans for eastern Europe.

9          So the most efficient way to proceed and to

10  preserve the evidence in fact is to -- and that may include

11  exculpatory evidence -- is to begin discovery as presented under

12  1782.  We've already provided information in the way of

13  documents in the informal discussions between the parties that

14  probably would rise to the level of the automatic discovery that

15  we have here in the United States, in federal courts; and if we

16  should proceed in my view as if Genzyme did get its wish and

17  that case were being brought here in Massachusetts, so we don't

18  see any real objection to this.  We have offered to cooperate in

19  terms of reciprocal discovery whether it is in Cyprus or here.

20  Some of the comments, this doesn't help in the Ukraine, or if we

21  brought the case here, it wouldn't help in the Ukraine either.

22  Genzyme does in fact have -- has had some dealings with the

23  Ukraine because it was engaged in the approval of the drug

24  melatonin there, and we would be interested in seeing what was

25  involved in that approval process in connection with how it did

 1  not seek -- it sought here in the United States and not to have

 2  melatonin be a drug.

 3          On that basis, your Honor, we respectfully request

 4  that you enter the order for discovery.

 5          THE COURT:   Okay.  Now, I realize that you rely on

 6  the information from Mr. Ladas about Cypriot practice, and I

 7  don't mean to be unfair in asking you some questions about it.

 8  It may not be something you are able to answer; but as I read

 9  the materials, order 28 provides for some discovery which is

10  essentially documentary discovery.

11          MR.  CHOW:   Yes.

12          THE COURT:   Do you have any sense in a case like

13  this, commercial case, perhaps whether international or not, but

14  involving the same subject matter, what the course in terms of

15  time for discovery would be if the case, if an order for

16  discovery were issued under order 28?

17          MR.  CHOW:   Yes.

18          THE COURT:   Is it similar?  I am looking for a

19  gross dimensions.  Is it similar to what you might expect in

20  civil litigation here?  Is it much shorter?

21          MR.  CHOW:   I think it is longer.  Things are much

22  more relaxed and takes longer time in Cyprus.  My colleague Mr.

23  Savage has had some 15 years experience in Cyprus and their

24  courts but I am sure that --

25          THE COURT:   If you don't mind, I would ask Mr.

1    Savage.

2              MR. SAVAGE:  Yes, your Honor, certainly not an

3    expert on Cypriot procedure, but generally speaking, it is fair

4    to say that Cypriot civil procedure is based on the British

5    rules about 1960, the time Cyprus got --

6              THE COURT:   To overcharacterize it, prereform.

7              MR. SAVAGE:  Exactly.  As pointed out in the

8    affidavits, while not mandatory, it is routinely granted on

9    application through the judge, but there is no such thing as

10   mandatory discovery; and it basically involves, as I understand

11   it, counsel for each party preparing a list of documents upon

12   which they intend to rely.  And those are exchanged but there is

13   no real equivalent to sort of the system we have here under the

14   federal rules; and then the documents are exchanged and specific

15   objections can be brought to the court.  But it is English

16   discovery 40 years ago basically.  If that is helpful at all.

17             THE COURT:   It is.  But I was looking also for

18   sort of in practice what the pace is. Mr. Chow suggested it is a

19   little more leisurely than other places.

20             MR. SAVAGE:  The pace is slow, your Honor.  Cyprus

21   just joined the European Union last year; and as part of that

22   accession process, the EU had a number of study commissions to

23   harmonize the rules between the member states.  The one specific

24   area where Cyprus came in for criticism, and that is in, as I

25   say, the EU reports, is the judiciary, is the pace of the

1    proceedings, because I think the courts are starting to

2    recognize that; but the EU actually went so far almost to say

3    that there have been a couple of cases brought to the EU, the

4    Court of Human Rights recently on simply delays in Cyprus.  That

5    is a fact.

6              THE COURT:    Thank you.  I read someplace in the

7    papers, I am not sure I can tell you where, that there was an

8    assertion that this controversy would be governed by

9    Massachusetts law?

10             MR.  CHOW:    Yes, your Honor.

11             THE COURT:    Even if tried in Cyprus?

12             MR.  CHOW:    Yes, your Honor.

13             THE COURT:    The parties are in agreement on that?

14             MR.  CHOW:    I don't know if we are.

15             MR.  LEWIS:    I believe so, your Honor.

16             THE COURT:    Thanks.

17             MR.  CHOW:    And to end on this note that this is a

18   great opportunity for the court to give an example to Cyprus of

19   how efficient discovery can be done.

