IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re the Application of | : | |
| Kayat Trading Limited, | : | |
| Petitioner, | : | 05 MBD 10147-GAO |
| For an Order To Take Discovery of | : | |
| Genzyme Corporation, | : | |
| Respondent, | : | |
| Pursuant to 28 U.S.C. § 1782. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PETIONER KAYAT TRADING LIMITED'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL COMPLETION OF DISCOVERY AND TO EXPAND DISCOVERY PURSUANT TO STIPULATED DISCOVERY PLAN**

Petitioner Kayat Trading Limited ("Kayat") submits this memorandum in support of its order, in the form attached hereto, pursuant to 28 U.S.C. § 1782, or alternatively, Fed. R. Civ. P. 37, requiring respondent Genzyme Corporation ("Genzyme") to produce documents and provide testimony in connection with Kayat's suit in its home country, Cyprus, for Genzyme's fraudulent inducement and breach of an agreement for Kayat to distribute, in the exclusive territory of the Ukraine, MelaPure™ melatonin manufactured by Genzyme to pharmaceutical standards in finished dosage form ("FDF") – the tablets consumed by humans. Kayat contends that Genzyme supplied it with FDF melatonin for sale to the Ukrainian public that materially failed to conform to the specifications of the FDF

1

MelaPure™ that had been registered as a licensed medicine by the Ukrainian Ministry of Health after clinical tests of Genzyme-supplied samples.[1] Moreover, Kayat's suit alleges that the FDF MelaPure™ supplied by Genzyme was not, in fact, manufactured by Genzyme as had been represented to both Kayat and the Ukrainian public health authorities. Requested on this motion are:

(1) completion of discovery on the operative distribution agreement between the parties;

(2) completion of discovery on the circumstances of Genzyme's decision to exit from the melatonin business; and

(3) completion of discovery on Genzyme's manufacturing of FDF MelaPure™ melatonin for Kayat and extension of discovery to Genzyme's capability and experience in manufacturing FDF MelaPure™ melatonin generally in the 1995-2003 time period.

## Background of the Distribution Arrangement

Central to the underlying dispute is the exclusive agency/distributorship relationship between Genzyme and Kayat relating to the distribution, particularly in Russia and the Ukraine,[2] of FDF MelaPure™ branded melatonin as understood to be manufactured and sold by the apparently reputable Genzyme. The premises of this relationship were set forth in the "whereas" clauses of an agreement drafted and revised by Genzyme:

A)   <u>Genzyme manufactures and sells the products specified in Schedule I</u> ("the Products")

B)   Genzyme has agreed with the Distributor to grant [sic] to appoint the Distributor its sole and exclusive distributor for the products in the territories listed in Schedule 2 [the former Soviet republics] on the terms hereinafter

---

[1] A parallel may be found in the United States Food and Drug Administration's recent refusal to approve Genzyme's scaling-up of manufacture of its Myozyme drug for the rare Pompe disease. Wall St. J., Aug. 9, 2007, at C1, col. 2.

[2] The agency extended to all the countries of the former Soviet Republic, but distribution proceeded only in Russia and the Ukraine. Although Kayat elected to proceed in the Cypriot court solely on the Ukrainian distribution, some of the background, for example, clinical trials, occurred in connection with the Russian distribution also.

2

appearing.

(GEN000974[3] [emphasis added].)[4]  The "Products" are defined in Schedule I as "<u>MelaPure trade mark branded</u> Melatonin, <u>Melatonin Finished Dosage Form Tablets</u>, Melatonin Powder and any product produced by Genzyme to replace the same." (GEN000980 [emphasis added].)  The only product ever approved for sale as a medicine in the Ukraine was "MelaPure Melatonin 60 tablet bottle, 3 mg" (GEN000982), further specified in color, shape, assay methods and limits, and other qualities (GEN000983).  Manufacture specifically by Genzyme was contracted for in Clause 4.3:

> All Products supplied by Genzyme to the Distributor <u>shall be with Genzyme's standard packaging incorporating the name of Genzyme as the manufacturer</u>, the Distributor as the distributor and such other information and particulars as may be identified by the Distributor as being in compliance with the requirements of the respective Territories for which the order is intended.

(GEN000975 [emphasis added].)  Clause 4.2 called for Genzyme's delivery of product "with all reasonable dispatch and in any event within 28 days of the date of the order." (*Id.*)

Melatonin was in great demand in 1995 and 1996.  See "Melatonin Mania," cover story in Newsweek, Nov. 6, 1995 (Ollington Dep.[5] [Ex. 9] PX-34).  Genzyme distinguished itself as a supplier of its MelaPure™ brand melatonin, announcing in a March 22, 1996 press

---

[3] "GENxxxxxx" denotes a numbered page of Genzyme's document production, a copy of which is included in numerical order as Ex. 1, with  "Ex. y" denoting Exhibit y to the Declaration of Stephen Y. Chow in Support of Petitioner's Motion To Compel Completion of Discovery and To Expand Discovery Pursuant to Stipulated Discovery Plan" filed herewith.  "KAYATxxxxxx" denotes a numbered page of Kayat's document production, a copy of which is included in numerical order as Ex. 2

[4] Both this document and a draft were produced by Genzyme as part of the Discovery Plan herein, but no one was designated pursuant to the Discovery Plan under Fed. R. Civ. P. 30(b)(6) to testify on these central documents.  This document was signed by Kayat on July 15, 1997, but Genzyme disputes whether a written assurance by Genzyme of a different contract and payment term (KAYAT000666-67) is in effect.  An initial draft was not provided by Genzyme until December 30, 1996, after Kayat and its sub-distributors had substantially completed their efforts to register Genzyme MelaPure™ melatonin 3mg tablets in Russia and the Ukraine (provisional Ukrainian committee approval December 26, 1996, certificate of registration issued April 25, 1997), using the samples with bottling and labeling provided to them by Genzyme.