20             THE COURT:    Okay.

21             MR.  LEWIS:    Thank you, your Honor.  I think at

22   the inception of this argument it is important to recognize a

23   couple of things.  One is that the legal standard is undisputed.

24   We are not questioning the power of the court to enter the

25   order.  What we are questioning is whether or not you ought to

1    exercise your discretion to issue the discovery that is sought

2    and we are opposing it largely on grounds of timing and it is

3    premature, and on grounds of parity, and which is one of the

4    things that the court in Cyprus recognized can be done.  It is

5    also, the underlying facts and circumstances that generated this

6    petition are undisputed, that is what is going on, what is the

7    nature of the Cyprus proceeding, what's the name of the claim?

8    What is happening over there?

9           We had a petition with an affidavit from Mr. Ladas.

10   Genzyme filed its opposing memo from our lawyer in Cyprus, and

11   on Friday we got a supplemental affidavit.  We don't oppose

12   leave to file that supplemental affidavit.  What is important

13   about the supplemental affidavit is not what it says but what it

14   doesn't say.  It does confirm that the parties are in agreement

15   about the posture of the case in Cyprus, although we have

16   differing opinions about the probability of success of the

17   pending appeal and it confirms the importance of Ukrainian

18   evidence.

19          What it doesn't do is offer Genzyme any assurance

20   that if you enter the order that they've sought that we'll have

21   any realistic opportunity to gain the discovery that we need.

22   Mr. Ladas's affidavit makes as his reciprocal order of discovery

23   or agreement only that he would make depositions available for

24   their witnesses in Cyprus, not the many witnesses in the

25   Ukraine; and as I'll describe, the court in Cyprus, which is the

1   only court that had an opportunity to dig at all into the

2   allegations that Kayat is making, found in the very interim

3   ruling that they are relying on that the centrality of the

4   evidence was in the Ukraine, so it is very important from the

5   standpoint of parity to keep that in mind.

6               There are two fundamental issues here today.  One

7   of them is timing and the other one is scope.

8               With respect to timing there are two reasons why

9   this petition is premature.  The first is that in Cyprus

10  discovery hasn't begun yet.  The pleadings are not complete.  In

11  Cyprus under order 28, you can't even begin discovery until the

12  pleadings are complete.  Kayat hasn't sought to expedite

13  discovery there and they come in here, try to jump the gun and

14  start discovery in Massachusetts before there will be any

15  discovery in Cyprus.  More importantly, as we argue in our

16  brief, there is a very live issue in the courts of Cyprus as to

17  whether this case is going to remain in this court.  Genzyme has

18  protested it is a forum of nonconvenience.  That matter is

19  pending before the Supreme Court of Cyprus.  If the court over

20  there decides that the District Court in Nicosia is a forum of

21  nonconvenience, the case will be dismissed or stayed permanently

22  and in that case there will be no occasion, there is no

23  predicate for the 1782 petition; and we pointed your Honor to a

24  decision by this court, I think eight years ago, in which your

25  Honor granted a stay of discovery when a foreign defendant

 1  appeared in this court and challenged this court's jurisdiction

 2  as a forum of nonconvenience.  We suggest that the same

 3  principle ought to apply when a Massachusetts defendant in a

 4  foreign proceeding comes before this court and says:  I have got

 5  a live issue of forum nonconvenience over there and the

 6  discovery ought to be stayed until it is determined whether or

 7  not the case will have any vitality in Cyprus.

 8            THE COURT:    Is the question of forum

 9  nonconvenience governed by local Cyprian law or is it a matter

10  of European law?

11            MR.  LEWIS:    I think it is a matter of Cyprus law.

12  I don't think they've bought into a European scheme on issues of

13  that kind.  There is a predicate issue whether it is even an

14  appealable order.  That has been argued.  It will be decided

15  shortly.

16            THE COURT:    That is the only issue that has been

17  argued?

18            MR.  LEWIS:    That's correct.

19            Now, with respect to the scope of discovery.  I

20  want to focus on a couple of things.  One, your Honor has

21  already recognized, order 28, which is the governing procedural

22  rule in Cyprus, only contemplates document discovery.  And my

23  understanding it is slower to start and quicker to finish.  It

24  doesn't start until the pleadings have been completed, which in

25  this case has been slow by any standard; but then the lawyers

1   get together and they produce the documents that are required to

2   be produced under Cyprus procedure.  I don't claim to be an

3   expert on that at all.  But the important point that I want to

4   focus on is the issue about discovery of a case, not discovery

5   of a documents.