[5] July 17, 2006 Deposition of James F. Ollington, Ph.D., copies of referenced pages in numerical order followed by

release:

> "The MelaPure™ logo was developed as a visible way to reassure consumers that the melatonin they are using is of a guaranteed high and consistent standard," said Alan Walts, Ph.D., vice president and general manager, Genzyme Pharmaceuticals.[6] "MelaPure™ melatonin is only available from Genzyme Pharmaceuticals and is synonymous with manufacturing excellence and quality control, as well as the assurance of long term supply."

(KAYAT000412-13.)  Genzyme touted itself as providing "the care that a major drug company has to take by law" (KAYAT000290) and advertised on its melapure.com website that:

> Now you can order high quality, *pharmaceutical grade*, synthetic melatonin directly from Genzyme – one of the world's top five biotechnology companies. Genzyme is the world's leading manufacturer of melatonin.

(Ex. 3: 1997 webpage of www.melapure.com from web.archive.org [emphasis added].)

On May 16, 1996, Roger Sparrow, Genzyme Pharmaceutical's "Sales Director, Finished Dosage Form Pharmaceuticals,"[7] expressed to Kayat an interest in having it market Genzyme's FDF melatonin, attaching an advertisement showing a bottle of 60 – 3mg tablets under the MelaPure™ logo and proclaiming:

> **MELAPURE IS GENZYME QUALITY MELATONIN**.  THE MELAPURE STANDARD IS A GUARANTEE OF **MANUFACTURING EXCELLENCE**, **QUALITY CONTROL** AND **SUPPLY ASSURANCE.**

(KAYAT000408-09 [emphasis in original].)  Within two weeks, Genzyme had authorized Kayat to attempt to register MelaPure™ Melatonin in the Russian Federation, and Mr.

---

referenced exhibits included in Ex. 9

[6] Genzyme Pharmaceuticals, a division of Genzyme, is "a bit of a misnomer" because it sold chemicals to pharmaceutical companies rather than developed and sold pharmaceutical preparations itself.  (July 18, 2007 Deposition of Carol Greve-Philips ["Greve-Philips Dep.", Ex. 8] at 18-19.)  That misnomer quite understandably contributed to the belief that Genzyme Pharmaceuticals had experience with FDF melatonin sold in that form to human consumers.

[7] Mr. Sparrow had full authority to speak for Genzyme in this product line.  (GEN000986; Ollington Dep. [Ex. 9] at 35-37 [Mr. Sparrow reported to Tom Slater], 72-73 [no memory of Mr. Sparrow exceeding authority].)

Sparrow provided the following statement to the "Chief Registration of Pharmaceuticals, Medical Equipment, Medical Substances, Ministry of Public Health and Medical Equipment of The Russian Federation":

> I am pleased to inform you that Genzyme Pharmaceuticals is the largest manufacturer and supplier of the most popular Medicine in the United States of America which is called 'Melatonin'. The Genzyme product has the Trade Mark 'MelaPure' and we are very much interested to cooperate with Russian partners.

(KAYAT000405.) Genzyme Pharmaceuticals also initially sent five bottles of the 60 – 3mg MelaPure™.[8] (KAYAT000403.) A "full registration package" was supplied in November: 1996:[9]

> For Genzyme's part I can again re-state that as one of the worlds [sic] most successful Biotech companies the Pharmaceutical Division that I represent takes the strongest most ethical approach to its products and our mission in Russia is to make available a safe product manufactured to the highest standards of cGMP.

(KAYAT000220.)

Genzyme expressly represented to Kayat that Genzyme manufactured melatonin at its own plants in Switzerland and the U.K. and formed it into tablets at "Tishcon, Maryland" (KAYAT000404). This allowed the important description of its 60 – 3mg MelaPure™ tablets as "made in the U.S.A."

On October 25, 1996, Genzyme authorized Kayat to register MelaPure™ Melatonin in the Ukraine in their name or in the name of any local distributor of their choice. (KAYAT000272-73 [with specifications for MelaPure™ Melatonin Tablets 3mg Dosage].) Genzyme Pharmaceuticals granted Kayat and its Ukrainian partner OOO ANIT ("ANIT") a "Power of Attorney for Registration of Genzyme MelaPure Melatonin" before the Ukrainian

---

[8] Genzyme sent larger quantities in December 2006 to support clinical tests.