6           Kayat has come over here and said to this court:

7   Order Genzyme to produce witness for deposition.  Order Genzyme

8   to produce documents, all of the documents related to its entire

9   melatonin business worldwide over an eight-year period.  That is

10  what they want to get by discovery.  We've suggested as a matter

11  of parity we would need something comparable before an order of

12  that kind would be fair.  All Kayat tells this court, in the

13  first affidavit, they say:  We'll agree to reciprocal discovery.

14  In the second affidavit, paragraph 9, they say:  We'll agree to

15  reciprocal deposition discovery as regards Kayat's witnesses in

16  Cyprus.  That is all they are agreeing to produce for

17  depositions, witnesses in Cyprus for depositions over there, if

18  they are volunteering they are to produce them.

19          What they are not agreeing to produce is any

20  evidence from the Ukraine.  I want to focus on that.  It is

21  interesting to focus on the order from the court in Nicosia, on

22  paragraph 4 E.  The judge over in Cyprus says "the witnesses who

23  come mainly from the Ukraine."  That is where the evidence on

24  Kayat's side of the case is going to be found.  And then later

25  on page 10 of the interim ruling, the judge in Cyprus writes and

1  I quote:  "Most of the evidence, however, is to be found in the

2  Ukraine."  And it is not surprising, given the nature of the

3  underlying dispute.  This is a dispute about a contract for the

4  sale and distribution of melatonin in the Ukraine.  Kayat is in

5  Cyprus and the contract as a matter of Cyprus law was made in

6  Cyprus because it was executed by Kayat there.  That is the end

7  of the connection to Cyprus.

8          This contract was all about the Ukraine and you can

9  see that if you look at the statement of claim which was

10  attached to Mr. Ladas's initial affidavit.  In that statement of

11  claim what he talks about is the sale and distribution of

12  melatonin in the Ukraine.

13          The involvement of the Ukranian Scientific

14  Therapeutical Society in determining what the market for this

15  product would look like.  On joint venture with Kayat and there

16  are some interesting names:  000 ANIT and JV Certa and JV

17  Medical Commerce who Kayat alleges had arm length's deals with

18  Kayat that called for the subdistribution of this product in the

19  Ukraine at a time when the economy was failing over there at a

20  700% markup.

21          This evidence about:  What was going on in the

22  Ukraine?  Did the goods conform?  What were the regulatory

23  authorities doing?  And most importantly, what were the nature

24  of these underlying deals which Kayat claims generate its claim

25  for damages lie at the absolute core of this case?  Genzyme

1  protested and our opposition memorandum that.  Kayat had not

2  given us any assurances whatsoever that if your Honor granted

3  the discovery petition that they were seeking that we would have

4  any kind of meaningful reciprocal discovery and their only

5  response in the supplemental affidavit filed on Friday is:  As

6  regards their witnesses in Cyprus, they will agree to make them

7  available for deposition.

8            For these reasons, your Honor, we would suggest

9  that you should deny this petition as premature.  It is

10  premature because the pleadings haven't been completed in Cyprus

11  and it is premature because the issue of forum nonconvenience is

12  a live issue before the Supreme Court in Cyprus.  If your Honor

13  is disinclined to deny it as asked, we suggest that you stay

14  objection on this petition until the predicate events in the

15  Cyprus courts have been resolved.  The Supreme Court has decided

16  the issue of forum nonconvenience --

17            THE COURT:   The Supreme Court is the final court

18  of appeal?

19            MR.  LEWIS:   That is my understanding.  Until that

20  court has decided it is not going to decide or has decided the

21  issue on the merits and the pleadings have been completed.  If

22  we get to that point, then our suggestion to the court with

23  respect would be if you are not prepared to deny the petition as

24  we asked, that you urge the parties to see whether during that

25  period of time we are able to come up with a mutually agreeable

1  discovery plan that addresses this problem of the Ukranian joint

2  venturers and vendors to Kayat.  And if were able to do it,

3  we'll go forward.  If we are not, we'll come back to this court

4  some months down the road when discovery is ripe and your Honor

5  can decide what would be the fair way of conditioning the relief

6  that they are seeking under 1782 so that the core objective of

7  parity is achieved rather than having the process of this court

8  used to tilt the playing field in Cyprus.