[9] No copy of that package was provided in Genzyme's production of documents.

regulatory authorities.  (KAYAT000005.)  The Genzyme documentation for its 3mg MelaPure™ melatonin tablets was considered and recommended for licensing at the December 26, 1996 meeting of the Pharmacological Committee of the Ministry of Health of Ukraine (KAYAT000172, -173, -1448, -1449)   After reports were issued for clinical trials in Russia and the Ukraine of Genzyme's 3mg MelaPure™ melatonin tablets, a registration certificate for the product was issued April 25, 1997.[10]  (GEN004702-05)  Thereafter, Kayat entered an agreement with ANIT as an exclusive sub-distributor of "MelaPure MELATONIN product of Genzyme" during the five-year validity of the registration certificate for that specific product.  (KAYAT001348-51.)  Thus, the Ukrainian authorities, ANIT, and Kayat all relied on Genzyme's "guarantee of manufacturing excellence, quality control and supply assurance" in its production of "pharmaceutical grade" 3mg FDF MelaPure™ branded melatonin in Genzyme's plants in the United Kingdom, Switzerland and "Tishcon, Maryland" – finished in the U.S.A., calling for a certificate of origin in the U.S.

But Genzyme immediately thereafter showed that its promise of "**MANUFACTURING EXCELLENCE**, **QUALITY CONTROL** AND **SUPPLY ASSURANCE**" (KAYAT000409) was empty.  After unexplained production delays substantially in excess of the 28 days envisaged by the Kayat agreement, the first shipments in the Fall of 1997 to Russia and the Ukraine did not have proper certificates of origin and the tablets were subsequently found to be of different size, shape, color, weight and melatonin content than those submitted for registration.  In response to Kayat's initial protests in November, Genzyme responded, "We shut down the original supplier in the USA some time ago because his tablets were below standard for appearance, stability and they

---

[10] The Russian certificate was issued in July 1997 and was also valid for a period of five years.

6

routinely supplied tablets short on Melatonin dosage." (KAYAT000529.) On January 8, 1998, Genzyme issued a press release stating that it was "redirecting" and "redeploying" its United Kingdom facility.[11] (KAYAT001231-32.) On January 20, 1998, Mr. Sparrow wrote to Kayat, still suggesting that manufacturing was done in Genzyme facilities:

> I need to advise you that Genzyme Corporation in the United States has opened a new manufacturing facility in England to take over the manufacture of MelaPure Melatonin 60 tablet bottles.
>
> The United States Factory [sic] has been closed and the English factory will in future manufacture product which is produced to exactly the same formulation using the same quality of material. . . .

(KAYAT001221.) He also suggested the need to re-register with manufacturing in the U.K. (Natural Options tabletting). (KAYAT001226.)

In February 1998, after extensive correspondence, including to Genzyme's CEO, Henri Termeer (GEN005318-19), that expressed Kayat's and its sub-distributors' concerns over allegations that they were distributing counterfeit goods, citing the certificates of origin as well as the poor quality of the FDF MelaPure™ and its packaging, leading to one pre-arbitration notification (KAYAT001329-34),[12] Genzyme returned to Tishcon in Maryland (*e.g.*, KAYAT001156). Still, the quality problems persisted, including the use of incorrect product identification or "bar" codes with the result that the major shipments by Genzyme to Kayat's Ukrainian sub-distributors were arrested by the Ministry of Health of Ukraine, State Inspection

---

[11] Although Genzyme argues that it transferred all its responsibilities to "VitaPure" after July 30, 1998, Roger Sparrow originally talked about this being a line of business within Genzyme (KAYAT000206) and it was so considered during 1997 (Ollington Dep. [Ex. 9] at 57-59.) During this period, Genzyme supported various lines of business through "tracking stocks," accusations of manipulation of which it recently settled. Boston Globe, Aug. 10, 2007, at D1, col. 2. Mr. Sparrow continued to act with apparent authority for Genzyme after July 30, 1998, and Genzyme continued to negotiate with Kayat.

[12] Kayat and the sub-distributors also complained about the substantial delay in shipments because they had previously commenced an extensive marketing campaign, including both television and billboard advertisements, timed to coincide with the projected product launch.

7

on Drug Quality Control, for discrepancies with the documents on description and marking. (KAYAT 001562-65; Feb. 8, 2007 Deposition of Nadezhda Ivanouna Parshina, Director of State Inspection on Drug Quality Control, [Ex. 10] at 9, 19-21.)

### The Proceedings Thus Far

After Genzyme refused to replace the non-conforming product and it was clear that Genzyme-manufactured FDF melatonin product would not and could not be delivered, Kayat sued Genzyme in the District Court of Nicosia (the "Cypriot Action").[13] (Ladas Aff. ¶ 4.1.) The action was commenced on July 9, 2002. (*Id.* ¶ 3, Exs. AGL1A-1E.) Respondent Genzyme challenged the Cypriot court's jurisdiction (*id.* ¶ 5.1), but the court ruled against it on March 31, 2004 (*id.* ¶ 5.2, Exs. AGL3A, AGL3B). Kayat filed a detailed Statement of Claim on November 24, 2004. (*Id.* ¶ 6.1, Exs. AGL4A, AGL4B.) Kayat then petitioned this Court pursuant to 28 U.S.C. § 1782 for discovery (Paper #1), but at the May 23, 2005, hearing, where Genzyme argued that the Cypriot court's decision had been appealed, this Court stayed the proceeding pending further progress in the Cypriot Action, expressing concern about the uncertainty in the "contours of the litigation".[14] The Supreme Court of Cyprus, however, rejected Genzyme's jurisdictional challenge, and Kayat renewed its motion for discovery on August 19, 2005, filing with the Court both initial discovery and an offer to produce Ukrainian and Cypriot witnesses for U.S.-style deposition. (Paper #13.)