9             THE COURT:   Mr. Chow.

10            MR.  CHOW:   The core objective on the 1782 is not

11 parity.  It is an element certainly that some of the district

12 courts have imprinted some of the thinking.  In essence we have

13 here a situation where clearly under the Supreme Court

14 precedence, Congress actually expanded the jurisdiction from an

15 actual proceeding abroad to even a pending proceeding, so the

16 proceeding need not actually be in place, so the idea that we

17 need to hold off until a higher court decides first whether or

18 not to hear that appeal of Genzyme, and then beyond that to

19 decide on the merits of the jurisdictional argument that has

20 already been set down before -- by the District Court -- which

21 is where certainly this is very different from your Honor's

22 decision in LTX against Dao Woo.  That doesn't work under the

23 Supreme Court precedence.

24            The motion is timely today and the idea that

25 charging us, Kayat, with the responsibility of Ukranian

1    witnesses that would be true there or here, and for that matter

2    if Genzyme brought the case in the Ukraine, that would still be

3    the situation.  It is not a question of our reciprocating.

4              In fact we would be happy to cooperate with Genzyme

5    in terms of any Ukranian discovery.  We think that they have

6    some closer connections to the Ukraine because they went through

7    the process of approving the drug there.  All the issues we are

8    saying, I think the scope is overstated.  We're not seeking

9    everything with melatonin.  We sought specifically the plans for

10   melatonin in terms of sales and we sought specifically the

11   particular witnesses' communications with respect to melatonin,

12   so it is far less broad than is stated here; and in fact we've

13   offered to -- as has been done in many of the other 1782 cases

14   -- to allow American discovery rules to be put in place for

15   confidentiality orders, with limitation of scope.  We've asked

16   to present this before a magistrate as well.  But we think the

17   time period is correct.  I think there is a -- certainly the

18   pretransaction time period is very reasonable.  We seek about

19   three years after the transactions, which is a trailing end, and

20   we feel that that is reasonably calculated to lead to

21   discoverable, admissible evidence.  So I think that both points,

22   on scope and timing, there is no real basis for Genzyme to

23   object.

24              THE COURT:  Okay.  Well, at this stage I agree

25   with Genzyme that it is too early for me to know what discovery

1    ought to be permitted under 1782.  I don't think it is a

2    question of whether there will be discovery permitted but rather

3    what discovery will be permitted and that will depend on the

4    contours of the litigation.  This arises earlier than, for

5    example, the Intel case where the controversy seemed to have

6    been more fully developed between the parties and what was and

7    was not available elsewhere was more clearly understood.  I just

8    think it is too early to understand those things.  I recognize

9    that on Intel, the availability of information under American

10   rules compared with the availability under foreign rules is not

11   the guiding consideration.  The fact that it couldn't be had

12   there.  So it may well be there is discovery allowed here beyond

13   what would be available in Cyprus.

14            That said, it is difficult to know even what the

15   issues will be and what discovery orders might be made and

16   complied with under order 28 for example.  There is a lot of

17   factors that go into it and of course, as argued by Genzyme,

18   until we are sure that the case is going forward under Cyprus

19   law in a Cyprus forum and there is some uncertain time, I

20   suppose one outcome that is possible, not likely, but one is

21   possible is the interim ruling will be reversed and jurisdiction

22   will be declined and there will be a case somewhere.  We are not

23   sure where.  It might be here.  It might be in the Ukraine for

24   all we know.  That will change the picture.

25            I think this is not a yes-or-no answer.  It is:

1   How do we design the appropriate discovery when the time comes?

2   And I think it is just too early to do that intelligently.  So

3   then the question comes:  What do I do with the petition?  I

4   think probably the best thing to do is to stay it for now rather

5   than deny it.  We can deny without prejudice and lead to it at

6   some point being renewed perhaps.  I think just for

7   administrative reasons we have a case file open, with a docket

8   open, we might as well keep that rather than close it and open a

9   new one.  That will simply stay action on the petition until

10  there is some significant development.  I'll leave it to you to

11  decide if there is significant development.  If you feel there

12  is significant enough development to come back, we'll entertain

13  it.

14          One development would be with the Supreme Court of

15  Cyprus giving us an answer on jurisdiction.  That may or may not

16  be enough.  I don't say that is automatically enough to give me

17  the information to intelligently set the contours and limits of

18  discovery here.  But something like that anyway.  So for the

19  time being, I will not grant the request.  We'll stay action on

20  the petition pending further developments in the case pending in

21  Cyprus or any other change of circumstances that may warrant

22  taking a second look at this.  Okay?