After further extensions (*see* Paper #21), Genzyme agreed to a stipulated discovery plan, in which it undertook to produce, among eleven classes of documents, the documents relevant to

---

[13] Affidavit of Andreas G. Ladas executed on March 23, 2005, annexed to the Application for an Order To Show Cause, Paper #1 herein, filed April 7, 2005 ("Ladas Aff.").

[14] Transcript of May 23, 2005 Hearing at 19-20, attached as Exhibit 2 to "Renewed Motion for Discovery Pursuant to 28 U.S.C. § 1782" filed August 19, 2005 as Paper #13 herein.

this motion:

>   (c) All documents concerning Genzyme's plans for sales of melatonin product into any country formerly part of the Soviet Union for any period including any portion of the period from January 1, 1995, through December 31, 2003.
>
>   (d) All documents concerning the regulation of MelaPure as a medicine in any country formerly part of the Soviet Union.
>
>   (e) All documents concerning Genzyme's cessation or transfer to another entity of its melatonin business.
>
>   (f) All documents concerning the manufacture of melatonin for sale to Kayat.

(Paper #23, "Discovery Plan" ¶ 1.) Genzyme also undertook to produce for deposition "under Fed. R. Civ. P. 30(b)(6) a witness or witnesses designated by Genzyme to authenticate and testify with respect to the subject matter of the documents described in ¶ 1 of this Discovery Plan," as well as Frank Ollington, Mara Aspinall and Carol Greve-Philips. (*Id.* ¶ 5.) The parties exchanged documents during the winter of 2005-2006, and Genzyme took the depositions of nine Ukrainian governmental, marketing and sub-distributor witnesses in Kiev from February 6-11, 2006 and two Kayat witnesses in Nicosia, Cyprus from March 20-22, 2006. Genzyme did not produce Fed. R. Civ. P. 30(b)(6) witnesses (except to the extent that the produced witnesses answered with respect to their own documents), but produced Dr. Ollington, Ms. Aspinall and Ms. Greve-Philips on July 17-19, 2006.

As reviewed below, neither Dr. Ollington nor Ms. Aspinall, both presidents of Genzyme Pharmaceuticals during the relevant period, could speak about Genzyme's distribution agreement or arrangement with Kayat or the specific aspects of Genzyme's exit from the melatonin business. Ms. Greve-Philips was more knowledgeable about some aspects of the melatonin business and disclosed that Genzyme Pharmaceuticals in fact had very limited experience in and no ownership of the manufacture of FDF melatonin tablets. (Greve-Philips Dep. [Ex. 8] at 19-20, 106-07, 119-21). Ms. Aspinall confirmed that Genzyme's United States

9

FDF melatonin sales were primarily to Genzyme employees.  (Aspinall Dep.[15] [Ex. 7] at 20-24.)

This information was so contrary to Genzyme Pharmaceutical's representations to Kayat and third parties that Genzyme Pharmaceuticals was "the largest manufacturer and supplier of the most popular Medicine in the United States of America" and variations of the same, including the "pharmaceutical" quality of its products, juxtaposed with depictions of 3mg FDF MelaPure™ branded melatonin, that Kayat sought to amend its Statement of Claim in the Cypriot Action to include these misrepresentations of Genzyme's experience and capability in manufacturing "pharmaceutical grade" FDF melatonin, adding, *inter alia*, the following allegations:

> 19.2   Furthermore the defendant falsely represented to the plaintiff, expressly   and/or impliedly and/or by its conduct and/or left the plaintiff with the impression that,
>
>> (a)   the defendant manufactured MelaPure at its own facilities and/or according to its own manufacturing process; and/or
>>
>> (b)   MelaPure had large sales in the United States market; and/or
>>
>> (c)   MelaPure was supported by an extensive advertising and marketing campaign in the United States and/or in other countries.
>
> 19.3   In fact,
>
>> (a)   the defendant never itself manufactured MelaPure at its own facilities, but MelaPure was manufactured for the defendant by third parties on contract; and/or
>>
>> (b)   the manufacturing process did not belong to the defendant; and/or
>>
>> (c)   in the United States, the defendant  i) sold MelaPure to its own personnel only and ii) had done little or no advertising or promotion of MelaPure in the market, other than the establishment of a webpage for MelaPure.

[Re-amended] Statement of Claim,[16]  Similar allegations are made in relation to alleged common law

---

[15] July 19, 2006 Deposition of Mara Aspinall, copies of cited pages included as Ex. 7.