23          MR. CHOW:   Thank you, your Honor.

24          MR. LEWIS:   Thank you, your Honor.

25          MR. TWOHIG:   Thank you, your Honor.

1              (Matter finished at 2:36 pm.)

2              (Court stayed in session on other matters.)

3

4                  C E R T I F I C A T I O N

5

6          I, Nancy L. Eaton, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10    _____    _____

11    Nancy L. Eaton, Court Reporter              Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re Application of

Kayat Trading Limited,

        Petitioner,

for an Order to Take Discovery of       C.A. No. 05-MBD-10147-GAO

Genzyme Corporation,

        Respondent,

Pursuant to 28 U.S.C. § 1782

## THIRD AFFIDAVIT OF ANDREAS G. LADAS

I, the undersigned, Andreas G. Ladas of Nicosia, Cyprus, make oath and say as follows:

1.  I am an advocate licensed to practise before all Courts of the Republic of Cyprus. I have been in actual practice in Nicosia since 1974. I am the advocate handling the above case for the Plaintiffs ("Kayat") and have previously sworn two affidavits in support of Kayat's Petition for Discovery which was filed herein on 7 April 2005.

2.  I have read the transcript of the hearing held in this matter before the Honourable United States District Court Judge O'Toole on 23 May 2005.

3.  On 14 June 2005 the Supreme Court of Cyprus dismissed Genzyme's appeal of the interim ruling of the District Court of Nicosia and awarded costs to Kayat.  The Supreme Court held unanimously that, as a matter of law, the interim ruling was not appealable.  I have translated the Supreme Court's judgment into English and attach herewith:

(a)      as **Exhibit AGL7A** a copy of the Supreme Court's judgment; and

(b)      as **Exhibit AGL7B** an English translation thereof.

1

4.    The Supreme Court's decision is final, and there are no further avenues of appeal available to Genzyme.  The practical effect of the Supreme Court's judgment is to vest conduct of the proceedings exclusively in the hands of the trial court (i.e., the District Court of Nicosia).  Although Genzyme may, if it so elects, again contest the trial court's jurisdiction in its Statement of Defence and eventually in the trial of the action, the issue will not be determined until the final judgment of the District Court.

5.    In this regard I believe it is important to recognize that in the more than three years since this action began in Cyprus, Genzyme has yet to make any disclosure of its substantive defense to Kayat's claims.  If I have not made it clear previously, I should emphasize now that neither Genzyme's appeal nor its motion to strike portions of Kayat's claim have acted to extend the time limits for filing its defence. Kayat filed its Statement of Claim in November 2004. Given the period of summer judicial holidays in Cyprus, Genzyme will not file its Statement of Defence until September 2005 at the earliest.

6.    It is my opinion that Genzyme's conduct to date in the Cyprus action has been principally directed at achieving delay.

7.    As time continues to pass, the issue of preservation of witnesses' memories (and indeed evidence generally) becomes more urgent.  The crux of Kayat's action relates to alleged acts and omissions by Genzyme employees, none of whom are present in Cyprus or from whom the Cypriot court may effectively compel testimony or the production of documents.

8.    Cypriot law and procedure is based upon fundamental notions of jurisprudence developed in the English common law. Depositions and other relevant evidence produced by the parties pursuant to an order under 28 U.S.C. § 1782(a) will be admissible at trial in Cyprus. Given especially the fact that the defendant is located outside of its jurisdiction, the Cypriot Court will, I believe, welcome the assistance of the American Court

THE AFFIANT

...................................

Andreas G. Ladas

Sworn and signed before me
in the District Court of Nicosia
on ...................... 2005

REGISTRAR

2

ΑΝΩΤΑΤΟ ΔΙΚΑΣΤΗΡΙΟ ΚΥΠΡΟΥ

ΔΕΥΤΕΡΟΒΑΘΜΙΑ ΔΙΚΑΙΟΔΟΣΙΑ

(Πολιτική Έφεση Αρ. 11995)

14 Ιουνίου, 2005

[Π. ΑΡΤΕΜΗΣ, Τ. ΗΛΙΑΔΗΣ, Μ. ΦΩΤΙΟΥ, Δ/στές]

This is Exhibit ......... A.G.L.7.A
referred to in the
affidavit of ...........................
...... A.N.D.R.E.A.S. .L.A.D.A.S
dated ...... 20. July. 2005.
Registrar

GENZYME CORPORATION,

*Εφεσείοντες-Εναγόμενοι,*

v.