[16] "Statement of Claim," English translation provided as Ex. 4.

fraud (*id.* ¶ 26(e)) and alleged violations of Mass. General Laws chapters 106 and 93A (*id.* ¶¶ 25(b)(v) and 30(e)) and of 18 U.S.C. § 1962 (*id.* ¶ 33(vii)). The Cypriot Court allowed these amendments on December 5, 2006.[17]

In the meantime, Kayat on October 25, 2006, presented to Genzyme a list of defects in the document and deposition witness production as well as a reference to paragraph 7 of the Discovery Plan to expand discovery on the basis of the emergence during the depositions of evidence that Genzyme in fact had no experience in or ownership of the manufacture of FDF melatonin. Genzyme did not respond until January 23, 2007. The parties advised this Court at the January 30, 2007 status conference that discovery differences were still being discussed.

On April 25, 2007, after multiple extensions, Genzyme for the first time answered Kayat's Statement of Claim with a Defence,[18] among other things, disputing the construction of the distribution agreement, admitting only that Genzyme drafted it, and making the allegation:

> . . . the defendants deny that the plaintiffs were not aware of their intention (that is to say, the defendants' intention) to transfer and/or assign the business of manufacturing and marketing MelaPure to another corporate entity. On the contrary, the defendants allege that the plaintiffs had full knowledge and consented to the transfer of the business in issue to a third party, namely the company VitaPure Ltd. (VitaPure).

Defence [Ex. 6] ¶ 20. Genzyme also entirely denied Paragraph 19 of the Statement of Claim set forth above. Defence [Ex. 6] ¶ 23. Kayat filed a Reply on May 24, 2007 thereby closing the pleadings in Cyprus, and pressed Genzyme to complete the discovery, which included requests, as seen below, relative to the transfer of manufacturing to VitaPure – which was originally a

---

[17] On February 2, 2006, Genzyme had moved to strike the [Amended] Statement of Claim (Ladas Aff. ¶ 6.1, Exs. AGL4A, AGL4B) on various grounds, including the inapplicability of Massachusetts law. After hearing, the Cypriot court denied the motion on September 13, 2006, expressly noting in its ruling, after reviewing Genzyme's submissions of the records of this Court, that the 28 U.S.C. § 1782 discovery was made here for the purpose of facilitating the proceedings before the Cypriot courts rather than detracting from their jurisdiction. (English translation of Interim Ruling provided as Ex. 5, at 14.)

[18] "Defence", English translation provided as Ex. 6.

proposed Genzyme line of business.

After multiple mail exchanges and a 25-minute telephonic conference on June 27, 2007 between counsel for the parties, Messrs. Chow and Lewis, Kayat in a July 13, 2007 letter narrowed its request to the production of documents called for in items (4) and (5) below and for deposition of (1) Geoffrey Cox; (2) Thomas Slater; (3) Henri Termeer; and (4) the affiants or designees of Genzyme on the following items:

1. The source and modification of the distribution agreement presented by Genzyme to Kayat;

2. Specification of when and how Genzyme decided to exit the melatonin business;

3. Specification of how that exit was to be effected, including disposition of the various intermediate forms of bulk melatonin;

4. With respect to the manufacture of finished dosage form melatonin under a Genzyme brand or using Genzyme melatonin during the period January 1, 1995 to December 31, 2005

   a. identify each step of the manufacture from raw material to FDF, who performed the step and who owned the rights in the process;

   b. for each of (I) Tishcon, (II) Natural Options and (III) if different, any other party considered or used by Genzyme for manufacturing, tabletting or packaging MelaPure-brand FDF melatonin provided to Kayat or to regulatory agencies in the former Soviet countries,

      i. provide documentation of the consideration for use and the termination of use by Genzyme of such third parties for manufacturing, tabletting or packaging of MelaPure-brand FDF melatonin;

      ii. provide Genzyme's specifications of the FDF melatonin, including all contracts and correspondence (including proposed prices) between Genzyme and these third parties relating to the manufacturing, tabletting or packaging of MelaPure-brand FDF melatonin;

      iii. provide samples of documentation of good manufacturing practices for the manufacturing, tabletting and packaging steps;

      iv. provide documentation of all exceptions of adherence to proposed, contracted or established manufacturing practices, including

       documentation of quality control or production problems in about the [sic] 1997 at both Tishcon (referred to by Slater) and Natural Options (referred to by Sparrow);

5. With respect to Genzyme's marketing of finished dosage form melatonin during the period January 1, 1995 to December 31, 2005

  a. provide a sample of each marketing collateral mentioning Genzyme's MelaPure-brand FDF melatonin;

  b. provide a screenshot of each webpage on Genzyme's site mentioning Genzyme's MelaPure-brand FDF melatonin;

  c. provide the marketing or advertising files for Genzyme's introduction of its MelaPure-brand FDF melatonin internally (to the company), to United States customers (distributors or users) and to foreign markets; and

  d. provide documentation of all corporate- or decision-level decisions to commence or cease marketing of Genzyme's MelaPure-brand FDF melatonin.

Genzyme repeated in a July 25, 2007 letter its offer of Messrs. Cox and Slater only on the first three topics and no additional documents – in return for an agreement to cease any further requests. Kayat repeated its request by e-mail on September 5, 2007, and Genzyme repeated its offer – to be withdrawn if Kayat filed this motion. Kayat considers Genzyme's response unreasonable and moves now for the listed discovery including the production specifically of David DeLoria as one of the Rule 30(b)(6) witnesses on marketing.