KAYAT TRADING LIMITED,

*Εφεσιβλήτων-Εναγόντων.*

----------

Π. Πολυβίου, για εφεσείοντες-εναγόμενους

Α. Λαδάς και Στ. Ασπρόφτας, για τους εφεσίβλητους-ενάγοντες.

**Η ομόφωνη απόφαση του Δικαστηρίου θα δοθεί από τον**
**Π. Αρτέμη, Δ.**

**Α Π Ο Φ Α Σ Η**

**Π. ΑΡΤΕΜΗΣ, Δ.:**    Οι    εφεσίβλητοι-ενάγοντες με γενικώς οπισθογραφημένο κλητήριο καταχώρησαν αγωγή εναντίον της εναγόμενης εταιρείας από τη Μασσαχουσέτη των Ηνωμένων Πολιτειών, απαιτώντας αποζημιώσεις για παράβαση συμβολαίου, καθώς και για δόλο και/ή απάτη και/ή ψευδείς παραστάσεις.

Οι εφεσίβλητοι-ενάγοντες προηγουμένως είχαν εξασφαλίσει άδεια για σφράγιση, καταχώρηση και επίδοση του κλητηρίου εκτός δικαιοδοσίας στην πολιτεία της Μασσαχουσέτης.

Με αίτησή της η εφεσείουσα-εναγόμενη εταιρεία, αφού καταχώρησε εμφάνιση υπό διαμαρτυρία, ζητούσε (α) διάταγμα με το οποίο να απορρίπτεται και/ή να παραμερίζεται η αγωγή (β) και/ή διάταγμα με το οποίο να απορρίπτεται και/ή να παραμερίζεται η επίδοση της αγωγής (γ) και/ή διάταγμα με το οποίο να αναστέλλεται κάθε διαδικασία στην αγωγή.

Ως βασικός λόγος για την πιο πάνω αίτηση ήταν ο ισχυρισμός ότι τα Κυπριακά Δικαστήρια δεν είχαν δικαιοδοσία, ή έστω αν είχαν διαζευκτικά η Κύπρος δεν αποτελούσε το κατάλληλο ή αρμόδιο δικαιοδοτικό (forum conveniens).

Το πρωτόδικο Δικαστήριο έκρινε ότι στο στάδιο αυτό δεν μπορούσε να αποφασίσει τη δικαιοδοσία του Κυπριακού Δικαστηρίου και να καταλήξει σε οποιοδήποτε τελικό συμπέρασμα και απέρριψε τα αιτήματα υπό (α) και (β). Ακολούθως απέρριψε και το αίτημα για αναστολή της διαδικασίας, γιατί δεν ικανοποιήθηκε ότι η Κύπρος δεν αποτελούσε το κατάλληλο forum για εκδίκαση της υπόθεσης.

Δεν θα σχολιάσουμε την ουσία της απόφασης, αφού το θέμα δεν εγείρεται στο στάδιο αυτό της έφεσης. Το τι εκδικάζουμε προδικαστικώς είναι κατά πόσο η πρωτόδικη απόφαση, με την οποία απορρίφθηκε η αίτηση για απόρριψη και/ή παραμερισμό της αγωγής, συνιστά εφέσιμη απόφαση. Επί του προκειμένου ένσταση εγέρθηκε από τους εφεσίβλητους-ενάγοντες, που πρόβαλαν τον ισχυρισμό ότι το θέμα

καλυπτόταν από τις αρχές που διατυπώθηκαν στη *Χαρούς ν. Χαρούς, Π.Ε. 11272, ημερ. 4.11.03* και έτσι δε χωρούσε έφεση.

Στην πιο πάνω υπόθεση λέχθηκαν τα ακόλουθα στη απόφαση της πλειοψηφίας της Ολομέλειας στη σελ.2:

«Υπό το πρίσμα της ερμηνείας του όρου «απόφαση» στο **άρθρο 25(1)** του **περί Δικαστηρίων Νόμου** τ.ου 1960 (Ν. 14/60) – ο **Νόμος**, ορώμενο στο πλαίσιο της δευτεροβάθμιας δικαιοδοσίας του Ανωτάτου Δικαστηρίου, κρίθηκε στη *Χάσικος κ.α. ν. Χαραλαμπίδη (1990) 1 Α.Α.Δ. 389*, ότι μόνο αποφάσεις καθοριστικές ή δηλωτικές για τα δικαιώματα των διαδίκων, υπόκεινται σε έφεση. Κατά συνέπεια μόνο ενδιάμεσες αποφάσεις που έχουν άμεσες επιπτώσεις στα δικαιώματα των διαδίκων μπορεί να αποτελέσουν το αντικείμενο έφεσης. Ως εκ τούτου αποφασίστηκε ότι δεν χωρούσε έφεση κατά απόφασης Επαρχιακού Δικαστηρίου απορριπτικής αιτήματος για την έκδοση συνοπτικής απόφασης, εφόσον αυτή δεν ήταν καθοριστική για τα δικαιώματα του διαδίκου.»

Και ακολούθως στη σελ.8:

«Κρίνουμε ότι τόσο ως ζήτημα νομολογιακής δέσμευσης όσο και ως θέμα αρχής, η *Χάσικος* και μεταγενέστερες αποφάσεις στοιχειοθετημένες στον ίδιο λόγο, καθορίζουν ποίες ενδιάμεσες αποφάσεις πρωτόδικων δικαστηρίων υπόκεινται σε έφεση.»

Ο συνήγορος των εφεσειόντων υπέβαλε στο Δικαστήριο ότι η πιο πάνω απόφαση δεν έχει εφαρμογή στην παρούσα περίπτωση, αφού το θέμα είναι τόσο σοβαρό και αφορά αυτή ταύτη τη δικαιοδοσία του Δικαστηρίου και αφού δεν μπορεί να χαρακτηρισθεί ως ενδιάμεσο, καθόσον εγέρθηκε πριν καν ξεκινήσει η διαδικασία και στο πρώτο της στάδιο.

Έχοντας εξετάσει με προσοχή το θέμα, έχουμε καταλήξει πως η υπόθεση **Χαρούς** εφαρμόζεται και στην παρούσα περίπτωση, καθιστώντας την υπό κρίση απόφαση μη εφέσιμη.

Η υπό κρίση απόφαση σαφώς δεν είναι τελική απόφαση και εμπίπτει στην κατηγορία ενδιάμεσων αποφάσεων, αφού έχει καταχωρηθεί μετά την έναρξη της διαδικασίας της αγωγής. Στην πιο πάνω απόφαση της πλειοψηφίας της Ολομέλειας δεν γίνεται διάκριση μεταξύ διαφορετικών τύπων ενδιάμεσων αποφάσεων, ανάλογα με το θέμα στο οποίο κάθε απόφαση αφορά. Η παρούσα αίτηση, στην οποία εκδόθηκε η υπό κρίση απόφαση, ανήκει στην τάξη εκείνων των αιτήσεων που, το κατά πόσο η απόφαση σ΄αυτές είναι εφέσιμη, εξαρτάται από το αποτέλεσμα τους. Ένα τέτοιο παράδειγμα είναι η αίτηση για συνοπτική απόφαση. Αν μεν εκδοθεί συνοπτική απόφαση τότε, αφού έχουν διαγνωσθεί τα δικαιώματα των διαδίκων, η απόφαση είναι εφέσιμη. Αν όμως απορριφθεί και δοθεί άδεια για υπεράσπιση, η απόφαση αυτή δεν είναι εφέσιμη, γιατί δεν δηλώνει, ούτε και καθορίζει τα δικαιώματα των διαδίκων. Το ίδιο ισχύει και στην παρούσα περίπτωση, όπου η αίτηση έχει απορριφθεί και έτσι η απόφαση δεν μπορεί να θεωρηθεί καθοριστική ή δηλωτική των δικαιωμάτων των διαδίκων, τα οποία ουδόλως επηρεάζει, μη έχοντας άμεσες επιπτώσεις σ΄αυτά, που εξακολουθούν να παραμένουν υπό κρίση. Παρεμπιπτόντως, ενδεικτικά επισημαίνουμε πως και το θέμα της δικαιοδοσίας, όπως αναφέραμε πιο πάνω, δεν έχει τελικά κριθεί.

**Κατά συνέπεια η απόφαση κρίνεται ως μη εφέσιμη και η έφεση απορρίπτεται, με έξοδα εναντίον των εφεσειόντων.**

Δ.                          Δ.                          Δ.

/Χ.Π.