**Argument**

"This Court retains jurisdiction to enforce this Order and to resolve in accordance with the Federal Rules of Civil Procedure any disputes that may arise during the course of the discovery contemplated by the Discovery Plan." (Paper #24 [Discovery Order].) The authorizing statute itself refers to the Federal Rules for a default procedure. 28 U.S.C. § 1782(a). Thus the familiar relevancy standard, including the test of "reasonably calculated to lead to the discovery of admissible evidence," Fed. R. Civ. P. 26(b)(1), applies here.

**I.    GENZYME SHOULD PROVIDE TESTIMONY ON ITS DRAFTING OF THE DISTRIBUTION AGREEMENT THE CONSTRUCTION OF WHICH IT CONTESTS IN THE CYPRUS ACTION.**

Obviously information on the drafting of the agency/distribution agreement granting Kayat exclusive distribution rights to FDF MelaPure melatonin in the countries of the former Soviet Union is likely to lead to the discovery of admissible evidence because Genzyme has challenged the construction of that agreement. Although the document was clearly called for as relating to Genzyme's plans to introduce melatonin product into the countries of the former Soviet Union (Paper #23, "Discovery Plan" ¶ 1(c)) and therefore a Rule 30(b)(6) designee should have been produced to authenticate and testify with respect to the document (*id.* ¶ 5), the only witness produced by Genzyme with responsibility its melatonin business at the time of the drafting of the contract – the eight months or so prior its signing on or about July 1, 1997 by Geoffrey Cox (GEN000973-84) – was Dr. Frank Ollington, then President of Genzyme Pharmaceuticals, who claimed no recollection of the document or any issues raised in negotiation (Ollington Dep. [Ex. 9] at 112-19). Genzyme should be required to produce a knowledgeable witness on Genzyme's construction of its own document – possibly Mr. Cox or Thomas Slater, Mr. Sparrow's supervisor at the time (*id.* at 37.)

**II.   GENZYME SHOULD PROVIDE TESTIMONY ON THE EXTENT TO WHICH IT HAD DECIDED TO EXIT THE MELATONIN BUSINESS AT THE SAME TIME IT INDUCED KAYAT TO ENTER THE AGREEMENT TO DISTRIBUTE MELATONIN.**

Information, both documentary and oral, on the circumstances of Genzyme's decision to exit from the melatonin business, including the economics of its manufacture and disposition of bulk melatonin, and its timing relative to its 1996-97 inducement of Kayat to enter the July 1997 distribution agreement, is clearly material to the charges of fraud asserted in the Cypriot Action. Apart from some of the documents relating to transfer of parts of Genzyme's melatonin business

14

to VitaPure, the documents produced by Genzyme presumably in response to the call for all documents concerning Genzyme's cessation or transfer of its melatonin business (Paper #23, "Discovery Plan" ¶ 1(e)) are exemplified by the following, with only item #9 providing any strategic analysis of Genzyme's melatonin business and why it decided to exit:

    1. Minutes/Actions from the Program Review Meeting held on 11th June 1996 at Kendall Square, including "T Slater" and "C Greve-Philips (in part)" indicated that "Price pressure [in Melatonin Sales/Marketing] is now severe" and the Q2 forecast was less than 27% of Q1 sales. (GEN003360.) Ms. Greve-Philips did not recall her involvement. (Greve-Philips Dep. [Ex. 8] at 53-54.)

    2. "Genzyme Corporation Pharmaceuticals Division July 1996 Operating Commentary," distributed to, among others, "G. Cox" and "T. Slater" noted "Melatonin sales decreased 84% . . . due to a full product pipeline and competitive pressures." (GEN003075-76.) Ms. Aspinall testified that, as President of the Division, she did not see such detailed reports. (Aspinall Dep. [Ex. 7] at 94-95.)

    3. "Genzyme Corporation Pharmaceuticals Division February 1997 Operating Commentary," distributed to, among others, " F. Ollington", "G. Cox" and "T. Slater" noted "There were virtually no Melatonin FDF sales." (GEN003010, -14.) Dr. Ollington disclaimed knowledge of the operating commentary. (Ollington Dep. [Ex. 9] at 97-99.)

    4. "Genzyme Corporation Pharmaceuticals Division 1997 Forecast Review – April 24, 1997 by F. Ollington" noted "Melatonin bulk and FDF sales poor" with melatonin inventory as a critical issue. (GEN001262, -65, -68.)

    5. June 3, 1997 e-mail from David DeLoria to Antony Newton, copying among others, Tom Slater that "[w]e have reached a decision point regarding [continuation or discontinuation of] intra-office sale of melapure bottles and sale of the product over the internet." (GEN004864.) Ms. Aspinall did not recall when the intra-office sale of MelaPure tablets occurred. (Aspinall Dep. [Ex. 7] at 84.)