THE SUPREME COURT OF CYPRUS

APPELLATE JURISDICTION

Civil Appeal no. 11995

14 June 2005

[P. ARTEMIS, T. ELIADES, M. PHOTIOU, JJs]

This is Exhibit ............A.G.L.7.B.
referred to in the
affidavit of ....................................
.........A.N.D.R.E.A.S.....L.A.D.A.S.
dated .......20.July.2005.
..............................
Registrar

GENZYME CORPORATION

Appellants – Defendants

v.

KAYAT TRADING LIMITED

Respondents – Plaintiffs

P. Polyviou, for appellants – defendants.

A. Ladas with S. Asproftas, for respondents – plaintiffs.

**The unanimous judgment of the Court will be given by**
**P. Artemis, J.**

**JUDGMENT**

**P. ARTEMIS, J:** The respondents – plaintiffs by a generally indorsed writ of summons filed an action against the defendant company from Massachusetts of the United States, claiming damages for breach of contract, as well as for fraud and/or deceit and/or false pretenses.

The respondents – plaintiffs had previously secured leave to seal, file and serve the writ of summons outside the jurisdiction in the state of Massachusetts.

1

By application the appellant – defendant company, after filing an appearance under protest, asked for (a) an order dismissing and/or setting aside the action (b) and/or order dismissing and/or setting aside the service in the action (c) and/or order staying the proceedings in the action.

As the basic ground for the above application was the allegation that the Cypriot Courts had no jurisdiction, or, alternatively, even if they had, that Cyprus was not the appropriate or competent jurisdictional forum (forum conveniens).

The Court of first instance decided that at this stage it could not determine the jurisdiction of the Cypriot Court and to reach any final conclusions and dismissed prayers (a) and (b). It then dismissed the prayer for stay of the proceedings, because it was not satisfied that Cyprus was not the appropriate forum to try the case.

We shall not comment on the substance of the judgment, since the matter is not raised at this stage of the appeal. What we are trying preliminarily is whether the first instance judgment, which dismissed the application to dismiss and/or set aside the action, constituted an appealable judgment. An objection on this was raised by the respondents – plaintiffs, who put forward the allegation that the matter was covered by the principles laid down in **Charous v. Charous, C.A. 11272, dated 4.11.03** and so no appeal lay.

In the above case the following were stated in the decision of the majority of the Full Bench, at p.2:

> "In view of the definition of the term "judgment" in **section 25(1) of the Courts of Justice Law, 1960, (L.14/60) –the Law**, seen in the context of the appellate jurisdiction of the Supreme Court, it was determined in **Hasikos a.o. v. Charalambides (1990) 1 C.L.R. 389**, that only judgments which determine or declare the rights of the parties are subject to appeal. Consequently, only interim rulings which have direct consequences on the rights of the parties can be the subject of an appeal. As a result it was decided that no appeal lay against a decision of the District Court dismissing an application for summary judgment, since this was not determinative of the rights of the party."

2

And subsequently at p.8 :

> "In our judgment, both as a matter of binding case-law and as a matter of principle, *Hasikos* and subsequent cases grounded on the same ratio, determine which interim rulings of first-instance Courts are subject to appeal."

Counsel for the appellants submitted to the Court that the above decision does not apply to this case, since the matter is so serious and concerns the jurisdiction of the Court and since it cannot be characterized as interim, since it was raised even before the proceedings started and at their first stage.

Having carefully examined this matter, we have concluded that the **Charous** case does apply to this case, rendering the judgment under consideration non-appealable.

The judgment under consideration is clearly not a final judgment and falls within the category of interim rulings, since it was filed after the commencement of the proceedings in the action. In the above majority judgment of the Full Bench no distinction is made between different types of interim rulings, depending on the subject-matter of each ruling. The present application, in which the judgment under consideration was given, belongs to that class of application where whether or not the judgment therein is appealable, depends on the result. One such example is the application for summary judgment. If a summary judgment is issued then, since the rights of the parties have been determined, the judgment is appealable. But if it is dismissed and leave to defend is granted, that judgment is not appealable, because it does not declare, nor does it determine the rights of the parties. The same applies in this case, where the application has been dismissed and so the judgment cannot be considered as determining or declaring the rights of the parties, which it does not affect in any way, not having any direct effect on same, which continue to remain sub-judice. Incidentally, we indicatively point out that even the matter of jurisdiction, as we mention above, has not been finally adjudicated upon.

**Consequently the judgment is adjudged to be non-appealable and the appeal is dismissed, with costs against the appellants.**

J.                                    J.                                    J.