    6. Fax dated June 25, 1997, from Tom Slater to Roger Sparrow of an e-mail dated June 16, 1997 (which apparently had failed to go through), in reply to an e-mail from Sparrow to Slater dated June 13, 1997[19] where Slater states, two weeks before the contract with Kayat was signed by Geoffrey Cox to be sent to Kayat, that Genzyme had "shutdown spending on melatonin until and unless … an investment partner [could be found]". (GEN000909). The quote strongly suggests that Genzyme's decision to exit the melatonin business had already been taken.

---

[19] The heading for Sparrow's e-mail, labeled "URGENT" appears at the bottom of the produced page, but the body of that e-mail has not been located in Genzyme's production.

       7. July 22, 1997 e-mail from Roger Sparrow to Dave DeLoria, copying among others, Tom Slater that "we should sell off [stock of 2,500,000 3mg tablets we have in Genzyme] first to reduce the inventory to zero prior to pressing more tablets in England. Therefore as a matter of urgency could you get the tablets on site re-tested . . and [if pass] ship out the material to Russia latest second week of August." (GEN000910.) Dr. Ollington recalled nothing of the inventory. (Ollington Dep. [Ex. 9] at 119.)

       8. "Genzyme Corporation July Pharmaceuticals Forecast Package," distributed to, among others, " F. Ollington", "G. Cox" and "T. Slater" noted "halted Melatonin safety/clinical study." (GEN002927, -29, -39.) Dr. Ollington recalled nothing of the halting of melatonin clinical trials. (Ollington Dep. [Ex. 9] at 119-20.)

       9. August 15, 1977 report of "Genzyme Pharmaceuticals Business Planning Process Product Rationalization Team," including Tom Slater, recommending immediate exit for bulk melatonin, to be sold at "any price," and for FDF melatonin, "Reduce efforts from Commercial and support groups" and "Look for Specialized Partner for MelaPure product," summary for melatonin "ITS OVER", with the melatonin sub-report written by David DeLoria and Roger Sparrow (GEN004383, -91-92, -94, -425-37.) Dr. Ollington did not recall which specific recommendations were adopted other than reducing support for the FDF program, looking for a partner and ultimately transferring the FDF business to VitaPure; he was not surprised by the report. (Ollington Dep. [Ex. 9] at 123-34.)

Dr. Ollington did not recall specific decisions on the Genzyme Pharmaceutical product line during his tenure as the division's president, referring to his successor, Mara Aspinall as "involved" in "decision-making conversations toward the end of '97 and into early '98." (Ollington Dep. [Ex. 9] at 38-39.) He saw his own responsibility as limited:

    Q.  Was it your responsibility to make a decision on what product lines to keep?

    A.  Not solely.

    Q.  Who else would be involved?

    A.  Geoffrey Cox, Henri Termeer.

    Q.  Anyone else at that time?

    A.  I can't recollect.

(*Id*. at 41.) Ms. Aspinall in turn referred back to Dr. Ollington in decisions to cease melatonin production. (Aspinall Dep. [Ex. 7] at 44-45.) Her prior work on a strategic plan for Genzyme Pharmaceuticals also involved Geoffrey Cox and Henri Termeer. (*Id.* at 15-16.)

To reasonably complete the discovery in the Discovery Plan, Rule 30(b)(6) witnesses should be produced for deposition on the cessation and transfer of Genzyme's melatonin business that should include Thomas Slater and David DeLoria as knowledgeable about the product rationalization process culminating in the recommendations of the August 15, 1997 Report (Item #9) and Geoffrey Cox and Henri Termeer as the decision-makers to whom the two Presidents of Genzyme Pharmaceuticals reported and deferred.

### III. GENZYME SHOULD PROVIDE DOCUMENTS AND TESTIMONY ON THE EXTENT TO WHICH IT HAD EXPERIENCE AND CAPABILITY IN MANUFACUTURING "PHARMACEUTICAL GRADE" FINISHED DOSAGE FORM MELATONIN AT THE TIME IT INDUCED KAYAT TO ENTER INTO THE AGREEMENT TO DISTRIBUTE GENZYME-BRAND FINISHED DOSAGE FORM MELATONIN.

The issue of Genzyme's ability to manufacture MelaPure™ FDF melatonin of the quality and in the quantities envisaged by the Kayat agreement is repeatedly raised in the Cypriot Action: in addition to the parts of the Statement of Claim (Ex. 4, ¶¶ 19.2, 19.3) quoted at page 10 *supra*, as a breach of a specific term of the contract (*id.* ¶ 19.1(d)), as an instance of breach by Genzyme of its good faith obligations under section 1-203 of Massachusetts General Laws chapter 106 (*id.* ¶ 25(b)(iv)), as an instance of common law fraud by Genzyme (*id.* ¶ 26(c)), as an instance of Genzyme's violation of section 2 of Massachusetts General Laws chapter 93A (*id.* ¶ 30(c)(i)), and as an instance of Genzyme's civil violation of section 1962 of United States Code title 18 (RICO) (*id.* ¶ 33(vii)).

Information on Genzyme's actual experience and capability in manufacturing or outsourcing manufacture of, and marketing MelaPure™ FDF melatonin is, therefore, clearly material to the issues in the Cypriot Action indicated above. In light of the disclosure that Genzyme had achieved only very limited distribution of MelaPure™ FDF melatonin in the United States – contrary to the its representation that "Genzyme Pharmaceuticals is the

17

largest manufacturer and supplier of the most popular Medicine in the United States of American which is called 'Melatonin'" – the expansion of the Discovery Plan document categories 1(c) [plans for sales], 1(d) [regulatory efforts] and 1(e) [manufacture] to all FDF MelaPure™ markets would not be unduly burdensome and likely could be drawn from the 45 boxes Genzyme alleges that it collected from which its approximately two boxes of production was culled.[20] The document requests on this motion call for a subset of these. Kayat respectfully submits that good cause has been shown for this limited search.

Two of the three witnesses that Genzyme produced were clearly inadequate even as to the existing Discovery Plan documents. Despite his prior and subsequent responsibility for quality assurance and his presidency of Genzyme Pharmaceuticals, Dr. Ollington could not recall any details in the process for manufacturing melatonin, the contract manufacturer for FDF MelaPure™ melatonin, the formulation for tablets, or Genzyme's quality assurance procedures (Ollington Dep. [Ex. 9] at 26-27, 69, 121-22); he did not recall any marketing of FDF melatonin by Genzyme in the U.S. or in the former Soviet republics (*id.* at 34). Nor could he distinguish FDF MelaPure™ from the therapeutic forms in clinical investigation. (*Id*. at 44-45.) Dr. Ollington's successor as President of Genzyme Pharmaceuticals also did not know the process of melatonin production (Aspinall Dep. [Ex. 7] at 107) and did not know where FDF melatonin was "put together" or Tishcon's role in manafacture (*id.* at 85).

Ms. Greve-Philips did recall the commencement of the MelaPure™ branding program in 1996 with the in-house-developed "sleeping man" logo authorized by Tom Slater. (Greve-

---

[20] That production appeared to be incomplete in any case, missing, for example, responses to or actions taken in respect of item #5 (page 15 *supra*) on the cessation of intra-company and internet FDF MelaPure™ sales, item #7 (page 16 *supra*) on the disposition of Tishcon MelaPure™ tablets and item #9  (*id.*) on the exit options for both bulk and FDF MelaPure™ melatonin.

Philips Dep. [Ex. 8] at 20-21.)  She testified:

> A.  The logo was to attest to the quality of the melatonin in the tablets, and so the purpose of the campaign was to differentiate product manufactured by various nutraceutical companies as having used a high-quality, pharmaceutical grade melatonin.
>
> Q.  What was the difference between pharmaceutical grading and nonpharmaceutical grading?
>
> A.  Pharmaceutical grade bulk active material is manufactured to good manufacturing practices as regulated by the FDA.  It meets the specifications -- it follows a master batch record.  Batch records are carefully signed off on, and then a certificate of analysis is generated by the analytical group.  And then the material is placed on stability testing   for some period of time, which was different than what other chemical manufacturers were required to do.

(*Id*. at 22-23.)  As Genzyme held out its MelaPure™ melatonin to be "pharmaceutical grade" and registration as a medicine in the Ukraine was achieved on this basis, Kayat should be allowed to discover Genzyme's capability and experience in producing "pharmaceutical grade" FDF MelaPure™ tablets, including its relationship with Tishcon and Natural Options, the alternative English manufacturer used by Genzyme to supply Kayat (*id*. at 38, 63-64).  Ms. Greve-Philips also disclosed that after Genzyme had abandoned the melatonin business, it was unable to authorize Roger Sparrow's manufacture of FDF MelaPure™ because Genzyme itself did not have the rights to the formulation of tablets and the process for manufacturing them.  (*Id*. at 106-07, 119-24; GEN001079-80.)  Additional information on these rights are material to the issue of Genzyme's own ability to manufacture the FDF MelaPure™ tablets that it supplied to Kayat.

In addition to the documents requested in the motion, Genzyme should produce a Rule 30(b)(6) witness on the manufacturing processes and contractors that it used or considered using to produce FDF MelaPure™.  With respect to the marketing of FDF MelaPure™, Genzyme should produce the requested documents and Thomas Slater, the

manager responsible for the branding of and sale of MelaPure™ melatonin (Ollington Dep. [Ex. 9] at 37; Aspinall Dep. [Ex. 7] at 93; Greve-Philips Dep. [Ex. 8] at 22) and David DeLoria, also involved in the sale of MelaPure™ and in its "product rationalization" (Ollington Dep. [Ex. 9] at 119, 151; GEN004416; *see also* Ex. 3, "Distributors Wanted" contact David DeLoria).  Good cause has been shown under the Discovery Plan (Paper #23) ¶ 7 for these additional depositions.

## Conclusion

For these reasons, the completion of discovery under the Discovery Plan should be compelled through the production of the Rule 30(b)(6) witnesses and extended for good cause shown as specified above and in the proposed order.

Dated:  September 7, 2007

Respectfully submitted,
KAYAT TRADING LIMITED
By Its Attorneys


/s/ Stephen Y. Chow_____
Stephen Y. Chow (BBO# 082990)
Michael Twohig (BBO#648079
BURNS & LEVINSON LLP
125 Summer Street
Boston, Massachusetts 02110
(617) 345-3000

## Certificate of Service

I hereby certify that on September 7, 2007, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


/s/ Stephen Y. Chow

20