**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re the Application of                                    :

Kayat Trading Limited,                                     :

               Petitioner,              :         05 MBD 10147-GAO

For an Order To Take Discovery of                          :

Genzyme Corporation,                                       :

               Respondent,              :

Pursuant to 28 U.S.C. § 1782.                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**DECLARATION OF STEPHEN Y. CHOW IN SUPPORT OF PETITIONER'S MOTION**
**TO COMPEL COMPLETION OF DISCOVERY AND TO EXPAND DISCOVERY**
**PURSUANT TO STIPULATED DISCOVERY PLAN**

     I, Stephen Y. Chow, declare and say as follows:

     1.  I am counsel in the above-captioned proceeding for Kayat Trading Limited ("Kayat"), petitioner herein and plaintiff in Kayat Trading Limited v. Genzyme Corporation, Action No. 7462/02 currently pending in the District Court of Nicosia, Cyprus ("the Cypriot Action") and make this declaration on personal knowledge and in support of Kayat's motion filed herein to compel completion of discovery agreed to by the parties (Paper #23 herein) and ordered by this Court (Paper #24) on October 6, 2005.

     2.  Exhibit 1 hereto comprises true and correct copies of Genzyme production document pages numbered GEN000909, -910, -973-84, -986, [1a] -1079-80, -1272-74, -2927-40, -3010-16, -3075-83, [1b] -3360-65, -4383-94, -4401-37, -4702-05, -4864-65, and -5318-19.

     3.  Exhibit 2 hereto comprises true and correct copies of Kayat production document pages numbered KAYA000005, -172-73, -206, -272-73, -290-91, -403-05, -408-09, -412-13, -529-30, -666, [2a] -667,  -1156, -1221, -1226, -1231-32, -1329-34, -1348-51, -1448-49, and -1562-65.

     4.  Exhibit 3 hereto is printout of the home page and "Distributor Wanted" page for a February 14, 1997 version of www.melapure.com found on web.archive.org.

     5.  Exhibit 4 hereto is an English translation of the [Re-Amended] Statement of Claim

filed in the Cypriot Action by and translated by Kayat's counsel in the Cypriot Action, Andreas Ladas.

6.  Exhibit 5 hereto is an English translation of a September 6, 2006 Interim Ruling in the Cypriot Action translated by Mr. Ladas.

7.  Exhibit 6 hereto is an English translation of the Statement of Defence filed by Genzyme in the Cypriot Action by Genzyme and translated by Mr. Ladas.

8.  Exhibit 7 hereto comprises true and correct copies of the transcript of the July 19, 2006 deposition of Mara Aspinall pages 1-2, 15-16, 20-24, 44-45, 84-85, 93-95, and 107.

9.  Exhibit 8 hereto comprises true and correct copies of the transcript of the July 18, 2006 deposition of Carol Greve-Philips pages 1-2, 18-23, 38, 53-54, 63-64, 106-07, and 119-24.

10.  Exhibit 9 hereto comprises true and correct copies of the transcript of the July 17, 2006 deposition of  James F. Ollington, Ph.D. pages 1-2, 26-27, 34-39, 41, 44-45, 57-59, 69, 72-74, 97-99, 112-17, 119-36 and 151 and PX-34.

11.  Exhibit 10 hereto comprises true and correct copies of the transcript of the February 8, 2006 Deposition of Nadezhda Ivanouna Parshina pages 1, 9, and 19-21.

I declare under penalty of perjury that the foregoing is true and correct.  Signed this 7th day of September, 2007 at Boston, Massachusetts.


/s/ Stephen Y. Chow_____
Stephen Y. Chow


**Certificate of Service**

I hereby certify that on September 7, 2007, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.


/s/ Stephen Y. Chow

**EXHIBIT 1**



Post-it® Fax Note  7671

Date 6/25/97  # of pages ► 1

To R. Sparrow
Co./Dept. Haverhill
Phone #
Fax #

From T. Slater
Co. Genzyme US
Phone #
Fax # +1 (617) 252-7772

Page 1

**Subject:** Mail failure

**To:** Slater, Tom

FROM: GENZYME/MTNPCPOST/POSTMASTER
TO: Slater, Tom
SUBJECT: Mail failure

DATE: 06-16-97
TIME: 10:56

-------------------------------------------------------------------------

[005] Mail retry count exceeded sending to:
  HHSERV  /HH

-------------------------------------------------------------------------
From: Slater, Tom
To: Sparrow, Roger
Subject: RE: MelaPure,' The Longsight' Project Manche
Date: 1997-06-13 15:26
Priority: R
-------------------------------------------------------------------------
From: Slater, Tom
Date: Fri, Jun 13, 1997 3:26 PM
Subject: RE: MelaPure,' The Longsight' Project Manche
To: Sparrow, Roger
Roger:

Here are a few reactions:

1.) Since we have shutdown spending on melatonin until and unless we can
recruit an investment partner I see funding this project very unlikely.

2.) We may want to or could support the project with our DMF/Manuf position,
animal tox data and or clinical trial material. However, we should not commit
to anything until we think through the ramifications of supporting this study
on our effort to attract an investor in the melatonin program. Especially
since
this gentlemen seems to have far reaching contacts.

That's it for now. We need to hear from Spencer and others on this situation.

Cheers,

Tom Slater

-------------------------------------------------------------------------

*** URGENT ***
From: Sparrow, Roger on Fri, Jun 13, 1997 11:21 AM
Subject: MelaPure,' The Longsight' Project Manche
To: Slater, Tom

Roger:
E-mail as you know has been a disaster.

See my comments below.

supporting the study with clinical material should be OK. We

position with respect to recruiting an investment partner.

on

As we don't know their final plan for utilization of the data - this in my opinion could compromise give them access to our animal tox data. We should not

GEN000909

# genzyme
## PHARMACEUTICALS

37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

## Fax Transmission

**To: Dave Deloria, CC: Tom Slater**

**From:  Roger Sparrow**         **22 July 1997**         **Page 1 of 1**

Direct Fax Line (44) 1440 716286               Mobile: (44) 0410 393635
Direct Phone Line (44) 1440 716232

Dear Dave

Talked with Tom this morning about the stock of 2,500,000 3mg tablets we have in Genzyme.

Rather than produce new tablets in the UK at this time Tom feels we should sell off this stock first to reduce the inventory to zero prior to pressing more tablets in England.

Therefore as a matter of urgency could you get the tablets on site re-tested for quality, appearance and shelf life as we need to print an expiry date on the bottles. If passed I will need a copy of the C of A.

If tablets pass QC we will need to ship them to the UK urgently as I need to bottle and ship out material to Russia latest second week of August.

Sincerely

Rog





A Division of Genzyme Limited
Registered in England No. 1556886. Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England.

ISO9001
Certificate No. 938232, 1994

GEN000910



GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562, U.S.A.
617-252-7500
FAX 617-252-7600

Kayat Trading Ltd.
Attn. Mrs. H. Achkar
36, Grivas Digenis Avenue
Nicosia
Cyprus                                                                    July 3, 1996

_____(Short message)_____

( )        for your files

( )        for your information

( )        please review

(√)        please sign and return **1 copy to Daniela Schuster**

( )        please call on this matter

(√)        as discussed with  Roger Sparrow

(√)        Trademark License Agreement

**Enclosures:**
- 2 copies signed by Genzyme

Regards,

Daniela Schuster
Assistant to Dr. Frank Ollington
President, Genzyme Pharmaceuticals



GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562, U.S.A.
617-252-7500
FAX 617-252-7600

1.   THIS AGREEMENT is dated 25 June 1996 (6.4 and 6.5 added 1st January 1997) and is made between GENZYME CORPORATION whose office is at One Kendall Square Cambridge Massachusetts 02139 USA (hereinafter "Genzyme") and Kayat Trading Limited, PO Box 3393, 36 Diginis Ave, Cyprus (hereinafter "Distributor").

WHEREAS:

A)   Genzyme manufactures and sells the products specified in Schedule 1 ("the Products");

B)   Genzyme has agreed with the Distributor to grant to appoint the Distributor its sole and exclusive distributor for the Products in the territories listed in Schedule 2 ("the Territory") on the terms hereinafter appearing.

NOW IT IS HEREBY AGREED as follows :

## 1.   DEFINITIONS

1.1   In this Agreement unless the context otherwise requires:

a)   "the Appointment" means the appointment of the Distributor effected by Clause 2;

b)   "person" means an individual or a body corporate or unincorporate or a partnership;

c)   references to clauses, sub-clauses, paragraphs and schedules are to clauses, sub-clauses and paragraphs of and schedules, respectively, to this Agreement; and

d)   the headings of clauses shall not affect their interpretation

## 2.   APPOINTMENT

Genzyme hereby appoints the Distributor and the Distributor agrees to act as the sole and exclusive distributor of the Products in the Territory directly or through local sub-distributors approved by Genzyme.

G  002403

Confidentiality Agreement: Genzyme, Kayat    pg. 2

## 3.  PERIOD

The appointment shall commence on the date of this Agreement and shall continue for a period of Two years. Thereafter, the Appointment shall continue from year to year unless or until terminated by either party giving to the other at least 6 calendar months' prior notice in writing.

## 4.  ORDERS

4.1  Orders for the Products shall be given by the Distributor to Genzyme at 37 Hollands Road Haverhill Suffolk CB9 8PU England or at such other address as Genzyme may subsequently notify in writing and Genzyme shall sell the Products to the Distributor in accordance with those orders at the prices shown in Schedule 3.  All such orders shall be sold and purchased on the terms and conditions of this Agreement which supersedes all Genzyme's and the Distributor's other conditions of sale to the extent of any conflict.  No modification of this Agreement shall be effective unless made in writing by Genzyme and the Distributor.

4.2  Genzyme undertakes to use its best reasonable efforts to fill the orders of the Distributor for the Products with all reasonable despatch and in any event within 28 days of the date of the order but shall not be liable in any way for any loss of trade or profit incurred by the Distributor in the event of delivery of the Products being restricted, frustrated or delayed by strikes, riots, lockouts, trade disputes, acts or restraints of governments the imposition of restrictions on exportation or from any other cause.

4.3  All Products supplied by Genzyme to the Distributor shall be with Genzyme's standard packaging incorporating the name of Genzyme as the manufacturer, the Distributor as the distributor and such other information and particulars as may be identified by the Distributor as being in compliance with the requirements of the respective Territories for which the order is intended.

## 5.  RISK, TITLE AND PAYMENT

5.1  Risk of, loss of or damage to any of the Products and title thereto shall pass to the Distributor when they shall have been delivered for a common carrier, except that title to the Products shall pass to the Distributor upon payment of the price of any of the Products if made prior to delivery.

5.2  Payment for the Products ordered:

a)  shall be due from and payable by the Distributor within 30 days after  receipt of an invoice for such Products by the Distributor;  and

b)  shall be made by the Distributor to Genzyme in United States Dollars at any bank in England selected by Genzyme.

G  002404

GEN000975

Confidentiality Agreement: Genzyme, Kayat    pg. 3

## 6.    DEFECTIVE PRODUCTS

6.1    If any of the Products do not comply in all respects with the order or this Agreement, or are otherwise defective in any respect, the Distributor shall at its sole discretion be entitled either to accept or reject such Products. Any such rejection shall be based on a failure of the Product to conform to the product specification as shown in Schedule 4 confirmed through appropriate analytical procedures.

6.2    In the case of any rejected Products, if Genzyme agrees with such rejection, Genzyme shall comply with the directions of the Distributor either to refund forthwith to the Distributor the amount of any purchase price paid by the Distributor in respect of such Products or to replace such Products upon and subject to such reasonable and practicable terms and conditions as to shipment, delivery and otherwise as the Distributor shall stipulate.

6.3    Genzyme shall be liable in all respects for any rejected, defective Products from the time of notice or rejection given by the Distributor including, without limitation, responsibility for collection from the Distributor for return to Genzyme or elsewhere.

6.4    Genzyme hereby agrees to indemnify, defend and hold harmless the Distributor from any losses or damages resulting solely from product liability claims asserted against the Distributor by end user consumers of the Product, provided that such product liability claims are not the result of negligence or wilful malfeasance on the part of the Distributor. In no event shall Genzyme be liable for indirect, consequential or special damages, nor shall Genzyme be liable for amounts exceeding the value of the Products sold to the Distributor in the year that such a claim is brought.

6.5    For the avoidance of doubt, Genzyme hereby expressly confirms that it has and shall maintain in force sufficient product liability insurance to satisfy claims brought under 6.4

## 7.    DISTRIBUTOR'S UNDERTAKINGS

The Distributor hereby undertakes with Genzyme that it will at all times during the continuance of the Appointment:

a)    use its best efforts to promote and extend sales of the Products in the Territory;

b)    it will not do any act which will or may reflect adversely upon the business integrity or goodwill of Genzyme;

c)    not without the previous consent in writing of Genzyme purchase, sell, market or distribute, either directly or indirectly, any goods in the Territory which are competitive with any of the Products;

d)    bring to the attention of Genzyme any improper or wrongful use in the Territory which comes to its notice of any patents or patent applications, registered designs, trade marks or trade names relating to the Products of which Genzyme is or may at any time during the continuance of this Agreement become the registered proprietor;

e)    bring to the attention of Genzyme any information received by it which is likely to be of interest, use or benefit to Genzyme in relation to the marketing of the Products;

G  002405

GEN000976

Confidentiality Agreement: Genzyme, Kayat    pg. 4

f) be responsible for procuring such import licences in relation to the Products which shall from time to time be required and will bear the cost of obtaining the same. The import licence and registration documents remain the sole property of Genzyme Corporation;

g) shall purchase the minimum amount of Products on an annual basis as shown in Schedule 5;

h) sell any Product covered by this Agreement outside the Territory; and

I) provide a full marketing plan for the promotion and sale of the Products on a 6 month basis and provide sales reports on a quarterly basis. Genzyme shall have the opportunity to review and approve the marketing plan.

## 8. CONFIDENTIALITY AND EMPLOYERS

The Distributor undertakes with Genzyme that it will not during the term of this Appointment or at any time thereafter, itself use otherwise than in accordance with and for the purpose of this Agreement or divulge or communicate to any person any of the trade secrets or other confidential information relating to the Products, manufacturing processes, affairs or business or method of carrying on business of Genzyme which it may have received or obtained in the performance of or as a result of this Appointment, provided that this restriction shall cease to apply to information which is or may hereafter come into the public domain otherwise than by breach of this Agreement.

## 9. COMPANY'S UNDERTAKINGS

Genzyme hereby agrees with the Distributor that it will during the continuance of the Appointment:

a) not sell the Products in or for delivery to the Territory nor appoint any person other than the Distributor as a distributor of the Products in or for the Territory;

b) use its best and reasonable efforts so far as permitted by law to safeguard the sole and exclusive rights hereby granted to the Distributor.

c) direct all enquiries in respect of sales of the Products proposed to be made within the Territory to the Distributor;

d) supply the Distributor with any relevant information including marketing information which it may possess which is likely to be of use or benefit to the Distributor in relation to the marketing and sales of the Products; and

e) supply the Distributor with such amount of instruction books technical pamphlets catalogues photographs and advertising material as may reasonably be required by the Distributor for promoting sales of the Products within the Territory.

G 002406

GEN000977

Confidentiality Agreement: Genzyme, Kayat    pg. 5

## 10. WARRANTIES

Genzyme hereby warrants and represents to and undertakes with the Distributor that the Products (a) correspond in all respects with their description in this Agreement and (b) are new and unused.

Except as provided in this Clause 10, GENZYME EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES AGAINST THE INFRINGEMENT OF ANY PATENTS OR TRADEMARKS.

## 11. ENTIRE UNDERSTANDING

This Agreement embodies the entire understanding between the parties in relation to the Products and there are no promises terms or conditions or obligations oral or written expressed or implied other than those expressed herein.

## 12. NOTICES

12.1 Any notice to be given under this Agreement shall be in writing in English and shall be deemed duly given if signed by or on behalf of a duly authorised officer of the party giving the notice and if left at or sent by registered or recorded delivery/first class post or by telex, telegram, facsimile transmission or other means of telecommunication in permanent written form to its registered office or address in this Agreement. Any such notice or other communication shall be deemed to be given:

a) at the time when the same is handed to or left at the address of the party to be served;

b) by post on the day (not being a Sunday or public holiday) 5 days following the day of posting; and

c) in the case of a telegraph telex or facsimile on the next following day.

12.2 In proving the giving of a notice it shall be sufficient to prove that the notice was left or that the envelope containing the notice was properly addressed and posted or that the applicable means of telecommunications was properly addressed and despatched (as the case may be).

## 13. TIME AND NONWAIVER

Time is of the essence in performance under this Agreement. No failure or delay on the part of any party in executing any right, power or remedy under this Agreement shall operate as a waiver thereof.

G  002407

GEN000978

Confidentiality Agreement: Genzyme, Kayat    pg. 6

14. **ASSIGNMENT**

None of the parties shall, without the prior written consent of the other party, assign or transfer any of its obligations hereunder save and except that the Distributor may appoint sub-distributors, reasonably acceptable to Genzyme, in the Territories.

15. **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and interpreted in accordance with the laws of the commonwealth of Massachussetts, U.S.A., and the parties agree to submit to the jurisdiction of the courts of Massachusetts, U.S.A., but the parties may enforce this Agreement in any court of competent jurisdiction.

IN WITNESS whereof this Agreement has been entered into the day and year first above written.

**Genzyme Corporation**                          **Kayat Trading, Ltd.**

Signature:                                        Signature: _____

Title:    _Executive Vice President_              Title:    _____

Date:    _07/01/97_                               Date:    _____

G 002408

GEN000979

Confidentiality Agreement: Genzyme, Kayat    pg. 7

## SCHEDULE 1

### The Products

MelaPure trade mark branded Melatonin, Melatonin Finished Dosage Form Tablets, Melatonin Powder and any product produced by Genzyme to replace the same.

Confidentiality Agreement: Genzyme, Kayat     pg. 8

## SCHEDULE 2

### Territories comprising the Territory

**Armenia, Belorussia, Azerbaijan, Georgia, Kazakstan, Kirgizia, Moldova, Turkmenia, Tadjikistan, Uzbekistan, Russia and Ukraine and such other territories as may be agreed by Genzyme and the Distributor to be added to schedule 2**

G  002410

GEN000981

Confidentiality Agreement: Genzyme, Kayat    pg. 9

## SCHEDULE 3

### Pricing -as agreed between the two parties

### Initial order for MelaPure Melatonin 60 tablet bottle, 3mg at $3.50bottle

GEN000982

Confidentiality Agreement: Genzyme, Kayat    pg. 10

GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562, U.S.A.
617-252-7500
FAX 617-252-7600

**SCHEDULE 4**

**Specification**

Melatonin 3 mg Tablets
Code # EXP-780-A

PRODUCT SPECIFICATIONS

| | |
|---|---|
| Category: | Nutritional Supplement |
| Description: | White colored, round shaped, $^3/_8$ " regular, uncoated tablets. |

|  |  |
|---|---|
| Tablet Weight: | 510 mg ± 5 % |
| Tablet Diameter: | $^3/_8$ " |
| Tablet Thickness: | 0.230 ± 7.5 % |

| | |
|---|---|
| Tablet Weight Variation: | ± 5 % of actual average weight |
| Disintegration Limit: | 30 Minutes in water ( USP Apparatus A) |
| Active Ingredient: | Melatonin 3 mg |
| Assay Method: | HPLC |
| Assay Limits: | 90-110 % of labeled claim |

Inactive Ingredients :

| | |
|---|---|
| Dibasic Calcium Phosphate, unhydrous | USP |
| Microcrystalline Cellulose | NF |
| Croscarmellose Sodium | NF |
| Stearic Acid | NF |
| Magnesium Stearate | NF |
| Colloidal Silicon Dioxide | NF |

| | |
|---|---|
| Microbial Limits: | Reference USP 23, Nutritional Supplement The total bacterial count does not exceed 3000 per gram, and the total combined mold and yeasts count does not exceed 300 per gram. Tablets meet also the requirements of the tests for absence of Salmonella Species, Escherichia Coli, and Staphylococcus Aureus. |
| Expiration Date: | 24 months from the manufacturing time, when stored in high density polyethylene bottles. |

G 002412

GEN000983

Confidentiality Agreement: Genzyme, Kayat    pg. 11

## SCHEDULE 5

Value of business in first full year to be $300,000 minimum. Year to commence from date of marketing approval in Russia and Ukraine. (This equates to 20 pallets of MelaPure bottles 96,000 bottles in total)

G 002413

GEN000984


PHARMACEUTICALS

GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562, U.S.A.
617-252-7500
FAX 617-252-7600

Kayat Trading Ltd
Konstantin Mechkov, Director
P.O. Box 1576
CY- 1510
Nicosia, Cyprus

September 9,1997

Dear Mr. Mechkov

Thank you for your recent correspondence of 27.8.97 for which I am grateful. Also I am pleased with the initiative you have undertaken to continue building a strong working relationship between our companies on behalf of the melatonin opportunities available in the territories which you cover.

As you well know, both my company and yours have expended considerable effort in establishing the program up to this point. For our part in our collaboration with you, I believe we have set very favorable transfer pricing and, recently, credit terms which should benefit your company. Also the marketing literature we have generated and supplied to you should prove helpful in your selling efforts.

I know I speak for both parties when I point out that we are anxious to see the sales of this product develop and grow substantially so that each of us can realize a fair return.

Once again, I do appreciate your position and I am thankful of your commitment and hard work in support of MelaPure. I want to re-state my confidence in Roger Sparrow also as the leader of the MelaPure business; that he is well qualified to consider the types of proposals you have generated and to decide upon them, and inform you directly. He is a valuable resource to each of us in this way.

Thank you again for your inquiry.

Yours sincerely,

Dr. Frank Ollington
President, Genzyme Pharmaceuticals

cc: R. Sparrow

GEN000986

**EXHIBIT 1a**

**MEMO TO:**    Roger Sparrow

**FROM:**    Carol Greve-Philips

**DATE:**    April 20, 1998

**SUBJECT:**    Melatonin Issues

The idea of selling the MelaPure logo to you and VitaPure is a simple one.  We give you the right to use the logo, trademark and Sleeping Man image and you give us royalties on each bottle of MelaPure tablets that you sell.  It becomes more complex and I'd like to list the issues we should sort out.  They are:

Regulatory

1.  In Australia discussions were underway between Pearce Pharmaceuticals and the TGA on the status of melatonin as a dietary supplement.  What was the decision ? Shall we withdraw the file for a drug ?  (Genzyme is working with the TGA on therapeutic agents and medical devices and wishes to be clear on our filing status for melatonin.)
2.  In China what is the status of required local clinical trials for HCl ?  Who is Jennifer Jiang Carter and how is she related to Walter Loh ?  Why would we send all of the same toxicology, clinical information, etc. to Jennifer that Walter Loh already has ?
3.  In Turkey data on tablet stability is required.  Do you have that data ?
4.  In the UAE a license is required. How does it apply to other Arab countries ?  The license is up in June.  What is the fee to reapply ?
5.  In Hungary  is the private label melatonin immediate release for sale to Mr. Mezossy-Urban ?  Have we satisfied their requests for information ?
6.  In Romania there has been no response from the regulatory body or Moody International .  Do you know what is happening with them ?
7.  In Slovenia tablets were shipped under a special license.  Can we continue to ship to Slovenia using this license ?
8.  In Kenya tablet stability is needed.

Financial

1.  Jim DeTore is continuing to get different opinions on our ability to sell or transfer the melatonin in inventory (193 kg released and 777 kg in quarantine).  I hope to have the definitive answer by the end of the week.
2.  We need to agree on the size of the royalty payment per bottle.
3.  Transfer of the business may cost $1 for the transaction to be legal.

Inclusions
1.  Logo
2.  Trade Mark
3.  Sleeping Man image
4.  Rights to license MelaPure name to third parties
5.  Regulatory filing now in place

GEN001079

Exclusions
1. Tablet formulation
2. Manufacturing process
3. Use of MelaPure logo for clinical studies underway and products derived  from them.

Liability

1. With Genzyme's name recognition of the MelaPure logo the quality of the melatonin going into future batches of tablets needs to be high.  Depending on the disposition of the bulk inventory Genzyme may be remembered for tablets that no longer have our own bulk and this creates a potential liability.
2. Since Genzyme has announced its write-off of the melatonin product line new labels that are printed should not show the Genzyme name.

Toxicology Data

1. There are two studies in the rat. One is a 90 day study and the second is thought to be a 180 day study.  I need to understand who at Genzyme owns the data so it can be negotiated into the sale.

Public Relations

1. Genzyme would like to issue a press release announcing the sale of the MelaPure logo to VitaPure .

GEN001080

# *GENZYME   CORPORATION*

# *PHARMACEUTICALS   DIVISION*

# *1997  Forecast  Review*

# *April  25,  1997*

**F. Ollington 4/24/97**

GEN001262

Pharmaceuticals Division
Q2/97 Senior Management Financial Review
April 25, 1997


# *Agenda*


1.   Q1/97 Summary


2.   1997 Forecast


3.   1997 Plan Critical Issues


F. Ollington, 4/24/97

GEN001263

Pharmaceuticals Division
Q2/97 Senior Management Financial Review
April 25, 1997

## 1.    Q1/97 Summary

## Good

- Forecasted product/royalty revenues achieved

- PharmaChemie prepared to negotiate on P.O.P

- Astra relationship strengthening

- SBS progress on peptide formulation

- Liquid Crystal project: "Lazarus"

- S&OP process making impact

- Clindamycin sales to SoloPak

- Supply chain for Clindamycin strengthening

- OPEX's controlled

F. Ollington, 4/24/97

Pharmaceuticals Division
Q2/97 Senior Management Financial Review
April 25, 1997

## 1.    *Q1/97 Summary (cont.)*

## Not so Good

- R&D revenue not achieved

- The division returned a loss (PBT)

- Inventory levels remain high

- Melatonin bulk and FDF sales poor

- Biocompatibles reduces forecast for Hema-PC

- Operations performance impacts salable inventory

- Plant engineer at Liestal resigns

F. Ollington, 4/24/97

# Genzyme Corporation
## Pharmaceuticals Division
### Q1 Total Division

| OOO's of USD | Actuals | Base Frcst 1/21/97 Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 563 | 500 | 63 | 13% | Higher royalty payment |
| Product revenue | 7,432 | 7,341 | 91 | 1% | Slower foreign Melatonin FDF |
| COGS | 4,507 | 4,526 | 19 | 0% | registrations offset by one |
| STD margin | 2,925 | 2,815 | 110 | 4% | additional lot HA & more Clinda |
| % | 39% | 38% | | | |
| OCOS | 961 | 1,026 | 65 | 6% | Reduced FX on lower I/C shipments |
| Gross margin | 2,527 | 2,289 | 238 | 10% | |
| % | 32% | 29% | | | |
| R&D revenue | - | 2,000 | (2,000) | (100%) | POP revenue slip to Q2 |
| Selling | 838 | 963 | 125 | 13% | Eliminated marketing programs |
| R&D | 936 | 1,511 | 575 | 38% | Delayed outside testing (POP) |
| Clinical/Reg | 254 | 211 | (43) | (20%) | |
| Reserves | - | - | - | n/a | |
| Goodwill | 93 | 115 | 22 | 19% | |
| Direct G&A | 302 | 338 | 36 | 11% | |
| Sub-total | 2,423 | 3,138 | 715 | 23% | |
| Operating income | 104 | 1,151 | (1,047) | (91%) | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 300 | 300 | - | 0% | |
| Sub-total | 300 | 300 | - | 0% | |
| PBT | (196) | 851 | (1,047) | (123%) | |
| % | n/a | 11% | | | |
| Inventory | 20,136 | 21,073 | 937 | | |
| A/R | 6,644 | 6,265 | (379) | | |
| Fixed assets | 24,910 | 27,167 | 2,257 | | |
| Melatonin reserve | (2,626) | (2,626) | - | | |
| A/P | (2,357) | (3,219) | (862) | | |
| Total capital | 46,707 | 48,660 | 1,953 | | |
| Return on capital | n/a | 7% | | | |
| Months of inventory | 10.5 | 10.7 | | | |
| DSO | 75 | 72 | | | |

GEN001266

# Genzyme Corporation
## Pharmaceuticals Division
## Q1 1997 Results

| In US dollars | Pharma | FDF | HA | Total |
|---|---|---|---|---|
| Royalties | 0 | 0 | 563 | 563 |
| | | | | |
| Product revenues | 6,254 | 48 | 1,130 | 7,432 |
| STD COGS | 4,359 | 24 | 124 | 4,507 |
| Standard Margin | 1,895 | 24 | 1,006 | 2,925 |
| Margin % | 30% | 51% | 89% | 39% |
| | | | | |
| OCOS | 789 | 0 | 172 | 961 |
| Gross Margin | 1,106 | 24 | 1,397 | 2,527 |
| Margin % | 18% | 50% | 83% | 32% |
| | | | | |
| R&D Revenue | 0 | 0 | 0 | 0 |
| | | | | |
| Selling | 524 | 221 | 93 | 838 |
| R & D | 111 | 971 | (146) | 936 |
| Clinical/Reg | 156 | 98 | 0 | 254 |
| Reserves | 0 | 0 | 0 | 0 |
| Goodwill | 93 | 0 | 0 | 93 |
| Direct G & A | 245 | 57 | 0 | 302 |
| Sub-total | 1,128 | 1,348 | (53) | 2,423 |
| | | | | |
| Operating Income | (21) | (1,324) | 1,450 | 105 |
| | | | | |
| Imputed Interest | 0 | 0 | 0 | 0 |
| G & A allocation | 100 | 100 | 100 | 300 |
| Sub-total | 100 | 100 | 100 | 300 |
| | | | | |
| PBT | (121) | (1,424) | 1,350 | (195) |
| % of Sales | (2%) | (2989%) | 80% | (2%) |
| | | | | |
| Inventory | 19,492 | 0 | 644 | 20,137 |
| A/R | 5,821 | 32 | 791 | 6,645 |
| Fixed assets | 22,392 | 1,518 | 1,000 | 24,910 |
| Melatonin reserve | (2,626) | 0 | 0 | (2,626) |
| A/P | (2,357) | 0 | 0 | (2,357) |
| Total capital | 42,722 | 1,551 | 2,435 | 46,708 |
| | | | | |
| Return on capital | (0%) | (92%) | 55% | (0%) |
| | | | | |
| Months of Inventory | 10.8 | 0.0 | 5.0 | 10.5 |
| D S O | 84 | 61 | 63 | 75 |

4/24/97, 2:03 PM                                   WB2 - backup sch, Q1 97 results

GEN001267

Pharmaceuticals Division
Q2/97 Senior Management Financial Review
April 25, 1997

## 3.    *1997 Plan Critical Issues*

- FDA inspections

    - Ciba prodcuts                                 Haverhill

    - Clindamycin $PO_4$
      and Amendment to file for C-HCl              Haverhill

    - Peptide manufacturing                         Liestal

- Marketing partnerships and R&D revenue for FDF products

- Carbazole Ester
  development, manufacturing and sales            Q4

- Ciba products availability                      Q4

- LMW and HMW HA to Alcon                         Q4

- Melatonin inventory

F. Ollington, 4/24/97

# Genzyme Corporation
## Pharmaceuticals Division
### Total Division
### Full Year

| OOO's of USD | April Forecast | 1/21/97 Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 2,273 | 2,125 | 148 | 7% | |
| Product revenue | 35,543 | 39,745 | (4,202) | (11%) | |
| COGS | 23,184 | 24,642 | 1,458 | 6% | |
| STD margin | 12,359 | 15,103 | (2,744) | (18%) | |
| % | 35% | 38% | | | |
| COOS | 3,267 | 4,046 | 779 | 19% | |
| Gross margin | 11,365 | 13,182 | (1,817) | (14%) | |
| % | 30% | 31% | | | |
| R&D revenue | 6,500 | 6,500 | - | 0% | |
| Selling | 3,653 | 3,806 | 153 | 4% | |
| R&D | 6,002 | 6,541 | 539 | 8% | |
| Clinical/Reg | 2,469 | 1,980 | (489) | (25%) | |
| Reserves | - | - | - | n/a | |
| Goodwill | 438 | 460 | 22 | 5% | |
| Direct G&A | 1,306 | 1,353 | 47 | 3% | |
| Sub-total | 13,868 | 14,140 | 272 | 2% | |
| Operating income | 3,997 | 5,542 | (1,545) | (28%) | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 1,200 | 1,200 | 0 | 0% | |
| Sub-total | 1,200 | 1,200 | 0 | 0% | |
| P B T | 2,797 | 4,342 | (1,545) | (36%) | |
| % | 7% | 10% | | | |
| Inventory | 20,060 | 18,412 | (1,648) | | |
| A/R | 8,365 | 10,928 | 2,563 | | |
| Fixed assets | 27,025 | 29,876 | 2,851 | | |
| Melatonin reserve | (2,626) | (2,626) | - | | |
| A/P | (2,472) | (2,876) | (404) | | |
| Total capital | 50,351 | 53,714 | 3,363 | | |
| Return on capital | 6% | 8% | | | |
| Months of inventory | 9.1 | 8.0 | | | |
| D S O | 55 | 62 | | | |

WB - P&L backp sch, Year var to fore

GEN001269

## Genzyme Corporation
### Pharmaceuticals Division
### Total Division

| OOO's of USD | Q1 97 | Q2 97 | Q3 97 | Q4 97 | Q1 98 | Q2 98 | Total 1997 |
|---|---|---|---|---|---|---|---|
| Royalty | 563 | 565 | 570 | 575 | 580 | 585 | 2,273 |
| Product revenue | 7,432 | 7,483 | 7,546 | 13,082 | 8,849 | 8,183 | 35,543 |
| COGS | 4,507 | 4,832 | 5,135 | 8,710 | 6,071 | 5,060 | 23,184 |
| STD margin | 2,925 | 2,651 | 2,411 | 4,372 | 2,778 | 3,124 | 12,359 |
| % | 39% | 35% | 32% | 33% | 31% | 38% | 35% |
| OOOS | 961 | 925 | 683 | 698 | 887 | 975 | 3,267 |
| Gross margin | 2,527 | 2,291 | 2,297 | 4,249 | 2,471 | 2,733 | 11,365 |
| % | 32% | 28% | 28% | 31% | 26% | 31% | 30% |
| R&D revenue | - | 2,000 | 2,500 | 2,000 | - | - | 6,500 |
| Selling | 838 | 932 | 919 | 964 | 1,006 | 1,011 | 3,653 |
| R&D | 936 | 1,684 | 1,795 | 1,586 | 1,596 | 1,273 | 6,002 |
| Clinical/Reg | 254 | 836 | 748 | 631 | 600 | 280 | 2,469 |
| Reserves | - | - | - | - | - | - | - |
| Goodwill | 93 | 115 | 115 | 115 | 115 | 115 | 438 |
| Direct G&A | 302 | 316 | 337 | 350 | 378 | 393 | 1,306 |
| Sub-total | 2,423 | 3,883 | 3,915 | 3,647 | 3,695 | 3,072 | 13,868 |
| Operating income | 104 | 408 | 883 | 2,603 | (1,224) | (339) | 3,997 |
| Interest expense | - | - | - | - | - | - | - |
| G&A allocation | 300 | 300 | 300 | 300 | 480 | 480 | 1,200 |
| Sub-total | 300 | 300 | 300 | 300 | 480 | 480 | 1,200 |
| PBT | (196) | 108 | 583 | 2,303 | (1,704) | (819) | 2,797 |
| % | n/a | 1% | 7% | 17% | n/a | n/a | 7% |
| Note:  PBT with revised G&A allocation | (371) | (67) | 408 | 2,128 | | | 2,097 |
| Inventory | 20,136 | 19,778 | 20,614 | 20,060 | 21,747 | 22,164 | 20,060 |
| A/R | 6,644 | 5,051 | 5,054 | 8,365 | 6,057 | 5,603 | 8,365 |
| Fixed assets | 24,910 | 24,764 | 26,445 | 27,025 | 27,261 | 28,025 | 27,025 |
| Melatonin reserve | (2,626) | (2,626) | (2,626) | (2,626) | (2,626) | (2,626) | (2,626) |
| A/P | (2,357) | (2,298) | (2,270) | (2,472) | (2,492) | (2,527) | (2,472) |
| Total capital | 46,707 | 44,668 | 47,217 | 50,351 | 49,947 | 50,639 | 50,351 |
| Return on capital | n/a | 1% | 5% | 18% | n/a | n/a | 6% |
| Months of inventory | 10.5 | 10.1 | 9.7 | 9.1 | 9.0 | 8.9 | 9.1 |
| DSO | 75 | 56 | 56 | 55 | 58 | 58 | 55 |

4/24/97, 8:50 AM

USD total

GEN001270

# Genzyme Corporation
## Pharmaceuticals Division
### Consolidated OCOS

|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | *Total* |
|---|---|---|---|---|---|---|---|
| **US** | | | | | | | |
| Freight & duty | 55 | 68 | 68 | 68 | 68 | 68 | 259 |
| Distribution overhead | 22 | 22 | 22 | 22 | 25 | 25 | 88 |
| FX impact | 95 | 109 | 158 | 186 | 226 | 87 | 548 |
| sub-total US Pharma | 172 | 199 | 248 | 276 | 319 | 180 | 895 |
| FDF freight & duty | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HA reserves | 21 | 21 | 21 | 21 | 21 | 21 | 84 |
| HA capacity | 151 | 135 | 162 | 154 | 239 | 459 | 602 |
| Total US OCOS | 344 | 355 | 431 | 451 | 579 | 660 | 1,580 |
| **UK** | | | | | | | |
| Freight | 19 | 23 | 24 | 24 | - | - | 91 |
| Purchase price | (37) | - | - | - | - | - | (37) |
| Mgt challenge | (138) | (125) | (48) | (48) | - | - | (358) |
| Process variances | 75 | (20) | 10 | 5 | - | - | 69 |
| Capacity | 367 | (52) | 254 | 89 | - | - | 658 |
| Shutdown | 136 | 131 | (400) | 133 | 133 | 133 | 1 |
| Y/E revaluation amort | (107) | (102) | - | - | - | - | (209) |
| Reserve accrual | - | 208 | 211 | 211 | 25 | 25 | 630 |
| Amortization | (49) | 133 | 168 | (310) | - | - | (57) |
| Total UK OCOS | 266 | 197 | 219 | 105 | 159 | 159 | 787 |
| **CHF** | | | | | | | |
| Capacity/ variances | 347 | 373 | 33 | 142 | 149 | 156 | 896 |
| Total variances | 957 | 925 | 683 | 698 | 887 | 975 | 3,263 |

< ------ *Debit/(Credit)* ------ >

USD total, Total OCOS

## Genzyme Corporation
## Pharmaceuticals Division
### FDF R&D

USD total, R&D

| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | 1996 Total |
|---|---|---|---|---|---|---|---|---|
| **POP** | | | | | | | | |
| SBS | | 337 | 336 | 586 | 336 | 187 | - | 1,595 |
| Other outside testing | | 63 | 314 | 262 | 158 | 502 | 425 | 797 |
| Regulatory/Clinical labor | | 13 | 66 | 81 | 61 | 41 | 61 | 221 |
| Balance CC 371 | | 198 | 291 | 367 | 410 | 466 | 466 | 1,266 |
| Other supporting CC | | 144 | 55 | 50 | 119 | 170 | 149 | 368 |
| Liestal peptides | | - | 212 | 212 | 212 | - | - | 636 |
| | P&L charges | 755 | 1,274 | 1,558 | 1,296 | 1,366 | 1,101 | 4,883 |
| Capitalized spending | | - | 307 | 348 | 266 | 287 | 286 | 921 |
| | Total POP | 755 | 1,581 | 1,906 | 1,562 | 1,653 | 1,387 | 5,804 |
| | | | | | | | | |
| **Melatonin** | | | | | | | | |
| Clinical costs | | - | 340 | 411 | 314 | 303 | - | 1,065 |
| Regulatory/Clinical labor | | 85 | 150 | 176 | 176 | 176 | 139 | 588 |
| CC 371 | | 130 | 231 | 91 | 115 | 41 | 33 | 567 |
| Other supporting CC | | 33 | 47 | 56 | 56 | 38 | - | 192 |
| Lilly license ($150 pymt, 8 yr amort) | | - | 40 | 5 | 5 | 5 | 5 | 49 |
| | Total Melatonin | 248 | 807 | 739 | 667 | 563 | 176 | 2,460 |
| | | | | | | | | |
| **Total** | | | | | | | | |
| SBS | | 337 | 336 | 586 | 336 | 187 | - | 1,595 |
| Other outside testing | | 63 | 314 | 262 | 158 | 502 | 425 | 797 |
| Clinical costs | | - | 340 | 411 | 314 | 303 | - | 1,065 |
| Regulatory/Clinical labor | | 98 | 216 | 257 | 237 | 217 | 200 | 809 |
| CC 371 | | 328 | 522 | 458 | 525 | 507 | 499 | 1,833 |
| Other supporting CC | | 177 | 102 | 106 | 175 | 208 | 149 | 560 |
| Lilly license/ Liestal Peptide | | - | 252 | 217 | 217 | 5 | 5 | 685 |
| | Total R&D Investments | 1,003 | 2,081 | 2,297 | 1,963 | 1,929 | 1,277 | 7,343 |

Balance per P&L:          7,343

Check          Yes



# Pharmaceuticals Inventory Trends

Legend: US, UK, CHF

Quarter: Q4 95, Q1 96, Q2 96, Q3 96, Q4 96, Q1 97, Q2 97, Q3 97, Q4 97

USD Thousands: 2,000 / 4,000 / 6,000 / 8,000 / 10,000 / 12,000 / 14,000

Inventory Chart 2, Inventory Chart 2

4/24/97, 2:58 PM

GEN001273

# Genzyme Corporation
## Pharmaceuticals Division
### Free Cash Flow

|  |  | Q1 97 | Q2 97 | Q3 97 | Q4 97 | Q1 98 | Q2 98 |
|---|---|---|---|---|---|---|---|
| **EBT** |  | (196) | 108 | 583 | 2,303 | (1,704) | (819) |
| **Add depreciation:** |  |  |  |  |  |  |  |
| Haverhill |  | 587 | 593 | 634 | 639 | 626 | 613 |
| Liestal |  | 328 | 362 | 404 | 424 | 448 | 469 |
| US |  | 38 | 37 | 45 | 54 | 56 | 76 |
|  | Sub-total | 953 | 992 | 1,083 | 1,116 | 1,130 | 1,158 |
| **Add goodwill:** |  | 93 | 115 | 115 | 115 | 115 | 115 |
| **Less capital expenditures:** |  |  |  |  |  |  |  |
| Haverhill |  | 282 | 1,250 | 1,389 | 754 | 317 | 317 |
| Liestal |  | 237 | 469 | 492 | 341 | 373 | 391 |
| US |  | 37 | 188 | 207 | 100 | 447 | 728 |
|  | Sub-total | 557 | 1,907 | 2,088 | 1,195 | 1,138 | 1,436 |
| **Changes in working capital- cash (use)/provided:** |  |  |  |  |  |  |  |
| Inventory |  | (224) | 358 | (837) | 555 | (1,687) | (418) |
| A/R |  | 880 | 1,593 | (3) | (3,311) | 2,308 | 454 |
| A/P |  | (10) | (59) | (28) | 202 | 20 | 35 |
|  | Sub-total | 646 | 1,892 | (867) | (2,555) | 641 | 72 |
| **Free cash flow** |  | 939 | 1,200 | (1,175) | (216) | (956) | (910) |
| **Cumulative FCF** |  |  | 2,140 | 965 | 749 | (207) | (1,117) |

4/24/97, 8:31 AM                                              WB - P&L backp sch, F C F

GEN001274

# GENZYME CORPORATION
# INTEROFFICE MEMORANDUM

To:          Distribution

From:        J. DeTore

Date:        July 30, 1997                                    *File*

Subject:     July Pharmaceuticals Forecast Package

## *Index*

| Subject | Page |
|---|---|
| 1997 P&L by quarter | 1 |
| Q3 forecast comparisons | 2 |
| Q4 forecast comparisons | 3 |
| Total year variance comparisons | 4 |
| Haverhill forecast comparisons (statutory) | 5 |
| Liestal forecast comparisons (statutory) | 6 |
| 1998 P&L by quarter | 7 |
| 1998 vs 1997 P&L comparison | 8 |
| Haverhill 1998 vs 97 comparisons (statutory) | 9 |
| Liestal 1998 vs 97 comparisons (statutory) | 10 |
| Consolidated OCOS details | 11 |
| Melatonin & POP R&D spending | 12 |
| Inventory by element | 13 |

Distribution:

| | | | |
|---|---|---|---|
| R. Barker | A. Calderbank | R. Champion | S. Cousins |
| P. Edwards | P. Hoffmann | S. Morris | G. Cox |
| T. Narwid | S. Shames | T. Slater | J. Warren |
| T. Nichols | F. Ollington | M. Smith | C. Jackson |

M. Bamforth

GEN002927

# Genzyme Corporation
## Pharmaceuticals Division
### Total Division

| OOO's of USD | Actual Q1 97 | Actual Q2 97 | Fcst Q3 97 | Fcst Q4 97 | Total 1997 |
|---|---|---|---|---|---|
| Royalty | 563 | 531 | 540 | 545 | 2,179 |
| Product revenue | 7,432 | 7,656 | 6,744 | 10,881 | 32,713 |
| COGS | 4,507 | 4,577 | 4,062 | 6,734 | 19,879 |
| STD margin | 2,925 | 3,079 | 2,683 | 4,147 | 12,834 |
| % | 39% | 40% | 40% | 38% | 39% |
| OCOS | 961 | 836 | 715 | 1,009 | 3,521 |
| Gross margin | 2,528 | 2,774 | 2,507 | 3,683 | 11,492 |
| % | 32% | 34% | 34% | 32% | 33% |
| R&D revenue | - | - | 1,000 | 3,000 | 4,000 |
| Selling | 838 | 902 | 941 | 1,006 | 3,686 |
| R&D | 936 | 1,191 | 2,262 | 2,012 | 6,401 |
| Clinical/Reg | 254 | 97 | 177 | 166 | 694 |
| Reserves | - | - | - | - | - |
| Goodwill | 93 | 92 | 115 | 115 | 415 |
| Direct G&A | 302 | 282 | 400 | 410 | 1,396 |
| Sub-total | 2,423 | 2,564 | 3,895 | 3,710 | 12,592 |
| Operating income | 104 | 211 | (388) | 2,973 | 2,900 |
| Interest expense | - | - | - | - | - |
| G&A allocation | 300 | 301 | 300 | 300 | 1,201 |
| Sub-total | 300 | 301 | 300 | 300 | 1,201 |
| P B T | (196) | (91) | (688) | 2,673 | 1,699 |
| % | n/a | n/a | n/a | 23% | 5% |
| Inventory | 20,136 | 21,424 | 20,116 | 18,391 | 18,391 |
| A/R | 6,644 | 6,339 | 4,473 | 8,304 | 8,304 |
| Fixed assets | 25,309 | 25,583 | 25,764 | 25,883 | 25,883 |
| Melatonin reserve | (2,626) | (2,626) | (2,626) | (2,626) | (2,626) |
| A/P | (2,357) | (1,864) | (2,291) | (2,463) | (2,463) |
| Total capital | 47,106 | 48,857 | 45,435 | 47,489 | 47,489 |
| Return on capital | n/a | n/a | n/a | 23% | 4% |
| Months of inventory | 13.4 | 11.5 | 11.1 | 10.0 | 10.0 |
| D S O | 75 | 70 | 55 | 65 | 65 |

/

USD total

GEN002928

**Genzyme Corporation**
Pharmaceuticals Division
Q3 Total Division

| OOO's of USD | July Forecast | April Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 540 | 570 | (30) | (5%) | |
| Product revenue | 6,744 | 7,546 | (802) | (11%) | HA Powder & Clindamycin |
| COGS | 4,062 | 5,135 | 1,073 | 21% | |
| STD margin | 2,683 | 2,411 | 272 | | Fav Mix- Lower Margin Clinda sales |
| % | 40% | 32% | | | offset by increase in Higher margin |
| | | | | | Dimethadine Maleate (UK Pharm) |
| OCOS | 715 | 683 | (32) | (5%) | |
| Gross margin | 2,507 | 2,298 | 209 | 9% | |
| % | 34% | 28% | | | |
| R&D revenue | 1,000 | 2,500 | (1,500) | (60%) | European POP Milestone pushed |
| | | | | | into 1998 |
| Selling | 941 | 919 | (22) | (2%) | |
| R&D | 2,262 | 1,795 | (467) | (26%) | Outside Testing pushed in from |
| Clinical/Reg | 177 | 748 | 571 | 76% | Q2 offset by halted Melatonin |
| Reserves | - | - | - | n/a | safety/clinical study |
| Goodwill | 115 | 115 | - | 0% | |
| Direct G&A | 400 | 337 | (63) | (19%) | Liestal Incr Dep'n |
| Sub-total | 3,895 | 3,914 | 19 | 0% | |
| Operating income | (388) | 884 | (1,272) | (144%) | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 300 | 300 | 0 | 0% | |
| Sub-total | 300 | 300 | (15) | (5%) | |
| P B T | (688) | 584 | (1,287) | (220%) | |
| % | n/a | 7% | | | |
| Inventory | 20,116 | 20,614 | 498 | 2% | |
| A/R | 4,473 | 5,054 | 581 | 12% | UK - Large Volume Novartis Sale |
| Fixed assets | 25,764 | 26,445 | 681 | 3% | Haverhill Capital pushed into Q4 |
| Melatonin reserve | (2,626) | (2,626) | - | 0% | |
| A/P | (2,291) | (2,270) | 21 | (1%) | |
| Total capital | 45,435 | 47,217 | 1,782 | 4% | |
| Return on capital | n/a | 5% | | | |
| Months of inventory | 11.1 | 9.7 | (1.4) | (14%) | |
| D S O | 55 | 56 | 1 | 1% | |



GEN002929

**Genzyme Corporation**
Pharmaceuticals Division
Q4 Total Division

| OOO's of USD | July Forecast | 4/23/97 Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 545 | 575 | (30) | (5%) | |
| Product revenue | 10,881 | 13,082 | (2,201) | (17%) | HA Powder (LMW) ,/Carb Ester |
| COGS | 6,734 | 8,710 | 1,976 | 23% | & Melatonin Sales Down |
| STD margin | 4,147 | 4,372 | (225) | (5%) | Fav mix, Less DTT & Melatonin Sales |
| % | 38% | 33% | | | |
| OCOS | 1,009 | 698 | (311) | (45%) | Liestal Capacity & UK Process Var |
| Gross margin | 3,683 | 4,249 | (566) | (13%) | |
| % | 32% | 31% | | | |
| R&D revenue | 3,000 | 2,000 | 1,000 | 50% | Astra/Sweden & Canadian License |
| Selling | 1,006 | 964 | (42) | (4%) | |
| R&D | 2,012 | 1,586 | (426) | (27%) | Inc outside testing  (non SBS) for POP |
| Clinical/Reg | 166 | 631 | 465 | 74% | halted Melatonin clinical trials |
| Reserves | - | - | - | n/a | |
| Goodwill | 115 | 115 | - | 0% | |
| Direct G&A | 410 | 350 | (60) | (17%) | Incr Dep'n for Liestal network |
| Sub-total | 3,710 | 3,646 | (64) | (2%) | |
| Operating income | 2,973 | 2,603 | 370 | 14% | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 300 | 300 | 0 | 0% | |
| Sub-total | 337 | 322 | (16) | (5%) | |
| P B T | 2,636 | 2,281 | 354 | 16% | |
| % | 23% | 17% | | | |
| Inventory | 18,391 | 20,060 | 1,669 | 8% | UK |
| A/R | 8,304 | 8,365 | 61 | 1% | |
| Fixed assets | 25,883 | 27,025 | 1,142 | 4% | UK |
| Melatonin reserve | (2,626) | (2,626) | - | 0% | |
| A/P | (2,463) | (2,472) | (9) | 0% | |
| Total capital | 47,489 | 50,352 | 2,863 | 6% | |
| Return on capital | 22% | 18% | | | |
| Months of inventory | 10.0 | 9.1 | (0.9) | (9%) | |
| D S O | 65 | 55 | (10) | (19%) | |

GEN002930

**Genzyme Corporation**
Pharmaceuticals Division
Total Division
Full Year

| OOO's of USD | July Forecast | Base Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 2,179 | 2,273 | (94) | (4%) | Estimated Royalty Payments |
| Product revenue | 32,713 | 35,543 | (2,830) | (8%) | |
| COGS | 19,879 | 23,184 | 3,305 | 14% | |
| STD margin | 12,834 | 12,359 | 475 | 4% | Favorable Sales Mix |
| % | 39% | 35% | | | |
| OCOS | 3,521 | 3,267 | (254) | (8%) | Liestal Capacity and Inv W/O (AAD) |
| Gross margin | 11,492 | 11,365 | 127 | 1% | |
| % | 33% | 30% | | | |
| R&D revenue | 4,000 | 6,500 | (2,500) | (38%) | Missed European POP Milestone |
| Selling | 3,686 | 3,653 | (33) | (1%) | US inc Headcount |
| R&D | 6,401 | 6,002 | (399) | (7%) | Increased Outside Testing POP |
| Clinical/Reg | 694 | 2,469 | 1,775 | 72% | Stopped Melatonin safety/clinical |
| Reserves | - | - | - | n/a | study |
| Goodwill | 415 | 438 | 23 | 5% | |
| Direct G&A | 1,396 | 1,306 | (90) | (7%) | Liestal |
| Sub-total | 12,592 | 13,868 | 1,276 | 9% | |
| Operating income | 2,900 | 3,997 | (1,097) | (27%) | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 1,201 | 1,200 | (1) | (0%) | |
| Sub-total | 1,334 | 1,222 | (112) | (9%) | |
| P B T | 1,566 | 2,775 | (1,209) | (44%) | |
| % | 4% | 7% | | | |
| Inventory | 18,391 | 20,060 | 1,669 | 8% | |
| A/R | 8,304 | 8,365 | 61 | 1% | |
| Fixed assets | 25,883 | 27,025 | 1,142 | 4% | |
| Melatonin reserve | (2,626) | (2,626) | - | 0% | |
| A/P | (2,463) | (2,472) | (9) | 0% | |
| Total capital | 47,489 | 50,352 | 2,863 | 6% | |
| Return on capital | 3% | 6% | | | |
| Months of inventory | 10.0 | 9.1 | (0.9) | (9%) | |
| D S O | 65 | 55 | (10) | (19%) | |

7/29/97, 12:29 PM

*4*

WB - P&L backp sch, Year var to fore

GEN002931

**Genzyme Corporation**
Pharmaceuticals Division
Haverhill, Full Year 1997

| OOO's of USD | July Forecast | 4/23/97 Forecast | Fav/(Unfav) | % Change |
|---|---|---|---|---|
| Royalty | - | - | - | n/a |
| | | | | |
| Product revenue | 6,908 | 7,903 | (995) | (13%) |
| COGS | 4,316 | 4,501 | 185 | 4% |
| STD margin | 2,592 | 3,402 | (810) | (24%) |
| % | 38% | 43% | | |
| | | | | |
| OCOS | 825 | 791 | (34) | (4%) |
| Gross margin | 1,767 | 2,611 | (844) | (32%) |
| % | 26% | 33% | | |
| | | | | |
| R&D revenue | - | - | - | n/a |
| | | | | |
| Selling | 665 | 699 | 34 | 5% |
| R&D | 8 | - | (8) | n/a |
| Clinical/Reg | - | - | - | n/a |
| Reserves | - | - | - | n/a |
| Goodwill | - | - | - | n/a |
| Direct G&A | 217 | 212 | (5) | (2%) |
| Sub-total | 890 | 911 | 21 | 2% |
| | | | | |
| Operating income | 877 | 1,700 | (823) | (48%) |
| | | | | |
| Interest expense | - | - | - | n/a |
| G&A allocation | - | - | - | n/a |
| Sub-total | - | - | - | n/a |
| | | | | |
| P B T | 877 | 1,700 | (823) | (48%) |
| % | 13% | 22% | | |
| | | | | |
| I/C revenue | 9,903 | 14,027 | (4,124) | (29%) |
| I/C COGS | 9,083 | 12,830 | 3,747 | 29% |
| I/C margin | 820 | 1,197 | (377) | (32%) |
| | | | | |
| I/C R&D | - | - | - | n/a |
| I/C R&D Cogs | - | - | - | n/a |
| I/C R&D margin | - | - | - | n/a |
| | | | | |
| Total I/C margin | 820 | 1,197 | (377) | (32%) |
| | | | | |
| Total P B T | 1,697 | 2,897 | (1,200) | (41%) |
| | | | | |
| Inventory | 7,947 | 8,730 | 783 | 9% |
| A/R | 1,365 | 1,270 | (95) | (7%) |
| Fixed assets | 14,056 | 15,335 | 1,279 | 8% |
| A/P | (1,760) | (1,746) | 14 | (1%) |
| Total capital | 21,608 | 23,589 | 1,981 | 8% |
| | | | | |
| Return on capital | 8% | 12% | | |
| | | | | |
| Months of inventory | 25.8 | 6.0 | (19.8) | (331%) |
| D S O | 95 | 53 | (42) | (80%) |

5

WB - P&L backp sch, Haverhill Year

GEN002932

# Genzyme Corporation
## Pharmaceuticals Division
### Liestal, Full Year 1997

| OOO's of USD | July Forecast | 4/23/97 Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | - | - | - | n/a | |
| Product revenue | 4,362 | 4,693 | (331) | (7%) | |
| COGS | 2,534 | 2,827 | 293 | 10% | |
| STD margin | 1,828 | 1,866 | (38) | (2%) | |
| % | 42% | 40% | | | |
| OCOS | 1,118 | 896 | (222) | (25%) | |
| Gross margin | 711 | 970 | (259) | (27%) | |
| % | 16% | 21% | | | |
| R&D revenue | - | - | - | n/a | |
| Selling | 428 | 383 | (45) | (12%) | |
| R&D | 854 | 673 | (181) | (27%) | |
| Clinical/Reg | - | - | - | n/a | |
| Reserves | - | - | - | n/a | |
| Goodwill | - | - | - | n/a | |
| Direct G&A | 1,178 | 1,094 | (84) | (8%) | |
| Sub-total | 2,460 | 2,150 | (310) | (14%) | |
| Operating income | (1,749) | (1,180) | (569) | 48% | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | - | - | - | n/a | |
| Sub-total | - | - | (133) | n/a | |
| P B T | (1,749) | (1,180) | (702) | 59% | |
| % | n/a | n/a | | | |
| I/C revenue | 3,355 | 2,854 | 501 | 18% | |
| I/C COGS | 2,690 | 2,355 | (335) | (14%) | |
| I/C margin | 666 | 499 | 167 | 33% | |
| I/C R&D | 396 | 296 | 100 | 34% | |
| I/C R&D Cogs | - | - | - | n/a | |
| I/C R&D margin | 396 | 296 | 100 | 34% | |
| Total I/C margin | 1,062 | 795 | 267 | 34% | |
| Total P B T | (687) | (385) | (435) | 113% | |
| Inventory | 3,216 | 3,242 | 26 | 1% | |
| A/R | 1,433 | 985 | (448) | (45%) | |
| Fixed assets | 10,163 | 10,220 | 57 | 1% | |
| A/P | (703) | (726) | (23) | 3% | |
| Total capital | 14,109 | 13,721 | (388) | (3%) | |
| Return on capital | n/a | n/a | | | |
| Months of inventory | 7.7 | 5.6 | (2.1) | (38%) | |
| D S O | 89 | 46 | (43) | (93%) | |

*6*

WB - P&L backp sch, Liestal Year

GEN002933

**Genzyme Corporation**
Pharmaceuticals Division
Total Division
1998 Quarterly Trend

| OOO's of USD | Q1 98 | Q2 98 | Q3 98 | Q4 98 | 1998 1st Pass Budget |
|---|---|---|---|---|---|
| Royalty | 550 | 550 | 550 | 550 | 2,200 |
| | | | | | |
| Product revenue | 7,286 | 10,808 | 8,387 | 10,029 | 36,510 |
| COGS | 4,701 | 6,987 | 5,179 | 6,368 | 23,235 |
| STD margin | 2,585 | 3,822 | 3,208 | 3,661 | 13,275 |
| % | 35% | 35% | 38% | 37% | 36% |
| | | | | | |
| OCOS | 863 | 739 | 615 | 667 | 2,885 |
| Gross margin | 2,272 | 3,632 | 3,143 | 3,544 | 12,591 |
| % | 29% | 32% | 35% | 33% | 33% |
| | | | | | |
| R&D revenue | 500 | 1,250 | 1,500 | 1,500 | 4,750 |
| | | | | | |
| Selling | 1,069 | 1,071 | 1,071 | 1,071 | 4,282 |
| R&D | 1,888 | 1,739 | 1,484 | 1,529 | 6,640 |
| Clinical/Reg | 168 | 157 | 168 | 167 | 660 |
| Reserves | - | - | - | - | - |
| Goodwill | 115 | 115 | 115 | 115 | 460 |
| Direct G&A | 426 | 432 | 371 | 372 | 1,601 |
| Sub-total | 3,666 | 3,513 | 3,209 | 3,254 | 13,642 |
| | | | | | |
| Operating income | (894) | 1,369 | 1,434 | 1,790 | 3,698 |
| | | | | | |
| Interest expense | - | - | - | - | - |
| G&A allocation | 480 | 480 | 480 | 480 | 1,920 |
| Sub-total | 480 | 480 | 480 | 480 | 1,920 |
| | | | | | |
| P B T | (1,374) | 889 | 954 | 1,310 | 1,778 |
| % | n/a | 8% | 11% | 12% | 5% |
| | | | | | |
| Inventory | 18,059 | 18,318 | 18,507 | 18,691 | 18,691 |
| A/R | 6,119 | 7,947 | 6,599 | 7,739 | 7,739 |
| Fixed assets | 27,613 | 28,380 | 29,658 | 30,472 | 30,472 |
| Melatonin reserve | (2,626) | (2,626) | (2,626) | (2,626) | (2,626) |
| A/P | (2,395) | (2,340) | (2,338) | (2,338) | (2,338) |
| Total capital | 46,771 | 49,679 | 49,800 | 51,938 | 51,938 |
| | | | | | |
| Return on capital | n/a | 2% | 2% | 3% | 3% |
| | | | | | |
| Months of inventory | 9.6 | 8.6 | 8.3 | 8.5 | 8.5 |
| D S O | 70.3 | 63.0 | 66.5 | 65.8 | 65.8 |

7/29/97 11:51 AM
J DeTore

7

GEN002934

**Genzyme Corporation**
Pharmaceuticals Division
Total Division
Full Year

| OOO's of USD | 1998 1st Pass Budget | 1997 Forecast | Fav/(Unfav) | % Change | Commentary |
|---|---|---|---|---|---|
| Royalty | 2,200 | 2,179 | 21 | 1% | |
| | | | | | |
| Product revenue | 36,510 | 32,713 | 3,797 | 10% | Carbozole Estra (2.7) & Clinda |
| COGS | 23,235 | 19,879 | (3,356) | (14%) | |
| STD margin | 13,275 | 12,834 | 441 | 3% | |
| % | 36% | 39% | | | Lower Mix (less Novartis Products) |
| | | | | | |
| OCOS | 2,885 | 3,521 | 636 | 22% | Reduced Proc Var in UK |
| Gross margin | 12,591 | 11,492 | 1,098 | 9% | |
| % | 33% | 33% | | | |
| | | | | | |
| R&D revenue | 4,750 | 4,000 | 750 | 16% | |
| | | | | | |
| Selling | 4,282 | 3,686 | (596) | (14%) | Inc Headcount US & Full Yr UK |
| R&D | 6,640 | 6,401 | (238) | (4%) | Inc H/C & support for POP Program |
| Clinical/Reg | 660 | 694 | 34 | 5% | |
| Reserves | - | - | - | n/a | |
| Goodwill | 460 | 415 | (45) | (10%) | |
| Direct G&A | 1,601 | 1,396 | (205) | (13%) | Liestal-1 head + Dep'n of Network |
| Sub-total | 13,642 | 12,592 | (1,050) | (8%) | |
| | | | | | |
| Operating income | 3,698 | 2,900 | 798 | 22% | |
| | | | | | |
| Interest expense | - | - | - | n/a | |
| G&A allocation | 1,920 | 1,201 | (719) | (37%) | Incr 1998 Alloc |
| Sub-total | 1,920 | 1,201 | (586) | (31%) | |
| | | | | | |
| P B T | 1,778 | 1,699 | 212 | 12% | |
| % | 5% | 5% | | | |
| | | | | | |
| Inventory | 18,691 | 18,391 | (300) | (2%) | |
| A/R | 7,739 | 8,304 | 565 | 7% | |
| Fixed assets | 30,472 | 25,883 | (4,589) | (15%) | UK & Syg Plant/Equip |
| Melatonin reserve | (2,626) | (2,626) | - | 0% | |
| A/P | (2,338) | (2,463) | 125 | (5%) | |
| Total capital | 51,938 | 47,489 | (4,200) | (8%) | |
| | | | | | |
| Return on capital | 3% | 4% | | | |
| | | | | | |
| Months of inventory | 8.5 | 10.0 | (1.4) | (17%) | |
| D S O | 66 | 65 | 0 | 1% | |

7/29/97  11:53 AM
Jim DeTore

8

GEN002935

Genzyme Corporation
Pharmaceuticals Division
Haverhill Total
1998 vs 1997

| OOO's of USD | Total 1998 | Total 1997 | Fav/(Unfav) | Change |
|---|---|---|---|---|
| Royalty | - | - | - | n/a |
| | | | | |
| Product revenue | 8,683 | 6,908 | 1,775 | 26% |
| COGS | 5,545 | 4,316 | (1,229) | (28%) |
| STD margin | 3,138 | 2,592 | 546 | 21% |
| % | 36% | 38% | | |
| | | | | |
| OCOS | 303 | 825 | 523 | 63% |
| Gross margin | 2,835 | 1,767 | 1,068 | 60% |
| % | 33% | 26% | | |
| | | | | |
| R&D revenue | - | - | - | n/a |
| | | | | |
| Selling | 893 | 665 | (228) | (34%) |
| R&D | - | 8 | 8 | 100% |
| Clinical/Reg | - | - | - | n/a |
| Reserves | - | - | - | n/a |
| Goodwill | - | - | - | n/a |
| Direct G&A | 198 | 217 | 19 | 9% |
| Sub-total | 1,090 | 890 | (200) | (23%) |
| | | | | |
| Operating income | 1,745 | 877 | 868 | 99% |
| | | | | |
| Interest expense | - | - | - | n/a |
| Other | - | - | - | n/a |
| G&A allocation | - | - | - | n/a |
| Sub-total | - | - | - | n/a |
| | | | | |
| P B T | 1,745 | 877 | 868 | 99% |
| % | 20% | 13% | | |
| | | | | |
| I/C revenue | 10,234 | 9,903 | 332 | 3% |
| I/C COGS | 9,306 | 9,083 | (223) | (2%) |
| I/C margin | 929 | 820 | 109 | 13% |
| | | | | |
| I/C R&D | - | - | - | n/a |
| I/C R&D Cogs | - | - | - | n/a |
| I/C R&D margin | 0 | 0 | - | n/a |
| | | | | |
| Total I/C margin | 929 | 820 | 109 | 13% |
| | | | | |
| Total P B T | 2,673 | 1,697 | 977 | 58% |
| | | | | |
| Inventory | 7,284 | 7,947 | 663 | 8% |
| A/R | 1,763 | 1,365 | (398) | (29%) |
| Fixed assets | 16,875 | 14,056 | (2,819) | (20%) |
| A/P | (1,754) | (1,760) | (6) | 0% |
| Total capital | 24,168 | 21,608 | (2,560) | (12%) |
| | | | | |
| Return on capital | 11% | 8% | | |
| | | | | |
| Months of inventory | 13 | 26 | 12.6 | 49% |
| D S O | 57 | 95 | 38 | 40% |

*9*

7/29/97  2:01 PM
J DeTore

GEN002936

Genzyme Corporation
Pharmaceuticals Division
Liestal Total
1998 vs 1997

| OOO's of USD | Total 1998 | Total 1997 | Fav/(Unfav) | Change |
|---|---|---|---|---|
| Royalty | - | - | - | n/a |
| | | | | |
| Product revenue | 4,396 | 4,362 | 34 | 1% |
| COGS | 2,459 | 2,534 | 74 | 3% |
| STD margin | 1,937 | 1,828 | 108 | 6% |
| % | 44% | 42% | | |
| | | | | |
| OCOS | 876 | 1,118 | 242 | 22% |
| Gross margin | 1,061 | 711 | 350 | 49% |
| % | 24% | 16% | | |
| | | | | |
| R&D revenue | - | - | - | n/a |
| | | | | |
| Selling | 445 | 428 | (18) | (4%) |
| R&D | 907 | 854 | (53) | (6%) |
| Clinical/Reg | - | - | - | n/a |
| Reserves | - | - | - | n/a |
| Goodwill | - | - | - | n/a |
| Direct G&A | 1,403 | 1,178 | (225) | (19%) |
| Sub-total | 2,755 | 2,460 | (295) | (12%) |
| | | | | |
| Operating income | (1,694) | (1,749) | 55 | (3%) |
| | | | | |
| Interest expense | - | - | - | n/a |
| Other | 152 | 133 | (19) | (14%) |
| G&A allocation | - | - | - | n/a |
| Sub-total | 152 | 133 | (19) | (14%) |
| | | | | |
| P B T | (1,846) | (1,882) | 36 | (2%) |
| % | n/a | n/a | | |
| | | | | |
| I/C revenue | 3,872 | 3,355 | 517 | 15% |
| I/C COGS | 3,103 | 2,690 | (414) | (15%) |
| I/C margin | 768 | 666 | 103 | 15% |
| | | | | |
| I/C R&D | 309 | 396 | (87) | (22%) |
| I/C R&D Cogs | - | - | - | n/a |
| I/C R&D margin | 309 | 396 | (87) | (22%) |
| | | | | |
| Total I/C margin | 1,078 | 1,062 | 16 | 1% |
| | | | | |
| Total P B T | (768) | (820) | 52 | (6%) |
| | | | | |
| Inventory | 3,336 | 3,216 | (119) | (4%) |
| A/R | 1,825 | 1,433 | (392) | (27%) |
| Fixed assets | 10,896 | 10,163 | (733) | (7%) |
| A/P | (584) | (703) | (119) | 17% |
| Total capital | 15,473 | 14,109 | (1,364) | (10%) |
| | | | | |
| Return on capital | -5% | -6% | | |
| | | | | |
| Months of inventory | 13 | 8 | (4.9) | (63%) |
| D S O | 149 | 89 | (60) | (68%) |

Note: Due to Late Changes in Sales Forecasts in the US, I/CO Sales & Revenue
needed to be adjusted from the original submission.

7/29/97  1:45 PM
J DeTore

10

GEN002937

### Genzyme Corporation
Pharmaceuticals Division
Consolidated OCOS

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | 1997 Total | 1998 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | < ------- Debit/(Credit) ----------- > | | | | | | | |
| **US** | | | | | | | | | | |
| Freight & duty | 55 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 310 | 340 |
| Distribution overhead | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 88 | 88 |
| FX impact | 95 | 75 | 47 | 89 | 62 | 76 | 59 | 70 | 306 | 268 |
| sub-total US Pharma | 172 | 182 | 154 | 196 | 169 | 183 | 166 | 177 | 704 | 696 |
| | | | | | | | | | | |
| FDF freight & duty | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HA reserves | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 84 | 84 |
| HA capacity | 151 | 190 | 219 | 229 | 229 | 229 | 239 | 229 | 789 | 926 |
| Total US OCOS | 344 | 393 | 395 | 446 | 419 | 433 | 426 | 427 | 1,577 | #### |
| | | | | | | | | | | |
| **UK** | | | | | | | | | | |
| Freight | 23 | 25 | 24 | 24 | 24 | 24 | 24 | 24 | 96 | 96 |
| Purchase price | (37) | 2 | 16 | 24 | - | - | - | - | 4 | - |
| Mgt challenge | (138) | (139) | (97) | (96) | - | - | - | - | (470) | - |
| Process variances | 75 | (61) | 232 | (16) | (70) | (113) | (112) | (172) | 230 | (467) |
| Capacity | 367 | (164) | 345 | 120 | (33) | (175) | 326 | 88 | 668 | 205 |
| Shutdown | 136 | 137 | (406) | 134 | 134 | 134 | (409) | 136 | 2 | (5) |
| Y/E revaluation amort | (107) | (106) | - | - | - | - | - | - | (213) | - |
| Reserve accrual | - | 173 | 218 | 216 | 80 | 80 | 81 | 81 | 607 | 322 |
| Amortization | (49) | 259 | (202) | (107) | 93 | 137 | 58 | (136) | (99) | 152 |
| Total UK OCOS | 270 | 126 | 131 | 299 | 226 | 86 | (31) | 21 | 826 | 303 |
| | | | | | | | | | | |
| **CHF** | | | | | | | | | | |
| Efficiency/Yield | 48 | 106 | 35 | 71 | 36 | 37 | 36 | 36 | 261 | 146 |
| Dumped batches | - | - | - | - | - | - | - | - | - | - |
| Overhead variance | 59 | 75 | 49 | 50 | 72 | 74 | 73 | 73 | 233 | 292 |
| Rework | 66 | 90 | - | - | - | - | - | - | 156 | - |
| Capacity variances | 176 | 46 | 106 | 107 | 109 | 110 | 109 | 109 | 435 | 438 |
| Other | (2) | - | - | - | - | - | - | - | (2) | - |
| W/O's | - | - | - | 36 | - | - | - | - | 36 | - |
| Freight & Royalties | - | - | - | - | - | - | - | - | - | - |
| Amortization | - | - | - | - | - | - | - | - | - | - |
| Total | 347 | 317 | 190 | 264 | 217 | 221 | 219 | 219 | 1,118 | 876 |
| | | | | | | | | | | |
| Total variances | 961 | 836 | 715 | 1,009 | 863 | 739 | 615 | 668 | 3,521 | #### |

*//*

USD total, Total OCOS

GEN002938

# Genzyme Corporation
## Pharmaceuticals Division
### FDF R&D

| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | 1997 Total | 1998 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **POP** | | | | | | | | | | |
| **P&L charges** | | | | | | | | | | |
| S B S | 337 | 120 | 586 | 336 | 187 | - | - | - | 1,379 | 187 |
| Other outside testing | 63 | 14 | 500 | 336 | 215 | 111 | 206 | 355 | 913 | 887 |
| Regulatory/Clinical labor | 13 | 12 | 87 | 86 | 88 | 77 | 88 | 87 | 198 | 340 |
| Balance CC 371 | 198 | 244 | 367 | 507 | 471 | 499 | 499 | 494 | 1,316 | 1,963 |
| Other supporting CC | 144 | 417 | 552 | 628 | 785 | 896 | 753 | 803 | 1,741 | 3,237 |
| **Total POP** | 755 | 807 | 2,092 | 1,893 | 1,746 | 1,583 | 1,546 | 1,739 | 5,547 | 6,614 |
| Capitalized spending | 755 | 807 | 2,092 | 1,893 | 1,746 | 1,583 | 1,546 | 1,739 | 5,547 | 6,614 |
| **Melatonin** | | | | | | | | | | |
| Clinical costs | - | - | - | - | - | - | - | - | - | - |
| Regulatory/Clinical labor | 85 | 31 | 10 | - | - | - | - | - | 126 | - |
| CC 371 | 130 | (3) | - | - | - | - | - | - | 127 | - |
| Other supporting CC | 33 | 67 | 10 | - | - | - | - | - | 110 | - |
| Lilly license ($150 pymt, 6 yr amort) | - | - | 50 | 5 | 5 | 5 | 5 | 5 | 55 | 20 |
| **Total Melatonin** | 248 | 95 | 70 | 5 | 5 | 5 | 5 | 5 | 418 | 20 |
| **Total** | | | | | | | | | | |
| S B S | 337 | 120 | 586 | 336 | 187 | - | - | - | 1,379 | 187 |
| Other outside testing | 63 | 14 | 500 | 336 | 215 | 111 | - | - | 913 | 326 |
| Clinical costs | | | | | | | | | | |
| Regulatory/Clinical labor | 98 | 43 | 97 | 86 | 88 | 77 | 88 | 87 | 324 | 340 |
| CC 371 | 328 | 241 | 367 | 507 | 471 | 499 | 499 | 494 | 1,443 | 1,963 |
| Other supporting CC | 177 | 484 | 562 | 628 | 785 | 896 | 753 | 803 | 1,851 | 3,237 |
| Lilly license/ Liestal Peptide | - | - | 50 | 5 | 5 | 5 | 5 | 5 | 55 | 20 |
| **Total R&D investments** | 1,003 | 902 | 2,162 | 1,898 | 1,751 | 1,588 | 1,345 | 1,389 | 5,965 | 6,073 |

*[handwritten note: "if not grown"]*

USD total, R&D

7/29/97, 12:46 PM - JPV

GEN002939

# Genzyme Corporation
## Pharmaceuticals Division
### Balance Sheet Data

|  | Q1 97 | Q2 97 | Q3 97 | Q4 97 | Q1 98 | Q2 98 | Q3 98 | Q4 98 |
|---|---|---|---|---|---|---|---|---|
| **US** | | | | | | | | |
| HA FG | 729 | 696 | 1,037 | 1,234 | 1,488 | 1,715 | 1,928 | 2,121 |
| Pharma FG | 1,158 | 1,046 | 1,133 | 1,195 | 1,322 | 1,486 | 1,643 | 1,803 |
| Melatonin FG | 2,880 | 2,842 | 2,657 | 2,595 | 2,472 | 2,324 | 2,176 | 2,028 |
| Sub-total FG | 4,767 | 4,584 | 4,827 | 5,024 | 5,282 | 5,525 | 5,747 | 5,952 |
| | | | | | | | | |
| Melatonin RM | 2,931 | 2,931 | 2,931 | 2,931 | 2,931 | 2,931 | 2,931 | 2,931 |
| Pharma RM | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 |
| Sub-total RM | 3,087 | 3,087 | 3,087 | 3,087 | 3,087 | 3,087 | 3,087 | 3,087 |
| | | | | | | | | |
| General reserves | (641) | (742) | (742) | (742) | (742) | (742) | (742) | (742) |
| HA reserves | (85) | (100) | (121) | (142) | (163) | (184) | (205) | (226) |
| Sub-total reserves | (726) | (842) | (863) | (884) | (905) | (926) | (947) | (968) |
| | | | | | | | | |
| Total US inventory | 7,128 | 6,829 | 7,051 | 7,227 | 7,464 | 7,686 | 7,887 | 8,071 |
| | | | | | | | | |
| **U K** | | | | | | | | |
| Raw materials | 2,515 | 1,815 | 2,823 | 2,400 | 2,392 | 2,389 | 2,392 | 2,392 |
| WIP | 5,256 | 7,082 | 4,894 | 3,627 | 3,137 | 3,132 | 3,137 | 3,137 |
| FG | 4,009 | 4,506 | 4,032 | 4,000 | 3,987 | 3,981 | 3,987 | 3,987 |
| Variances | 113 | - | - | - | - | - | - | - |
| Reserves | (1,456) | (1,888) | (1,855) | (2,080) | (2,233) | (2,229) | (2,233) | (2,233) |
| Total UK inventory | 10,437 | 11,515 | 9,894 | 7,947 | 7,284 | 7,272 | 7,284 | 7,284 |
| | | | | | | | | |
| **CHF** | | | | | | | | |
| Raw materials | 703 | 731 | 752 | 763 | 775 | 787 | 781 | 781 |
| WIP | 923 | 932 | 958 | 972 | 1,014 | 1,029 | 1,022 | 1,022 |
| FG | 945 | 1,419 | 1,461 | 1,481 | 1,522 | 1,544 | 1,533 | 1,533 |
| Variances | - | - | - | - | - | - | - | - |
| Reserves | - | - | - | - | - | - | - | - |
| Total CHF inventory | 2,571 | 3,082 | 3,171 | 3,216 | 3,312 | 3,360 | 3,336 | 3,336 |
| | | | | | | | | |
| **Total Division** | 20,136 | 21,426 | 20,116 | 18,391 | 18,059 | 18,318 | 18,507 | 18,691 |
| | | | | | | | | |
| **Summary:** | | | | | | | | |
| Raw materials | 6,305 | 5,633 | 6,662 | 6,250 | 6,255 | 6,262 | 6,260 | 6,260 |
| W I P | 6,180 | 8,014 | 5,852 | 4,599 | 4,152 | 4,162 | 4,159 | 4,159 |
| Finished Goods | 7,652 | 7,780 | 7,602 | 7,541 | 7,653 | 7,894 | 8,088 | 8,271 |
| Total | 20,136 | 21,426 | 20,116 | 18,391 | 18,059 | 18,318 | 18,507 | 18,691 |

GEN002940

# GENZYME CORPORATION
# INTEROFFICE MEMORANDUM

To:        Distribution

From:      J. Viliesis

Date:      March 18, 1997

Subject:   February 1997 Pharmaceuticals Operating Results

## *Index*

| *Subject* | *Page* |
|---|---|
| February results | 1 |
| January & February results versus the Q1 base forecast | 2 |
| February results versus November | 3 |
| Operating commentary | 4 |
| A/R & Inventory details | 5 |
| January & February results by site | 6 |

Distribution:

| | | | |
|---|---|---|---|
| R. Barker | A. Calderbank | R. Champion | S. Cousins |
| P. Edwards | P. Hoffmann | S. Morris | G. Cox |
| T. Narwid | S. Shames | T. Slater | J. Warren |
| T. Nichols | F. Ollington | J. Charest | |

GEN003010

# Genzyme Corporation
## Pharmaceuticals Division
### February

| In US dollars | US Pharma | £ 1.627 Haverhill | CHF 1.453 Liestal | US FDF | HA | Total |
|---|---|---|---|---|---|---|
| **Royalties** | | | | | 563 | 563 |
| **Product revenues** | 591 | 203 | 28 | 1 | 299 | 1,122 |
| | | | | | | |
| **STD COGS** | 491 | 137 | 15 | 0 | 33 | 676 |
| **Standard Margin** | 100 | 67 | 12 | 0 | 267 | 446 |
| **Margin %** | 17.0% | 32.8% | 45.0% | 40.0% | 89.1% | 39.8% |
| | | | | | | |
| **OCOS** | 9 | 73 | 131 | 0 | 16 | 229 |
| **Gross Margin** | 91 | (7) | (118) | 0 | 814 | 780 |
| **Margin %** | 15.4% | (3.2%) | (430.0%) | 40.0% | 94.4% | 46.3% |
| | | | | | | |
| **R&D Revenue** | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| **OPEX:** | | | | | | |
| **Sales** | 226 | 41 | 40 | 52 | 31 | 390 |
| **R & D** | 27 | 0 | 53 | 248 | 0 | 328 |
| **Reserves (G&A)** | 0 | 0 | 0 | 0 | 0 | 0 |
| **Direct G & A** | 0 | 20 | 98 | 0 | 0 | 117 |
| **Sub-total** | 253 | 60 | 191 | 300 | 31 | 835 |
| | | | | | | |
| **Operating Income** | (162) | (67) | (309) | (300) | 783 | (55) |
| | | | | | | |
| **Other Expenses** | | | | | | |
| **Goodwill** | 31 | 0 | 0 | 0 | 0 | 31 |
| **G & A allocation** | 34 | 0 | 0 | 33 | 33 | 100 |
| **Sub-total** | 65 | 0 | 0 | 33 | 33 | 131 |
| | | | | | | |
| **PBT** | (227) | (67) | (309) | (333) | 750 | (186) |
| **% of Sales** | (38.3%) | (32.8%) | | | 250.4% | (16.5%) |

73 OOS
£25k company
45 k S/D promin

# Genzyme Corporation
## Pharmaceuticals Division
## Q1 1997 Summary

*Budget*

| In US dollars | Jan/Feb Actuals | Base Forecast | Fav/(Unfav) | Percent Achieved |
|---|---|---|---|---|
| **Royalties** | 563 | 500 | 63 | 113% |
| **Product revenues** | 2,528 | 7,342 | (4,814) | 34% |
| **STD COGS** | 1,513 | 4,526 | 3,013 | 33% |
| **Standard Margin** | 1,015 | 2,816 | (1,801) | 36% |
| Margin % | 40.2% | 38.4% | 1.8 | |
| **OCOS** | 569 | 1,025 | 456 | 56% |
| **Gross Margin** | 1,008 | 2,291 | (1,283) | 44% |
| Margin % | 32.6% | 29.2% | 3.4 | |
| **R&D revenue** | 0 | 2,000 | (2,000) | 0% |
| **OPEX:** | | | | |
| **Selling** | 651 | 964 | 313 | 67% |
| **R & D** | 708 | 1,722 | 1,014 | 41% |
| **Reserves** | 0 | 0 | 0 | 0% |
| **Direct G & A** | 204 | 338 | 134 | 60% |
| Sub-total | 1,563 | 3,024 | 1,461 | 52% |
| **Operating Income** | (554) | 1,267 | (1,821) | (44%) |
| **Other Expenses** | | | | |
| **Goodwill Amort** | 63 | 115 | 52 | 54% |
| **Imputed Interest** | 0 | 0 | 0 | n/a |
| **G & A allocation** | 200 | 300 | 100 | 67% |
| Sub-total | 263 | 415 | 152 | 63% |
| **PBT** | (817) | 852 | (1,669) | (96%) |
| % of Sales | (26.4%) | 10.9% | 37.3 | |
| **Inventory** | 21,078 | 21,073 | (5) | (0%) |
| **A/R** | 4,024 | 6,265 | 2,241 | 36% |
| Total W Capital | 25,102 | 27,338 | 2,236 | 8% |
| **Return on W Capital** | (3.3%) | 3.1% | -6.4 | |
| **Months of Inventory** | 10.5 | 10.7 | 0.2 | 2% |
| **DSO** | 67 | 72 | 5.0 | 7% |

GEN003012

# Genzyme Corporation
## Pharmaceuticals Division
## Monthly Comparisons

| In US dollars | February Actuals | November Actuals | F/<U> | Percent Change |
|---|---|---|---|---|
| Royalties | 563 | 544 | 19 | 3% |
| Product revenues | 1,122 | 527 | 595 | 113% |
| STD COGS | 676 | 367 | (309) | (84%) |
| Standard Margin | 446 | 160 | 286 | 179% |
| Margin % | 39.8% | 30.4% | 9.4 | |
| OCOS | 229 | 19 | (210) | (1111%) |
| Gross Margin | 780 | 685 | 95 | 14% |
| Margin % | 46.3% | 64.0% | -17.7 | |
| R&D revenue | 0 | 0 | 0 | 100% |
| OPEX: | | | | |
| Selling | 390 | 355 | (35) | (10%) |
| R & D | 328 | 278 | (50) | (18%) |
| Reserves | 0 | 0 | 0 | (100%) |
| Direct G & A | 117 | 106 | (11) | (11%) |
| Sub-total | 835 | 739 | (96) | (13%) |
| Operating income | (55) | (54) | (1) | 2% |
| Other Expenses | | | | |
| Goodwill Amort | 31 | 35 | 4 | 13% |
| G & A allocation | 100 | 80 | (20) | (25%) |
| Sub-total | 131 | 115 | (16) | (14%) |
| PBT | (186) | (169) | (17) | 10% |
| % of Sales | (11.0%) | (15.8%) | 4.8 | |
| Inventory | 21,078 | 21,635 | 557 | 3% |
| A/R | 4,024 | 2,881 | (1,143) | (40%) |
| Total W Capital | 25,102 | 24,516 | (586) | (2%) |
| Return on W Capital | (0.7%) | (0.7%) | -0.1 | |
| Monthly Inv T/O | 10.5 | 7.5 | -3.0 | (40%) |
| DSO | 67 | 66 | -1 | (2%) |

Q1 1997  P&L's

GEN003013

## GENZYME CORPORATION
Pharmaceuticals Division
February 1997 Operating Commentary

1.  Pharmaceuticals revenue for February was $1,685 compared to $1,071 in November, an increase of 57%.  This is due to increased volume of HA powder sales to Alcon (from $6 to $299) and US Clindamycin (from $5 to $328).

2.  HA royalty income was $563, an increase of $21 from November.

3.  Bulk Melatonin revenue for February was $32 versus ($30) in November, a change of $62.  There were virtually no Melatonin FDF sales.

4.  Margins on the pharmaceutical product group were (8%), versus a 29% margin in November.  A two week plant shut-down for maintenance in Liestal cost $131 and there was a mix of unfavorable manufacturing variances of $73 in Haverhill.  Without the plant shut-down cost, margins would have been 9%.  Margins were also depressed due to selling US Clindamycin at an ASP of $1,571 versus a standard cost of $1,734.  If sales were at cost, margins would have been raised by $34 or 4%

5.  Selling expenses were $35 higher than November due to the annual sales meeting.

6.  R&D expenses were $50 higher due to a continued program ramp-up of efforts at SBS in support of the Peptide Oncology Program.

7.  The loss before tax is $186 versus a loss of $169 in November.

8.  Inventory increased $557 to $21,078 or 3% when compared to November.  Finished goods inventory in Haverhill increased in preparation for large product shipments in March.

9.  In February the DSO stood at 67 days versus 66 days in November.

**GENZYME CORPORATION**
Pharmaceuticals Division
Balance Sheet Stats

|  |  | Q3 1996 | Oct-96 | Nov-96 | Q4 1996 | Jan-97 | Feb-97 |
|---|---|---|---|---|---|---|---|
| **Accounts Receivable:** |  |  |  |  |  |  |  |
| US |  | 3,605 | 3,131 | 1,595 | 3,722 | 3,700 | 2,342 |
| Haverhill |  | 964 | 1,128 | 333 | 2,755 | 1,370 | 864 |
| Liestal |  | 997 | 948 | 953 | 1,047 | 1,018 | 819 |
|  | Total | 5,566 | 5,207 | 2,881 | 7,524 | 6,088 | 4,024 |
|  |  |  |  |  |  |  |  |
| DSO |  | 73 | 76 | 66 | 86 | 55 | 67 |
|  |  |  |  |  |  |  |  |
| **Inventory:** |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
| **U S :** |  |  |  |  |  |  |  |
| HA Powder FG |  | 493 | 534 | 651 | 600 | 704 | 774 |
| HA Reserves |  | (214) | (229) | (244) | (100) | (107) | (116) |
| Pharma/FC/FDF FG |  | 936 | 399 | 855 | 2,176 | 1,682 | 1,320 |
| Reserves |  | 0 | 0 | 0 | (26) | (26) | 0 |
| Melatonin RM |  | 0 | 0 | 2,837 | 2,580 | 2,580 | 2,580 |
| Melatonin FG |  | 1,168 | 1,937 | 587 | 2,234 | 2,225 | 2,195 |
|  |  | 2,383 | 2,641 | 4,686 | 7,464 | 7,058 | 6,753 |
|  |  |  |  |  |  |  |  |
| **U K:** |  |  |  |  |  |  |  |
| RM |  | 4,077 | 4,021 | 2,636 | 2,516 | 2,233 | 2,340 |
| W I P |  | 7,662 | 8,263 | 7,194 | 5,740 | 5,726 | 5,793 |
| FG |  | 2,625 | 3,323 | 5,527 | 2,946 | 3,222 | 4,732 |
| Reserves/Variances |  | (2,003) | (1,569) | (1,418) | (1,224) | (1,145) | (1,286) |
| Sub-total |  | 12,360 | 14,039 | 13,940 | 9,977 | 10,036 | 11,579 |
|  |  |  |  |  |  |  |  |
| Sygena: |  |  |  |  |  |  |  |
| Total inventory |  | 2,608 | 2,941 | 3,009 | 2,473 | 2,537 | 2,746 |
|  |  |  |  |  |  |  |  |
| **Total Inventory** |  | 17,352 | 19,621 | 21,635 | 19,914 | 19,631 | 21,078 |

*RB to explain* (handwritten, near UK FG)

*— AAD — to start (cream bottle)* (handwritten)

**Ge...me Corporation**
**Pharmaceuticals Division**
**Q1 1997**

*(January + February Actuals vs the Q1 Base Forecast)*

| In US dollars | U.S. Pharma | | | U.K. | | | Sygena | | | F D F | | | HA Powder | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actuals | 1/21/97 Forecast | % | 1,598 Actuals | 1/21/97 Forecast | % | 1,415 Actuals | 1/21/97 Forecast | % | Actuals | 1/21/97 Forecast | % | Actuals | 1/21/97 Forecast | % |
| **Royalties** | 0 | 0 | | 0 | | | 0 | | | 0 | 0 | 0% | 563 | 500 | 113% |
| **Product revenues** | 1,372 | 2,947 | 47% | 625 | 1,895 | 33% | 221 | 1,222 | 18% | 1 | 468 | 0% | 309 | 810 | 38% |
| **STD COGS** | 1,063 | 2,235 | 48% | 298 | 1,141 | 26% | 119 | 789 | 15% | 1 | 272 | 0% | 34 | 89 | 38% |
| **Standard Margin** | 310 | 712 | 43% | 327 | 754 | 43% | 102 | 433 | 24% | | 196 | | 276 | 721 | 38% |
| **Margin %** | 22.8% | 24.2% | | 52.4% | 39.8% | | 46.3% | 35.4% | | 54.5% | 41.9% | | 89.1% | 89.0% | |
| **COGS** | 31 | 282 | 11% | 281 | 160 | 175% | 233 | 487 | 48% | 0 | 4 | 0% | 24 | 92 | 26% |
| **Gross Margin** | 278 | 430 | 65% | 47 | 594 | 8% | (131) | (54) | 243% | 1 | 192 | 0% | 814 | 1,129 | 72% |
| **Margin %** | 20.3% | 14.6% | | 7.5% | 31.3% | | (59.5%) | (4.4%) | | 54.5% | 41.0% | | 93.4% | 86.2% | |
| **R&D Revenue** | | | | | | | | | | 0 | 2,000 | | | | |
| **OPEX:** | | | | | | | | | | | | | | | |
| Sales | 329 | 410 | 80% | 90 | 208 | 43% | 65 | 97 | 67% | 104 | 156 | 67% | 62 | 93 | 67% |
| R & D | 57 | 60 | 95% | 0 | 0 | n/a | 118 | 113 | 105% | 533 | 1,549 | 34% | 0 | 0 | n/a |
| Reserves (G&A) | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| Direct G & A | 0 | 0 | n/a | 39 | 54 | 73% | 165 | 284 | 58% | 0 | 0 | n/a | 0 | 0 | n/a |
| Sub-total | 386 | 470 | 82% | 130 | 262 | 50% | 348 | 494 | 70% | 637 | 1,705 | 37% | 62 | 93 | 67% |
| **Operating Income** | (108) | (40) | 269% | (83) | 332 | (25%) | (479) | (548) | 87% | (636) | 487 | (131%) | 752 | 1,036 | 73% |
| **Other Expenses** | | | | | | | | | | | | | | | |
| Goodwill | 63 | 115 | 54% | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| Interest | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| FX | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| G & A allocation | 68 | 100 | 68% | 0 | 0 | | 0 | 0 | | 66 | 100 | 66% | 66 | 100 | 66% |
| Sub-total | 131 | 215 | 61% | 0 | 0 | | 0 | 0 | | 66 | 100 | 66% | 66 | 100 | 66% |
| **PBT** | (238) | (255) | 93% | (83) | 332 | (25%) | (479) | (548) | 87% | (702) | 387 | (181%) | 686 | 936 | 73% |
| **% of Sales** | (17.4%) | (8.7%) | | (13.3%) | 17.5% | | (217.1%) | (44.8%) | | ######## | 82.7% | | 221.8% | 115.6% | |

*double counts in mis coding*

# GENZYME CORPORATION
# INTEROFFICE MEMORANDUM

To:        Distribution

From:      J. Viliesis

Date:      August 15, 1996

Subject:   July Pharmaceuticals Operating Results

## *Index*

| *Subject* | *Page* |
|---|---|
| Operating commentary | 1 |
| July results versus April results | 2 |
| July results versus forecast | 3 |
| July results by site versus forecast | 4 |
| Margin summary | 5 |

Distribution:

| | | | |
|---|---|---|---|
| R. Barker | A. Calderbank | R. Champion | S. Cousins |
| P. Edwards | P. Hoffmann | H. Immer | S. Morris |
| T. Narwid | T. Newton | S. Shames | T. Slater |
| U. Sommer | M. Roe | R. Wandeler | A. Walts |
| J. Warren | G. Cox | CW Yong | T. Ingallerina |
| G. Malenfant | C. Jackson | | |

GEN003075

# GENZYME CORPORATION
Pharmaceuticals Division
July 1996 Operating Commentary

1. Pharmaceuticals revenue for July was $1,695 compared to $2,638 in April, a decrease of 36%. This decrease is due to reduced volume and ASP of bulk US Melatonin sales.

2. Melatonin sales decreased 84% (from $1,427 to $234) due to a full product pipeline and competitive pressures. 70 Kgs were sold during the month versus 319 Kgs in April. The ASP decreased from $4,500/Kg in April to $3,300/Kg in July.

3. However, Melatonin margins remained constant at 77% due to the introduction of a new manufacturing process which has increased yields and decreased processing time. Melatonin generated 26% of the division's margin for the month ($181 out of a total $709).

4. Alcon powder product sales total $345 with a 58% margin versus $253 in sales in April with a 75% margin. July results include an accounting error of $40 that will be reversed in August.

5. Margins on the pharmaceutical product group were 29%, versus a 3% margin in April. The product mix has changed. No zero margin products (such as 5-CO and Clindamycin) were sold during the month. However, reserves were taken for $180 of Haverhill inventory. Five products have batches that can not be reworked.

6. Operating expenses (exclusive of reserves) had no significant changes at the $520 per month level.

7. During July no reserves were booked for excess inventory due to potential changes in Melatonin market conditions . A reserve of $170 was booked in April. A cumulative reserve of $2,707 has been deemed adequate.

8. Contribution before tax is $25 versus pretax profit of $505 in April. This decrease is due to reduced Melatonin sales.

9. Inventory increased $135 to $15,806 or 1% when compared to April.

10. In July the DSO stood at 67 days versus 43 days in April. In the US Melatonin market, our customers are delaying payment. Two accounts have been forwarded to a collection agency for collection.

\

# Genzyme Corporation
## Pharmaceuticals Division
## Monthly Comparisons

| In US dollars | July Actuals | April Actuals | F/<U> | Percent Change |
|---|---|---|---|---|
| **Royalties** | 0 | 0 | 0 | #DIV/0! |
| **Product revenues** | 1,695 | 2,638 | (943) | (36%) |
| **STD COGS** | 1,031 | 1,322 | 291 | 22% |
| **Standard Margin** | 664 | 1,317 | (653) | (50%) |
| Margin % | 39.2% | 49.9% | -10.7 | |
| **OCOS** | (45) | (15) | 31 | (207%) |
| **Gross Margin** | 709 | 1,331 | (622) | (47%) |
| Margin % | 41.8% | 50.5% | -8.6 | |
| **OPEX:** | | | | |
| **Selling** | 180 | 299 | 119 | 40% |
| **R & D** | 209 | 88 | (121) | (138%) |
| **Reserves (G&A 12%)** | 0 | 170 | 170 | 100% |
| **Direct G & A** | 138 | 115 | (23) | (20%) |
| Sub-total | 528 | 672 | 144 | 21% |
| **Operating income** | 182 | 660 | (478) | (72%) |
| **Other Expenses** | | | | |
| **Goodwill Amort** | 36 | 37 | 0 | 1% |
| **Imputed Int/Ipswich** | 40 | 38 | (2) | (5%) |
| **G & A allocation** | 80 | 80 | 0 | 0% |
| Sub-total | 157 | 155 | (2) | (1%) |
| **PBT** | 25 | 505 | (480) | (95%) |
| % of Sales | 1.5% | 19.1% | -17.7 | |
| **Inventory** | 15,806 | 15,941 | 135 | 1% |
| **A/R** | 6,931 | 5,461 | (1,470) | (27%) |
| Total W Capital | 22,738 | 21,402 | (1,336) | (6%) |
| **Return on W Capital** | 0.1% | 2.4% | -2.2 | |
| **Monthly Inv T/O** | 7.7 | 6.2 | -1.5 | (25%) |
| **DSO** | 67 | 43 | -24 | (56%) |

8/15/96, 4:56 PM

Q3 P&L's copy 1.1

GEN003077

# Genzyme Corporation
## Pharmaceuticals Division
## July Summary

| In US dollars | July Actuals | 25-Jul-96 Q3 Forecast | Balance Remaining | Percent Achieved |
|---|---|---|---|---|
| Royalties | 0 | 400 | (400) | 0% |
| Product revenues | 1,695 | 7,621 | (5,926) | 22% |
| STD COGS | 1,031 | 4,534 | 3,503 | 23% |
| Standard Margin | 664 | 3,087 | (2,423) | 22% |
| Margin % | 39.2% | 40.5% | 40.9% | |
| OCOS | (45) | (746) | (701) | 6% |
| Gross Margin | 709 | 4,233 | (3,524) | 17% |
| Margin % | 41.8% | 52.8% | -10.9 | |
| R&D revenue | 0 | 2,500 | (2,500) | 0% |
| OPEX: | | | | |
| Selling | 180 | 1,071 | 891 | 17% |
| R & D | 209 | 1,061 | 852 | 20% |
| Reserves | 0 | 1,500 | 1,500 | 0% |
| Direct G & A | 138 | 372 | 234 | 37% |
| Sub-total | 528 | 4,004 | 3,476 | 13% |
| Operating income | 182 | 2,729 | (2,547) | 7% |
| Other Expenses | | | | |
| Goodwill Amort | 36 | 115 | 79 | 31% |
| Imputed Interest | 40 | (400) | (440) | (10%) |
| G & A allocation | 80 | 241 | 161 | 33% |
| Sub-total | 157 | (44) | (201) | (356%) |
| PBT | 25 | 2,773 | (2,748) | 1% |
| % of Sales | 1.5% | 34.6% | -33.1 | |

| | | | | |
|---|---|---|---|---|
| Inventory | 15,806 | 15,756 | (50) | (0%) |
| A/R | 6,931 | 5,803 | (1,128) | (19%) |
| Total W Capital | 22,738 | 21,559 | (1,179) | (5%) |
| Return on W Capital | 0.1% | 12.9% | -12.8 | |
| Months of Inventory | 7.7 | 8.3 | 0.6 | 7% |
| DSO | 67 | 65 | -2 | (3%) |

*3*

**Genzyme Corporation**
Pharmaceuticals Division
Q2 1996

| In US dollars | U.S. Pharma Actuals | 7/25/96 Forecast | % | U.K. 0.515 Actuals | 7/25/96 Forecast | % | Sygena 0.477 Actuals | 7/25/96 Forecast | % | F D F Actuals | 7/25/96 Forecast | % | HA Powder Actuals | 7/25/96 Forecast | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Royalties | 0 | 0 | 0% | 0 | 0 | | | | | 0 | 0 | 0% | 0 | 400 | 0% |
| Product revenues | 419 | 3,693 | 11% | 490 | 1,276 | 38% | 441 | 748 | 59% | 0 | 734 | 0% | 345 | 1,170 | 29% |
| STD COGS | 234 | 2,803 | 8% | 433 | 829 | 52% | 309 | 458 | 67% | 0 | 257 | 0% | 56 | 187 | 30% |
| Standard Margin | 185 | 890 | 21% | 57 | 447 | 13% | 132 | 290 | 46% | 0 | 477 | 0% | 289 | 983 | 29% |
| Margin % | 44.2% | 24.1% | | 11.7% | 35.0% | | 30.0% | 38.8% | | #DIV/0! | 65.0% | | 83.8% | 84.0% | |
| COGS | 40 | 75 | 53% | (363) | (1,145) | 32% | 179 | 306 | 58% | 11 | 35 | 31% | 88 | (17) | (518%) |
| Gross Margin | 145 | 815 | 18% | 420 | 1,592 | 26% | (46) | (16) | 289% | (11) | 442 | (2%) | 201 | 1,400 | 14% |
| Margin % | 34.7% | 22.1% | | 85.8% | 124.8% | | (10.5%) | (2.1%) | | #DIV/0! | 60.2% | | 58.3% | 89.2% | |
| R&D Revenue | | | | | | | | | | 0 | 2,500 | 0% | | | |
| **OPEX:** | | | | | | | | | | | | | | | |
| Sales | 131 | 855 | 15% | 36 | 140 | 25% | 14 | 76 | 18% | 0 | 0 | n/a | 0 | 0 | n/a |
| R & D | 49 | 357 | 14% | 0 | 0 | n/a | 76 | 169 | 45% | 84 | 420 | 20% | 0 | 115 | 0% |
| Reserves (G&A) | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 1,500 | 0% | 0 | 0 | n/a |
| Direct G & A | 0 | 0 | n/a | 31 | 78 | 40% | 107 | 294 | 36% | 0 | 0 | n/a | 0 | 0 | n/a |
| Sub-total | 180 | 1,212 | 15% | 66 | 218 | 30% | 197 | 539 | 37% | 84 | 1,920 | 4% | 0 | 115 | 0% |
| Operating income | (35) | (397) | 9% | 354 | 1,374 | 26% | (244) | (555) | 44% | (95) | 1,022 | (9%) | 201 | 1,285 | 16% |
| **Other Expenses** | | | | | | | | | | | | | | | |
| Goodwill | 36 | 115 | 31% | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| Interest | 40 | (400) | (10%) | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| FX | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| G & A allocation | 80 | 241 | 33% | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a | 0 | 0 | n/a |
| Sub-total | 157 | (44) | (356%) | 0 | 0 | | 0 | 0 | | 0 | 0 | | 0 | 0 | |
| PBT | (191) | (353) | 54% | 354 | 1,374 | 26% | (244) | (555) | 44% | (95) | 1,022 | (9%) | 201 | 1,285 | 16% |
| % of Sales | (45.6%) | (9.6%) | | 72.2% | 107.7% | | (55.2%) | (74.2%) | | #DIV/0! | 139.2% | | 58.3% | 109.8% | |

8/12/96, 2:53 PM

Q3 P&L's

GEN003079

**GENZYME CORPORATION**
Pharmaceuticals Division
Revenue and Margin Summary
(in thousands of USD)

| April | Melatonin | Alcon Product | Alcon Royalty | FDF | Other Pharma | Division Total | Melatonin | Alcon Product | Alcon Royalty | FDF | Other Pharma | Division Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | < ------ Percentage of Total Division ------> | | | | |
| Kg | 319 | | | | | | | | | | | |
| Revenue | $1,427 | $253 | $0 | | $958 | $2,638 | 54% | 10% | 0% | | 36% | 100% |
| Gross Margin | $1,108 | $191 | $0 | | $32 | $1,331 | 83% | 14% | 0% | | 2% | 100% |
| % | 78% | 75% | #DIV/0! | | 3% | 50% | | | | | | |

| July | Melatonin | Alcon Product | Alcon Royalty | FDF | Other Pharma | Division Total | Melatonin | Alcon Product | Alcon Royalty | FDF | Other Pharma | Division Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | < ------ Percentage of Total Division ------> | | | | |
| Kg | 70 | | | | | | | | | | | |
| Revenue | $234 | $345 | $0 | $39 | $1,077 | $1,695 | 14% | 20% | 0% | 2% | 64% | 100% |
| Gross Margin | $181 | $201 | $0 | $16 | $311 | $709 | 26% | 28% | 0% | | 44% | 100% |
| % | 77% | 58% | #DIV/0! | 41% | 29% | 42% | | | | | | |



WB - Melatonin & 95 P&Ls

GEN003080

|                        |       | Mar-96 | Apr-96 | May-96 | Jun-96 | Jul-96 |
|------------------------|-------|--------|--------|--------|--------|--------|
| **Accounts Receivable:** |       |        |        |        |        |        |
| US                     |       | 6,966  | 4,532  | 3,792  | 5,590  | 4,976  |
| Haverhill              |       | 981    | 520    | 764    | 1,485  | 1,260  |
| Liestal                |       | 523    | 409    | 527    | 964    | 695    |
|                        | Total | 8,470  | 5,461  | 5,084  | 8,039  | 6,931  |
| **Sales:**             |       |        |        |        |        |        |
| US                     |       | 5,577  | 2,344  | 2,275  | 3,062  | 764    |
| Haverhill              |       | 446    | 152    | 508    | 898    | 490    |
| Liestal                |       | 336    | 143    | 416    | 584    | 441    |
|                        | Total | 6,359  | 2,639  | 3,199  | 4,544  | 1,695  |
| DSO                    |       | 39     | 43     | 51     | 64     | 67     |
| **Inventory:**         |       |        |        |        |        |        |
| **U S :**              |       |        |        |        |        |        |
| HA Powder              |       | 612    | 725    | 695    | 704    | 714    |
| HA Reserves            |       | (692)  | (665)  | (665)  | (551)  | (593)  |
| Haverhill              |       | 2,937  | 3,872  | 5,267  | 637    | 558    |
| Clinda Reserves        |       |        | (447)  | (447)  | (410)  | (410)  |
| Melatonin              |       | 0      | 0      | 0      | 3,673  | 3,593  |
|                        | F G   | 2,857  | 3,485  | 4,850  | 4,053  | 3,862  |
| **U K:**               |       |        |        |        |        |        |
| RM                     |       | 3,554  | 3,873  | 2,684  | 2,812  | 2,949  |
| W I P                  |       | 4,767  | 3,843  | 5,745  | 6,404  | 6,196  |
| F G                    |       | 4,153  | 2,416  | 2,948  | 3,166  | 2,949  |
| Res                    |       | (2,912)| (733)  | (2,913)| (3,548)| (3,185)|
| Sub-total              |       | 9,563  | 9,399  | 8,463  | 8,834  | 8,909  |
| **Sygena:**            |       |        |        |        |        |        |
| RM                     |       | 2,663  | 3,057  | 2,968  | 2,756  | 3,036  |
| W I P                  |       | 0      | 0      | 0      | 0      | 0      |
| F G                    |       | 0      | 0      | 0      | 0      | 0      |
| Sub-total              |       | 2,663  | 3,057  | 2,968  | 2,756  | 3,036  |
| Total Inventory        |       | 15,083 | 15,941 | 16,281 | 15,643 | 15,806 |
| C O G S                |       | 4,228  | 1,307  | 1,484  | 2,116  | 986    |
| Months of inventory    |       | 6.3    | 6.2    | 5.4    | 7.1    | 7.7    |

|                    | Mar-96    | Apr-96    | May-96    | Jun-96    | Jul-96    |
|--------------------|-----------|-----------|-----------|-----------|-----------|

/ / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / / /

**INPUT FIELDS:**

|                    | Mar-96    | Apr-96    | May-96    | Jun-96    | Jul-96    |
|--------------------|-----------|-----------|-----------|-----------|-----------|
| UK M/E FX rate:    | £ 1.5277  | £ 1.5083  | £ 1.5505  | £ 1.5520  | £ 1.5561  |
| Sygena M/E FX:     | F 1.1911  | F 1.2440  | F 1.2495  | F 1.2530  | F 1.1976  |
| U K:               |           |           |           |           |           |
| RM                 | £ 2,327   | £ 2,568   | £ 1,731   | £ 1,812   | £ 1,895   |
| W I P              | £ 3,121   | £ 2,548   | £ 3,705   | £ 4,126   | £ 3,982   |
| F G                | £ 2,719   | £ 1,602   | £ 1,901   | £ 2,040   | £ 1,895   |
| Variances          | £ 288     | £ 0       | (£ 944)   | (£ 1,175) | (£ 747)   |
| Reserves           | (£ 2,194) | (£ 486)   | (£ 935)   | (£ 1,111) | (£ 1,300) |
| Sub-total          | £ 6,260   | £ 6,232   | £ 5,458   | £ 5,692   | £ 5,725   |
| Clinda             | £ 0       | £ 0       | £ 0       | £ 0       | £ 0       |
| Melatonin          | £ 0       | £ 0       | £ 0       | £ 0       | £ 0       |
| Sygena:            |           |           |           |           |           |
| RM                 | F 0       | F 0       | F 0       | F 0       | F 0       |
| W I P              | F 0       | F 0       | F 0       | F 0       | F 0       |
| F G                | F 0       | F 0       | F 0       | F 0       | F 0       |
| Sub-total          | F 3,172   | F 3,803   | F 3,709   | F 3,453   | F 3,636   |
| Sygena A/R         | F 623     | F 509     | F 659     | F 1,208   | F 832     |
| UK A/R             | £ 642     | £ 345     | £ 493     | £ 957     | £ 810     |

## Genzyme Corp
Pharmaceutica
YTD 1996

FX    1.5284    1.1949

| In US dollars | Total Division | | | US | Haverhill in BPS | Sygena S. Francs | Sygena S. Francs |
| | Actuals | 4/30/96 Forecast | % | Proof Totals | Actuals | Actuals | Y/E Adj |
|---|---|---|---|---|---|---|---|
| **Royalties** | 956 | 0 | n/a | 956 | 0 | 0 | F 0 |
| **Product revenues** | 29,002 | 0 | n/a | 23,448 | £2,253 | F 2,591 | F 0 |
| | | | | | | | |
| STD COGS | 13,823 | 0 | n/a | 10,107 | £1,630 | F 1,503 | F 0 |
| **Standard Margin** | 15,178 | 0 | n/a | 13,341 | £823 | F 1,087 | F 0 |
| **Margin %** | 52.3% | #DIV/0! | n/a | 56.9% | 27.7% | 42.0% | #DIV/0! |
| | | | | MC 4 | | | |
| OCOS | 873 | 0 | n/a | 1,408 | (£960) | (F 261) | F 0 |
| **Gross Margin** | 15,262 | 0 | n/a | 12,885 | £1,583 | F 1,348 | F 0 |
| **Margin %** | 50.9% | #DIV/0! | n/a | 55.0% | 70.3% | (10.1%) | #DIV/0! |
| | | | | | | | |
| **R&D revenue** | 0 | 0 | n/a | 0 | 0 | 0 | F 0 |
| | | | | | | | |
| **OPEX:** | | | | | | | |
| Sales | 2,367 | 0 | n/a | 1,952 | £177 | F 166 | F 0 |
| R & D | 1,167 | 0 | n/a | 679 | £2 | F 590 | F 0 |
| Reserves (G&A) | 1,476 | 0 | n/a | 1,476 | £0 | F 0 | F 0 |
| Direct G & A | 844 | 0 | n/a | 0 | £130 | F 792 | F 0 |
| **Sub-total** | 5,854 | 0 | n/a | 4,107 | £309 | F 1,548 | F 0 |
| | | | | | | | |
| **Operating income** | 9,408 | 0 | n/a | 8,778 | £1,274 | (F 1,809) | F 0 |
| | | | | | | | |
| **Other Expenses** | | | | | | | |
| Goodwill | 255 | 0 | n/a | 255 | £0 | (F 28) | F 0 |
| Interest | 269 | 0 | n/a | 269 | £0 | F 60 | F 0 |
| FX | 0 | 0 | n/a | 0 | £0 | F 23 | F 0 |
| G & A allocation | 562 | 0 | n/a | 562 | £0 | F 70 | F 0 |
| **Sub-total** | 1,086 | 0 | n/a | 1,086 | £0 | F 125 | F 0 |
| | | | | | | | |
| **PBT** | 8,322 | 0 | n/a | 7,692 | £1,274 | (F 1,933) | F 0 |
| **% of Sales** | 28.7% | n/a | | 32.8% | 56.5% | (74.6%) | #DIV/0! |

| | Haverhill | Sygena | Sygena |
|---|---|---|---|
| I/C Product Sales | £8,271 | F 1,918 | F 0 |
| I/C COGS | £7,925 | F 1,575 | F 0 |
| I/C Product Margin | £346 | F 343 | F 0 |
| % | 4.2% | 17.9% | #DIV/0! |
| | | | |
| I/C R&D Sales | £0 | F 237 | F 0 |
| I/C COGS | £0 | F 0 | F 0 |
| I/C R&D Margin | #DIV/0! | F 237 | F 0 |
| % | £346 | 100.0% | #DIV/0! |
| | | | |
| Total I/C Margin | £346 | F 580 | F 0 |
| | | | |
| Total PBT | £1,620 | (F 1,354) | F 0 |

GEN003083

**EXHIBIT 1b**

## MINUTES/ACTIONS FROM THE PROGRAM REVIEW MEETING HELD ON 11TH JUNE 1996 AT KENDALL SQUARE

**Present:** S Cousins, D Clennell, A J Newton, R Barker, U Sommer, T Slater, H Immer, C Jackson, R Wandeler, R Champion, N Isaacs, Sue Stewart, C Greve-Philips (in part)

**c.c:** A Walts, T Narwid, R Sparrow, S Shames, P Edwards

---

### MELATONIN

1. **Sales/Marketing**

   Price pressure is now severe and product is being offered at $2950/kg. Russian material now available at $2500/kg.

   | | | |
   |---|---|---|
   | Melatonin sales Q1 | | $12.5M |
   | Forecast | Q2 | $3.34M |
   | Budget | Q2 | $3.74M |

   **USA**

   Pipeline now full but retail sales are reported to be good. Marketing plans for the introduction of DR (delayed release product) were shown.

   **R.O.W.**

   Beginning to see the development of FDF business starting with HK/Singapore. Bulk sales in small quantities are ongoing. Have a registration package in place to support dosage form business which includes free sale certificate.

   Estimated quarterly sales was 800-1000kg for US market with an equal potential in R.O.W. - once established. Unable to estimate bulk tablet or bottle sales at this time.

2. **Costs**

   Presentation given on cost of production of the Melatonin bulk, with the implementation of the new process for stage 1. Cost of Melatonin bulk now at $963/kg (old standard $\geq$ $1400). This breaks down as follows :

   | | |
   |---|---|
   | Stage 1 | $659 |
   | Stage II | $187 |
   | Stage III | $137 (Standard) |
   | | $963 |

- 2 -

Out of this total cost 60% is represented by R.M.  Suggested that we should continue to look at stage 1 where we have the majority of the costs.  The yield is now consistent at ~50% but I feel that we have a considerable opportunity to increase the yield.  This is particularly important as it is believed that we will continue to come under price pressure during this year and we must remain competitive.

3.    **Production**
      Need to discuss the prioritisation of this R & D work.        - HI/next week

3.1   Future production of Melatonin at Sygena should be in campaigns.  <u>US</u> to propose dates when this would fit the Sygena production schedule. **CBJ/US**

3.2   Aim to maintain stock levels at 2000kg of Bulk Melatonin.

      Should put stage II on stability to assess storage conditions  should we need to keep a bulk supply of this intermediate prior to shipment and conversion to stage III.                                                      **CBJ**

3.3   <u>Second Crops</u>
      •   Plans for next batch to be discussed with DC                        **US**
      •   Manufacturing procedure needs to be completed.              **US**
      •   Analytical validation needs to be complete before a
          release date can be agreed - projected to be end of
          June.                                                                        **CBJ**
      •   Suggested that stability studies and impurity profile
          of these batches needs to be completed.  Is this
          correct?                                                                    **CBJ**

4.    **Dosage Form**
      As this business begins to develop, the proposal was that we should look at the possibility of installing a GMP tabletting line at Haverhill for bulk tablets - suggested that packaging would still be carried out under contract.  Should look at cost/benefit of doing tabletting in-house.   **RB**

5.    **Quality**

5.1   <u>USP Monograph</u>
      •   Awaiting analytical validation                                          **CBJ**
      •   Does a USP monograph assume GMP standards                  **DC**
      •   What are the pros/cons of compiling this                         **DC to**
                                                                              **follow up with TI**

- 3 -

5.2  **GMP**
- Statements are needed to support the sales function       **DC**
- Package of information that describes the benefits of
  GMP production standards to be compiled to assist
  sales group in explaining this to the Melatonin purchasers.
  Generally, these purchasing people are not familiar with
  GMP concepts.                                             **DC**
                                                    **by end of June**
- GMP training course to be arranged for the sales group   **TBA**

5.3  **DMF**
IND support Neurim's work/Genzyme
- supply agreement with Neurim required                     **RS**
  (Post meeting note: this is now in final stages of negotiation)

**At Sygena**
- IKS - Validation master plan needed by the end of June   **RW**
- Action plan presented by RW
- To follow this will be the timetable for GMP production
  of Melatonin.

5.4  **Raw Materials**
- Have commitment for 10 tonnes of Acetal, which is agreed
  to be held by supplier (Ajinomoto).
- Also commitment for 45 tonnes of PMPH.  Agreed rate of
  take off 5 tonne/Q 1996. 4 tonne/Q 1997, 1998.
  (Post meeting note: this is under negotiation to reduce total off
  take commitment to 30 tonne).                            **CBJ**

5.5  Yields and quality of all stages are within the limits expected and
are remarkably consistent.

6.  **Traded Melatonin**
Concern over trading Melatonin was raised on two main points :-

(i)   We can make more than enough in-house
(ii)  Quality of traded Melatonin and Melapure™ trademark.

The argument for trading material was security of supply.  This could be
addressed by :

a)   Have Sygena make all 3 stages
b)   Get contract manufacturer to make stage 2

- 4 -

<u>Traded Melatonin</u>  (Cont'd./....)

Agreed that this wasn't an area of immediate action with the current inventory position;  that we should take the next 3 lots of Helsinn material @ 20kg/month, but not commit to any additional orders.

- Helsinn material should only be supplied to <u>NON</u> MelaPure customers.

## <u>HEMA-PC</u>

### <u>Current Production</u>

- Projected that 2 more batches will be completed before the end of Q2 (50 and 51) giving a forecast of 30kg.
- In addition, 13kg have been sampled to Biocompatibles and the results are awaited.
- Forecast for Q3 is 90kg i.e. 6 batches.

### <u>Raw Materials</u>

- 100kg of CCP have been obtained (ex Fluka)
- In addition 200kg CCP are on order - delivery dates to be confirmed.                                                    **US**

All above CCP ≡ 200kg.  HEMA-PC at the standard yield.  Should be enough for 1996!

- Meeting with Biocompatible on technical issues arranged for 13th June.

(Post meeting note: This was an important meeting that seemed to go well, some new ideas on how to control the quality of HEMA-PC were discussed and a program to investigate them will be implemented).

**SC/RW**

Biocompatibles seemed to be reassured of the efforts and commitment that Sygena were making on this project).

## <u>CLINDAMYCIN PHOSPHATE</u>

- Current stock vs. inventory situation was discussed.  Every effort to bring materials in QC/QA/quarantine through to release status must be made.  We will soon be scraping the barrel.          **RB**

- 5 -

- Production plan for US saleable Phosphate bring the 4 x batches of pH failed material out of production week 26 and available for sale early Q3. This should give 250kg
- Decision on whether this is still US saleable needs to be made. **DC**
- Next production is for ~850kg in Q4 1996 for US saleable material
- No plans to make any non US material at present.
- We should implement the Lek impurity testing method in Haverhill to prevent batches being rejected by Lek.    **CBJ**
- Discussion of the use of Chinese Jaiojiang factory to convert our NON US blocked Clindamycin HCl to Phosphate. Plan is for CBJ and S Giles to audit facility w/c 24th June and to begin negotiations.
- Should declare country of origin on our traded Clindamcyin products.    **DC/RB**
- Questions posed to regulatory group who were, in general, negative towards the use of Chinese produced material.
    - If we buy in Chinese PO4 and recrystallise to give the MeOH soluble form, can we claim this is made in UK, for sale outside of USA?
    - Is it possible to purchase blocked Clindamycin HCl from China for conversion in Haverhill to US saleable Phosphate. What quality/regulatory issues do we need to address?
- Should seek a US approved source of Clindamycin HCl    **CBJ/RB**
- Agreed that we need a separate meeting to discuss the overall strategy for Clindamycin Phosphate.    **TBA →CBJ**
- Information on the current situation at OPOS. RW agreed that this would be investigated.    **RW**
- We are currently holding sufficient stocks of key raw materials Lincomycin HCl USP, Carbon Tetrachloride and Triphenyl Phosphine to manufacture one more campaign. No plans to implement this are in place today.    **RB**
- Brief discussion on further R & D effort to improve the yield of the final stage.
    This should be discussed at the next meeting as part of the overall R & D discussion.

## OTHER BUSINESS

- Packing to DMF stated requirements. RB explained that systems were being put in place to prevent this
- Regulatory to discuss with FDA/other experts the DMF requirements for Phospholipids. We are currently being asked to provide a type II DMF to support some customers' drug applications. This could potentially

GEN003364

- 6 -

trigger an FDA inspection that we could not, at this time, support at Sygena.  We are telling customers that only a Type IV DMF will be available in the short term.
Nancy Isaacs and Tony Newton to discuss situation with NeXstar.

<div align="right">NI/CBJ</div>

- Agenda items that were not covered in the meeting :
R & D priorities
Production conflicts - this was partly done outside the meeting
Ciba Geigy update


## DATE OF NEXT MEETING

11th July at Sygena



# GENZYME PHARMACEUTICALS

# BUSINESS PLANNING PROCESS

# PRODUCT RATIONALISATION TEAM

J Beaumont
S Cousins
D Deloria
C Jackson
T Slater
CW Yong

**15 th August 1997**

GEN004383

# PRODUCT RATIONALISATION

Initiatives:

Assess the performance of a number of products, product lines currently sold.

>Select non performing products

>Maximize profitability for Division / Corporation

Criteria:

>Financial Performance

>Technology

>Marketplace

>Competitive Analysis

>Strategic Fit

Recommendations

>Strategy for future, Exit or Expand or Outsource

>When

>Financial Impact

Other Considerations (general)

GEN004384

## PRODUCT AND REVENUES 1997

- CLINDAMYCIN                        $ 8,000,000

- DTT                               $  850,000

- MELATONIN FDF/BULK   $  595,000

- LIQUID CRYSTALS                   $2,050,000

- AMINO ACID DERIVATIVES   $ 2,086,000

- TRIFLIC ANHYRIDE                  $   900,000

**TOTAL**                           **$ 14,481,000**

GEN004385

# DTT

- Not Strategic to Pharmaceutical Business

- Supply inconsistent

- Competitive pricing

- Reputation with customers

- Low Margin (~ 10%)

- Growing market

- Process Development needed

**Recommendation**

- Exit Strategy

- From end of 1997

- Key customer management

**Revenue impact 1998    ($250,000)**

**No linkage to other key initiatives**

GEN004386

## TRIFLIC ANHYDRIDE

- Not strategic to Pharmaceutical business

- Competitive Threat

    Not basic in key raw material

    Unsustainable long term

- Low Margin (10%)

- Technical Expertese

- Customer knowledge

**Recommendations**

    Exit from bulk sales 1998


Linkage    Consider leverage of knowledge in handling TA in contract
manufacture strategy


Revenue impact

| | | |
|---|---|---|
| 1997 | $ | 900,000 |
| 1998 | $ | 1,200,000 |
| 1999 | $ | 0 |

GEN004387

## LIQUID CRYSTAL(S)

- Not strategic to Pharmaceuticals Business

- Single Product - CCP V2 1

- Single Customer  -  Merck

- Strong Technology

- Good Margin (>40%)

- non GMP

- Recommendations

    Exit strategy

    Maintain business short term (1 - 3 years)

    Reactive to new business

    Exploit technology  (?)

- Linkage to other initiatives  -  none

- Revenue impact

    | 1997 | $ 2,050,000 |
    | 1998 | $ 2,100,000 |
    | 1999 | $ 2,200,000 |

GEN004388

## CLINDAMYCIN PHOSPHATE

- Bulk generics are not strategic to Pharmaceutical Business
- Strong competition

    Chinese companies

    OPOS

- Bulk price threat w/w for parentral product
- Good production record
- Customer knowledge

Recommendations

    Exit strategy after 1998

    Continue to investigate Chinese producers

        Trading partner

    Consider topical formulated product

    Inventory management, (Melatonin 2!!)

Linkage to other initiatives - formulated product?

Revenue impact

|      |             |                     |
|------|-------------|---------------------|
| 1997 | $8,000,000  |                     |
| 1998 | $10,000,000 | ( but this is at risk) |

# AMINO ACID DERIVATIVES

- Strategic to Oncology program

- Good Technology

- Multi-customer products

- Multi Product group

- Financial performance - unclear for all products

- Limited competition

- Growing - good reputation

- Growth potential

- non GMP products

Recommendations

    Expansion opportunity

    Focus product line on Fmoc products

    Continual review

Linkage to other initiatives

    Raw materials for Peptide Oncology products

    Raw materials for solid phase peptide production

# MELATONIN

## Bulk Product

Market Saturation

Price Eroded now ($500 / kg)

Many Competitors

Inventory

Recommendations

    Exit Strategy

    Immediate

    Sell bulk at "any price"

    Take financial hit and move on

Financial Impact

    1997       ($4.2M)

GEN004391

**MELATONIN**

**FDF**

Slow Market Development

Many hurdles

Many competitors

Would benefit from Clinical Program results

Good Margin

Low Sales

Recommendations

Reduce efforts from Commercial and support groups

Look for Specialized Partner for MelaPure product

Royalty payments

Linkage to other initiatives

Melatonin Clinical program

GEN004392

# ORGANISATIONAL IMPLICATIONS
## (General)

Capacity availability

    Replacement products

    **Who owns the Capacity?**

Morale of Sales, Production Personnel

Revenue / Margin loss

Communication

    Internally

    Externally

Continue to review Products as ongoing project

    Assign responsibility

    Develop tools for this (Phast)

# SUMMARY

| | |
|---|---|
| CLINDAMYCIN | BEWARE THE CHINESE ARE COMING! |
| MELATONIN | ITS OVER |
| DTT | ITS OVER |
| TRIFLIC ANHYDRIDE | ITS NEARLY OVER |
| LIQUID CRYSTALS | A FEW YEARS LEFT |
| AAD'S | GROWTH POTENTIAL |

GEN004394



*Clindamycin or
Topical ??
— ourselves
— partner
— ADDS ??
Supply Side → china*

*Melatonin FDF
— W/W registration*

*— DTF*

# *Confidential*

## *Product Rationalization Project Report*
### *Phase I*

*Product Rationalization; Draft 1.0*
*Strategic Planning Program*
*Genzyme Pharmaceuticals*
*July 31, 1997*

*Prepared by; J. Beaumont, S. Cousins, D. DeLoria, C. Jackson, T. Slater, CW. Yong*

GEN004395

# *Table of Contents*

*I. Executive Summary*

*II. Individual Product Rationalization Reports*

      *A. Beaumont: Fine Chemicals*

      *B. Cousins: Liquid Crystal Contract Manuf.*

      *C. DeLoria: Melatonin Bulk/FDF*

      *D. Jackson: Clindamycin Phosphate*

      *E. Yong: Amino Acid Derivatives*

*III. Future Work Plan*

      *A. Phase I; complete*

      *B. Phase II*

      *C. Phase III*

*IV. Team Recognition*

*V. Appendices*

GEN004396

# Executive Summary

## 1.0) Overview

*The Product Rationalization Team has attempted to review and assess the performance of a number of products and product lines currently marketed by Genzyme Pharmaceuticals. Our goal has been to determine the future involvement of the division in these products. The criteria used to assess the products were; financial performance, technology strength or weakness, marketplace strength or weakness, competition, manufacturing capacity, revenue impact, and quality. Data was collected and evaluated and a recommendation issued each product or product area. In subsequent phases of the Product Rationalization Project, transition plans with resource needs will be prepared.*

*During the process of conducting our assessment a number of crucial issues were identified which require comment. They are; Impact on Revenue, Financial Information, Outsourcing/Partnering, Chemical Processes and Organizational Structure. These issues will be addressed before the recommendations section as they establish a frame of reference from which the recommendations were derived.*

*The assessment was conducted with the degree of due diligence allowable in the time frame allocated and with the information systems available. We believe that we have more work to do on The Product Rationalization Project. However, our recommendations are provided with a sense of commitment to the conclusions while cautioning that new information may surface which causes use to revise or change a recommendation.*

## 2.0) Impact on Revenue

*The combined revenue generated by all of the products and product lines we studied is as follows:*

| Year | Product | Revenue | % of Revenue |
|------|---------|---------|--------------|
| 1997 | All | $16,800,000 | 49% |
| 1997 | Other FC's | $2,350,000 | 7% |
| 1997 | DTT | $850,000 | 2% |
| 1997 | *Triflic Anhy* | *$900,000* | *3%* |
| 1997 | All FC's | $4,100,000 | 12% |
| 1997 | Liquid Cryt | $2,050,000 | 6% |
| 1997 | Mela Bulk/FDF | $595,000 | 1% |
| 1997 | Clindamycin | $8,000,000 | 23% |
| 1997 | AAD's | $2,086,000 | 7% |

## 2.0) Impact on Revenue (continued)

| Year | Product | Revenue | % of Revenue |
|------|---------|---------|--------------|
| 1998 | All | $19,120,000 | 49% |
| 1998 | Other FC's | $1,350,000 | 7% |
| 1998 | DTT | $250,000 | 2% |
| 1998 | Triflic Anhy | $1,200,000 | 3% |
| 1998 | All FC's | $2,800,000 | 12% |
| 1998 | Liquid Cryt | $2,100,000 | 6% |
| 1998 | Mela Bulk/FDF | $1,620,000 | 1% |
| 1998 | Clindamycin | $10,300,000 | 23% |
| 1998 | AAD's | $2,300,000 | 6% |

*Clearly, as can be seen from the tables above, we do not have a walk away option at this time. We will have to continue to move our product mix and revenue base away from under performing products toward more strategic and profitable products. Transition plans become essential to the orderly management of our business.*

## 3.0) Financial Information

*The team's ability to provide financial information has been hampered by the reporting systems we use and their level of sophistication. This is most noticeable when trying to look at actual product costs versus standards. Therefore, the following information has been developed primarily from standard margin calculations.*

| Product | 1997 Revenue | COGS | Est. Margin* | % |
|---------|-------------|------|-------------|---|
| Clindamycin | 8,000,000 | $6,507,214 | $1,492,786 | 18.6% |
| Liquid Crystal | 2,050,000 | $1,230,000 | $820,000 | 40% |
| Mela Bulk | $279,000 | $279,000 | $0 | 0% |
| Mela FDF | $316,000 | $142,200 | $173,800 | 55% |
| DTT | $850,000 | $756,000 | $94,000** | 10% |
| Triflic Anhy | $900,000 | $810,000 | $90,000*** | 10% |
| Other FC's | 2,350,000 | TBC | TBC | TBC |
| AAD's | 2,086,000 | TBC | TBC | TBC |

*Margin is estimated based on standard margin not actual margin.
**DTT actual production costs are expected to be significantly higher than
    standard.
***Triflic actual production costs are expected to be significantly higher than
    standard.

TBC: To Be Completed

## 4.0) Outsourcing/Partnering

*It is apparent that outsourcing intermediates and or complete products is essential to our ability to transition our business away from low value, low profit products to high value, high margin products. However, our infrastructure and skill set is not set up to do significant outsourcing. In addition to outsourcing a number of recommendations involve looking for partnerships with other companies on some of our products. Again, we are not set up or staffed at this time to invest in the effort to find and negotiate partnerships on non-strategic products.*

## 5.0) Chemical Processes

*The analysis of numerous products was significantly impacted by the fact that our chemical processes are not well developed resulting in lack of consistency and high rejection rates. This results in concomitantly high production costs and low through put. Examples of this are DTT and Triflic Anhydride. Therefore, the true economic value of certain products to the division may be obscured or even completely missed.*

## 6.0) Organizational Structure

*The organizational structure of the division does not create the environment for product focused improvements. To our knowledge, there are no incentives in place for operations to work closely with the commercial group to improve product financial performance by lowing rejection rates, improving processes, increasing through put and batch size. We believe this has lead to a lack of focus on product excellence and overall quality.*

## 7.0) Recommendations Summary

### 7.1) Fine Chemicals

*DTT: DTT does not fit our strategic vision of the future and The Pharmaceuticals Division should move out of DTT completely. As of July all costs associated with DTT should be re-allocated. All further development work, capital costs and plant depreciation should be evaluated based on Cerezyme's use of this reagent. In it's current state DTT is a very substantial financial liability to the division as well as customer relationship problem. Future involvement would only be considered with strong demonstration by corporate of low cost and stable supply.*

*Revenue impact: 1998; -$250,000*

*Triflic Anhydride: The Pharmaceuticals Division should immediate begin to look for a partner to produce Triflic Anhydride with Genzyme marketing the product, or taking a royalty. Our ability to handle and use Triflic may enhance our ability to produce Active Pharmaceutical Ingredients (API) for major pharmaceutical companies. This focus on API's with Triflic*

*will be evaluated and actioned if appropriate. Triflic revenue in 1998 should be maintained, however, our goal should be to count on no revenue from Triflic by 1999. This will allow us to make a smooth transition with out current customer base.*

*Revenue impact: 1998; None*

## 7.2) Liquid Crystals

*CCP-V2-1: In the short term 1-3 years we need to maintain our involvement with CCP-V2-1. At this time CCP-V2-1 appears to generate both revenue and profit, however, a complete financial analysis of current production should be done at the end of 1997 to confirm this statement. We should accept additional liquid crystal business from Merck provided it fits the CCP-V2-1 model of; on-going bulk production with at least a 40% GPM. The CCP-V2-1 business should be stabilized with a contract for 1-2 additional years and we should begin applying the outsourcing concept to a CCP-V2-1 intermediate. If a contract is not possible with Merck we should listen to the message! Longer term we can choose our level of involvement based on our capacity and whether we have an effective outsourcing partner.*

*Revenue impact: 1998; None*

## 7.3) Melatonin Bulk/FDF

*Melatonin Bulk: Short term we should seek to sell as much bulk material as we can at competitive prices. If a selling opportunity exists at below market price we should decide on a case by case basis whether to accept the business. Longer term it is unlikely we will sell melatonin into the supplement market in the USA. With competitive price quotes of $500-700/kg the Genzyme process can not compete and there appears to be no logic in further process development. We will, however, need to have bulk to support our drug program. If we can recruit a development partner the use of Genzyme bulk melatonin would be sustainable based on prescription sales.*

*Revenue impact: None 1998, but significant negative profitability, depending on how we treat the accounting.*

*Melatonin FDF: Continue working on the nutritional/OTC FDF MelaPure business opportunity with a reduced allocation of R. Sparrow's time; keep approximately 25-40% allocated to the program. Also, look for a company willing to represent the MelaPure product or buy the product outright. This activity will not be highly resourced at this time. In the event Genzyme proceeds ahead on the clinical program, the nutritional/OTC program may benefit from the available data and further resource allocation will be considered.*

*Revenue impact: 1998; None*

GEN004400

## 7.0) Recommendations Summary (continued)

*Rx: see the latter pages marked*

### 7.4) Clindamycin Phosphate

Clindamycin: Our safest and probably most economical strategy is to replace Clindamycin with another profitable API. This could come from an external contract manufacturing opportunity or from an internal Genzyme corporate need. In tandem with the above strategy we will pursue a relationship with a Chinese company in order to protect some revenue, free up our production capacity and hopefully generate additional revenue/profit.. A combination of the above would be most beneficial to the division, however, our planning should not count on a combined benefit ie; a Chinese relationship and new API to produce

Revenue impact: 1998; None expected, but up to 10,000,000 at risk!

### 7.5) Amino Acid Derivatives

Amino Acid Derivatives: Certain of the FMOC trifunctional amino acids are strategic to our peptide oncology program. For these products we need to maintain a production capability. This will allow us to use these products in the production of Leuprolide and Goserelin. In addition we can sell them into the merchant market at a profit and use them in other peptide intermediate work for pharmaceutical companies which we expect to be profitable. Other simple FMOC or tBoc amino acids should only be purchased, not manufactured. The use of effective outsourcing should be applied here to gain a better economic performance on the merchant market sales of simple AAD's. We should also consider an acquisition in the AAD area to consolidate our manufacturing position in this business. A review of the overall AAD sales should occur next year at this time. If additional profitability has not been achieved on the merchant market business we should consider exiting this business.

Revenue impact: 1998; None

Confidential

# Product Rationalization
## Melatonin
### Bulk / Finished Dosage Form

**Team Captain:**              **David DeLoria**
**Working Group Member:**      **Roger Sparrow**


## Introduction and Background

In the late 1980s Genzyme was approached by a private concern in New
Zealand seeking melatonin for regulation of breeding cycles in sheep.  A
manufacturing  process was developed and the bulk product became a part of
the Pharmaceutical division product line.  By 1994, following on the heels of a
number of popular publications demonstrating the efficacy of melatonin as a
sleep aid in humans, the product had found it's way into product lines among
dietary supplement and "nutriceutical"  suppliers throughout the US and rest-of-
world. Immediately following the publication of an August, 1995 *Newsweek*
cover story defining "The Melatonin Miracle" the demand for the product
increased exponentially
 Genzyme exploited this opportunity establishing direct distribution channels for
the product  throughout these market segments as well as substantial
relationships with brokers of the material, quickly becoming the primary source
for the product in the world. Production was successfully scaled-up to meet this
requirement.  Product demand reached it's pinnacle in the first quarter of 1996.
During this period Genzyme delivered 2.7 tons of the material realizing
revenues of over 12 million dollars.
 In March of 1996 Genzyme announced the introduction of MelaPure™, a
branded form of high purity synthetic melatonin.  This trademark was developed
to reassure consumers that the melatonin they are using is of a guaranteed high
and consistent quality.  By entering into agreement with Genzyme for the use of
the MelaPure™ logo, supplement manufacturers where also granted the right to
partner with Genzyme in the joint marketing of the product.
As an entry into rest-of-world markets, Genzyme developed it's own finished
dosage form of the product in the later half of 1995.  Offered  bottled under the
MelaPure™  logo or as bulk tablets, the finished dosage form product line
enables customers immediate entry into untapped overseas markets.
To date, growing national regulatory barriers have proven difficult to overcome
in the effort to introduce melatonin to some larger world markets.  Substantial
resources and effort have been drawn from Genzymes' regulatory affairs
department in an effort to submit for an import license in these regulated
countries.  To date this effort has met with moderate success.  Revenue
generated from sale of finished dosage form products continue to be abated by
lack of entry to date into these new markets.

At present, sales of melatonin and melatonin based products have stalled in the US. Quarterly customer reviews and market assessment indicate that the product has fully matured. At the retail level, the product has disappeared from the shelves of "boutique" type health food stores and has found it's home at the mass market venue. Intelligence indicates that major manufacturers of melatonin based finished dosage products built extensive inventories of the raw material during the high demand period of early 1996. Lower level sales at the retail level, entry of numerous producers worldwide and an overfilled pipeline at the point of raw material purchase have combined to significantly erode the price of the product and slow revenue generation.

This document will analyze existing conditions related to these products and their markets and offer recommendations for future action. For the sake of clarification, an analysis of bulk melatonin and the finished dosage form product line will be offered separately.

## MelaPure™, Bulk Melatonin

### Product Analysis

Product Specification:

Product Spec Sheet enclosed (Addendum I)

Production Capability

| | |
|---|---|
| Monthly Manufacturing Capacity: | 1480 kilograms (approx) |
| Average Lot Size: | 185 kilograms (approx) |
| Lot Pass/Fail Rate (%): | 95 |
| Cost of Goods: | $1,300.00 / Kilogram |

Finished Goods Inventory

| | |
|---|---|
| Existing Inventory: | 1,976.7 kilograms |
| Value of Inventory: | $2,569,718.00 |

Approximately 1,600 kilos exist in stock in Alston, 360 kilograms are held in Haverhill and 17 kilograms are held at Sygena.

## Finished Goods Inventory (Cont.)

All inventory shown has surpassed it's assigned date of re-test and awaits re-testing in order to establish a new re-test date and new Certificate of Analysis. At present, none of the inventory shown is available for sale.

Approximately 675 kilograms of material are scheduled for re-test and availability to ship by mid August.

## Sales    Analysis

### Volume  of  Material  Sold    (Monthly  1/'95   -   6/'97)



Total  Volume  1995          1,643
Total  Volume  1996          3,853
Total  Volume  1997             93

### Revenue   (Monthly   1/'95   -   6/'97)



Total  Revenue  1995          6,765,275
Total  Revenue  1996         17,203,721
Total  Revenue  1997            119,050

GEN004418

Average Selling Price per Kilogram    (Monthly  1/'95  -  6/'97)



Average  Sale  Price  (Kg)  1995        4,117
Average  Sale  Price  (Kg)  1996        4,465
Average  Sale  Price  (Kg)  1997        1,010

Profit      (Monthly  1/'95  -  6/'97)



Total  Profit  1995                6,674,470
Total  Profit  1996               12,194,821
Total  Profit  1997                        0

GEN004419

**Market   Analysis**

Top  10  Customers

| 1995 | Customer | Sales Dollars |
|------|----------|---------------|
|      | Twin Labs | 1,765,950 |
|      | Threshold  Enterprises | 1,765,725 |
|      | Natrol | 1,361,450 |
|      | Weider  Schiff | 518,250 |
|      | Now  Natural  Foods | 318,350 |
|      | Sunsource  Int.  Inc. | 238,000 |
|      | General  Nutrition  Products | 229,500 |
|      | GCI Nutrients | 220,925 |
|      | Pharmaceutical  Labs | 216,750 |
|      | Weinstein  Nutritional | 215,900 |

Total  Number  of  Customers   1995          7 1

Top  10  Customers

| 1996 | Customer | Sales Dollars |
|------|----------|---------------|
|      | General  Nutrition  Products | 3,218,750 |
|      | Natrol | 3,061,210 |
|      | Threshold  Enterprises | 2,654,500 |
|      | Twin  Labs | 1,255,000 |
|      | Sunsource | 1,174,500 |
|      | Natures  Bounty | 909,500 |
|      | Weider  Schiff | 668,000 |
|      | Now  Natural  Foods | 492,200 |
|      | Contract  Pharmacal | 354,200 |
|      | Rexall  Sundown | 318,750 |

Total  Number  of  Customers   1996         1 0 8

| 1997 | Customer | Sales Dollars |
|------|----------|---------------|
|      | Natures  Bounty | 49,000 |
|      | GCI Nutrients | 18,750 |
|      | Contract  Pharmacal | 10,800 |
|      | Farmatrade | 7,350 |
|      | Celestial  Seasonings | 7,000 |

Top 10 Customers  1997 (Cont.)

| | |
|---|---|
| Rexall  Sundown | 3,900 |
| Arnet  Pharmaceutical | 3,000 |
| Action  Labs | 2,750 |
| Guillermo  P.  Lockhart | 1,900 |
| Ortho  Pharmaceutical | 1,500 |

Total Number of Customers    1997              2 0

Customer  Review

Quarterly customer reviews have been conducted by customer service for the past four quarters.  Any customer having purchased any volume of melatonin was contacted and surveyed regarding purchasing habits, sources employed, pricing and purchase potential. The following is a summation of these reviews:

Q3  1996

Contacts  Attempted:             9 6
Contacts  Made:                  8 8
Number of Customers Continuing To Purchase Melatonin:    6 3
Customers Planning To Purchase Material Within The Quarter:  6
Customers Lowest Avg. Quotation Received Within The Qtr:    $1,100

Q4  1996

Contacts  Attempted:             8 2
Contacts  Made:                  6 9
Number of Customers Continuing To Purchase Melatonin:    5 9
Customers Planning To Purchase Material Within The Quarter:  4
Customers Lowest Avg Quotation Received Within The Qtr:    $900

Q1  1997

Contacts  Attempted:             6 7
Contacts  Made:                  5 1
Number of Customers Continuing To Purchase Melatonin:    4 9
Customers Planning To Purchase Material Within The Quarter:  2
Customers Lowest Avg Quotation Received Within The Qtr:    $750

<u>Q2 1997</u>
Contacts Attempted:                                    5 0
Contacts Made:                                         5 0
Number of Customers Continuing To Purchase Melatonin:        4 7
Customers Planning To Purchase Material Within The Quarter:  1
Customers Lowest Avg Quotation Received Within The Qtr:      $500

<u>Competition</u>
Throughout the melatonin "boom" of 1995-1996 we faced our most
substantial competition from Helsin and Biosynth. Both of these
organizations priced their respective products very aggressively but
where not able to displace Genzyme due to our superior regulatory
compliance which was of value to tablet manufacturers at the time.
Throughout 1996 word of a growing number of manufacturers of
bulk material in India and China was relayed to us by our customer
base. These Asian manufacturers are most responsible for the price
erosion we have seen in the bulk market. We have learned that our
application for an import license to China is accompanied by 26 other
applications. We can assume that a significant number of these
represent the efforts of bulk manufacturers. Obviously, the number
of bulk material manufacturers has grown considerably over the past
two years.

<u>Average Market Value of Bulk Melatonin per Kilogram</u>

$500.00 per Kilogram

This figure is based on most recent intelligence gathered by customer
review (above) as well as by discussions with customer
representatives at the 1996 Natural Nutritional Foods Association
Convention held in Las Vegas, Nevada July 13-16.

**Recommendations and Actions**

The above information indicates a number of truths pertaining to
the bulk melatonin and retail melatonin finished dosage form
markets.

1.    The retail finished product opportunities in the US exist now only in a mass-market setting i.e. Walgreen, Cosco, K-mart and supermarket sales.   The finished products' existence in health food stores and "boutique" type outlets is limited and represents a holdover of stock approaching expiration.

2.    The product is being sold to these mass-market venues at a minimal margin by a small group of larger FDF manufacturers (Natrol, Weider-Schiff, Sunsource etc.).

3.    Larger US manufacturers of FDF products are looking overseas more aggressively to find distribution channels for their products.

4.    The industry accepted value of the bulk material stands at $500.00   per kilogram.

5.    Present market value of the material indicates that Genzyme can not manufacture the product in the future without incurring a substantial loss.   This remains true when considering newly derived cost figures for melatonin production.

6.    Declining sales and price erosion indicate that there is very little to be gained from a reworking of our existing process in an effort to re-approach profitability.

7.    Raw materials in place for further manufacture must be directed toward other products, re-sold or written off.


These points clearly lead to an indisputable recommendation.   We can no longer view a future for melatonin at Genzyme that would involve the manufacture of additional bulk material.   We must establish an exit strategy that allows for the realization of revenue for existing finished goods inventory before expiration of said inventory.   We will not realize revenue equivalent to the cost of manufacture of our existing finished goods inventory and we must be prepared to price the product more aggressively than our competitors, for the first time, in order to minimize loss on this inventory.

Exit Strategy
Genzyme, to date, has realized profits on bulk melatonin approaching 20 million dollars.   We should not be timid now in our actions to

minimize losses associated with the disposition of the remaining inventory. Hesitation puts all of this material at risk of once again approaching its retest date, a retest I am not absolutely confident it will withstand.

The job at hand is to generate as much revenue as possible for our existing finished goods bulk material inventory. The cost associated with this inventory, as indicated, is approx. $2,600,000. The low value of this material in the market indicates that breaking even is an impossibility.

Genzyme strongly resisted and never lead the downward price war associated with this product. We held to a price premium based on our superior quality and level of regulatory compliance. This strategy was viable when retail sales of finished dosage products was strong. Now that these sales have stalled we must accept that these value additions hold no importance with finished product manufacturers. We must , for the first time, take the lead in the market as the lowest priced bulk material available.

I recommend that we approach the top ten remaining manufacturers in the market with a price of $400.00 per kilo in an effort to sell 1000 kilograms of our remaining stock.

As stated, this handful of manufacturers remain with distribution channels in place to the mass-market venues which still hold potential for significant sale of the finished product. These concerns have also begun to step-up their efforts to market their products overseas. We have established strong associations with all of these organizations and must now exploit these relationships to insure the take-off of as much of this 1000 kilograms as possible.

The remainder of our inventory will be held for two purposes; first, to support the manufacture of tablets for our finished dosage form program, which is ongoing, and secondly, for availability to customers which may still be willing to pay a per kilogram price above the market standard for reasons of loyalty to Genzymes' product or a lack of knowledge related to the bulk market. These sales will be low volume and will not be placed with a frequency that we can count on to relieve the entire existing inventory prior to its' expiration.

# MelaPure™ Finished Dosage Form

## Product Analysis

### Product Specifications

Certificates of Analysis enclose for all tablets (addendum II-V)

### Production Capability

Tishcon Corporation of Salisbury, MD has performed the task of tablet manufacture since the onset of the finished dosage form project. At capacity they are capable of producing 600,000 tablets per day in any of our existing formulations.
Our relationship with Tishcon has, in the past, allowed for a high level of prioritization for our required production. Having placed no orders upon over the past two and one half quarters, we no longer enjoy this level of prioritization. A 20,000 bottle order of 3 mg tablets would require a lead time of two weeks in July of 1996. We should expect that this same order would take upwards of 3-4 weeks today.

Roger has secured a tablet manufacturer in this UK prepared to supply bottled tablets of high quality. We are yet to employ this source and lead times and capacities are yet to be finalized.

Walter Loh has assisted in securing a packaging organization of DR tablets in box form in Hong Kong. We have utilized this source once in order to satisfy a single order for DR boxed tablets.

### Finished Goods Inventory

The following is a to-date listing of all tablets held in inventory:

| Part Number | Product | # In Inventory |
|---|---|---|
| 999021 | 3 mg/20,000 | 2,500,000 tabs |
| 999022 | 3 mg/ 10 mg B6/20,000 | 1,380,000 tabs |
| 999039 | 3 mg/ 60 tab bottle | 385 bottles |
| 999072 | 3 mg/10 mg B6/60 tab bottle | 0 bottles |
| 999073 | 3 mg Dr/ 20,000 | 100,000 tabs |

<u>Finished goods Inventory (Cont.)</u>

| | | |
|---|---|---|
| 999074 | 3 mg DR/ 30 tab box | 0 boxes |
| 999077 | 1 mg/ 60 tab bottle | 0 bottles |
| 999078 | 1 mg/ 20,000 | 4,000,000 tabs |

**Sales   Analysis**

Revenue   1995



| | |
|---|---|
| Total  Revenue  1995: | $299,230.00 |
| Total  Profit  1995: | $227,830.00 |
| Product  Line  Margin 1995: | 76% |

Revenue   1996



| | |
|---|---|
| Total  Revenue  1996: | $292,062.00 |
| Total  Profit  1996: | $206,888.00 |
| Product  Line  Margin  1996: | 71% |

GEN004426

Revenue  1997



Total  Revenue  1997:          $72,417.00
Total  Profit  1997:            $44,282.00
Product  Line  Margin:          61%


**Market   Analysis**

Product  Launch  Status  for  worldwide  markets  and  '97  forecast  enclosed  (addendum  VI-VII).


**Recommendation   and   Action**

At  this  time  there  exist  four  potential  options  or  directions  we  can  move  in  regarding  our  efforts  in  the  FDF  market.   They  are  as  follows:

1.     Kill  the  program  immediately  and  face  the  impact  off  this  action  when  taking  a  write-off  against  raw  materials.

2.     Stay  with  the  program  for  another  year  to  take  advantage  of  the  successes  that  we  are  beginning  to  realize.

3.     Place  a  third  party  between  ourselves  and  the  market.   License  the  brand  name  to  another  organization  contracting  over  to  them  the  costs  of  marketing,  registration,  manufacture  and  stock  holding,  insisting  that  they  purchase  raw  material  from  Genzyme.   We  would  insist  on  a  royalty  on  each  box/bottle  sold.   The  target  company  for  such  an  agreement  would  be  a  functional  foods  organization  dedicated  to  the  success  of  such  a  program.   By  marketing  the

GEN004427

product as part of a line of supplement products they would enjoy greater access to market.

4.    Sell the program for a lump sum to a major concern.

Though option 3 is attractive it assumes interest in such an agreement from the type of concern described.  Our experience in the market indicates that such a company with interest in the product, interest in the program and a place in the world market would be difficult if not impossible to find.  There appears to be little incentive for an organization to enter the melatonin FDF market carrying the burden of a royalty payment on product sold. As we know, raw material costs are eroding constantly and we bring little else to the table.

Option 4 is based on the same assumptions as option 3.  Though there may in fact be an organization willing to grant us value for our part in such an agreement, they are not readily known and finding them would eat heavily into the window of opportunity that exists for a FDF melatonin product in newly opened markets.

Option 1 would appear the option of choice considering our limited inventory and growing regulatory barriers to the product.  This would be an immediate choice if, in fact, our continued presence in the market was attached to increasing costs of doing business.  This however is not the case.  The products have been developed, the groundwork for accessing markets has been done and the necessary resources for remaining in the market are less, not more, than at the outset of the program.  To abandon the program now we would have, in essence, done all of the work and left prior to reaping any of the benefits of that effort.

In our opinion, option 2 is the most reasonable to support at this time;   staying the course with our own program. We have recently begun to see   license approval for sale of product in forecasted countries.   Within July we have received orders from Ukraine, Russia and The United Arab Emirates with a combined value of $100,000 for Q3.  These successes are hard-won in the face of expanding regulation in the overseas dietary supplement markets.   They are exemplary of our intensive effort to date to license our FDF products worldwide.   We can assume similar success and additional opportunity in other markets to come of these efforts.

? ?

# PRODUCT DATA SHEET

# Melatonin

CAS Registry #73-31-4

## N-Acetyl-5-Methoxytryptamine

## Product Code # BR-05-059

| | |
|---|---|
| Description | White to off-white solid |
| Molecular Formula | $C_{13} H_{16} N_2 O_2$ |
| Molecular Weight | 232.3 |
| Structural Formula | |



| Test | Method | Specification |
|---|---|---|
| Appearance | Visual inspection | White to off white powder |
| IR Spectrum | Infrared spectral analysis | Conforms to reference |
| Assay | HPLC | 98.0 -102.0% (dry basis) |
| Impurities | TLC | Total 1.0% maximum<br>0.5% max for any individual |
| Sulphated Ash | USP | _ 0.1% |
| Heavy Metals | USP | _ 20 ppm |
| Water Content | Karl Fischer | _ 1.0% |
| Ethyl Acetate | GC | _ 0.3% |
| Acetic Acid | GC | _ 0.3% |

## Storage Conditions

Store in cool, dry place (15° - 22°C).

## Standard Package Sizes

1kg, 5 kg, and 25 kg packed in double polyethylene bag inside polyethylene bottle or drum.

**CAUTION: For manufacture, processing and repacking only. Not for internal consumption**

Genzyme Corporation
One Kendall Square
Cambridge, MA 02139
Toll Free (800) 868-8208
Tel.      (617) 374-7248
Fax      (617) 252-7772

Genzyme Pharmaceuticals
Hollands Road, Haverhill
Suffolk CB9 8PU
England
Tel.  (+44)1440-703522
Fax  (+44)1440-707783

Printed 5/96

# *TISHCON*
## *CORP.*

30 New York Avenue, Westbury, NY 11590 USA

Tel: (516) 333-3050  Telex: 650 528 0177MCI,UW  Fax: (516) 997-3660

# CERTIFICATE OF ANALYSIS
### (Uncoated and film Coated Tablets)

| Product Name | Dual Release Melatonin 3 mg Tablets |
|---|---|
| Product Code Number | EXP-788-A |
| Batch Control Number | 0031-E-5921 |
| Lab.Code Number | 12-95-319 |
| Description | Two layers, light pink and white colored, mottled, flat, bevelled, uncoated tablets. Av. Thickness 0.173" |
| Disintegration Dissolution | Comply with USP |
| Average Weight | 465 mg |
| Weight Variation ± 5% | Comply with USP |

| Active Ingredient | label | Assay | % |
|---|---|---|---|
| Melatonin | 3 mg | 3.1 mg | 103.3 |

Dissolution test

Time: 1st hour, 3rd hour, and 6th hour.

USP apparatus 2 (Paddle)

Medium: $H_2O$, Volume: 500 mL

R.P.M 75.

Melatonin Release of label claim.

| | | |
|---|---|---|
| 1st Hour | 1.46 mg | 48.7 % |
| 3rd Hour | 2.04 mg | 68.0 % |
| 6th Hour | 3.05 mg | 101.7 % |

Quality Control
Date:December 20,1995

# *GEL TEC*

30 New York Avenue, Westbury, NY 11590 USA
Tel: (516) 333-3050  Telex: 650 526 0177MCI UW  Fax: (516) 997-3660

## CERTIFICATE OF ANALYSIS
### (Uncoated and Film Coated Tablets)

| Product Name | Melatonin 1 mg Tablets |
|---|---|
| Product Code Number | 6792-A |
| Batch Control Number | 1241-6970 |
| Lab.Code Number | 07-96-258 K |
| Description | White colored, round shaped uncoated tablets. Av. Thickness 0.146" |
| Disintegration Dissolution | Comply With USP. |
| Average Weight | 206 mg |
| Weight Variation ± 5 % | Comply With USP. |

| Active Ingredient | label | Assay* | % |
|---|---|---|---|
| Melatonin | 1 mg | 1.01 mg | 101.0 |

*Assay done by HPLC

<u>Inactive Ingredients :</u>

| Dibasic Calcium Phosphate, Anhydrous | USP |
|---|---|
| Powdered Cellulose | NF |
| Croscarmellose Sodium | NF |
| Stearic Acid | NF |
| Magnesium Stearate | NF |
| Colloidal Silicon Dioxide | NF |

## MICROBIOLOGICAL TEST

| Total Bacterial Count | Does not exceed 3,000 per gram |
|---|---|
| Total Mold & Yeast Count | Does not exceed 300 per gram |
| Salmonella | Negative per 10 gram |
| E. Coli | Negative per 10 gram |
| Staphylococcus Aureus | Negative per 10 gram |

Quality Control
Date:July 18,1996



GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562, U.S.A.
617-252-7500
FAX 617-252-7600

# CERTIFICATE OF ANALYSIS
## (Uncoated and film Coated Tablets)

Manufacturing Date : 11/95

| Product Name | Melatonin 3 mg Tablets |
|---|---|
| Product Code Number | Exp-780-A |
| Batch Control Number | 0011-E-5911 |
| Lab.Code Number | 11-95-146 M |
| Description | White colored,round shaped,uncoated tablets. Av. Thickness 0.226" |
| Disintegration Dissolution | Comply with USP |
| Average Weight | 513 mg |
| Weight Variation ± 5% | Comply with USP |

| Active Ingredient | | label | Assay* | % |
|---|---|---|---|---|
| Melatonin | | 3 mg | 3.2 mg | 106.7 |

* Assay done by HPLC.

Inactive Ingredients :
| | |
|---|---|
| Dibasic Calcium Phosphate, unhydrous USP | |
| Microcrystalline Cellulose | NF |
| Croscarmellose Sodium | NF |
| Stearic Acid | NF |
| Magnesium Stearate | NF |
| Colloidal Silicon Dioxide | NF |

ORIGINAL COPY

## MICROBIOLOGICAL TEST

| Total Bacterial Count | Does not exceed 3,000 per gram |
|---|---|
| Total Mold & Yeast Count | Does not exceed 300 per gram |
| Salmonella | Negative per 10 gram |
| E. Coli | Negative per 10 gram |
| Staphylococcus Aureus | Negative per 10 gram |

Mohamed I Abdelbarr
Quality Control
Date:November 11,1995

# *TISHCON*
## *CORP.*

30 New York Avenue, Westbury, NY 11590 USA

Tel: (516) 333-3050  Telex: 650 528 0177MCI UW  Fax: (516) 997-3660

# CERTIFICATE OF ANALYSIS
### (Uncoated and film Coated Tablets)
### (10 Months Stability Data at Room Temperature 25 ± 2° C & 60 % R.H ± 5 %)

| | |
|---|---|
| Product Name | Melatonin 3 mg + B6 10 mg Tablets |
| Product Code Number | 6472-A |
| Batch Control Number | 0821-5911 |
| Lab Code Number | 11-95-110 M |
| Description | White colored, round shaped, uncoated tablets. Av. Thickness 0.208" |
| Disintegration | Comply with USP (1 Min) |
| Average Weight | 497 mg |
| Weight Variation ± 5% | Comply with USP |

| Active Ingredients | label | Assay* | % |
|---|---|---|---|
| Vitamin B6 (Pyridoxine HCL) | 10 mg | 11.19 mg | 111.9 |
| Melatonin | 3 mg | 2.94 mg | 98.0 |

*Assay done by HPLC.

Inactive Ingredients:

Croscarmelose Sodium
Dibasic Calcium Phosphate
Colloidal Silicon Dioxide
Powdered Cellulose
Stearic Acid
Magnesium Stearate

Packaging Sample:
Container: High Density Polyethylene 75 CC
Count: 60 Tablets
Filler : Cotton
Liner : Heat Induction Foil Seal
Closure : Plastic Cap

Conclusion at 10 months Stability data at room temperature :-
* No signs of deterioration or degradation in physical appearance of the tablets.
* Disintegration time complies with product specification.
* Potency of active ingredients per dosage unit, continues to fulfill the product specifications after 10 months of shelf stability at room temperature of 25 ± 2°C & R.H. 60 % ± 5 %.

Mohamed I Abdelbar

Quality Control
Date: September 16, 1996

Issue 7 Dated 7 July 1997

## MelaPure Dosage Form Forecast 1997

| Status | Region | Customer | Product | Volume | Price | $ | % | Weighted $ | Budget |
|---|---|---|---|---|---|---|---|---|---|
| **Q1** | | | | | | | | | |
| Invoiced | F R Yugoslavia | Z M Commerce | MelaPure 1mg straight B | 8961 Bot/Box | $ 3.50 | $ 31,364 | 100% | $ 31,364 | |
| Invoiced | Russia | Kayat Cyprus | MelaPure 3mg straight B | 2,800 Bot/Box | $ 3.50 | $ 9,800 | 100% | $ 9,800 | |
| Invoiced | UK | Nutritionelle | Melatonin 3mg straight B | 480 Bot/Box | $ 3.0 | $ 1,440 | 100% | $ 1,440 | |
| Invoiced | Spain | Garcia | MelaPure 3mg straight B | 25 Bot/Box | $ 13.00 | $ 325 | 100% | $ 325 | |
| Invoiced | UK | Nutritionelle | MelaPure 3mg straight B | 836 Bot/Box | $ 3.00 | $ 2,508 | 100% | $ 2,508 | |
| **Total** | | | | | | **$ 45,437** | | **$ 45,437** | **$300,000** |
| **Q2** | | | | | | | | | |
| Invoiced | Ukraine | Kayat | MelaPure 3mg straight B | 2000 Bot/Box | $ 3.5 | $ 7,000 | 100% | $ 7,000 | |
| Invoiced | Swiss | Herzog | MelaPure 3mg DR boxed | 1200 Bot/Box | $ 4.0 | $ 4,800 | 100% | $ 4,800 | |
| Invoiced | Swiss | Herzog | MelaPure 3mg straight B | 120 Bot/Box | $ 5.0 | $ 600 | 100% | $ 600 | |
| Invoiced | Spain | Garcia | MelaPure 3mg straight B | 40 Bot/Box | $ 13.0 | $ 520 | 100% | $ 520 | |
| Invoiced | Singapore | BioLife | MelaPure DR 3mg Boxed | 4000 Bot/Box | $ 3.5 | $ 14,000 | 100% | $ 14,000 | |
| Invoiced | Mail Order | K L Fields | MelaPure 3mg straight B | 2 Bot/Box | $ 30.00 | $ 60 | 100% | $ 60 | |
| **Total** | | | | | | **$ 26,980** | | **$ 26,980** | **$490,000** |

GEN004434

| Status | Region | Customer | Product | Volume | | Price | | $ | % | Weighted $ | Budget |
|--------|--------|----------|---------|--------|--|-------|--|---|---|-----------|--------|
| **Q3** | | | | | | | | | | | |
| Order | Russia | Kayal Cyprus | MelaPure 3mg straight B | 19,200 Box/Bot | $ | 3.5 | $ 67,200 | 100% | $ 67,200 | |
| Order | UAE | New Medical | MelaPure 3mg straight B | 3,000 Box/Bot | $ | 4.09 | $ 12,270 | 100% | $ 12,270 | |
| Forecast | China | Naturest | MelaPureDR tablets | 1000 (1 Mill) | $ | 31.00 | $ 31,000 | 25% | $ 7,750 | |
| Forecast | China | Naturest | Melatonin bulk powder | 50 Kg | $ | 1,250 | $ 62,500 | 25% | $ 15,625 | |
| Forecast | Ukraine | Kayal Cyprus | Melapure 3mg straight B | 2400 Bot/Box | $ | 3.00 | $ 7,200 | 25% | $ 1,800 | |
| Forecast | Rest of Arab Gul | Various | MelaPure 3mg straight B | 2000 Bot/Box | $ | 4.00 | $ 8,000 | 25% | $ 2,000 | |
| Forecast | F R Yugoslavia | Z M Commerce | MelaPure 3mg straight | 2400 Bot/Box | $ | 3.50 | $ 8,400 | 25% | $ 2,100 | |
| Forecast | Singapore | Bio-Life | MelaPure DR | 2000 Bot/Box | $ | 3.50 | $ 7,000 | 25% | $ 1,750 | |
| Forecast | Croatia | Chemossan | MelaPure 3mg straight B | 2,400 Bot/Box | $ | 3.50 | $ 8,400 | 25% | $ 2,100 | |
| Forecast | Kyrgystan | Liakat Pharma | MelaPure DR | 1,000 Bot/Box | $ | 3.00 | $ 3,000 | 50% | $ 1,500 | |
| | | | | | | | | | | |
| **Total** | | | | | | | **$ ___** | | **$ 114,___** | **$___** |
| **Q4** | | | | | | | | | | | |
| Forecast | China | Naturest | MelaPureDR tablets | 3000 (3 Mill) | $ | 31.00 | $ 93,000 | 25% | $ 23,250 | |
| Forecast | China | Naturest | Melatonin bulk powder | 150 Kg | $ | 1,250 | $ 187,500 | 25% | $ 46,875 | |
| Forecast | Russia | Kayal Cyprus | MelaPure 3mg straight B | 24000 Bot/Box | $ | 3.00 | $ 72,000 | 50% | $ 36,000 | |
| Forecast | Ukraine | Kayal Cyprus | MelaPure 3mg straight B | 4800 Bot/Box | $ | 3.00 | $ 14,400 | 50% | $ 7,200 | |
| Forecast | UAE | New Medical | MelaPure 3mg straight B | 4800 Bot/Box | $ | 4.00 | $ 19,200 | 50% | $ 9,600 | |
| Forecast | Rest of Arab Gul | Various | MelaPure 3mg tablets | 4800 Bot/Box | $ | 4.00 | $ 19,200 | 50% | $ 9,600 | |
| Forecast | Eastern Europe | Open | MelaPure DR tablets | 4800 Bot/Box | $ | 3.00 | $ 14,400 | 50% | $ 7,200 | |
| Forecast | Thailand | Mod Man, Medicap | MelaPure 3mg straight B | 480 (thous) | $ | 40.00 | $ 19,200 | 50% | $ 9,600 | |
| Forecast | Africa | Apple | MelaPure 3mg straight B | 2000 Bot/Box | $ | 3.00 | $ 6,000 | 50% | $ 3,000 | |
| Forecast | F R Yugoslavia | Z M Commerce | MelaPure 3mg straight B | 4800 Box/Bot | $ | 3.50 | $ 16,800 | 50% | $ 8,400 | |
| Forecast | Singapore | Bio-Life | MelaPure 3mg DR | 4000 Box/Bot | $ | 3.50 | $ 14,000 | 50% | $ 7,000 | |
| **Total** | | | | | | | **$ 475,700** | | **$ 167,725** | **$1,___,___** |

# MelaPure Launch Status Worldwide-1 July 1997

Retail price per bottle $3.00
Wholesale price per bottle $1.50
Genzyme market share 20%

## Asia Pacific

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | Estimated Total Market Size (000's) | | | Anticipated Sales Post Launch | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
| Australia & N Zealand | Blackmoores | MelaPure BtDR | Prescription Drug | Following Europe | 30 | $240 | $105 | $5 | $21 |
| China | Naturest | Bulk and Bottles | Reg't Drug/Supplement | Aug-97 | 1000 | $8,000 | $3,500 | $175 | $700 |
| Hong Kong | Naturest | MelaPure BtDR | Soft File | Launched | 10 | $80 | $35 | $2 | $7 |
| Indonesia | Open | MelaPure BtDR | Prescription Drug | Following Europe | 44 | $352 | $154 | $8 | $31 |
| Korea | Open | MelaPure BtDR | Prescription Drug | Following Europe | 44 | $352 | $154 | $8 | $31 |
| Malaysia | Bio-Life | MelaPure BtDR | Prescription Drug | Following Europe | 44 | $352 | $154 | $8 | $31 |
| Philippines | Cleo, Singapore | MelaPure BtDR | Reg't Drug/Supplement | End 97 | 16 | $128 | $56 | $3 | $11 |
| Singapore | Bio-Life | MelaPure BtDR | Reg't Supplement | Launched | 13 | $104 | $46 | $2 | $9 |
| Thailand | Medicap | MelaPure BtDR | Prescription Drug | Following Europe | 44 | $352 | $154 | $8 | $31 |
| Taiwan | Giraffes Pharma | MelaPure BtDR | Prescription Drug | Following Europe | 15 | $120 | $53 | $3 | $11 |
| Vietnam | Medicap | MelaPure BtDR | Prescription Drug | Following Europe | 13 | $104 | $46 | $2 | $9 |
| | | | | | 1273 | $10,184 | $4,456 | $223 | $891 |

## Middle East

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
|---|---|---|---|---|---|---|---|---|---|
| Bahrain | Just William | MelaPure BtDR | Reg't Drug | Following UAE | 4 | $32 | $14 | $1 | $3 |
| Cyprus North | Open | MelaPure BtDR | Reg't Drug | Following Europe | 1 | $8 | $4 | $0 | $1 |
| Cyprus South | Kayral Trading | MelaPure BtDR | Reg't Drug | Following Europe | 2 | $16 | $7 | $0 | $1 |
| Egypt | HCI | MelaPure BtDR | Reg't Drug | Launched Powder | 19 | $152 | $67 | $3 | $13 |
| Iran | Open | MelaPure BtDR | Reg't Drug | Following Europe | 2 | $16 | $7 | $0 | $1 |
| Iraq | Open | MelaPure BtDR | Reg't Drug | Following Europe | 2 | $16 | $7 | $0 | $1 |
| Israel | Open | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Jordan | HCI | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Kuwait | Al Mufid Pharma | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Lebanon | Phenicia, Beirut | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Oman | Thalka Group | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Qatar | Barzan Pharma | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Saudi Arabia | HCI | MelaPure BtDR | Reg't Drug | Following Europe | 40 | $320 | $140 | $7 | $28 |
| Syria | AlQasmi Drug Store | MelaPure BtDR | Reg't Drug | Following UAE | 1 | $8 | $4 | $0 | $1 |
| Turkey | Karadeniz (Akay) | MelaPure BtDR | Reg't Drug | End 97 | 25 | $200 | $88 | $4 | $18 |
| UAE | New Medical Centre | MelaPure BtDR | Reg't Drug | Aug-97 | 20 | $160 | $70 | $4 | $14 |
| Yemen | Yemen Drugs | MelaPure BtDR | Reg't Drug | Following UAE | 3 | $24 | $11 | $1 | $2 |
| | | | | | 125 | $1,000 | $438 | $22 | $98 |

Addendum VII

## Eastern Europe

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | Estimated Total Market Size (000's) | | | Anticipated Sales Post Launch | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
| Albania | Open | MelaPure BIDR | Reg'l Drug | Following Hungary | 1 | $8 | $4 | $0 | $1 |
| Bulgaria | Open | MelaPure BIDR | Reg'l Drug | Following Hungary | 1 | $8 | $4 | $0 | $1 |
| Czech | Beril s.a. | MelaPure BIDR | Reg'l Drug | Following Hungary | 5 | $40 | $18 | $1 | $4 |
| Croatia | Chemosan | MelaPure BIDR | Soft File | Launched | 4 | $32 | $14 | $1 | $3 |
| F.R Yugoslavia | Z.M Commerce | MelaPure BIDR | Soft File | Launched | 4 | $32 | $14 | $1 | $3 |
| Hungary | Pharma Cross | MelaPure BIDR | Reg'l Drug | Oct-97 | 14 | $112 | $49 | $2 | $10 |
| Macedonia | M & D Commerce | MelaPure BIDR | Reg'l Drug | Launched | 1 | $8 | $4 | $0 | $1 |
| Poland | KRKA | MelaPure BIDR | Reg'l Drug | Following Hungary | 13 | $104 | $46 | $2 | $9 |
| Romania | Open | MelaPure BIDR | Reg'l Drug | Following Hungary | 1 | $8 | $4 | $0 | $1 |
| Russia | Karyat Trading | MelaPure BIDR | Reg'l Drug | Launching July 97 | 400 | $3,200 | $1,400 | $70 | $280 |
| Slovakia | Open | MelaPure BIDR | Reg'l Drug | Following Hungary | 5 | $40 | $18 | $1 | $4 |
| Slovenia | Open | MelaPure BIDR | Reg'l Drug | Following Hungary | 1 | $8 | $4 | $0 | $1 |
| Ukraine | Karyat Trading | MelaPure BIDR | Reg'l Drug | Launched | 25 | $200 | $88 | $4 | $18 |
| | | | | | 475 | $3,800 | $1,663 | $83 | $333 |

## West'n Europe (open)

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
|---|---|---|---|---|---|---|---|---|---|
| Portugal | Productos Dieteticos | MelaPure BIDR | Dietary Supp | Launched | 1 | $8 | $4 | $0 | $1 |
| Malta | Pro-Health | MelaPure BIDR | Dietary Sup | Launched | 3 | $24 | $11 | $1 | $2 |
| | | | | | 4 | $32 | $14 | $1 | $3 |

## Africa

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
|---|---|---|---|---|---|---|---|---|---|
| Algeria | Open | MelaPure BIDR | Reg'l Drug | Following Kenya | 1 | $8 | $4 | $0 | $1 |
| Angola | Open | MelaPure BIDR | Reg'l Drug | Following Kenya | 1 | $8 | $4 | $0 | $1 |
| Ethiopia | Apple Pharm | MelaPure BIDR | Reg'l Drug | Following Kenya | 1 | $8 | $4 | $0 | $1 |
| Kenya | Apple Pharm | MelaPure BIDR | Reg'l Drug | Filed | 4 | $32 | $14 | $1 | $3 |
| South Africa | HCl | MelaPure BIDR | Hard Drug | Following Europe | 32 | $256 | $112 | $6 | $22 |
| Sudan | Open | MelaPure BIDR | Reg'l Drug | Following Kenya | 1 | $8 | $4 | $0 | $1 |
| Zambia | Apple Pharm | MelaPure BIDR | unknown | Following Kenya | 2 | $16 | $7 | $0 | $1 |
| | | | | | 42 | $336 | $147 | $7 | $29 |

## Indian Sub Cont

| Country | Distributor | Product | Regulatory Filing Status | Anticipated Launch Date | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
|---|---|---|---|---|---|---|---|---|---|
| Bangladesh | Micro Labs | MelaPure BIDR | Reg'l Drug | Following India | 25 | $200 | $88 | $4 | $18 |
| India | Micro Labs | MelaPure BIDR | Reg'l Drug | Jan-98 | 44 | $352 | $154 | $8 | $31 |
| Pakistan | Masoni (Eastern) | MelaPure BIDR | Reg'l Drug | Following India | 25 | $200 | $88 | $4 | $18 |
| | | | | | 186 | $1,488 | $651 | $33 | $130 |

## Regional Summary

| Region | Estimated Total Market Size (000's) | | | Anticipated Sales Post Launch | |
|---|---|---|---|---|---|
| | # Bottles | $ Retail | $ Wholesale | First Quarter | First Year |
| Asia Pacific | 1273 | $10,184 | $4,456 | $223 | $891 |
| Middle East | 125 | $1,000 | $438 | $22 | $88 |
| Eastern Europe | 475 | $3,800 | $1,663 | $83 | $333 |
| West'n Europe (open) | 42 | $336 | $147 | $7 | $29 |
| Africa | 186 | $1,488 | $651 | $33 | $130 |
| Indian Sub Cont | 186 | $1,488 | $651 | $33 | $130 |
| Total | 2287 | $18,296 | $8,005 | $400 | 501 |



37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

## Fax Transmission

**To: Tom Slater, CC: Toni Nichols, Nancy Issac, Alodia Ruiz, Sue Stewart, Adam Sherman**

**From: Roger Sparrow**      **14 May 1997**      **Page 1 of 3**

Direct Fax Line (44) 1440 716286
Direct Phone Line (44) 1440 716232

Dear Tom

At last my promise number one has come good.

There follows a fax copy of our MelaPure Melatonin registration in the Ukraine in Genzyme Pharmaceuticals USA name for a five year period.

Next step the order and hopefully the bigger one i.e. Russia

Keep you posted.

Regards

Rog



A Division of Genzyme Limited.
Registered in England No. 1856886. Registered Office: 37 Hollands Road, Haverhill, Suffolk. CB9 8PU, England.



МІНІСТЕРСТВО ОХОРОНИ ЗДОРОВ'Я УКРАЇНИ
MINISTRY OF HEALTH OF UKRAINE

РЕЄСТРАЦІЙНЕ
ПОСВІДЧЕННЯ

REGISTRATION
CERTIFICATE

FROM : TATANACЛ.    PHONE NO.  :    D+2 PR1

## Ministry of Health of Ukraine
### Bureau for Pharmaceuticals Registration

# Registration Certificate
## # 2173

This certificate is issued to the firm
"Genzyme Pharmaceuticals", USA

ascertaining that in compliance with a regulation, set by Ministry of Public Health of Ukraine, the preparation called

**MELA PURE MELATONIN**

is registered in Ukraine as a therapeutic form
tablets 3 mg N 60

The certificate is real as concomitant forwarding this preparation.

The certificate is issued on:        "25" April 1997
The certificate is valid until:        "25" April 2002



Chairman
Bureau for Pharmaceuticals Registration ................... M. Serdiuk

---

## Міністерство охорони здоров'я України
### Бюро реєстрації лікарських засобів

# Реєстраційне посвідчення
## № 2173

Це посвідчення видане фірмі
"Джензим Фармасьютикалс", США

в тому, що відповідно до порядку, установленого Міністерством охорони здоров'я України, препарат під назвою

**МЕЛА ПУР МЕЛАТОНІН**

зареєстрований в Україні у вигляді лікарської форми
таблетки по 3 мг № 60

Посвідчення не є зобов'язанням щодо залучної щодо препарату.

Посвідчення видане        "25" квітня 1997 р.
Посвідчення дійсне до        "25" квітня 2002 р.

Голова
Бюро реєстрації лікарських засобів ................... І.М. Сердюк

GEN004704

FROM : TATANECO.     PHONE NO. :

# Ministry of Health of Ukraine
Bureau for Pharmaceuticals Registration

## Registration Certificate
## # 2173

This certificate is issued to the firm
"Genzyme Pharmaceuticals" USA

ascertaining that in compliance with a regulation, set by Ministry of Public Health of Ukraine, the preparation called
MELA PURE MELATONIN

is registered in Ukraine as a therapeutic form
tablets 3 mg N 60

The certificate is made a commitment for marketing this preparation.

The certificate is issued on:       "25" April 1997
The certificate is valid until:     "25" April 2002

Chairman
Bureau for Pharmaceuticals Registration   M. Savchat

---

# Міністерство охорони здоров'я України
Бюро реєстрації лікарських засобів

## Реєстраційне посвідчення
## № 2173

Це посвідчення видане фірмі
"Джензайм Фармасьютикалс" США

е тому, що відповідно до порядку, установленого Міністерством охорони здоров'я України, препарат під назвою
МЕЛА ПУР МЕЛАТОНІН

зареєстрований в Україні у якості лікарської форми:
таблетки 3 мг № 60

Посвідчення не є зобов'язанням щодо вчинення цього препарату.

Посвідчення видане             "25" квітня 1997 р.
Посвідчення дійсне до          "25" квітня 2002 р.

Голова
Бюро реєстрації лікарських засобів   Л.М. Сорокан

## Seaborne, Marianne

| | |
|---|---|
| **From:** | Deloria, David     (DELORD) |
| **Sent:** | Tuesday, June 3, 1997 1:47 PM |
| **To:** | Newton, Antony |
| **Cc:** | Kazakaitis, Laima; Seaborne, Marianne; Skogstrom, Kellie |
| **Subject:** | Melapure |
| **Importance:** | High |

*have 3 mos supply now*

*4/20/97*

From: DeLoria, David
Date: Tue, Jun 3, 1997 2:47 PM
Subject: Melapure
To: Newton, Antony
Cc: Kazakaitis, Laima; Seaborne, Marianne; Skogstrom, Kellie; Slater, Tom

Tony,

We have reached a decision point regarding intra-office sale of melapure bottles and sale of the product over the internet.

≠Inventory of bottled 3mg tablets has been depleted to approximately 25 bottles.
≠ This inventory represents 1-2 weeks sales.
≠Sales by these methods have leveled to a rate on average of 20 bottles per week.
≠Price differential for overseas sales of the bottles brings the average sales
price to $6.00 or an annual gross of $6,000.00.

Cost of the product is dependent upon production volumes.  Typical per bottle costs at a run rate of 20,000 bottles follow:

| | |
|---|---|
| Cost of raw active | .23 |
| Tableting, Bottling and Labeling | .80 |
| Label | .12 |

The cost of servicing each order is less readily determined.  Contributors to this cost are: customer service processing, shipping and receiving.  In addition to this we are paying a maintenance fee of $135.00 per month to maintain our commercial web-site.

The actual cost per bottle of tablets as shipped in response to an internal or
internet order is  closely approximated at $2.00 (when bottling run is >20,000).

Our options at this time are as follows:

1.     Manufacture one years worth of inventory.  Continue to service orders.

The cost per bottle at a run rate of 1000-2000 bottles would show an increase of 33% in the areas of tableting, bottling and labeling and in the cost of labels.  A run at this time would employ tablets already in inventory, alleviating some of this cost increase.  Bottles from this run would ship out

Page 1

GEN004864

at a cost approximated at $2.60.

The upside here is in the maintenance of a low revenue, high margin business
segment.  The original intent of this opperation was to supply a service to
Genzyme employees and to sell product to people who are not in a position to
purchase the product from retail outlets for whatever reason.
A few Genzyme employees continue to take advantage of this opportunity.
However, foreign internet sales have slowed as deliverability has become
increasingly difficult in many countries.

2.  Await the opportunity to manufacture one years inventory for this business
segment as an addition to a more substantive bottling order.

Th upside here is that we drive per-bottle costs down and re-address  the
business segment when bottles are available.

At this time however, it is not clear that we will receive an order of any
significant volume on which to add this requirement.  As inventory runs out we
begin backordering the individual bottle sales which means holding credit card
information in the office indefinately.  This is a practice we decided was
unacceptable at the outset of the project.

A savings in the order of $600-$700 does not justify the increased burden on
customer service of handling inquiries related to a back order situation.

3.  Eliminate the offer of the product via inter-office and internet.

The upside here is in the immediate removal of a significant time restraint
from customer service.  Present turn around on orders is long enough in many
cases to cause the customer to re-contact customer service adding to their
required, per order, input.  Elimination ofthe business also relieves shipping
and receiving of 20 fulfillments per week, on average.

Elimination of the business would mean the loss of $3,000.00 - $4,000.00 profit
to the division annually.  as well as the loss of a service to a limited number
of Genzyme employees who may now purchase the product in retail facilities at a
very similar price to that available through the division.

Please consider the above and discuss your opinions with me upon your return on
Wednesday.  We need to make this decision quickly as we will begin to
back-order the product next week.

David

GEN004865

02/13/98  FRI 12:45 FAX 617 252 7600        GENZYME CORP.        NO.197   P.1        ☑001

# Kayat Trading Ltd

96 Grivas Digenis Ave., P.O.Box 3393,  1682 Nicosia-Cyprus,  Tel: +357-2-452680, Fax: +357-2-441928

**Top urgent.**

40/94                                                                13.2.1998.

Mr. **HENRI TERMEER**
President
Genzyme Pharmaceuticals
Cambridge, USA.

Dear Mr. Termeer,

Re: Problems with Melatonin business in Russia and Ukraine.

Kayat Trading Ltd is an off-shore Company based in Cyprus and doing business
as an Exclusive Agent of Genzyme for Melatonin in countries of ex-Soviet Union.
We are member of a big and powerful group of companies which is doing large
scale business in many regions of the World.
Our business is usually based on top level contacts and deep knowledge of needs
and requirments of the markets.

In 1996 we began cooperation with your Corporation. Our target was to bring
Genzyme to Russia and Ukraine and established it there as one of the leading
manufacturer in the World. As the first step we signed an Agreement for Melatonin.

Our approach to this matter as always was seriously prepared.
During rather short period we on our initiative arranged clinical tests of Melatonin
in both countries. Results which we recieved promised to be very useful for the
future business.(Reports of this tests I, showing our good will, passed to
Mr.R.Sparrow gratuitously).
After that we completed with registration of Melatonin as medicine and got
Registration Certificates for 5 years each.
Next step was advertisment to create demand. From September 1997 we started big
advertising campaign in newspapers and magazines, in special medical TV
programs, we shot 23 seconds trailer and were showing it on TV during December
- January.

**To carry out all the above mentioned spade-work Kayat Trading Ltd had to
invest to this project more than $200,000.**

GEN005318

02/13/98  FRI 12:46 FAX 617 252 7600      GENZYME CORP.
13.FEB.1998  19:54    KAYAT TRADING                        NO.137    P.2    002

- 2 -

As the result – there is growing demand and many inquiries for Melatonin.

But now we have to stop all deliveries and sales because of a very serious problem. The fact is that Melatonin which has been delivered to Russia and Ukraine does not correspond to the samples, documentation which were submitted to the appropriate Authorities. We recieved from Ukraine list of distinctions.

1. Origin. Under the Registration Application the Finished Product should be of the USA origin.
2. The supplied bottles are different from the sample.
3. Cover of bottles is different.
4. Way of packing is different.
5. Tablets are of smaller size.
6. Tablets are of different colour.
7. Instead of 510mg the weight of tablets is 395 mg.

This matter is now under investigation at the Ukranian State Committee for Quality Control and they prohibited all sales of Melatonin in the country and blocked 20,480 bottles at the custom-house.

The situation is very serious and fraught with heavy consequences. We signed our Agency Agreement with you, Mr. Termeer, we did everything possible to prepare good ground for Melatonin and start establishing Genzyme on the markets, but now we trust it is your turn to take necessary steps to improve the situation and save this business and our name and reputation.
There is only one way for this: urgent delivery of Melatonin which will be in strict conformity with the Registration Application and samples.

There are huge markets for medical products in Russia and Ukraine.
We have keys from the doors to both of them.
It will be a great pity if we do not use these opportunities.

Our program is still the same - minimum 50,000 bottles of Melatonin a month  and in the near future - expansion of our activity with your other products.

Looking forward to your quick reaction and reply.

Yours faithfully

Konstantin Mechkov,
Director.

GEN005319

**EXHIBIT 2**



37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

## Power of Attorney for Registration of
## Genzyme MelaPure Melatonin

Genzyme Pharmaceuticals hereby authorizes their Agent MM Kayat Trading Ltd, represented by Mrs Huguette Achkar and/or MM ANIT represented by Mr Alexander Kondrashkin to register at the Ministry of Health in Ukraine our product MelaPure Melatonin.

This letter will serve to authorize MM ANIT to sign for and on behalf of Genzyme Pharmaceuticals all necessary documents at the following institutions:

- The Pharmacology Committee
- The Pharmacopoeia Committee
- The State inspector of Control

Or any other institution where the signature of documents referring to the registration of MelaPure Melatonin is necessary.

This authorization remains valid until obtention of the Registration Certificate of MelaPure Melatonin.

Roger Sparrow

Sales Director, Finished Dosage Form Pharmaceuticals

24 February 1997





A Division of Genzyme Limited.
Registered in England. No. 1354490 Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU England.



KAYAT000005

# ВИПИСКА З ПРОТОКОЛУ № 10

засідання фармакологічного комітету

МОЗ України від 26 грудня _____ 1996 р.

Затверджено _____ 199_ р.

## ПОСТАНОВА ФАРМАКОЛОГІЧНОГО КОМІТЕТУ

Корпорация "ДЖЕНЗИМ", США

Настоящим подтверждаем, что материалы фирмы ДЖЕНЗИМ, США, по препарату МЕЛАПУР-МЕЛАТОНИН, таблетки 3 мг, были рассмотрены на заседании Фармакологического Комитета МЗ Украины, Протокол №10 от 26.12.1996 г.

На основании положительного заключения профильных экспертных комиссий, Фармакологическим комитетом было принято решение рекомендовать регистрацию препарата Мелапур-Мелатонин фирмы Джензим, США, сроком на 5 лет.

В соответствии с утвержденным Положением, Свидетельство о регистрации Мелапур-Мелатонин будет выдано после рассмотрения данного вопроса на Бюро по регистрации лекарственных средств при Министерстве здравоохранения Украины.

Заместитель Председателя
Фармакологического Комитета
МЗ Украины, профессор,                    В.С.Даниленко

## EXTRACTION FROM THE PROTOCOL N 10

### of the meeting of the Farmacological Committee
### Ministry of Health of Ukraine,   26.12.1996.

### Resolution of the Farmacological Committee.

Corporation  "Genzyme",  USA

Hereby we confirm that documents of Messrs. "Genzyme", USA for Melapure -Melatonin, 3 mg tablets, have been considered at the meeting of Farmacological Commitee of the Ministry of Health of Ukraine, Protocol N 10 of 26.12.1996.

On the basis of positive conclusions of profile expert commissions Farmacological Committee have taken a decision to recommend registration of Melapure - Melatonin  of Messrs. Genzyme, USA for the period 5 years.

In accordance with the approved Regulation Certificate of registration of Melapure - Melatonin will be given after consideration of this matter at the Bureau for registration of medicines at the Ministry of Health of Ukraine.

**Deputy Chairman**
**of the Farmacological Committee**
**of Ministry of Health of Ukraine**
**Professor**                              **V.S.Danilenko**



## PHARMACEUTICALS

**37 HOLLANDS ROAD**
HAVERHILL SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707753

# Fax Transmission

To : Kayal Trading Ltd, Mrs H Achkar

From : Roger Sparrow        25th November 1996        Page 1 of 1

Direct Fax Number (44) 1440 716286
Direct Telephone Line (44) 1440 716232

RE: MelaPure™

Dear Huguette

Thanks for the good news, Alan Watts my big boss has moved onto bigger things and a Dr Frank Ollington has taken over. I have known Frank for some time and I am asking for his support to launch VitaPure a range of vitamin supplements which require no registration. I plan to launch 4 to 6 initially once I have worked out a business plan. Please keep this to yourself at this time as I am going it alone here and not informing anyone at Genzyme of my plans.

However if it happens it will be great for you as you can launch a new range of products on the back of MelaPure.

For Russia don't forget I can sell you the dual release blister boxed product which for sleep is very much more efficient.

I await orders with some excitement!!

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited.
Registered in England no. 1966586, Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England



KAYAT000206



37 HOLLANDS ROAD
HAVERHILL SUFFOLK
CB9 9RU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 702269

## Fax Transmission-most urgent please

To : Hotel Baltschug Kempinski Moskau, Mrs H Achkar Guest Room 342

From : Roger Sparrow

Date : 13 November 1996                    Page 1 of 4

---

### Direct Telephone Line with Voice Mail (44) 01440 716232

RE: MelaPure™

Dear Huguette

Thank you for your fax which I received a short while ago. I am so disappointed that I missed this visit to Moscow only because I could not obtain the visa in time with my trip to the USA the previous week. Please inform Dr Rudakov of my disappointment but also of my determination to visit him soon. This would be an honour for me.

I can confirm that I have called regulatory affairs in Boston and requested the urgent despatch, by courier, a copy of the Genzyme Pharmaceuticals full registration package which is a comprehensive document the contents of which are detailed on the following two pages.

Dosage is recommended at 3mg as Melatonin has a half life in the body of around 30minutes. It should be taken one hour before retiring or desired sleep. We have found that the patient feels the benefits after two or three evenings. The Jet Lag, disrupted sleep pattern is felt almost immediately and its antioxidant properties act in the way of a regularly taken vitamin supplement.

I can undertake to have my colleagues in the USA to try and get hold of an official FDA statement about its status. However it is regarded as a dietary supplement in the USA under the DSHEA act so they probably do not give out any statements as it is not in their area of responsibility.

For Genzyme's part I can again re-state that as one of the worlds most successful Biotech companies the Pharmaceutical Division that I represent takes the strongest most ethical approach to its products and our mission in Russia is to make available a safe product manufactured to the highest standards of cGMP



A Division of Genzyme Limited.
Registered in England No. 1606886. Registered Office 37 Hollands Road, Haverhill, Suffolk. CB9 8RL England



KAYA000220



37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707753

I know you have discussed the dual release formulation where half the dose is released immediately and half over the next 6 hours. This closely mimics nature and assists sleep in the most efficient way.

I will do all I can to support Dr Rudakov and will endeavour to meet with him in Moscow, however please inform Dr Rudakov that if he ever plans to make a trip to the USA we would be delighted to assist with the arrangements and a visit to our Boston facilities would, I am sure, be professionally exhilarating for him.

I am in the office tomorrow so please call if you need more assistance. I will inform Dr Rudakov when we have sent the file. I will include some Melatonin books for information and some more samples if they are needed for analysis.

My very best wishes

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited.
Registered in England No. 1866884. Registered Office 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England



KAYAT000221

# Melatonin Registration

## Table of Contents

| | | |
|---|---|---|
| **A.** | **Formula and Manufacture Technology** | 3 |
| | 1. Names and Structure | 3 |
| | 2. Reaction Scheme | 5 |
| **B.** | **Specification of the Product** | 9 |
| | 1. Biology and Occurrence | 9 |
| **C.** | **Toxicological Safety Evaluation Reports** | **11** |
| | 1. Safety Profile | 11 |
| | 2. Reported Adverse Events | 11 |
| | 3. Potential Drug Interactions | 13 |
| | 4. Potential Contraindications | 13 |
| | 4.1. Autoimmune Disease | 13 |
| | 4.2 Individuals Trying to Conceive | 13 |
| | 4.3. Individuals with Impaired Hepatic Function | 13 |
| | 4.4. Individuals with Depression | 14 |
| | 5. Literature Review | 15 |
| | 5.1. Mechanism-based Effects | 15 |
| | a. Lowering of Core Body Temperature | 15 |
| | b. Somnolence and Fatigue | 15 |
| | 5.2. High Dose Exposure to Animals and Humans | 15 |
| | 5.3. Potential Adverse Effects of Melatonin | 16 |
| | a. Reproductive Organs | 16 |
| | b. Endocrine Function | 17 |
| | c. Effect of Exogenous Melatonin on the Amplitude of Endogenous Circadian Melatonin Secretion | 18 |
| | d. Cardiovascular Effects | 18 |
| | e. Mutagenicity | 19 |
| | f. Tumorogenicity / Carcinogenicity | 19 |
| | g. Ocular Effects | 20 |
| **D.** | **Health Function Evaluation Reports** | **22** |
| | 1. Pharmacology and Pharmacokinetics | 22 |
| | 1.1. Pharmacology | 23 |
| | a. Circadian Rhythms and Sleep | 23 |
| | b. Reproduction | 24 |
| | c. Antioxidant Activity | 25 |
| | d. Immunostimulation | 25 |
| | 1.2. Pharmacokinetics | 26 |
| | a. Adsorption and Distribution | 26 |
| | b. Metabolism and Excretion | 27 |
| | 2. Review of Clinical Studies | 30 |
| | 2.1. Clinical Efficacy | 30 |
| | a. Normal Volunteers | 32 |
| | b. Insomnia - Young Adult | 33 |
| | c. Insomnia - Elderly Subjects | 34 |
| | d. Insomnia - Neurologically Impaired Children | 38 |
| | 2.2. Circadian Effect | 39 |
| | a. Delayed Sleep Phase Syndrome | 40 |
| | b. Blind Individuals | 40 |
| | c. Jet Lag | 40 |

KAYAT000222

# Melatonin Registration

## Table of Contents

E.     **Functional Component Identification**     **41**
1. Introduction     41
2. IR Spectrum     41
3. Elemental Analysis     43
4. Mass Spectrometry     43
5. Nuclear Magnetic Resonance Spectroscopy     44

F.     **Test Method of Functional Components**     **46**

G.     **The Stability Test of Functional Component**     **48**
1. Introduction     48
2. Stability Data     49

H.     **Laboratory Test Reports**     **50**

I.     **Labels**     **51**

J.     **Product Standards of Original Country**     **53**

K.     **Manufacturing and Marketing Certifications**     **54**

L.     **Appendices**
1. Safety Information from Clinical Trials
2. The Effect of Melatonin on Endocrine Functions
3. Analytical Validation Reports
4. Test Method Protocols
5. Stability Protocol
6. Certificates of Analysis
7. Manufacturing Certifications

KAYAT000223



37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
C09 9FU, ENGLAND
TEL +44 1440 703522
TLX 81320 GENPIN G
FAX +44 1440 707753

Mrs H Achkar
Kayat Trading Ltd
36 Grivas Digenis Avenue
PO Box 3393
1682 Nicosia
Cyprus

25 October 1996

Dear Mrs Achkar

I confirm we have appointed as our sole distributor Messrs 'Kayat
Trading Ltd' to represent Genzyme Pharmaceuticals on the market of
Ukraine and I authorise 'Kayat Trading Ltd' to register MelaPure™
Melatonin in Ukraine in their name or in the name of any local
distributor of their choice.

Details of our relationship will be confirmed later by contract after
certain performance criteria are met.

Thank you very much for your co-operation and we look forward to a
fruitful relationship in the near future.

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited.
Registered in England No. 1868886. Registered Office and 37 Hollands Road, Haverhill, Suffolk C09 8PU, England



KAYAT000272



37 HOLLANDS ROAD
- AVERHILL, SUFFOLK
CB9 8PL, ENGLAND
Tel. +44 1440 703922
T.X 813.5 GENEN G
FAX +44 1440 707783

MelaPure™ Melatonin Tablets 3mg Dosage

Identification and Composition

1. Identification

For Identification test the solvent used is a mixture of Water 690ml, Methanol 280ml and Glacial Acetic Acid 30ml.

| 2. Specification of Tablets | | Percentage |
|---|---|---|
| Melatonin 3mg plus 5% overage | 3mg | 0.6 |
| Croscarmellose Sodium USP | 15mg | 3.0 |
| Microcrystalline Cellulose USP | 100mg | 20.0 |
| Calcium Phosphate, Dibasic (anhydrous) USP | 373.5mg | 74.7 |
| Stearic Acid USP | 5mg | 1.0 |
| Magnesium Stearate USP | 2.5mg | 0.5 |
| Aerosil | 1mg | 0.2 |

3. Quantity in Bulk Pack

20,000 tablets (approximately 10kg weight)

4. Material of construction of pack

275 test 10.5" x 10.5" x 10.5" corrugated carton with polyethylene liner and two desiccants

5. Product Specification

| | |
|---|---|
| Tablet Weight | 500mg +/- |
| Tablet Diameter | 3/8" (0.375") = 9.5mm |
| Tablet Thickness | 0.235" +/- = 6mm +/- |
| Friability | Less than 1% |
| Disintegration Time | Less than 10 minutes |
| Tablet Shape | Round, Bioconvex |
| Tablet Type | Uncoated |
| Weight Variation | +/- 5% |



A Division of Genzyme Limited.
Registered in England No. 1558956. Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PJ, England.



KAYAT000273





**genzyme**
PHARMACEUTICALS

<div align="right">

37 HOLLANDS ROAD
HAVERHILL SUFFOLK
C89 8PJ. ENGLAND
TEL +44 1440 703522
TLX 81389 GENFIN G
FAX +44 1440 707783

</div>

Mrs H Achkar
Kayat Trading Ltd
36 Digenis Ave
PO Box 3393
1682 Nicosia
Cyprus

RE: Registration of Genzyme MelaPure™ Melatonin    8 October 1996

Dear Mrs Achkar

I am most grateful for the continued work you are doing on behalf of
Genzyme Pharmaceuticals ( a division of the worlds top 3
Biotechnology companies) with regard to registration of our product
in Russia. You have our continued full support and permission to act on
our behalf in the decisions relating to the registration procedure.

I know you were asked a few questions by the Russian Health Ministry
and I am happy to give full and honest answers.

Firstly Melatonin is a very attractive product in many ways, it is being
used world-wide in many instances to allow patients to cease taking
expensive Benzodiazapine drugs for treatment of sleep disorder and
depression. These drugs cause dependency and in all cases have side
effects. Melatonin on the other hand is less expensive in use and is a
natural remedy for Insomnia with no side effects as the body naturally
produces Melatonin in the Brain. As we become older we need to
supplement these levels as they decline over the years.

Unfortunately many unscrupulous companies are seeing Melatonin as
an opportunity to rush into the market without the care a major drug
company has to take by law, subsequently only two manufacturers in
the world manufacture the raw material to complete drug
regulations. Genzyme is the leading supplier in this field and offers
complete guarantee of purity. We do not buy from any other source
relying totally on our own manufacture in England and Switzerland.

We now have our MelaPure on sale across Asia, Middle East, South
America and have a full Clinical and Toxicology file with the European
Health Authorities awaiting a licence for sale. This information can be
made available to you under strict confidentiality.



A Division of Genzyme Limited
Registered in England No. 1856056. Registered Office: 37 Hollands Road, Haverhill, Suffolk, C89 8PJ, England



KAYAT000290



97 HOLLANDS ROAD
HAVERHILL SUFFOLK
CB9 8PU, ENGLAND
TEL + 44 1440 703522
T X 81535 GENE N G
FAX +44 1440 707763

Over 70 companies now sell Melatonin in the USA where it is allowed as a free sale product as it is recognised by the Health Committees that it is completely safe. In fact over 20 Million Americans have been consuming Genzyme Melatonin for 2 Years with not one adverse reaction reported to the US FDA.

I am very exited by the prospect of selling the benefits of Melatonin to the Russian people. it has many other attributes apart from insomnia. It has powerful antioxidant properties which are important to stop cell damage from free radicals in the worlds atmosphere. In this way ageing and cancer is being fully researched so that the worlds medical people can document the benefits against disease.

Please assure our Russian friends that we will be completely open with them and are prepared to accept any visit from their representatives so that our important manufacturing procedures can be independently audited.

If required I am very willing to visit Moscow to answer any questions direct. I look forward to receiving favourable news in November.

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited
Registered in England No. 1036886. Registered Office: 37 Hollands Road, Haverhill, Suffolk. CB9 8PU. England.





57 HOLLANDS ROAD
HAVERHILL SUFFOLK
CB9 9PU, ENGLAND
TEL +44 1440 703522
TELEX 530 GENPHA G
FAX +44 1440 707702

Mrs Huguette Achkar
President
Kayat Trading Ltd
PO Box 3393
36, Grivas Digenis Ave
Nicosia
Cyprus

30 May 1996

Dear Mrs Achkar

It was a great pleasure to meet with you yesterday to discuss the launch of
MelaPure™ Melatonin onto the Russian market. I felt a little sorry that you had
to travel to us but I am presently very stretched with Melatonin.

You will find in this package 2 copies of a letter for the Russian Registration
department as requested and also 5 bottles of labelled MelaPure product.

I have reserved for you 22,000 bottles of MelaPure at $3.89 per bottle and will
have the Artwork produced with Kayat Trading as the distributor. You will see
a copy of this label before we go to print.

For the future we can offer the timed release formulation and a 3mg
Melatonin combined with 10mg Vitamin B6. Perhaps we can discuss line
extensions later.

However in the meantime here are our Bank details:

Bankers Name: National Westminster Bank plc
PO Box 4, 3, High Street, Maidstone, Kent, ME14 1XU, England.

Sort Code: 60.60.08
US Dollar Account: 01-03656985

I will fax full price list for all products to your office and look forward to
receiving your confirmation order.

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited
Registered in England No. 1856626  Registered Office 37 Hollands Road, Haverhill Suffolk CB9 9PU, England



KAYAT 000403



27 HOLLANDS ROAD
HAVERHILL SUFFOLK
CB9 8PU, ENGLAND
TEL (44) 1440 703522
TWX 817565 GENZY G
FAX (44) 1440 707743

29 May 1996

Mrs H Achkar
Kayat Trading Ltd
36 Grivas Ave
PO Box 3393
1682 Nicosia
Cyprus

Dear Mrs Achkar

Genzyme Corporation is pleased to provide by means of this letter,
the information necessary for registration of our product, Melatonin,
bulk powder, or 3mg tablets, in Cyprus.

The registration package includes a Free Sale Certificate issued by
the US FDA and the contents of the file remain the property of
Genzyme Corporation and are strictly confidential.

The bulk synthetic Melatonin product is manufactured at Genzyme
facilities in the United Kingdom and Switzerland. The tablets are
presently manufactured from this same material in the United States
at Tshcon, Maryland.

Melatonin is freely marketed in the United States under the Dietary
Supplement and Health Education Act of 1994. Melatonin may be
useful to assist restful sleep.

I trust this registration meets with your approval.

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited
Registered in England No. 1356506, Registered Office 37 Hollands Road, Haverhill Suffolk CB9 8PU, England



KAYAT000404



37 HOLLANDS ROAD
AVERILL, SUFFOLK
C89 8PL, ENGLAND
TEL +44 1440 705522
TLX 81005 GENBMD G
FAX +44 1440 702762

Mrs Galina N Kolesnikova
Chief Registration of Pharmaceuticals,
Medical Equipment, Medical Substances
Ministry of Public Health and Medical Equipment of
The Russian Federation
Moscow

30 May 1996

Dear Mrs Kolesnikova

I am pleased to inform you that Genzyme Pharmaceuticals is the
largest manufacturer and supplier of the most popular Medicine in the
United States of America which is called 'Melatonin' The Genzyme
product has the Trade Mark 'MelaPure' and we are very much
interested to cooperate with Russian partners.

For the purpose I kindly ask your support in making all the necessary
formalities to obtain permission to import the above mentioned
Medicine to Russia.

I confirm that we have appointed, initially for a trial 6 month period, as
our sole distributor agent Messrs 'Kayat Trading Ltd' to represent us on
the market of Russia and I authorise 'Kayat Trading' to register
MelaPure™ Melatonin. Our relationship will be confirmed later by
contract after certain performance criteria are met.

Thank you in advance for your co-operation and we look forward to a
fruitful relationship in the very near future.

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals






37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
TLX 81353 GENFIN G
FAX +44 1440 702788

## Fax Transmission

To : Kayat Trading, Mrs H Achkar

From : Roger Sparrow

Date : 16 May 1996                                Page 1 of 1

Direct Telephone Line with Voice Mail (44) 01440 716232

RE: MelaPure™

Dear Mrs Achkar

I am very interested to talk with you about marketing of finished dosage form Melatonin.

I will be in the office next Tuesday

Please see our advertisement following

Sincerely

Roger Sparrow
Sales Director, Finished Dosage Form Pharmaceuticals



A Division of Genzyme Limited
Registered in England No. 1586856. Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England.



KAYAT000408



# SETTING THE QUALITY STANDARD FOR MELATONIN



**MELAPURE IS GENZYME QUALITY MELATONIN.**

THE MELAPURE STANDARD IS A GUARANTEE OF **MANUFACTURING**

EXCELLENCE, **QUALITY CONTROL** AND **SUPPLY ASSURANCE**.

DEPEND ON THE **MELAPURE** NAME AND LOGO AS YOUR

**QUALITY STANDARD** MELAPURE QUALITY MELATONIN IS ONLY

AVAILABLE FROM GENZYME PHARMACEUTICALS.

**CALL NOW FOR DETAILS.**



Genzyme Pharmaceuticals
One Kendall Square
Cambridge, Massachusetts
02139, U.S.A.
Telephone: 617 374 7248
Facsimile: 617 252 7759

Genzyme Pharmaceuticals
Hollands Road
Haverhill, Suffolk CB9 8PU,
England
Telephone: (44) 1440 703522
Facsimile: (44) 1440 707733

Melatonin tablets are
only available in certain,
non-U.S., countries.



KAYAT000409

FOR IMMEDIATE RELEASE

Contact:     Barbara Hatt
             Gail Becker Associates, Inc.
             (516) 829-1104

## GENZYME PHARMACEUTICALS INTRODUCES MELAPURE™ MELATONIN
### New Branded Form of High Purity, Synthetic Melatonin

CAMBRIDGE, MA, MARCH 22, 1996 -- Genzyme Pharmaceuticals, the world's largest manufacturer of melatonin, today announced the introduction of the MelaPure™ brand name which will appear on products containing its high purity, synthetic melatonin.

"The MelaPure™ logo was developed as a visible way to reassure consumers that the melatonin they are using is of a guaranteed high and consistent standard," said Alan Watts, Ph.D., vice president and general manager, Genzyme Pharmaceuticals. "MelaPure™ melatonin is only available from Genzyme Pharmaceuticals and is synonymous with manufacturing excellence and quality control, as well as the assurance of long term supply."

Melatonin is a naturally occurring chemical substance present in a number of foods. Research had shown that melatonin, which is also produced by the pineal gland in the brain, plays a role in regulating the biological clock's natural wake-sleep cycle (Dawson, D., Encel, N., *Journal of ineal Research*, 1993). Melatonin has also been shown to have anti-oxidant properties (Reiter, R., *Frontiers in Neuroendocrinology*, 1995).

MelaPure™ melatonin is manufactured in Genzyme's Swiss GMP facility using a proprietary synthetic process developed to produce a high specification product. Genzyme has many years of experience in manufacturing pharmaceutical intermediates and actives and has applied similar strict levels of control on the entire manufacturing process from raw material supply to quality

-more-



Genzyme Pharmaceuticals
One Kendall Square
Cambridge, Massachusetts 02139 USA
Telephone: 617 374 7218
Facsimile: 617 252 7772

Genzyme Pharmaceuticals
Hollands Road
Haverhill, Suffolk CB9 8PU, England
Telephone: +44 1440 702526
Facsimile: +44 1440 707793

KAYAT000412

testing. Part of MelaPure™ program will be to share standards and quality testing methods with key customers. The benefit to the industry will be to eliminate the risk of using a lesser quality ingredient.

MelaPure™ melatonin will be offered to all current suppliers of melatonin nutritional supplements. A new MelaPure™ logo, which suppliers may place on their own product labels, will inform customers that they are purchasing products made with Genzyme quality melatonin.

For product information on MelaPure melatonin, please call Genzyme Pharmaceuticals at 1-800-868-8208.

One of the world's top five biotechnology companies, Genzyme focuses on developing innovative products and services for major unmet medical needs. The company's General Division markets Ceredase® and Cerezyme® replacement enzymes for the treatment of Gaucher disease. It also develops and markets surgical and diagnostic products, genetic diagnostic services, and pharmaceuticals.

### ###

KAYAT000413



37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

**Fax Transmission**

**To: Kayat Trading Ltd, Mr K Mechkov**

| From: **Roger Sparrow** | 20 November 1997 | Page 1 of 2 |
|---|---|---|

Direct Fax Line (44) 1440 716266         Mobile: (44) 0410 393635
Direct Phone Line (44) 1440 716232

Dear Mr Mechkov

Making some return on this MelaPure business is certainly a challenge, but worthwhile I feel.

If Anit and Newcom are good distributors they will help us overcome the problems so that we can start shipping material as a routine with no issues.

Just an update on current matters:

We shipped the 9,600 bottles to Ukraine last week and are testing 10,000 bottles for Russia which will be ready to ship early next week.

Sufficient blends were passed for Melatonin content yesterday, sufficient to tablet 20,000 bottles. Which label do you want on these, all one country, or 10,000 Russia and 10,000 Ukraine, please advise soonest.

The additional Certificate of Origin was sent to Anit by FEDEX a couple of weeks ago. I have sent another today again by FEDEX unofficially. This has to be last time or I will be in deep trouble. I trust you persuaded our distributors to accept UK in future as this is all I can send unless you can action from Cyprus.

Our distributors Anit and Newcom earn much greater returns that we do so we must persuade them to work a little harder at overcoming the problems detailed in your fax.

We shut down the original supplier in the USA some time ago because his tablets were below standard for appearance, stability and they routinely supplied tablets short on Melatonin dosage.

So we now make in the UK to European regulations (Pharmacopoeia)

We sell the purest product, exactly 3mg dosage the only tablet of this quality anywhere in the world. It is formulated so that it cannot break up in the bottle but disintegrates in the stomach in 1minute.



A Division of Genzyme Limited.
Registered in England Nr. 1655686, Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England





37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PL. ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

We are very concerned that we comply with microbiological limits and test extensively for Yeast, Mold, Salmonella Species, Escherichia Coli and Staphlococcus Aureus. The only supplier doing this in Europe it is now the normal to not add a silica gel bag (not required) no cotton wool or hermetic seal as we have a tamper proof top which is much more secure. The top brand of Multi Vitamins "Centrum" which is on sale in the Russian and Ukraine markets is packed exactly as ours is. By not putting in the seal, cotton wool or silica gel we avoid the risk of Microbial contamination.

As this type of pack is not produced in the UK we cannot offer any other pack than the one you are receiving. It is not possible in the manufacturing process. So if we have to re-file on the basis of a new pack then we will stop the sales. Product will also be much more expensive.

There must be a way of getting acceptance of our standard pack, Anit and Newcom after all earn much more out of this than we do and therefore will have to work a little harder.

Fighting to get more supplies quicker as per our conversation today, also I have on site a visiting photographer doing shots of Genzyme. He has agreed to shoot some stills of the Russian and Ukraine MetaPure bottles surrounded by tablets and the sleeping man logo. We may be able to film the stills on Sony Video next week when they are developed and your people can add the spoken word. Lets see if this works.

I am busy with Hoffman La Roche here tomorrow, so I will break out of meeting to call you

Keep up the great work.

Sincerely

Roger Sparrow
Sales Director, International



A Division of Genzyme Limited.
Registered in England No. 1856886. Registered Office: 37 Hollands Road, Haverhill, Suffolk. CB9 8PU, England.



KAYAT000530



37 HOLLANDS ROAD
HAVERHILL SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703622
FAX +44 1440 707793

# FAX TRANSMISSION

**Dial Direct Telephone**
**+44 1440 716235**

**TO:    Kayat Trading Ltd**

**F.A.O:  Mr K Mechkov**

**FROM: Mrs.Gloria Mackenzie**

**DATE:  22nd September 1997**

**Number of pages 2 (including this page)**

---

Dear Mr Mechkov

I have spoken with Roger, with reference to the Agreement and he told me to send to you the attached fax that he had sent to Mrs Achkar this last July. It has been verbally agreed, and he asks that you be patient until his return to work when he will make certain that it is all finally agreed in writing.

Regarding the delivery date, Roger said could we please put down the 15th October, to make certain that the dates are all met.

I gave him your regards, but unfortunately his doctor has signed him off work for another 3 weeks.

I hope your trip to The Ukraine, was successful.

Kind regards

*Gloria Mackenzie*

Gloria Mackenzie
**Secretary to Roger Sparrow**



A Division of Genzyme Limited
Registered in England No. 1366801. Registered Office: 37 Hollands Road, Haverhill Suffolk, CB9 8PU England.



KAYAT000666

**EXHIBIT 2a**

# Kayat Trading Ltd

36 Grivas Digenis Ave., P.O.Box 3393,  1682 Nicosia-Cyprus,  Tel: +357-2-452680, Fax: +357-2-441928

Nicosia                                                                                 17.9.1997

**Mr. Roger Sparrow**
**Sales director, Finished Dosage Form Pharmaceuticals.**

Dear Mr.Sparrow,

I was very happy to know that you had a successful operation. Please don't forget that there is good place with good friends of yours and you are always welcome to come here to improve your health and mood.

As to L/C for Russia and Ukraine. We are ready to amend the first one and to open the second.

But on my opinion there is one small problem.
The last date of shipment looks more than strange, even scary. That is why please make it more real, say 6.10.97. However please have in mind that we need the Product as quickly as possible.

At the same time I would like to draw your attention to the fact that having verbal accord we still do not sign addendum to the Agreement dated 25.6.1996 concerning period of the Agreement and payment.

As you know we have started big campaign for penetration of Melatonin into the market which includes advertisment (TV, newspapers, magazines, posters), publications in scientific magazines, seminars. etc. This job is founded on a long term basis, and we would prefer to be guaranteed that our work will not be wasted. Please also do not forget that we managed to get Registration Certificates in both countries for the period of 5 years.

Please find enclosed to this letter the a/m addendum.

                                                                 Yours faithfully,

                                                                 K.Mechkov
                                                                 Director.

KAYAT000667



PHARMACEUTICALS

3?. HOLLANDS ROAD
HAVERHILL, SUFFOLK
CR9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 767783

## Fax Transmission

To: Tishcon Corp, Arun K Chopra

From:  Roger Sparrow

20 February 1988                    Page 1 of 1

Direct Fax Line (44) 1440 716286
Direct Phone Line (44) 1440 716232

Mobile: (44) 0410 393635
E Mail: r.sparrow@genzyme3.demon.co.uk

Dear Arun

Further to my previous fax I have spoken to our label supplier who have prepared artwork in Russian and Ukrainian with the sleeping man logo as previously supplied. It has our Bar Code on it issued in London which is internationally accepted except for sale in the USA where you use UPC numbers. I am told that the dear Russians will not accept our number because it implies that the product was manufactured in UK. Is there any possibility you can assist me with a USA bar code number, how do i get one e.t.c.

With the bar code I can finish the artwork and if it helps print the labels here and Fedex them to you as long as I have your specification. If not would it be better for you to print the labels in the USA with us supplying just the artwork. Isn't life difficult sometimes.

I am checking how much Melatonin to ship to you, I will advise this on Monday.

However I can give you our order today which is for 30,000 bottles (6 pallets x 5,000) 60 tablet bottle, 3mg dosage, label Ukraine language (supplied) format of bottle and tablet shape, size exactly as previously supplied, I will send you back the agreed spec from Tishcon on Monday.

This order is very urgent as they always are and we are under penalty to deliver mid march or there abouts. Again I will confirm a date with you.

I will phone you Monday to tie up the bar code and any outstanding issues.

Further orders for Russian and Hungarian label will follow.

Nice weekend

Sincerely

Roger Sparrow
Sales Director, International

A Division of Genzyme Limited
Registered In England No: 1535086. Registered Office: 37 Hollands Road, Haverhill, Suffolk, CR9 8PU, England

KAYAT001156





37 HOLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PU, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

## Fax Transmission

To: Kayat Trading Ltd, Mr K Mechkov

From:  Roger Sparrow                20 January 1998            Page 1 of 1

Direct Fax Line (44) 1440 716286                    Mobile: (44) 0410 393635
Direct Phone Line (44) 1440 716232

Dear Konstantin

I need to advise you that Genzyme Corporation in the United States has opened a new manufacturing facility in England to take over the manufacture of MelaPure Melatonin 60 tablet bottles.

The United States Factory has been closed and the English factory will in future manufacture all product which is produced to exactly the same formulation using the same quality of material. This has been actioned so that quality standards for Genzyme produced material will continue to be improved.

Please advise the licensing authorities your area.

Sincerely

Roger Sparrow
Sales Director, International



A Division of Genzyme Limited
Registered in England No. 1366865  Registered Office: 37 Hollands Road, Haverhill, Suffolk, CB9 8PU, England



KAYAT001221



**genzyme**

PHARMACEUTICALS

37 POLLANDS ROAD
HAVERHILL, SUFFOLK
CB9 8PJ, ENGLAND
TEL +44 1440 703522
FAX +44 1440 707783

## Fax Transmission

**To: Kayat Trading Ltd, Mr K Mechkov**

From:  Roger Sparrow        20 January 1998        Page 1 of 1

Direct Fax Line (44) 1440 716286        Mobile: (44) 0410 393635
Direct Phone Line (44) 1440 716232

Dear Konstantin

Just a thought!

As you are having difficulty getting orders and shipments of MelaPure into Russia and Ukraine because of country of origin perhaps now is the time to re-register the product under the name of the new company that Mike Wakeman and I have formed changing location to England. All other manufacture remains the same.

I cannot believe that many companies have faced the same problem and over come it. What about a letter from Genzyme in USA stating that they have shut down manufacture in the USA and now only manufacture in England.

I need to have some sales in the first half of this year to satisfy Boston.

It has been confirmed to me that I will be made redundant on 30th June of this year. MelaPure will cease from that day which is when I take over. So lets make sure we have a business to take over or else I will go broke!!

Let me have your comments

Sincerely



Roger Sparrow
Sales Director, International



Welcome back !



A Division of Genzyme Limited.
Registered in England No. 1240166  Registered Office: 37 Pollands Road, Haverhill, Suffolk, CB9 8PU, England.



98 87:35:42    PLEASE DELIVER TO:->         PHAIN/FINE CHEN          Page 001

08/98  TUE 00:33 FAX 017 374 7368       GENZYME CORP.COMMUN.                    ☎001



GENZYME CORPORATION
ONE KENDALL SQUARE
CAMBRIDGE, MA 02139-1562
617-252-7500
FAX 617-252-7600

**For Immediate Release**
Jan. 6, 1998

Contact:
Steve Push
617-761-8935

### Genzyme General Focuses Business Strategy, Announces Financial Provisions

CAMBRIDGE, Mass. -- Genzyme General (Nasdaq:GENZ) announced today strategic changes in its pharmaceuticals and surgical products business units that will lead to a provision of approximately $18 million after taxes in the fourth quarter of 1997.

These provisions are mainly associated with restructuring the pharmaceuticals business unit to focus on products that are more consistent with the company's long-term business strategy. This move will direct the pharmaceutical unit's business toward its higher-value products -- including phospholipids, peptides, and hyaluronic acid -- for drug delivery and other purposes and away from fine chemicals, bulk pharmaceuticals such as clindamycin phosphate, and dietary supplements such as melatonin. This emphasis builds on Genzyme's core technological strengths and also allows the company to redeploy its UK-based manufacturing expertise and resources to more strategic products. Consequently, the company will make an after-tax provision of $11.2 million.

(more)

KAYAT001231

FROM

'98 87:36:11   PLEASE DELIVER TO:->

08/98  TUE 09:04 FAX 017 374 7366         GENZYME CORP.COMMUN.

88.01.1998  11:10

PHARM/FINE CHEM     Page 882

TEL 1.441940718288

P. 2
P.02

002

Genzyme General Focuses Business Strategy – page 2

In its surgical products business unit, the company will not continue development of Sepracoat™ coating solution for the U.S. market. Sepracoat is designed to reduce adhesion formation that results from indirect trauma during surgery. In 1997, an advisory panel of the U.S. Food and Drug Administration recommended against approval of this product. The company will write off approximately $5 million after taxes for inventory and costs associated with manufacturing and selling Sepracoat.

This action will have no impact on the manufacture and sales of a related product, Seprafilm™ bioresorbable membrane, an FDA-approved product designed to reduce adhesions by acting as a physical barrier between tissues damaged by direct surgical trauma.

The remaining $1.7 million after tax provision represents an adjustment in the sale price of Genetic Design Inc., which was sold in 1996 when Genzyme left the identity testing business. The sale price included customer-retention objectives which were not met by the buyer. Genzyme did not record a gain on the sale.

Genzyme General develops and markets therapeutic products, surgical products, and diagnostic products and services. A division of the biotechnology company Genzyme Corp., Genzyme General has its own common stock intended to reflect its value and track its performance.

# # #

Genzyme's releases are on the World Wide Web at http://www.genzyme.com. They are also available from Genzyme's fax-on-demand service at 1-800-436-1443 within the United States or 1-201-521-1060 outside the United States.

* * * END * * *

KAYAT001232

УКРАЇНА

АКЦЮНЕРНЕ ТОВАРИСТВО

**СЄРТА**

свідоцтво № 21622510
252067, Україна, Київ-67
бульвар І.Лепсе, 4

20 лютого 1998 р.

№ 42

**ДЖЕНЗИМ Корп.**

**КАЙАТ Трейд.**

## ПРЕДАРБИТРАЖНОЕ ПРЕДУПРЕЖДЕНИЕ

г.Киев,    февраля 20, 1998 года.

АО СЕРТА 6.10.1997 г. заключило Контракт № 1 - 10 / 97 М  с Вашей фирмой, предметом которого является купля-продажа Товаров, а именно, медикамента МЕЛАПУР- МЕЛАТОНИН.

Вами были предоставлены  документы  и образцы готовой продукции для проведения  регистрации препарата Мелапур Мелатонин, таблетки 0,003 г №60 во флаконах производства «Джензим Фармацевтикалс», США, в Фармакологическом Комитете Минздрава Украины.  Данный продукт  был зарегистрирован Фармакологическим Комитетом МЗ Украины  25 апреля 1997 года Регистрационное свидетельство № 2173, срок регистрации 5 лет.

Регистрационные документы предполагают соответствие следующих характеристик готового продукта требованиям сертификата качества и сертификата анализа.

1. Внешний вид упаковки - должен полностью соответствовать образцам, предоставленным  для  регистрации в Фармакологический Комитет.
2. Укупорка флакона должна полностью соответствовать укупорке флаконов, предоставленных для регистрации  в Фармакологический Комитет
3. Во флаконе с таблетками должен находится  пакет с силикагелем, как это представлено в образцах  упаковок.
4. Внешний вид таблеток должен соответствовать следующему описанию: таблетки белого цвета, круглые, без оболочки, средней толщины 0,225 дюйма.
5. Средний вес таблеток должен быть равен  515 мг (0,515 г),  как это предусмотрено всеми нормативно-техническими документами, предоставленными  Вашей фирмой  в досье для регистрации в Фармакологический Комитет.
6. Содержание основного вещества - мелатонина в каждой таблетке должно быть 3 мг (0,003 г).

По указанному выше контракту Вашей фирмой  фактически был поставлен, а нашей фирмой получен товар по  таможенной декларации № 114374  от 5.11.1998 г  в количестве 1083 упаковок на сумму 16245 долларов,

KAYAT001329

по таможенной декларации №114226 от 14.11.1998 г. в количестве 9600 упаковок на сумму 144000 долларов.

11 декабря 1997 г. платежным поручением №37наша фирма оплатила полностью стоимость 1083 упаковок, путем банковского перевода на Ваш счет суммы 16245 долларов США.

В соответствии с действующим законодательством Украины каждая партия продаваемых в Украине медикаментов должна проходить контроль качества в учреждениях Государственной Инспекции Контроля Качества

Наша фирма сдала необходимое количество таблеток Мелапур-Мелатонина в Киевскую Лабораторию Госинспекции Контроля Качества Лекарственных Средств.

В результате проведения анализов образцов таблеток МЕЛАПУР было установлено следующее:

1. Внешний вид упаковки - упаковка посавленных серий не соответствует образцам упаковки, предоставленным для регистрации.
2. Укупорка флакона не соответствует укупорке флаконов, предоставленных в качестве образцов для регистрации в Фармакологический Комитет.
3. Во флаконах поставленных серии отсутствует силикагель, как это представлено в образцах упаковок.
4. Внешний вид таблеток соответствует следующему описанию: таблетки белого цвета, круглые, без оболочки, средняя толщина таблеток, не соответствует средней толщине таблеток, указанной в документах на регистрацию.
5. Средний вес таблеток оказался равен 395 мг (0.395 г), вместо 515 мг, указанных в сертификате и регистрационных документах, допустимое отклонение среднего веса не более 5% нарушено и фактически составляет 23%
6. Выборочный анализ таблеток свидетельствует о содержании основного вещества - мелатонина в таблетке в размере 0,0025 г, допустимое отклонение содержания основного вещества в объеме не более 5% также нарушено и фактически составляет 20%.

Данные факты явились основание для Госинспекции контроля качества вынести заключение о следующем:

1. Запретить фирме СЕРГА реализацию поставленных серий Мелапур Мелатонина производства «Джензим».
2. Изъять из аптечной сети Украины все упаковки Мелапур Мелатонина этих серий.
3. Приостановить действие Лицензии АО СЕРГА на право реализации лекарственных средств на момент выяснения обстоятельств поставок в Украину недоброкачественных серий препарат Мелапур Мелатонин
4. Направить документы о сериях препарата Мелапур-Мелатонин несоответствующих требованиям качества и регистрационных документов в Государственный Комитет Украины по защите прав потребителей.
5. Информировать Налоговую инспекцию о необходимости контроля за реализацией АО СЕРГА недоброкачественных серий препарата Мелапур Мелатонин.

KAYAT001330

6. Рекомендовать Фармакологическому Комитету МЗ Украины информировать фирму-производитель и FDA о факте поставки на рынок Украины недоброкачественных серий препарата Мелапур Мелатонин.

В связи с вышеуказанным заключением Инспекции по контролю качества наша фирма вынуждена приостановить деятельность по реализации препарата Мелапур-Мелатонин, изъять за свой счет реализованный конечным потребителям товар, вернуть потребителям перечисленные нам денежные средства.

Кроме того, в связи с приостановкой действия Лицензии АО СЕРТА на реализацию лекарственных средств, наша фирма вынуждена в одностороннем порядке разорвать договора поставок медикаментов потребителям Украины и стран СНГ. При этом среднемесячный оборот АО СЕРТА за последний год составляет 200000 долларов США в месяц, на февраль 1998 года АО СЕРТА обязано выполнить поставку лекарств на общую сумму 88000 долларов.

Статья 3 указанного выше контракта на куплю-продажу Мелатонина предполагает, что поставляемый товар должен соответствовать Сертификату качества, предоставляемому Продавцом, т.е. Вашей фирмой, фактически данное условие не выполнено.

В связи с вышеизложенным, АО СЕРТА считает, что Ваша фирма не выполнила взятые на себя обязательства по поставке качественного товара Мелапур-Мелатонин и таким образом разорвала договор в одностороннем порядке. Исходя из этого мы предлагаем Вам добровольно:

- вернуть нам сумму 16245 долларов США своевременно оплаченных нами за поставленный недоброкачественный товар;
- компенсировать нам фактически понесенный материальный ущерб в связи с проведением экспертизы Госинспекции контроля качества, работы по изъятию из продажи в аптеках и больницах Украины реализованного нами недоброкачественного товара, возврату конечным покупателям перечисленных нам средств на сумму 25700 долларов США
- компенсировать нам упущенную выгоду, понесенную нами в результате приостановления деятельности Лицензи АО СЕРТА на реализацию лекарственных средств, что было допущено в результате недобросовестных действий Вашей фирмы с нарушениями условий договора, на сумму 55055 долларов.

Общая сумма нашего ущерба соответствует 97000 (девяносто семь) тысяч долларов которые мы требуем перевести нам в срок до 28 февраля 1998 года на наш счет №260041148 в АППБ АВАЛЬ, г.Киев, МФО 300335, ОКПО21622510.

В противном случае мы будем вынуждены передать дело в Международный арбитражный суд где будем требовать возврата нам вышеуказанных сумм ущерба. Напоминаем, что в случае передачи дела в суд Ваши расходы возрастут в связи с необходимостью уплаты пошлины, пени и прочих судебных издержек

Финансовый Директор                   Гл. Бухгалтер

ЯРОШ В.С.                   МАЛЕЦА В.А.

Kayat Trading

# PREARBITRATION   NOTIFICATION

City of Kiev 20 February 1998

On the 06.10.97 the Joint Stock Company SERTA has signed a contract No1-10/97 with your company subject to sales and purchase of products (medicaments Melapure-Melatonin)

You have provided to the Pharmaceutical Committee of Ukraine the documentation and samples of the product for registration procedure of the medicament Melapure-Melatonin in tablets 0,003 grams No 60 in bottles manufactured by Genzyme Pharmaceuticals  USA. The product was registered by the Pharmaceutical Committee of Ukraine (PCU) on the 25 April 1997. The registration No is 2173 and it is valid for 5 years.

Registration documents suppose to comply with the following characteristics of the product to the Quality Certificate and Analysis Certificate requirements.

1. Package appearance – should fully match the samples, provided for the registration to the PCU.
2. Bottles lids should fully match the samples, provided for the registration to the PCU.
3. The bottle with the tablets should contain a silicagel pack, as it was provided with the samples.
4. Tablets appearance should match the following description: white colour, round shape, without coating, average thickness of 0,225 inch.
5. Average weight of the tablet should be 515 mgr. (0,515 gr.) as stated in the normative technical documentation presented to the PCU
6. Each tablet should contain 3mgr. (0,003 gr.) of the main ingredient – Melatonin .

According to the above mentioned contract your company has delivered and our company has received the products (custom declaration No114374 of 05.11.1998), quantity of products – 1083 packages for the amount of 16245 US Dollars as well as products (custom declaration No114276) of 14.11.98, quantity 9600 packages for the amount of 144000 US Dollars.

On the 11 December 1997 our company has made a payment of 16245 US Dollars for 1083 packages of the product by bank transfer (payment instruction No37).
In accordance with the law of Ukraine each shipment of medicaments delivered for sales in Ukraine must go though a State Inspection of Quality Control

Our company presented a required quantity of Melatonin tablets to Kiev Laboratory of State inspection of Quality Control for Medicaments.

The presented samples analysis stated the following:

KAYAT001332

1. Package appearance: the delivered items packaging does not match the samples presented for the registration.
2. The bottle lids do not match the corking of the samples.
3. The silicagel is missing in the delivered bottles.
4. Appearance of the tablets matches the following description: white colour, round shape, without coating, average thickness does not match the measurements stated in the presented for the registration documentation.
5. Average weight of the tablet is 395 mgr. instead of 515 mgr., as stated in the certificate and registration documents (considering that maximum permitted deviation could be no more than 5%, and in fact is 23%).
6. Selective analysis of the tablets has shown that the presence of the Melatonin ingredient is in fact 20% less, whilst the maximum permitted deviation could be no more than 5%.

Based on this data the State Inspection of Quality Control for Medicaments has reached the following resume:

1. To forbid the company SERTA distributing the delivered shipment of Melapure-Melatonin manufactured by Genzyme company.
2. To demonetize from pharmaceutical net of Ukraine all the packages of Melapure-Melatonin.
3. To suspend the License of SERTA for distributing of pharmaceuticals for the period of circumstantial ascertainment of Melapure-Melatonin products delivered to Ukraine.
4. To forward documentation of the shipment of poor quality Melapure-Melatonin, which does not comply with the quality requirements to the State Committee Consumers Rights of Ukraine.
5. To inform the Tax Inspection about the necessity to control distribution by Joint Stock Company SERTA of poor quality Melapure-Melatonin products.
6. To recommend the PCU to inform the company –manufacturer and FDA about the fact of poor quality Melapure-Melatonin Products delivery to the market of Ukraine.

In accordance with the above resume of the Quality Control Inspection our company is to stop the distribution of Melatonin, return the sold items and make a full refund to the consumers.
Other than that, with the termination of the license to distribute any medication, our company is to terminate al the agreements/contracts for delivery of medicaments to Ukraine and other CIS countries. Besides, the monthly turnover of the Joint Stock Company SERTA during the last year was 200000 US Dollars per month, and by February 1998 JS SETRA was supposed to deliver medicaments for the total amount of 88000 US Dollars.

Article 3 of the above-mentioned contract for sales and purchase of Melatonin supposes that the delivered products match the Certificate of Quality given to the consumer.



In accordance with the above, SERTA proclaims that your company did not fulfil the obligations to deliver good quality product Melapure-Melatonin, and that is why the contract is considered terminated. For that we propose the following:

1. To fully refund the amount of 16245 US Dollars, paid previously for the poor quality products.
2. To compensate our actual losses in accordance with the analysis carried out by PCU, activities, aimed at elimination of the products within pharmacies and hospitals of Ukraine, refund to consumers of received payments, total sum of 25700 US Dollars.
3. To compensate the possible profit as a result of suspension of the license, obtained by SERTA for medicaments distribution, resulted out of untrustworthy behaviour of your company, violating the agreement conditions, for the sum of 55055 US Dollars.

The total sum of our losses is 97000 US Dollars, which we demand to be transferred by the 28 February 1998 to our account No 260041148 APPG AVASh., city of Kiev, MFO 300335 OKPO 31628510, otherwise we will be forced to forward the case to the International Arbitration Tribunal where we shall demand the refund of all the above mentioned sums. We would like to remind you that in case of court your expenses will increase on the account of the necessity to pay taxes and court fees and penalties.

Financial Director      Chief Accountant
Signed                  Signed

KAYAT001334

August, 18, 1997

СОГЛАШЕНИЕ

AGREEMENT

Настоящее Соглашение заключено между ООО "АНИТ", в дальнейшем именуемым Дистрибьютор, и Kayat Trading Ltd., именуемой в дальнейшем Поставщик.

The present Agreement is concluded between OOO "ANIT" hereinafter referred to as the Distributor, and KAYAT TRADING LTD. hereinafter referred to as the Supplier.

## 1. ПРЕДМЕТ СОГЛАШЕНИЯ

ООО "АНИТ" является официальным эксклюзивным Дистрибьютором по продаже Мелатонина (продукт MelaPure производства фирмы Genzym) поставляемого компанией Kayat Trading Ltd., на территории Украины, в дальнейшем именуемой как территория Дистрибьютора, на условиях настоящего Соглашения.

## 1. THE SUBJECT OF THE AGREEMENT

OOO "ANIT" is an official exclusive Distributor of Melapure MELATONIN product of Genzyme delivered by the company KAYAT TRADING LTD. in the territory of Ukraine, hereinafter referred to as the Distributor territory, or terms of the present Agreement.

## 2. ВЗАИМНЫЕ ОБЯЗАТЕЛЬСТВА СТОРОН

2.1. Поставщик обязуется не заключать контракты на поставку Продукта с юридическими либо физическими лицами на территории Дистрибьютора и своевременно информировать Дистрибьютора о поступающих от третьих лиц предложениях на импорт Продукта.

## 2. MUTUAL LIABILITIES OF THE PARTIES

2.1 The Supplier undertakes not to conclude any contracts for delivering the Product with any legal or natural persons in the Distributor territory and will inform the Distributor about any proposals for the Product import of any third parts.

2.2. Дистрибьютор обязуется ежемесячно в течение срока действия настоящего Соглашения закупать не менее 20 паллет Продукта (каждая паллета содержит 4 800 упаковок по 60 таблеток по 3 мг Продукта) по

2.2. The Distributor undertakes to buy not less than 20 pallets of the Product per month during the validity of the present Agreement (each pallet carrying 4 800 bottles of 60 tablets of 3 MG of the Product) at the price of $ 15 (US $ fifteen)

KAYAT001349

цене $15 за единицу  (пятнадцать
долларов США).
При этом понимается, что закупки
должны начаться не позднее января
1997 года.

per unit.

2.3 Стороны на основе отдельного
соглашения проведут рекламную
кампанию Продукта.

2.3. The Parties will arrange advertising
campaign of the Product on the basis
of the separate agreement.

3. УСЛОВИЯ  ПОСТАВКИ

3. TERMS OF THE DELIVERY

Поставки осуществляются на
условиях CIF, Киев и сопровожда-
ются следующими документами:
оригинал сертификата происхожде-
ния, оригинал сертификата качества,
копия Соглашения

The deliveries will be made on terms
CIF, Kiev  and supplied by the fcllo-
wing documents: the original certificate
of origin. the original certificate of quality,
a copy of this Agreement.

4 УСЛОВИЯ  ПЛАТЕЖА

4.  TERMS OF PAYMENT

Платеж осуществляется путем
перевода Дистрибьютором 100%
стоимости  Продукта в течение
90 дней с даты отгрузки, Датой
отгрузки считается дата, указанная
в авиатранспортной накладной
Датой платежа считается дата по-
ступления перевода на счёт Постав-
щика.

The payment will be made by remittance
of 100% value of the Product within 90
days from the date of shipment.
The date of the Airway bill will be consi-
dered as the date of shipment. The date
of the receipt of the remittance at the
account of the Supplier will be considered
as the date of payment.

5.  ФОРС МАЖОР

5.  FORCE MAJEURE

5.1. Ни одна из сторон не несет от-
ветственности за полное или час-
тичное невыполнение своих обяза-
тельств по настоящему Соглашению.
если это невыполнение произошло
вследствие наводнения, катастрофы,
пожара, землетрясения, изменения
таможенных правил  а также войны
или военных действий или действий
исполнительной или законодатель-
ной власти, возникших после вступ-
ления Соглашения в силу.

5.1. None of the Parties is responsible
for a complete or partial failure to perform
their obligations under the present Agree-
ment.  If the said failure happened as a
result of fire, earthquake. change of the
customs procedures. war or government
actions  and other circumstances beyond
their control. that arose during the life
time of the present Agreement.

5.2. Сторона  для которой выполнение
обязательств стало невозможным.

5.2.The Party that found it impossible to
fulfil their obligations on the reason of the

KAYA100134

должна информировать другую сторону о начале, продолжительности и времени прекращения упомянутых выше обстоятельств. Факт, указанный в данном пункте, должен быть заверен Торгово-Промышленной Палатой соответствующей страны.

above circumstances is to inform the other Party about the beginning, duration and the termination of the said circumstances. The fact in the discussion should be certified by the Chamber of Commerce and Industry of the corresponding country.

## 6. СРОК ДЕЙСТВИЯ

## 6. DURATION

6.1. Настоящее Соглашение действует в течение срока действия Регистрационного Удостоверения, т.в. до 25 апреля 2002 года.
Если за три месяца до истечение срока действия настоящего Соглашения ни одна из сторон не заявит о своем намерении прекратить его действие, срок действия Соглашения продлевается еще на один год.

6.1. The present Agreement will be valid during the validity of the Rigistration Certificate i.e. till 25. April 2002.
If none of the Parties three months prior to expiration of the present Agreement declare their intention to terminate the Agreement. its validity will be extended by one year more

## 7. ПРОЧИЕ УСЛОВИЯ.

## 7. OTHER TERMS.

7.1. Все сборы, налоги, таможенные пошлины, комиссии банка и т.д. оплачиваются Дистрибьютором и Поставщиком в их странах в соответствии с установленным порядком.

7.1. All duties, taxes. customs duties, bank charges. etc. will be paid by the Distributor and the Supplier in their respective countries as applicable.

7.2. Любые изменения и дополнения к настоящему Соглашению действительны и являются его неотъемлемой частью только в том случае, если они сделаны в письменной форме и подписаны уполномоченными представителями обеих Сторон

7.2. Any amendments and additions to the present Agreement are to be valid and an integral part of the Agreement only if made in writing and signed by duly authorized representatives of both Parties

7.3. После подписания настоящего Соглашения все предыдущие договоренности и переписка по данному вопросу теряют силу и считаются недействительными.

7.3. After signing of the present Agreement all and any previous negotiations and correspondence pertaining thereof to be considered null and void.

7.4 Ни одна из Сторон не имеет права передавать третьей стороне права по данному Соглашению без письменного согласия другой Стороны.

7.4 Neither of the Parties has the right to assign their rights and obligations under the Agreement to any third party without written consent of the other Party.

7.5. Настоящее Соглашение состав-
лено в двух экземплярах на русском
и английском языках по одному экзе-
мпляру для каждой Стороны, причем
оба текста имеют одинаковую силу.

7.5. The present Agreement is done in
duplicate in Russian and in English by one
copy for each Party and both texts have
equal force.

7.6. Настоящее Соглашение вступает
в силу с момента подписания его
уполномоченными представителями
обеих Сторон.

7.6. The present Agreement comes into
force from the moment of its signing by
the authorized representatives from both
Parties.

8. АДРЕСА И РЕКВИЗИТЫ СТОРОН

8. LEGAL ADDRESSES OF THE
PARTIES

The Supplier

KAYAT TRADING LTD
36 Grivas Digenis Ave., P.O.Box
3393  1682 Nicosia-Cyprus.
Tel: +357-2-452680,
Fax:+357-2-441928



Дистрибьютор

ООО "АНИТ"
Украина, г. Киев,
ул. Киквидзе, 30 а
тел. 294-44-24,



KAYAT001251

KAYAT001448

EXTRACT FROM THE PROTOCOL No.10
of the meeting of Pharmacological Committee
of the Ministry of Health of Ukraine of 26.12.1996.

### RESOLUTION OF THE PHAMACOLOGICAL COMMITTEE

Genzyme Corporation. USA.

Hereby we confirm that the materials of firm Genzyme, USA, for the preparation Melapure-Melatonin, 3mg tablets, have been considered at the meeting of the Pharmacological Committee.

On the basis of positive conclusions of special expert commissions the Pharmacological Committee has taken a decision to recommend the registration of the preparation Melapure-Melatonin, USA, for the period of 5 years.

In accordance with the existing Regulation the Registration Certificate will be issued after consideration of this matter at the Bureau for registration of medical means of the Ministry of Health of Ukraine.

Deputy Chairman
Pharmacological Committee
Ministry of Health of Ukraine
Professor                                    V.S.Danilenko

# ВИПИСКА З ПРОТОКОЛУ № 10

### засідання фармакологічного комітету

МОЗ України від 26 грудня _____ 199 6 р.

Затверджено _____ 199__ р.

## ПОСТАНОВА ФАРМАКОЛОГІЧНОГО КОМІТЕТУ

Корпорация "ДЖЕНЗИМ", США

Настоящим подтверждаем, что материалы фирмы ДЖЕНЗИМ, США, по препарату МЕЛАПУР-МЕЛАТОНИН, таблетки 3 мг. были рассмотрены на заседании Фармакологического Комитета МЗ Украины, Протокол №10 от 26.12.1996 г.

На основании положительного заключения профильных экспертных комиссий, Фармакологическим комитетом было принято решение рекомендовать регистрацию препарата Мелапур-Мелатонин фирмы Джензим, США, сроком на 5 лет.

В соответствии с утвержденным Положением, Свидетельство о регистрации Мелапур-Мелатонин будет выдано после рассмотрения данного вопроса на Бюро по регистрации лекарственных средств при Министерстве здравоохранения Украины.

Заместитель Председателя
Фармакологического Комитета
МЗ Украины, профессор,                                    В.С.Даниленко

KAYAT001449

**STATE INSPECTION ON DRUG QUALITY CONTROL**
**Ministry of Health of Ukraine**

**STATE INSPECTION ON DRUG QUALITY CONTROL IN KIEV**

| | |
|---|---|
| Ukraine, 252034, Kiev | account 26000207640007 |
| Gonchara str., 17/19 | Kiev Bank Direction "Ukraine" |
| Telefax: 212-2584, tel/212-1435 | MPC 321574,  CKПC 2510466 |
| 23.03/2000  N 406 | |
| _____ of _____ | |

To the Manager of the Subject of
Economic activity in Kiev
OS "Serta"
Tsvetkov A.V.

Direction

Stop immediately realisation of tablets Melatonin 3mg N60, series 703003/1 in quantity of 11500 packs and series 703005/1 in quantity of 12800 packs produced by " Genzyme Corporation", USA that were rejected because of discrepancy with scientific documents on indices "Description" and "Marking".

The medicine is subject to destruction.

Prescription must be taken under personal control and it is necessary to inform about its fulfilment before " 5 "  04. 2000

Head of the State Inspection        N.I.Parshina

KAYAT001562

ДЕРЖАВНА ІНСПЕКЦІЯ З КОНТРОЛЮ ЯКОСТІ ЛІКАРСЬКИХ ЗАСОБІВ
МОЗ УКРАЇНИ

ДЕРЖАВНА ІНСПЕКЦІЯ З КОНТРОЛЮ ЯКОСТІ ЛІКАРСЬКИХ
ЗАСОБІВ В М. КИЄВІ

Україна, 252034, м.Київ
вул.С.Гончара, 17/19
телефакс 212-2584, тел.212-1435

Р/р 26000207840007 в ЦУРУ
Київської Дирекції банку "Україна"
МФО 321574, ОКПО 25410466

_23.03.2000р_   № _406_
№ ___  Від ___

Керівнику суб'єкта господарської
діяльності в м. Києві
_А.Серта_
/назва суб'єкта/
_Шевченку О.В._
/прізвище, ім'я керівника/

# ПРИПИС

Негайно призупинити реалізацію _таблеток мелатонину_
/назва препарату/
_2мг № 60, сер Ч03003/1 в кількості 1130уп_
/серія, фірма - виробник/
_та сер Ч03005/1 в кількості 1200уп, вироб-_
_ництва Джензайм Корпорейшн США,_
_забракованих по нав.лабораторії НД за_
_показником "середня вага таблеток"_
_Препарат підлягає знищенню_

Припис взяти під особистий контроль та про його виконання
повідомити до « _5_ » _04_ ~~1999~~ р. _2000р_

Начальник Держінспекції         Н.І.Паршина

KAYAT001563

**STATE INSPECTION ON DRUG QUALITY CONTROL**
**Ministry of Health of Ukraine**

**STATE INSPECTION ON DRUG QUALITY CONTROL IN KIEV**

| | |
|---|---|
| Ukraine, 252034, Kiev | account 26000207640007 |
| Gonchara str., 17/19 | Kiev Bank Direction "Ukraine" |
| Telefax: 212-2584, tel/212-1435 | MPC 321574,  CKHC 2510466 |
| 23.03/2000 N 405 | |
| of _____ | |

To the Manager of the Subject of
Economic activity in Kiev
OS "Serta"
Tsvetkov A.V.

Direction

Stop immediately realisation of tablets Melatonin 3mg N60, series 22118920 in quantity of 13310 packs and series 06018930 in quantity of 10925 packs produced by "Genzyme Corporation", USA that were rejected because of discrepancy with scientific documentation on indices "Description" and "Marking".

The medicine is subject to destruction.

Prescription must be taken under personal control and it is necessary to inform about its fulfilment before " 5 "  04. 2000

Head of the State Inspection          N.I.Parshina

ДЕРЖАВНА ІНСПЕКЦІЯ З КОНТРОЛЮ ЯКОСТІ ЛІКАРСЬКИХ ЗАСОБІВ
МОЗ УКРАЇНИ

ДЕРЖАВНА ІНСПЕКЦІЯ З КОНТРОЛЮ ЯКОСТІ ЛІКАРСЬКИХ
ЗАСОБІВ В М. КИЄВІ

Україна, 252034, м.Київ
вул.С.Гончара, 17/19
телефакс 212-2584, тел. 212-1435

Р/Р 26000207840007 в ОПЕРУ
Київської Дирекції банку "Україна"
МФО 321574, ОКПО 25410466

Керівнику суб'єкта господарської
діяльності в м. Києві

_____
/назва суб'єкта/

_____
/прізвище, ім'я, по батькові/

## ПРИПИС

Негайно призупинити реалізацію _____
_____
/назва препарату/
_____
/серія, фірма - виробник/
_____
_____
_____
_____

Препарат підлягає знищенню.

Припис взяти під особистий контроль та про його виконання
повідомити до « 5 » 04       1999 р. _____

Начальник Держінспекції                    Н.І.Паршина

KAYAT001565

**EXHIBIT 3**

# Now available
# from Genzyme Pharmaceuticals:



MELAPURE™
# MELATONIN

THE QUALITY STANDARD FOR MELATONIN

Now you can order high quality, pharmaceutical grade, synthetic melatonin directly from Genzyme - one of the world's top five biotechnology companies. Genzyme is the world's leading manufacturer of melatonin.

Rest assured, Genzyme manufactures melatonin according to strict standards of quality and purity.





What is Melatonin?

Frequently Asked Questions About Melatonin

How to Order: Secured Internet Form | Download Fax Form

About Genzyme Corporation

Distributors Wanted

Melatonin Bulk Raw Material

Melapure Home Page



# Distributors Wanted for



## Genzyme brand melatonin

## Distributors Wanted

Genzyme Pharmaceuticals is seeking to develop relationships with potential distributors in many international markets. Genzyme is the world's leading manufacturer of bulk melatonin and is able to make available on a world wide basis several final dosage form products. The MelaPure(tm) melatonin line includes: 3 mg melatonin, 3 mg melatonin with 10 mg vitamin B-6 and the new sustained release (MelaPure Dual Release) 3 mg tablets. MelaPure brand melatonin us supported by Genzyme's extensive consumer and trade promotional programs, authoritative scientific literature and trademark protection worldwide. Regulatory documentation including a Certificate of Free Sale and detailed product data are available. Genzyme has recently filed a Type II Drug Master File (DMF) with the U.S. FDA.

For more information, contact:

**For distribution in:**
**North and South**
**America:**

**For distribution in:**
**Europe, Middle East and Asia:**

David DeLoria                          Roger Sparrow
Genzyme Pharmaceuticals                Genzyme Pharmaceuticals
Cambridge, MA, USA                     Haverhill, Suffolk, England


Fax: (617) 252-7772                    Fax: 011 44 1440 707 783 e-
e-mail:                                mail:


## What is Melatonin?

## Frequently Asked Questions About Melatonin

How to Order: Secured Internet Form | Download Fax Form

## About Genzyme Corporation

## MelaPure Home Page

MelaPure(tm) is a trademark of Genzyme Corporation. MelaPure melatonin may not be available is some countries.



**EXHIBIT 4**

IN THE DISTRICT COURT OF NICOSIA

Action no.7462/02

Between:-

Kayat Trading Limited, of Nicosia.

Plaintiffs

-and-

Genzyme Corporation, of Massachusetts, U.S.A.

Defendants

STATEMENT OF CLAIM

**As amended by Order of the Court  dated 14.12.2005 and re-amended by Order of the Court  dated 5.12.2006**

1.      The plaintiff is a Cypriot international  business company registered  in accordance with the Companies Law, Cap 113 and amendments, with its seat in Nicosia and trading as its main activity.

2.      The defendant  is an American biotechnology and Pharmaceuticals company listed on the NASDAQ stock exchange with their seat in Cambridge,  in the Commonwealth of Massachusetts in the United States of America.   The defendant employs more than 6.300 persons at locations throughout the world, and as of **October, 2006**  its stock market capitalization was approximately USD **17.6** billion.

3.      In 1996 and 1997, at the time of the formation of a commercial relationship between the parties, a significant portion of the defendant's business was the manufacture  and  sale  of  **products**  containing  synthetic,  pharmaceutical-grade

1

melatonin under the registered trademark MelaPure. **There were two kinds of melatonin products sold by the defendant under the MelaPure brand, a) bulk melatonin in powder form which was used as a raw material and b) finished dosage form (FDF) melatonin in tablet form ready for consumption. At all material times the defendant manufactured bulk melatonin, but, as the plaintiff discovered afterwards, the defendant did not itself manufacture FDF melatonin. The commercial relationship between the parties related exclusively to FDF melatonin. Consequently, in the remainder of this statement of claim, a) the term ''MelaPure'' is used to refer to FDF melatonin only, and b) the references to ''manufacture of MelaPure by the defendant'' mean manufacture by third parties on account of the defendant.**

4.1   MelaPure **could be** marketed in the United States as a dietary supplement, but the defendant also wanted to **be able to** sell MelaPure in the European market where melatonin is, as a rule, subject to regulation as a medicine. In or about May 1996, the defendant began to cooperate with the plaintiff to achieve the registration of MelaPure as a licensed medicine in the Ukraine and the Russian Federation.

4.2   With the defendant's full knowledge, approval and material assistance, the plaintiff undertook the effort to register MelaPure as a medicine in the Ukraine and Russian Federation based upon the plain understanding of the parties that the defendant would appoint the plaintiff as its exclusive distributor for MelaPure in the country or countries in which registration was achieved, and probably in other countries.

4.3   On or about 25 April, 1997, MelaPure was registered as a licensed medicine in the Ukraine due to the efforts of the plaintiff and its associates. Registration provided the defendant substantial commercial advantages including exclusivity of importation, distribution and disposal in the registering country.

4.4   At all material times it was known to the parties that a MelaPure product, in order to be imported, distributed and/or disposed of in the Ukraine should conform strictly

with the description of the product in the registration license, which related not only to the composition of the medicine, but also, inter alia, to the size, form, appearance, colour, weight of the tablets, the kind, way, appearance and labelling of the packaging, and the country of origin of the tablets.

5.1    Following the registration of MelaPure as stated in paragraph 4.3 above, the plaintiff pressed the defendant for the conclusion of a distributorship agreement as had been contemplated from the beginning.

5.2  Consequently, by a contract in writing, made in Nicosia on or about the 15th of July, 1997 (hereinafter "the contract"), the defendant appointed the plaintiff as its exclusive distributor of MelaPure in a number of specified countries, former Soviet Union republics, among which was the Ukraine and the Russian Federation.

5.3 The contract was drawn up by the defendant. Negotiations between the parties took place only in relation to the part of the contract which determined the commercial relation between them, such as prices, minimum quantities, volume of sales, and duration of the agreement. There was no negotiation between the parties in relation to the part of the contract which determined the legal relationship between them, including the choice of the law of Massachusetts as the law governing the contract, as the defendant had made clear from the beginning that that part was not subject to negotiation and that the plaintiff had to either accept it as it was or reject it (when, of course, there would not have been an agreement),

6.1.    Even though the contract contains a provision that its duration would be for two years from the 25th June, 1996, the plaintiff alleges that, before its signature, the parties had agreed that its duration would be three (3) years from the date MelaPure had been registered as a medicine in the Ukraine, i.e. the 25th April, 1997.

6.2.    Since the defendant never properly terminated the contract in accordance with its terms by giving a written notice of termination at least six months prior to its expiration, the contract renewed annually after the initial three year period of its validity.

7.1    Clause 4,2 of the contract provided, inter alia, that defendants undertook to use its best reasonable efforts to fill the orders of the plaintiff with all reasonable despatch and in any event within 28 days of the date of the order.

7.2    Clause 4.3 of the contract provided that all Products supplied by the defendant would be with the defendant's standard packaging incorporating the name of the defendant as the manufacturer, the plaintiff as the distributor and such other information and particulars as might be identified by the plaintiff as being in compliance with the requirements of the respective Territories for which the order was intended.

7.3    Clause 9(d) of the contract provided that the defendant would supply the plaintiff with any relevant information including marketing information which it might possess which was likely to be of use or benefit to the plaintiff in relation to the marketing and sales of the defendant's products.

7.4    By means of clause 10 of the contract the defendant, inter alia, warranted and/or represented to and/or undertook with the plaintiff that the defendant's products (a) would correspond in all respects with their description in the Contract and (b) would be new and unused.

7.5    Clause 13 of the contract provided that time was of the essence in performance under the contract, and that no failure or delay on the part of any party in executing any right, power or remedy under the contract would operate as a waiver thereof.

7.6    Clause 14 of the contract forbade the assignment and/or transfer of any of the obligations of each of the contracting parties to a third person without the prior consent in writing of the other party, with the exception of the right of the plaintiff to appoint in the territories sub-distributors reasonably acceptable to the defendants.

7.7   Clause 15 of the contract provided that the contract would be governed by and interpreted in accordance with the laws of the commonwealth of Massachusetts, U.S.A., and that the parties agreed to submit to the jurisdiction of the courts of Massachusetts, U.S.A. but the parties might enforce the contract in any court of competent jurisdiction.

7.8   Schedule 3 of the contract set the plaintiffs purchase price for MelaPure at USD 3.50 per bottle of 60 3mg. tablets (hereinafter "the bottles").   In 1998, the purchase price was reduced to USD 3.00 per bottle.

7.9   In Schedule 4 of the contract are included detailed product specifications for MelaPure tablets. These specifications are identical, or almost identical, to the product specifications included in the registration license of MelaPure issued by the Ukrainian authorities,

7.10   Schedule 5 of the contract set the plaintiffs minimum annual purchase amount at USD 300,000 (or approximately 86,000 bottles).

7.11   The plaintiff reserves the right to refer at the hearing to the full text of the contract for its correct legal interpretation and effect.

8.1   Relying on the contract, the plaintiff,

a)   on or about 4 August 1997 **asked its associates in the Ukraine to contract** with the Ukrainian Scientific Therapeutical Society to survey the prospects for the sale of MelaPure in the Ukraine.    **Melatonin in tablet form** had been very successful upon its introduction in the United States, and the plaintiff reasonably expected a similar level of success **for MelaPure** in the Ukraine. The survey concluded that about 5% of the Ukrainian population (i.e. 2.5 million people) might be permanent consumers of melatonin and estimated that MelaPure sales should exceed 200,000 bottles monthly through April 2002;

b)   on or about 18 August 1997, made a written agreement with the Ukrainian

5

company 000 ANIT (hereinafter "ANIT") by which ANIT was appointed exclusive subdistributor of MelaPure in the Ukraine for the period of the validity of its registration as a medicine i.e. until 25 April.2002. ANIT assumed the obligation to buy at least 20 pallets (96,000 bottles) of MelaPure per month from the plaintiff at a price of USD 15 per bottle. The plaintiff shall refer at the hearing to the full text of the contract for its correct legal interpretation and effect; during the period from August, 1997 to the end of 1998 the plaintiff and ANIT carried out an extensive promotion and advertising campaign of MelaPure in the Ukraine. The said campaign, inter alia, took the form of

> i)   advertisements in the electronic and printed media;
> ii) advertisement boards in public places and means of transport;
> iii) printed articles and informative programming on television and radio;

d)   during the same period as above, the plaintiff made a concerted effort to have MelaPure included in the list of medicines used by the Ukrainian national health system.

8.2   In its turn ANIT made written agreements with the Ukrainian pharmaceutical companies, a) JV "CERTA" (hereinafter "CERTA") dated 5.9.1997, and b) JV "Medical Commerce" (hereinafter " 'Medical Commerce") dated 23.9,1997, to supply each with at least 12 pallets of MelaPure per month (i.e. a total of 24 pallets per month) at USD 19 per bottle, commencing in December, 1997. **In or about the years 1997-1998 Medical Commerce and/or CERTA, with ANIT's consent, entered into direct agreements with the plaintiff for the purchase of specific quantities of MelaPure. This was done at the request of the buyers to facilitate them in the process of importation, clearance from customs and/or payment for MelaPure.**

8.3 In the years 1996 to 2000, the plaintiff incurred the following expenses (in U.S. dollars), which the plaintiff claims from the defendant:

|  |  | USD |
|---|---|---|
| (a) | expenses for registering MelaPure as a medicine and marketing expenses | 45.700 |
| (b) | payments to Customs | 11.316 |
| (c) | travel and accomodation expenses | 57.000 |
| (d) | payments to the defendant for samples and the initial orders | 44.390 |
| (e) | advertising and promotion (as stated in paragraph 8.1 (c) above | 417.850 |
|  | Total | 576.256 |

9.1    The plaintiffs communications and dealings with the defendant were largely conducted through the defendant's branch and/or subsidiary and/or associate in Haverhill, England and, in particular, through the defendant's Director of International Sales **of the Pharmaceutical Division of the defendant**, Roger Sparrow (hereinafter "Sparrow"). At all material times Sparrow had and/or appeared to have full authority from the defendant, (express and/ or implied and/or apparent and/or ostensible) to exclusively represent and bind the defendant in its transactions with the plaintiff.

9.2   Indeed, in a letter to the plaintiff dated 9 September, 1997, the President of the **Pharmaceutical Division of the** defendant, Dr. Frank Ollington (Ollington"), fully confirmed Sparrow's authority, recited  promotional literature generated by the defendant, the  defendant's anxiety to see sales of MelaPure "develop and grow substantially."

10. In the period from signature of the contract through 31 December 1997 the plaintiff ordered the following quantities of MelaPure from the defendant (hereinafter "the 1997 orders"):

a)   on or about 27.8.1997, 2 pallets for the Ukraine;

b)   on or about 26.9.1997, 2 pallets for Russia and 2 pallets for the Ukraine;

c)   on or about 27.10.1997, a total of 55 pallets, i.e. 15 pallets for November, 1997 and   20 pallets each for December, 1997 and January, 1998.

11.1.    Despite the fact that the contract obliged the defendant to fill the plaintiffs

orders within 28 days, by the end of 1997 the defendant had delivered only 10,683 bottles of MelaPure to the Ukraine, a total of, approximately, 2% pallets.

11.2.    In or about January, 1998 the defendant delivered to the Ukraine 20.480 bottles of MelaPure, i.e. approximately 4,25 pallets.

11.3   No further quantities from the 1997 orders were ever delivered to the Ukraine.

12. All the MelaPure delivered by the defendant from the 1997 orders was not in accordance with and/or did not correspond to the specifications of the contract and/or the requirements of the Ukrainian registration and, as a result, the Ukrainian authorities impounded them in the customs and did not allow their clearance therefrom **and/or forbade their sale to the public**.

PARTICULARS

a.  The weight of the tablets was less (395 mg instead of 510 rng, approximately);

b.  the melatonin content of the tablets was less (2,5 mg instead of 3 mg);

c.  the tablets were smaller in size;

d.  the colour of the tablets was different;

e.  the bottles were different from the sample presented at the registration;

f.  the way of packaging was different from that of the sample;

g.  the products, although labelled as being of USA origin, in fact were of UK origin.

13.   On or about 20.2,1998 the plaintiff ordered 6 pallets of 5.000 bottles each with Ukrainian labels and, on or about 26.2.1998, doubled the order to 12 pallets, i.e. a total of 60.000 bottles with Ukrainian labels (hereinafter" the 1998 orders").

14.   Out of the 1998 orders the defendant delivered to the Ukraine in about the middle of April, 1998, 20.000 bottles or 4 pallets, and on or about the beginning of August, 1998, the balance of 40.000 bottles or 8 pallets. {The pallets of the 1998 orders contained 5.000 bottles each, instead of the 4,800 bottles of the pallets of the 1997 orders.)

15.   Earlier, in or about January, 1998, the plaintiff had informed the defendant in writing that, according to a new Ukrainian regulation, all products should bear on their packaging a bar code readable by a scanner. The particular bar code was agreed between the parties and it was agreed to be incorporated in the label of the products.

16.   All products delivered in execution of the 1998 orders were misbranded and/or mislabelled in that,

a)      they bore a wrong bar code, with the result that they could not be sold in the Ukraine;

b)      they were packed in containers which bore incorrect and/or incomplete descriptions of their contents;

c)  the labels were wrinkled and generally the appearance of the bottles was such that if gave the impression that the product was counterfeit,

17,1  Despite the assurances of the President of the **Pharmaceutical Division of the** defendant, referred to in paragraph 9,2 above, during 1997, at a time which the plaintiff cannot specify exactly, in a major reorganisation of its business, the defendant decided to quit totally the business of manufacturing and trading in MelaPure, or any other product, which contained melatonin.

17.2  As a result, and in implementation, of the above decision the defendant, at a time which the plaintiff cannot specify, transferred its entire business in MelaPure and all products containing melatonin, including ail trade marks, to the company Vita Pure Ltd, registered and having its seat in England (hereinafter "VitaPure").

17.3     With the above transfer, the defendant rendered impossible the further execution of the contract by itself.

17.4   The defendant never notified the plaintiff, at all or in time, of the defendant's above decision in a way which would make clear to the plaintiff that the contract had irrevocably been terminated, and that the production of MelaPure by the defendant

9

had definitely ended, which rendered the registration certificate useless.

18.    At all material times the defendant knew about

(a)  the existence of the plaintiffs contract with ANIT and in particular about its provisions, i) for a minimum quantity of 20 pallets per month, and  ii) the purchase price by ANIT of USD 15 per bottle;

(b)    the extent of the marketing and promotion effort of the plaintiff and ANIT, including the advertising campaign, the market surveys and the tangible possibility of introducing MelaPure into the Ukrainian national health system.

19. **1.**    The defendant breached the contract in at least the following ways with the result that the plaintiff suffered damage, which the plaintiff claims from the defendant:

(a)  delay in the delivery of the products way beyond the maximum period of 28 days allowed by the contract, in breach of clause 4.2 thereof;

(b)  delivery of different (lower) quantities than ordered, in breach of clause 4.1 thereof;

(c)  delivery of products which were not in accordance with the specifications of Schedule 4 and/or the specifications and/or intimations of the plaintiff in relation to the packaging of the products so that there would be compliance with the requirements of the Territories for which the order was intended, in breach of clauses 4.3 and 10 thereof

(d)  failure to notify and/or non-notification to the plaintiff, at all or in good time, of the changes in the place of manufacture of the products, the capability and capacity of manufacture, and the origin of the products, in breach of clause 9(d) thereof;

(e)  assignment and/or transfer of the defendant's obligations under the contract to VitaPure, without the prior written consent of the plaintiff, in breach of clause 14

thereof.

**19.2   Furthermore the defendant falsely represented to the plaintiff, expressly and/or impliedly and/or by its conduct and/or left the plaintiff with the impression that,**

(a)  **the defendant manufactured MelaPure at its own facilities and/or according to its own manufacturing process; and/or**

(b)  **MelaPure had large sales in the United States market; and/or**

(c)  **MelaPure was supported by an extensive advertising and marketing campaign in the United States and/or in other countries.**

**19.3 In fact,**

(a)  **the defendant never itself manufactured MelaPure at its own facilities, but MelaPure was manufactured for the defendant by third parties on contract; and/or**

(b)  **the manufacturing process did not belong to the defendant; and/or**

(c)  **in the United States, the defendant  i) sold MelaPure to its own personnel only and ii) had done little or no advertising or promotion of MelaPure in the market, other than the establishment of a webpage for MelaPure.**

20.1    ANIT has raised a claim against the plaintiff based on breach of contract, breaches of Ukrainian laws and regulations and claims against ANIT by CERTA and Medical Commerce also based on breach of contract and breaches of Ukrainian laws and regulations, arising from the same facts as those set out in this statement of claim. **CERTA and Medical Commerce also raised the same claims directly against the plaintiff.**

20.2   The plaintiff asserts that these claims should be taken into account in assessing the damages to which the plaintiff is entitled to receive from the defendant.

21.   By the phrase "the laws of the commonwealth of Massachusetts, U.S.A." in clause 15 of the contract are meant not only the laws passed by the Massachusetts legislature and the case law of the courts of Massachusetts, but also the relevant federal legislation of the U.S.A. which applies to Massachusetts, as well as the case law of federal and other courts which would be followed by the courts of Massachusetts. That is, every law and every case which would have been applied by the Massachusetts court if it was trying this case.

Breach by the Defendant of the Contract and of Its Duty of Good Faith Dealing

22. According to Massachusetts case law, any doubt or ambiguity in a contractual term is decided against the drafter of the contract, who in this case was the defendant.

23.1   Paragraph 1-203 of Chapter 106 of the General Laws of Massachusetts provides that every contract or duty which falls within Chapter 106 imposes an obligation of good faith in its performance or enforcement.

23.2   Paragraph 1-201 of Chapter 106 provides, inter alia, that, unless the context otherwise requires, in Chapter 106,

(a) the term "contract" means the total legal obligation which results from the parties' agreement as affected by Chapter 106 and any other applicable rules of law;

(b)  ''Good faith'' means honesty in fact in the conduct or transaction concerned.

23.3   Paragraph 2-103 of Chapter 106 provides, inter alia, that in Article 2 of Chapter 106, unless the context otherwise requires "Good faith" in the case of a

merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in trade.

23.4     Paragraph 2-104 of Chapter 106 provides that the term ''Merchant'' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

23.5   Paragraph 2-106 of Chapter 106 provides, inter alia, that in Article 2 of Chapter 106, unless the context otherwise requires,

(a) the terms ''contract'' and ''agreement'' are limited to those relating to the present or future sale of goods;

(b) ''contract for sale'' includes both a present sale of goods and a contract to sell goods at a future time;

(c)  a ''sale'' consists in the passing of title from the seller to the buyer for a price (section 2-401);

(d) a ''present sale'' means a sale which is accomplished by the making of the contract;

(e)  goods or conduct including any part of a performance are ''conforming'' or conform to the contract when they are in accordance with the obligations under the contract.

23.6   The plaintiff reserves its right to refer, at the hearing, to the full text of the above legislation for its true legal meaning and effect according to the applicable law.

13

24.  According to Massachusetts case law,

(a) the above obligation of good faith requires that no party shall do anything which would have the result of destroying or injuring the right of the other party to receive the fruits of the contract.

(b)  in the event of a breach of the above obligation of good faith, the innocent party is entitled to receive by way of damages, the fruits of the agreement. The relevant term used in the case-law is "expectancy damages". These damages are comprised of the value which the innocent party would have received if the breach had not occurred, less the value which it did in fact receive, plus any special damages.

25. The plaintiff states that,

(a)  the contract comes within the terms of the above section 1-203, ch. 106 of the General Laws of Massachusetts;

(b)  the defendant breached its obligation to perform and/or execute the contract in good faith with the result that the plaintiff suffered damage, in that the right of the plaintiff to enjoy the fruits of the contract was destroyed or injured, which the plaintiff claims from the defendant,

<u>PARTICULARS</u>

i. non-delivery, at all or in time, of products which would be in accordance with the contract and/or in the quantities ordered;

ii. non communication to the plaintiff, at all or in time, of the decision and/or intention of the defendant to stop the production of MelaPure and to withdraw completely from the business of manufacturing products which contained melatonin;

iii. non communication to the plaintiff, at ail or in time, of the defendant's decision to stop the manufacture of MelaPure in the United States and to move it to the United Kingdom;

14

iv. concealment from and/or non communication to the plaintiff, at all or in time, of the fact that the defendant did not have the capability to manufacture MelaPure in the quantities which would have satisfied the plaintiffs needs in accordance with its business plan.

**v.  false representation to the plaintiff, expressly and/or impliedly and/or by conduct that the defendant manufactured MelaPure itself at its own facilities and/or that the defendant was using its own manufacturing process and/or that MelaPure had large sales in the U.S.A. market and/or that MelaPure was the subject of extensive advertising and promotion in the market of the U.S.A. and/or of other countries.**

The Defendant Committed Common Law Fraud

26. The plaintiff alleges that the defendant is guilty of common law fraud as a result of which the plaintiff suffered damages, which the plaintiff claims from the defendant.

PARTICULARS OF FRAUD

a) whilst the defendant had already decided or was about to decide or was seriously considering to abandon the manufacture and trade of MelaPure and melatonin products generally, the defendant preceded to enter into the contract with the plaintiff;

(b)  the defendant concealed from and/or did not communicate, to the plaintiff, at ad or in time, its above intention and/or decision, both before and after the making of the contract;

(c)  whilst knowing the plaintiffs business plan and its monthly needs for the supply of MelaPure, the defendant concealed from and/or did not communicate to the plaintiff, at all or in time, the defendant's inability to manufacture and supply the plaintiff, in time or at all, the necessary quantities of MelaPure

conforming to the contract specifications;

(d) whilst the defendant had finally decided to abandon the field of manufacture and trade of melatonin products (including MelaPure), the defendant was giving to the plaintiff incomplete and/or misleading information and/or representations, knowing that this would convey to the plaintiff the false impression and/or the belief that in some way the defendant would continue to meet its obligations under the contract, either personally or through third parties.

**(e) the defendant falsely represented to the plaintiff, expressly and/or impliedly and/or by conduct that the defendant manufactured MelaPure itself at its own facilities and/or that the defendant was using its own manufacturing process and/or that MelaPure had large sales in the U.S.A. market and/or that MelaPure was the subject of extensive advertising and promotion in the market of the U.S.A. and/or of other countries.**

27.1  The plaintiff states that, according to Massachusetts case law, it is entitled to receive as damages for common law fraud what the plaintiff would reasonably expect to receive if the false representations had been true. In this respect, Massachusetts case law has followed article 552B of the Restatement (2nd) of Torts (1977) which provides, inter alia, that the damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it, and (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation, but not including the benefit of the plaintiff's contract with the defendant.

27.2  The plaintiff states that this case falls within the category of cases in which, according to Massachusetts case law, there exists a duty of full disclosure of relevant facts. In this respect, Massachusetts case law has adopted article 551(2) of the Restatement (2nd) of Torts (1977) which provides that one party to a business

transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement  of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

27.3  Article 551 (1) of the Restatement (2nd) of Torts (1977) provides that one who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain  from acting in a business transaction is subject to the same liability to the other as though he had represented the non-existence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

27.4  The plaintiff reserves its right to refer, at the hearing, to the full text of the above legislation for its true legal meaning and effect according to the applicable law.

<u>The Defendant Violated Chapter 93A of the General Laws of Massachusetts</u>

28.1   Section 2(a) of chapter 93A of the General Laws of Massachusetts provides that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

28.2   Section 11 of chapter 93A provides, inter alia, the following:

(a)      any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice rendered unlawful by section 2 of chapter 93A, may bring an action for damages and such other equitable relief, including an injunction.

(b)      if the court finds for the petitioner, recovery shall be in the amount of actual damages, or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.

28.3   The plaintiff reserves its right to refer, at the hearing, to the full text of the above legislation for its true legal meaning and effect according to the applicable law.

29.   In relation to chapter 93A, Massachusetts case law provides, inter alia, as follows:

a) Chapter 93A creates new substantive rights by rendering unlawful conduct which previously was not unlawful under the common law or other legislation.

b) Whilst the common law actions for fraud and deceit are included in the notion of unfair act under chapter 93A, the definition of ''unfair'' goes far beyond the scope of

18

those common law actions.

c) There is no need to make a finding of international or wilful conduct to establish a violation of chapter 93A.  Such finding is necessary, however, to enable the court to award double or treble damages in accordance with section 11 of chapter 93A.

d) Under chapter 93A, there is a duty to disclose all material facts known to the party at the time of the transaction.

e) The non-disclosure of a fact the disclosure of which might have influenced the other party not to go ahead with the transaction is a violation of chapter 93A.

f)  Conscious misrepresentation and half-truths may constitute serious deception.

g) A material and substantial breach of a term of the contract provides ample basis for recovery under chapter 93A for unfair or deceptive act or practice.

30.  From the year 1997 through to 1999, the defendant employed and/or applied unfair and/or deceptive acts and/or practices in the conduct of the defendant's business with the plaintiff, in violation of section 2 of chapter 93A (above) with the result that the plaintiff suffered loss of money and/or property, which the plaintiff claims from the defendant.

<u>PARTICULARS OF UNFAIR AND/OR DECEPTIVE ACTS AND/OR PRACTICES</u>

a)  having decided or being about to decide or seriously intending to abandon the business of manufacture and trade of melatonin products, including MelaPure, and/or in the process of winding down its melatonin business, the defendant from its seat in Boston, Massachusetts, assured the plaintiff of the defendant's desire and ability to perform the contract in accordance with the plaintiff's business plan of which the defendant was fully aware, including the necessity of strict compliance with the Ukrainian requirements which included the requirement that the goods be

of USA origin;

b)  even after the transfer of MelaPure and its melatonin business, the defendant from Boston informed the plaintiff that all the defendant's responsibilities under the contract had been transferred to VitaPure, implying that all was in order and that the contract would continue to be performed by VitaPure.

c)  the defendant failed to disclose to the plaintiff facts material to their relationship namely,

  i) the defendant's inability to manufacture MelaPure in sufficient quantities to satisfy the plaintiff's needs, and

  ii) the defendant's decision to get out of the melatonin business altogether;

d)  according to Massachusetts case law, the defendant acted in disregard of known contractual arrangements to secure to itself unwarranted benefit, by knowingly and wilfully disregarding its obligation to supply MelaPure of USA origin in order to secure benefits in implementing the defendant's reorganisation of its business, as described in 17.1 above, and/or to dispose of non-conforming MelaPure stocks.

**e)  the defendant falsely represented to the plaintiff, expressly and/or impliedly and/or by conduct that the defendant manufactured MelaPure itself at its own facilities and/or that the defendant was using its own manufacturing process and/or that MelaPure had large sales in the U.S.A. market and/or that MelaPure was the subject of extensive advertising and promotion in the market of the U.S.A. and/or of other countries.**

The Defendant Violated the Federal Racketeer Influenced and Corrupt Organizations Act

31.1  Section 1962(c) of Title 18 of the United States Code (18.U.S.C.), part of the Federal Law on Racketeer Influenced and Corrupt Organizations, 18 U.S.C.,

provides, inter alia, that it is unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, the interstate or foreign commerce of the United States of America, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

31.2   Section 1961(1) of the same Law provides that "racketeering activity" means, inter alia, any act which is indictable under, inter alia, any of the provisions of section 1341 (relating to mail fraud) or section 1343 (relating to wire fraud).

31.3   Section 1961(4) of the same Law provides that the term 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

31.4   Section 1961(5) of the same Law provides that for a "pattern of racketeering activity" to exist at least two acts of racketeering activity are required, which must not be more than ten years apart one from the other.

31.5    Section 1341 of the same Law provides, inter alia, that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do,  places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter

21

or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

31.6    Section 1343 of the same Law provides, inter alia, that whoever having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be fined or imprisoned not more than 20 years, or both.

31.7    Section 1964 (c) of the same Law provides, that any person injured in his business or property by reason of a violation of section 1962 of this Law may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

31.8   The plaintiff reserves its right to refer, at the hearing, to the full text of the above legislation for its true legal meaning and effect according to the applicable law.

32.1.  The case law of the United States provides that state courts have concurrent jurisdiction to try civil actions under sections 1961-1968 above. Both the federal and state courts of Massachusetts try such cases.

32.2.  The plaintiff states that the facts of this case bring it within the category of cases in which, according to the applicable case law, the defendant would be liable to the plaintiff under the above law, and especially to compensate the plaintiff under section 1964(c) thereof.

33.  In the years 1997 to 1999 inclusive, the defendant violated the above section 1962(c) by conducting or participating in the conduct of the affairs of an enterprise,

in which the defendant, the plaintiff, Sparrow, and the defendant's subsidiary in England were associated, of trading in melatonin products, which affected the foreign trade of the USA, through a pattern of racketeering activity that proximately caused damage to the business and/or property of the plaintiff, for which the plaintiff claims from the defendant.

PARTICULARS OF PATTERN OF RACKETEERING ACTIVITY

Having devised a scheme of trading in melatonin products, whilst having decided or being about to decide or seriously intending to abandon the business of manufacture and trade of melatonin products, including MelaPure, the defendant committed mail and/or wire fraud, in violation of sections 1341 and 1342 of Title 18 of the United States Code (18 U.S.C.) (above) in at least the following instances:

i. Sending by post to the plaintiff a letter dated 9 September, 1997, signed by the defendant's President Frank Ollington in which was stated the defendant's desire ''to see the sales of this product [i.e. MelaPure] develop and grow substantially so that each of us can realize a fair return'', as stated in paragraph 9.2 above.

ii. On several occasions in 1997 and 1998 delivering by interstate or commercial carrier to the plaintiff's sub-distributors spurious articles, i.e. articles which the defendant had mislabelled, as stated in paragraphs 12 (g) and 16 above.

iii. Sending by post to the plaintiff a letter dated 25 November, 1998, signed by the President of the defendant's pharmaceuticals division Mara Aspinall, by which it informed the plaintiff of the transfer, on 1 July, 1998 of its MelaPure and all melatonin product business to VitaPure and that VitaPure would assume ''responsibilities for all business activities'', implying and/or misleading the plaintiff into believing that the contract was still in existence and that the defendant's obligations thereunder would be performed by VitaPure.

iv. Multiple facsimile transmissions through the wire and/or wireless network by

Sparrow in carrying out foreign commerce fraudulently assuring the plaintiff of the ability and/or desire of the defendant to fulfil its obligations under the contract.

v. Multiple facsimile transmissions through the wire and/or wireless network by the defendant's director of business development Carol Greve-Phillips fraudulently assuring the plaintiff of the ability and/or desire of the defendant to fulfil its obligations under the contract.

vi. Correspondence and/or communications through the wire and/or wireless network, including e-mail messages, between Sparrow and the defendant in Massachusetts. Further particulars about the content of these communications cannot be given until there is full discovery of documents by the defendant.

**vii.  false representation to the plaintiff, expressly and/or impliedly and/or by conduct, contained in documents and/or correspondence sent to the plaintiff by post and/or in electronic form, that the defendant manufactured MelaPure itself at its own facilities and/or that the defendant was using its own manufacturing process and/or that MelaPure had large sales in the U.S.A. market and/or that MelaPure was the subject of extensive advertising and promotion in the market of the U.S.A. and/or of other countries.**

34.1  In the period before the filing of this action, the plaintiff repeatedly demanded from the defendant compensation for the plaintiff's losses but was unsuccessful.

34.2  In pursuing its claim against the defendant, the plaintiff incurred, and shall continue incurring, legal fees in the United States, which to date amount to USD**316.585,98**, and which the plaintiff claims from the defendant.

AND THE PLAINTIFF CLAIMS:

a)  Damages for breach of contract, as per paragraphs 19 and 24 above;

b)  Damages for fraud, as per paragraph 26 above;

c)  Damages for violation of chapter 93A of the General Laws of Massachusetts as per section 11 thereof, as per paragraph 30 above;

d)  Damages for violation of Title 18 of the United States Code (18 U.S.C.) as per section 1964 (c) thereof, as per paragraph 33 above;

e)   U.S.D. **892.841,98**, or equivalent in Cypriot pounds, special damages, as per paragraphs 8.3 and 34.2 above;

(f)   a declaration that the plaintiff is entitled to be indemnified by the defendant against any claims raised against the plaintiff by third parties arising from the facts of this case i.e. the contract between the parties, the deliveries of MelaPure to the Ukraine and/or all related facts;

(g)  legal interest ;

(h)  costs, plus V.A.T (VAT Reg. No. 425291X)


...............................................
G. & A. Ladas
Advocates for the Plaintiff


Filed on 15 December 2006.


A copy was delivered to Messrs Chryssafinis & Polyviou,
advocates for the defendant, on the same day.

**EXHIBIT 5**

**DISTRICT COURT OF NICOSIA**

**Before:  A. Paschalides P.D.C.**

<u>**Action no: 7462/02**</u>

**Between:-**

**Kayat Trading Limited of Nicosia**

<u>**Plaintiffs**</u>

**and**

**Genzyme Corporation of Massachusetts U.S.A.**

<u>**Defendants**</u>

<u>**Date:**</u>  **13 September, 2006**

<u>**Appearances:**</u>

**For the Plaintiffs:  Mr  Ladas**

**For the Respondents:  Mr  Polyviou**

<u>**INTERIM RULING**</u>

<u>**Application dated 20.2.06**</u>

By their above application the defendants pray for:

(a)         Order dismissing and/or setting-aside and/or annulling the action and/or the writ of summons and/or the proceedings to date in this action.

and/or

(b)          Order dismissing and/or setting-aside and/or annulling the order for service and/or the service of this action.

1

and/or

(c)      Order annulling and/or striking-out and/or suspending every proceeding and/or further proceeding in this action.

and/or

(d)      Order striking-out paragraphs 28.1 – 30(d) of the Statement Of Claim (concerning Chapter 93A of the General Laws of Massachusetts) as well as paragraphs 31.1 – 33.vi of the Statement of Claim (concerning the Federal Law about Racketeer Influenced Corrupt Organizations Act 18 U.S.C.) both for reasons of jurisdiction and of *forum conveniens* as well as for abuse of process.

and/or

(e)      Order striking-out paragraphs 28.1 – 30(d) of the Statement of Claim (concerning Chapter 93A of the General Laws of Massachusetts) as well as paragraphs 31.1 – 33.vi of the Statement of Claim (concerning the Federal Law about Racketeer Influenced Corrupt Organizations Act 18 U.S.C.) because the above paragraphs of the Statement of Claim introduce new and different causes of action, further than what is included in the Generally Indorsed Writ of Summons dated 9.7.2002, in clear contravention of the Civil Procedure Rules.

In order to understand the positions of the two sides it is necessary in my opinion to refer to the history of these proceedings as it emerges from the file of the case. I summarize.

By a writ of summons filed under the provisions of O.2, r.1, the plaintiffs, a limited liability company registered in Cyprus, claim against the defendants, a foreign company with its seat in Massachusetts, USA, compensation for damages which they, as they allege, have suffered due to breach by the defendants of a written

contract dated 15.9.97[1], by which the defendants appointed the plaintiffs as distributors of their products abroad.  The defendants also claim damages for fraud and/or deceit and/or false representations on the part of the defendants and/or their employees at the time of the making and/or execution of the subject-matter contract. According to clause 8[2] of the said contract, the contract *"……….. shall be governed by and interpreted in accordance with the laws of the commonwealth of Massachusetts, U.S.A. and the parties agree to submit to the jurisdiction of the courts of Massachusetts, U.S.A., but the parties may enforce this agreement in any court of competent jurisdiction."*

The filing of the writ of summons was preceded by applications by which the plaintiffs obtained leave to seal file and serve the writ of summons outside the jurisdiction by substituted service.

On 6.12.02 the defendants, after obtaining leave to appear under protest, filed an application relying on the same legal basis as that on which prayers under (a), (b) and (c) in this application rely. By the said application the defendants were seeking the issuing of orders identical to the orders sought under prayers (a), (b) and (c) in this application. By an interim ruling given on 31.3.04 after hearing, the Court dismissed  the said application of the defendants. The interim ruling of the Court was appealed against, but the appeal was dismissed because the said ruling was considered to be "non-appealable".

Approximately one month later, the plaintiffs applied to the Federal Court of Massachusetts, where, with the consent of the other side, they obtained an order for discovery under the relevant Law (28 U.S.C. para. 1782).

On 24.11.04 the statement of claim was filed, extensive parts of which became the object of an application to strike-out filed by the defendants. The plaintiffs objected to the said application. By its interim ruling given on 27.9.05, the Court ordered the striking-out of extensive passages of the said pleading. It is noted that, at the hearing of the said application, learned counsel for the defendants made a

---

[1] Translator's note: the date should be 15.7.1997.
[2] Translator's note: it should be clause 15 of the contract.

statement reserving the defendants' right *"if they considered it advisable, to proceed with a new application for forum non conveniens or similar application"*.

The interim ruling of 27.9.05 was followed by an application by the plaintiffs to amend the statement of claim, in which an order was made with the consent of the defendants, who reserved their right to apply to the Court to strike-out the statement of claim or parts thereof. As a result, the amended statement of claim was filed on 28.12.05. A few days later and in particular on 23.1.06, the plaintiffs filed an application for judgment for want of defence. The said application was withdrawn on 14.4.06 because in the meantime this present application had been filed.

This is, in summary, the history of these proceedings as it emerges from the file of the case.

The application is based on sections 2 and 21 of the Courts of Justice Law, 14/60, on section 3 of Cap. 6[3], on the Civil Procedure Rules, O.22, rr 2 and 3, O.6 rr 1,2,4,5,6 and 7, O.16, r 9, O.19, r 26, O.27, r 3, O.48, rr 1,2, 3,4,8. In the legal basis of the application invocation is also made of the inherent powers of the Court, the principles governing the exercise of the discretionary powers of the Court, and of the general principles of law *"which govern matters of jurisdiction and competence, forum conveniens, as well as on the principles which govern matters of abuse of process, public policy and similar matters."* The factual basis of the application is contained in a many-paged affidavit of advocate in the law office handling the case for the defendants, Litsa Malekou, on which a number of documents is attached as Exhibits. I summarize the content of the said affidavit. It should be noted that a large part of the affidavit accompanying the application makes reference to the history of these present proceedings, whilst another equally large part relates to the legal interpretation of the documents - exhibits attached to the application and/or the legal consequences of the actions of the plaintiffs to which reference is made, matters which have become in issue in these present proceedings.

Mrs Malekou, after referring to the history of the case and to specific actions of the plaintiffs after the interim ruling of the Court dated 31.3.04, states the following:

---

[3] Translator's note: Cap. 6 is the Civil Procedure Law.

4

*"Para. 3*

(i)     *After the filing of the Statement of Claim by the plaintiffs, and after the various proceedings - through an attorney - of the plaintiffs before the competent American Court, the entire situation (as regards the matter of forum conveniens)  has changed **radically** (in comparison to what it was at the issuing of the interim ruling dated 31.3.2004). **In particular**:*

(a)  *It is clear from the Statement of Claim that the matters raised are not confined to alleged breaches of the contract between the parties (and to ancillary matters), but on the contrary allegations are made against the defendants for contravention of legislative provisions which apply only in America, such as Chapter 93A of the General Laws of Massachusetts as well as the Federal Law on Racketeer Influenced Corrupt Organizations Act 18 U.S.C.*

*The above allegations had not been put before the District Court of Nicosia either in the Generally Indorsed Writ of Summons or in the original Application by which the leave of the Court to seal and serve the Writ of Summons outside the jurisdiction had been sought.*

(ii)    **Furthermore***, the plaintiffs have proceeded to judicial steps before the competent Court of the United States, as appears from the attached documents. On the contrary, until recently the plaintiffs were alleging that it was not possible to have recourse to the American Courts because of legal fees, which made their access to American justice extremely difficult if not impossible. On the contrary, with their steps before the competent American Court  the plaintiffs themselves invoke the aid and assistance of the American Courts, subject themselves to costs which they themselves characterized as difficult to bear, and totally negate the allegations on the basis of which they had secured the dismissal of the application of the defendants dated 6.12.2002.*

*In all*, its is not only clear that the plaintiffs have in effect misled the District Court of Nicosia, but also – as it arises from the undisputed facts which took place after the decision of the District Court of Nicosia on 31.3.2004 – the situation has been altered **dramatically and radically** (in comparison with what was before the District Court of Nicosia on 31.3.2004) and **new** facts and circumstances have arisen which make clear that the most appropriate forum to try this case, as it is **now** put, is not Cyprus but the American State of Massachusetts (the jurisdiction of which the plaintiffs themselves have invoked.)

4.   On the basis of all the above, as well as the totality of facts and circumstances which are **now** before the Honourable Court I believe – ………… – that the most appropriate and competent forum for the alleged disputes between the parties is no longer Cyprus and/or its Courts, but the American State of Massachusetts and/or its Courts.

**Especially**,   I note that apart from the applicable law to the alleged contract (which is the law of Massachusetts), apart from the fact that the defendants do not reside nor have a business or work in Cyprus, apart from the fact that the alleged breaches of the alleged contract have not taken place in Cyprus but elsewhere, the plaintiffs have resorted to an American Court  for discovery and to obtain evidence, and in the Statement of Claim are included alleged breaches of American legislation (**Chapter 93A of the General Laws of  Massachusetts** – paragraphs  28.1-30 d of the Statement of Claim as well as the **Federal Law on Racketeer Influenced Corrupt Organizations Act 18 U.S.C.** –  paragraphs  31.3 – 33.vi of the Statement of Claim. Those two laws are known as **Chapter 93A** and **RICO** respectively. I attach herewith **Chapter 93A (<u>Attachment X</u>)** and **RICO (<u>Attachment Ψ</u>)**.*"

The affiant further rejects the premise that the interim ruling of the Court dated 31.3.04 constitutes *res judicata* and maintains that continuation of the action *"as matters have developed, constitutes a flagrant abuse of process and contempt of Court."*

6

Finally Mrs Malekou prays, in the alternative, for the striking-out from the statement of claim of the controversial passages together with the remedies sought under paragraphs (c) and (d) of the statement of claim, *"both for reasons of jurisdiction and for reasons of forum conveniens as well as for reasons of abuse of process and public policy of Cyprus and of the Courts of Cyprus."* The affiant for the defendants seeks the striking-out of the controversial passages together with the remedies in the statement of claim also because *"these allegations introduce totally new and different causes of action, without any connection with the generally indorsed writ of summons dated 9.7.02."*

The application was opposed by the other side. Due to the nature of the issues raised in this proceeding I consider it advisable to quote the grounds of opposition verbatim, as they are set out in the main body of the Opposition.

*''A. In relation to prayers (a) (b) and (c) of the application*

1. *The said prayers are identical to the prayers which the defendants submitted in their application dated 6.12.2002 in the present case. Each one of those prayers was exhaustively examined by the Court and was dismissed by its interim ruling dated 31.3.2004, which was considered by the Court of Appeal to be non-appealable. Consequently, there is res judicata, which prevents the applicant from raising those matters before the Court again.*

2. *Any decision of the Court on the said prayers other than their dismissal shall be equivalent to a review and/or cancellation of the interim ruling of the Court dated 31.3.2004, which this Court has no jurisdiction to do.*

3. *If the applicant's position is that the interim ruling of 31.3.2004 was obtained by fraud or deliberate misleading of the Court (as appears from paragraphs 3, 5 and 7 of the affidavit dated 20.2.2006 in support of the application [henceforth ''the affidavit'']), then (the defendants) must seek to have the said ruling set aside by the appropriate legal action, if any, and not raise the same prayers by a new application.*

4.   Without prejudice to the above, and in the event the Court should decide to reopen the said matters on their merit, the respondent repeats its grounds of opposition in its Opposition dated 13.3.2003 to the application dated 6.12.2002 and especially paragraph 4 thereof, and adds the following:

    i.    according to section 3 of the Civil Procedure Law, the time at which the existence of jurisdiction and the matter of forum conveniens is decided is the time of granting of leave to serve the writ of summons outside the jurisdiction of the Court.

    ii.    acceptance of the applicant's prayer on the matter of forum conveniens would come into conflict with the express provision in clause 15 of the contract between the parties, as this is set out in paragraph 7.7 of the statement of claim, that the contracting parties had the right to enforce the contract in any Court which had jurisdiction.

    iii.    The facts relating to the existence of jurisdiction and the matter of forum conveniens are in no way altered or affected by the inclusion in the statement of claim of claims under Chapter 93A of the General Laws of Massachusetts (henceforth ''Chapter 93A'') and the Federal Racketeer Influenced and Corrupt Organisations Act 18 U.S.C. (henceforth ''RICO'') and/or the filing of an application to the Federal District Court of Massachusetts for discovery of documents and deposition of witnesses under section 1782 of the Federal Law 28 U.S.C. (henceforth ''§1782 28 U.S.C.'') as is elaborated herebelow.

    iv.    It is doubtful whether this action can today be brought before the Courts of Massachusetts due to prescription.

5.   The respondent asserts that the raising again of matters which have already been finally decided by the Court constitutes abuse of process.

8

*B' In relation to prayers (d) and (e) of the application*

6.    *The claim raised in paragraphs 28-30 of the statement of claim under Chapter 93A does not constitute a new cause of action within the meaning of the relevant provisions of the Civil Procedure Rules so that it cannot be added to the statement of claim without previous amendment of the general indorsement of the writ of summons, but arises from facts which are the same as, and/or include, and/or form part of, the facts upon which the causes of action included in the general indorsement of the writ of summons are based. This is evident from a simple examination of the facts pleaded in the statement of claim.*

7.    *The claim raised in paragraphs 31-33 of the statement of claim under RICO does not constitute a new cause of action within the meaning of the relevant provisions of the Civil Procedure Rules so that it cannot be added to the statement of claim without previous amendment of the general indorsement of the writ of summons, but arises from facts which are the same as, and/or include, and/or form part of, the facts upon which the causes of action included in the general indorsement of the writ of summons are based. This is evident from a simple examination of the facts pleaded in the statement of claim.*

8.    *Chapter 93A and RICO are introduced into this present case by the fact that the parties, exercising their free will, chose as governing law of the contract between them ''the laws of the commonwealth of Massachusetts, U.S.A.,'' In paragraph 21 of the statement of claim the respondents expressly plead their position as regards the correct interpretation of the phrase '' the laws of the commonwealth of Massachusetts, U.S.A.,'', that is, that the said phrase includes every item of legislation and of case-law, which would have been applied or followed by the Court of Massachusetts if it was trying this case. The applicant has the right to dispute this position of the respondents and put forward its own position in its defence, in which case the matter will become sub judice and shall be decided at the hearing of the action.*

9

9.   *The matters raised by prayer (d) cannot be decided by this Court within the framework of these present proceedings, because this would be equivalent to a hearing by stages and/or partial diagnosis of the substance of the case, something which this Court has no jurisdiction to do.*

10.  *Alternatively, and in the event the Court decides to examine the matters raised by prayer (d), the respondent asserts that Chapter 93A and/or RICO, as they are raised in this case, do not fall in the category of foreign laws which, under the principles of Cypriot private international law, cannot be enforced by the Cypriot Courts.*

11.  *In relation to the matters raised by prayer (e) the respondent repeats what is stated in paragraphs 6-11 above and adds that even if there was a breach of the Civil Procedure Rules (which the respondent expressly denies) this amounted to a simple irregularity and the applicant is estopped from raising it both because it took fresh steps in the action and because there is res judicata in the sense that it did not raise the matter in its application dated 6.4.2005.''*

The opposition is accompanied by an affidavit by lawyer S. Asproftas at the law office handling the case for the plaintiffs. The grounds of opposition are substantially advanced and particularized with references to facts and/or documentary exhibits. I shall make special reference to the contents of the affidavit at a later stage, provided of course that this is necessary for the purposes of this ruling. At this stage I confine myself to noting that, in this instance also, the affiant on behalf of the plaintiffs deals to a large extent with the legal interpretation of the documentary exhibits and/or the legal consequences of the actions at issue of the plaintiffs.

In their elaborate addresses learned counsel for the two sides put forward and advanced their positions and arguments as they emerge from the application and the opposition respectively. I shall proceed to consider the reliefs applied for in the sequence that they were put forward and argued at the hearing.

Given that prayers (a), ( b) and (c) had been raised in the application of 6.12.02, which came before this application, and had been dismissed by the interim ruling of the Court dated 31.3.04, the basic question raised is whether the defendants can reinstate the same prayers by a new application.

On this matter the positions of the two sides are diametrically opposed. Learned counsel for the defendants-applicants asserts that,  after the dismissal of the first application, the circumstances have been so fundamentally and radically altered by the actions of the plaintiffs which followed the interim ruling of the Court dated 31.3.04, that the reinstatement of the specific reliefs by a new application, i.e. this application, is justified. Specifying the particular actions of the plaintiffs, Mr Polyviou referred to the action of the plaintiffs to apply in the meantime to the American Courts and secure an order for discovery, and to the statement of claim and in particular to the claim for damages for breach of specific American legislative provisions. The opposite view has been expressed by learned counsel for the plaintiffs. In particular, Mr Ladas asserts that, any subsequent alteration of circumstances notwithstanding, the interim ruling of the Court dated 31.3.04, by which the first application of the defendants was dismissed, constitutes *res judicata* with the result that the defendants are estopped from reinstating the same prayers by a new application.

To support his position on this matter, Mr Polyviou referred the Court to **Halsbury's Laws of England**, 4th edition (Reissue), Vol. 8 (3), p. 118, sub-note 1 to paragraph 131 under the title **Forum conveniens,** where the author, citing the case of **Owens Bank Ltd v. Bracco** [1991] 4 AER 833, expresses the view that *"if the application is dismissed, it is permissible to reapply for a stay at a later date if changing circumstances justify it."* It is noted that the decision of the English Court of Appeal in the above case was affirmed on appeal by the House of Lords, [1992] 2 AER 193.

I have carefully gone through both the judgment of Lord Parker (Court of Appeal) and the judgment of Lord Bridge of Harwich (House of Lords) in the Owens case. I am of the view that the said case is substantially differentiated from the present case, both as regards the facts and points in issue, as well as regards the matters raised, whilst at the same time it does not support the principle invoked by Mr

11

Polyviou. It is I believe sufficient to point out that the Owens case, contrary to the present case, related to proceedings for the registration of a foreign judgment for the purpose of execution. In particular, in the said case, the plaintiffs had applied to the English Courts to register for purposes of execution a judgment which had been issued in a territory under British sovereignty and in particular by the Courts of Saint Vincent. The defendants sought to strike-out and/or stay the said proceedings in favour of the Italian Courts, alleging that the judgment was a product of fraud. It should be noted that the proceedings before the English Courts had been preceded by similar proceedings before the Italian Courts, in which the defendants had also raised the matter of fraud and the Italian Courts had reserved their judgment on that matter. In the alternative, by their said application, the defendants were seeking an order that the matter of fraud which they had raised should be tried by the English Courts. The basic questions which had been raised in the Owens case were whether the Convention in relation to Jurisdiction and Recognition of Civil and Commercial Judgments of 1968, and in particular articles 21 and 22 thereof which related to matters of *lis alibi pendens*, were applicable, alternatively whether the Administration of Justice Act, 1920, and in particular section 9(2)(d) thereof, which prohibited the registration of a judgment from a territory under British sovereignty if the said judgment had been obtained by fraud, were applicable, whether, in the particular case, the English Court had power to stay the proceedings before it for the registration for the purpose of execution of the foreign judgment pending the decision of the Italian Courts on the same matter, and, if the answer to the said question was yes, whether, in the circumstances of the particular case, the Court should exercise its discretion in favour of staying the proceedings. It is obvious that the Owens case is not only differentiated in every respect, substantially, from our case, but, with all respect to the distinguished author of the above textbook, does not establish in my opinion the principle for which it is cited and which is invoked by Mr Polyviou. Simply, in that case, the matter of whether the application for stay could be reinstated, if the proceedings before the Italian Courts created *res judicata,* was left open. In this context, I consider it advisable to quote the following passage from the first instance judgment, to which Lord Parker, with approval, makes particular reference in his judgment:

> *"In relation to enforcement, there is no question of forum conveniens, nor is there any ground for compelling a judgment creditor to elect as to his forum. He is perfectly entitled to seek enforcement until his judgment debt is satisfied. The English Court must control enforcement in England. There is no good ground for subordinating the English proceedings to the proceedings in Italy."*

Returning to the present case I note the following.

In this case the Court, by its interim ruling of 31.3.04, found that the provisions of clause 15 of the subject-matter agreement did not embody an exclusive jurisdiction clause in favour of the Courts of Massachusetts but *"the possibility of enforcing the agreement in any other Court was left to the parties"*. It is noted that what can be safely ascertained from the text of the ruling is that on this the side of the defendants agrees also. In its same ruling the Court pointed out the common ground which exists as to the applicable law which is none other than that of Massachusetts of the United States. Finally, in its same ruling, the Court, after taking account of a number of factors to which the ruling makes particular reference, found that the defendants had failed to discharge the burden (of proving) that *"Cyprus is not the appropriate forum and that Massachusetts is the most appropriate one."*

I agree with Mr Polyviou that the matter of *forum conveniens* may be raised at any stage of the proceedings, and in cases where the Court has jurisdiction to try the dispute the application for stay should be filed as soon as possible, but I do not agree with his more general position that the matter, even if it has been raised and dismissed, can be reinstated by a new application, if the circumstances warrant it. I am of the view that the nature of the matter is such that there is no room for this. A matter of *forum conveniens* is raised and considered, initially *ex parte* by the general application for leave to seal, file and serve the writ of summons abroad, when the matter of the suitability of the Cypriot Courts is established *prima facie*. Adoption of this position of Mr Polyviou not only would create ambiguity and uncertainty and would leave a fundamental matter such as that of the suitability of the forum to try the dispute pending indefinitely, but would also conflict with the need for speedy conclusion of the judicial process.

13

In this case, given that prayers (a), ( b) and (c) in this application were the subject-matter of the application of the defendants dated 6.12.02 , as well as that the parties remain the same, I am of the view that, in the circumstances, the interim ruling of the Court dated 31.3.04 constitutes *res judicata* as regards the matter of *forum conveniens* and consequently the defendants are estopped from reinstating the particular prayers for relief by this application. As regards the matter of jurisdiction I confine myself to pointing out that, at the stage when this matter was initially raised, it was considered on the basis of the contents of the statement of claim. Consequently, *res judicata* is not raised in relation to this matter, which, by its nature, can be raised at any stage of the proceedings, even by the Court itself.

As a result prayers (a), ( b) and (c) cannot succeed and are dismissed.

Notwithstanding my above conclusion, I would have dismissed prayers (a), ( b) and (c) for the following reasons.

1.    Even if we accept Mr Polyviou's position that the matter of *forum conveniens* can be reinstated by a new application if the circumstances have changed to such a degree that they justify reinstatement, again the position of the defendants that the action of the plaintiffs, after the interim ruling of the Court dated 31.3.04, to apply to the American Courts for discovery as well as their action to include in the statement of claim claims for damages for breach of specific Massachusetts laws, alter radically and substantially the circumstances, so that the resubmission of prayers (a), ( b) and (c) is justified, does not find me in agreement. As it can be safely ascertained from the material before me – the affidavits of the American lawyers accompanying the application and the oppositon respectively as well as the record of the Court of Massachusetts which considered the plaintiffs' application for discovery – that particular proceeding was initiated exclusively and solely for the purpose of facilitating the proceedings before the Cypriot Courts, i.e. this case. In no way can the particular action of the plaintiffs be interpreted as recognition by the latter that the subject-matter dispute can be more appropriately tried by the Massachusetts Courts rather than the Cypriot (Courts) and as submission to the jurisdiction of the said Courts.

14

The defendants also assert that the claims of the plaintiffs for damages for breach by the defendants of specific Massachusetts laws cannot succed because those laws reflect in substance the public policy of Massachusetts and consequently cannot be enforced by the Cypriot Courts. *"It is one thing"* learned counsel for the defendants-applicants stated characteristically in his address *"to apply the law of another country on the basis of a foreign law clause and another thing to enforce laws which emanate from, and reflect, exclusively, the public policy of other countries. The whole matter has a public and criminal nature. Those two laws are not suitable for enforcement by the Cypriot Courts because they represent primarily the foreign policy of another country and are not applicable in Cyprus because of public policy."* Mr Ladas supported the opposite view. Both counsel referred to the affidavits of the American lawyers accompanying the application and the oppositon respectively in order to substantiate their respective positions. The said affidavits demonstrate the total disagreement between the two sides on the particular matter, the existence of which renders the resolution of that particular matter impossible at this stage. I am of the view that in the particular circumstances the narrow confines of this present proceeding are not suitable for the resolution of that particular matter. In reality, the dispute which arises relates to the interpretation of foreign law which ought to be resolved in the light of relevant evidence to be placed before the Court which shall be called upon to decide on the substance of the matters in issue. We should not forget that matters of foreign law constitute matters of fact and should be proven as such. Consequently the correct framework for resolution of the particular matter is, in my opinion, the framework of the main trial, and the competent body to try it is the Court which shall examine the substance of the action and shall decide the disputed matters on which the entire case of the plaintiffs shall be judged.

It is obvious from the above that the particular facts, which the defendants invoke for the purpose of substantiating their position about a radical change of the circumstances, can be characterised as anything but radical.

I also consider it advisable to point out that, whilst on the one hand the defendants assert that the claims of the plaintiffs for damages for breach by the defendants of specific Massachusetts laws have contributed substantially and decisevely to the

15

alteration of the circumstances so as to justify the striking-out and/or stay of the present proceedings, on the other hand they ask for the striking-out from the statement of claim of the particular claims and allegations of facts on which they are based. I am of the view that not only these particular positions of the defendants conflict with each other, but, also, that success of their application for striking-out of the above claims would strike crucially and decisively at the factual basis of prayers (a), ( b) and (c). In substance it will leave those prayers without any real factual basis.

2.    I note the following from the file of the case. On 19.4.04, the interim ruling of the Court dated 31.3.04 was appealed against. The decision of the Court of Appeal dismissing the appeal was issued on 14.6.05. In the meantime and in particular on 24.11.04 the statement of claim was filed. On 6.4.05, with the appeal pending, the defendants filed an application to strike-out the statement of claim and/or passages thereof, which, after hearing, was accepted by the Court in part.

In **Ncgobo v. Thor Chemicals Holdings Ltd** [1995] Times 10th November, the defendants, after being granted leave to appeal against the ruling dismissing their application for stay of the proceedings for lack of jurisdiction of the Court, filed and served their statement of defence. That particular action of the defendants was considered as withdrawal of their objection to the trying of their case by the English Courts with the result that the notice of appeal which they had filed in the meantime was dismissed.

In the matter under consideration, the defendants, by proceeding to take measures to strike-out the statement of claim in its entirety and/or passages of same, after the filing of their first application for stay, and with their appeal pending, have, in my opinion, withdrawn whatever objection they had to being tried by the Cypriot Courts.

I now turn to prayers (d) and (e). In relation to the position of the defendants according to which the subject-matter claims should be dismissed because the particular laws of Massachusetts cannot be enforced by the Cypriot Courts because they reflect the public policy of that state, I have already reached the conclusion that on the particular matter, which, I would remind, is concerned with the interpretation

of foreign law, there exists a dispute between the two sides, and consequently a dispute concerning the facts.

The provisions of O.27, r.3, as well as those of O.19, r.26, which are invoked in the legal grounds of the application, give the Court power, by a summary process i.e. without the holding of a trial which is the natural arena for the ascertaining of the facts and the determination of their legal consequences, to strike-out any pleading, *inter alia*, where it does not disclose a reasonable cause of action. What the relevant case law provides is that the determination of a matter outside the framework of the trial constitutes an extraordinary measure, recourse to which is justified only when the facts are indisputable or admitted and provided that the matter in issue is crystallised to a purely legal matter, the determination of which can be pursued equally conveniently at any stage of the proceedings. Only in plain and obvious cases is recourse to the summary procedure based on the provisions of O.27 justified. (Vd. In **Re Pelmako Development Ltd** [1991] 1 CLR 246, **Loizos Louka & Son Ltd v. National Bank of Greece AE** [1999] 1CLR 1316).

In view of the above, I consider that, in the circumstances and for the reasons I have explained, bringing the proceedings to an end at this stage is not advisable. As a result I consider that the dismissal of the action under the provisions of O.27, r.3 is not possible.

Mr Polyviou also seeks the striking-out of particular paragraphs of the statement of claim because the claims of the plaintiffs for damages for breach by the defendants of specific Massachusetts laws do not constitute simple remedies but separate and substantial causes of action, which are introduced into the statement of claim without being covered by the general indorsement. According to Mr Ladas, the subject-matter claims are covered by the general indorsement because they are based on the same facts on which the claims included in the general indorsement are based and consequently are not different causes of action. The phrase ''the laws of the commonwealth of Massachusetts, U.S.A.,'' used in the foreign law clause in the subject-matter agreement, in accordance with its ordinary meaning when used in a choice of law clause, includes, according to Mr Ladas, the subject-matter foreign laws.

17

At the initial stages of my ruling I referred to the contents of the general indorsement and therefore I consider it unnecessary to repeat it. In relation to the contents of the subject-matter paragraphs of the statement of claim I confine myself to pointing out that they are long passages and to set out their contents would not serve any real purpose.

According to the prevailing opinion, the introduction in the statement of claim of a new different cause of action, which is not covered by the general indorsement, is not permitted. It should be preceded by amendment of the general indorsement, with the leave of the Court of course, unless it is not a new different cause of action but an alteration, modification or extension of the initial claim, when no amendment of the general indorsement is necessary. (Vd. **Annual Practice 1958**, p.493, **Nearchou v. Theodoulou** [1961] CLR 61, and **Christoforou v. Christoforou** [1998] 1 CLR 1551.)

I have carefully gone through the contents of both the general indorsement and of the subject-matter paragraphs of the statement of claim (paras. 28.1 - 30(d) and 31.1 – 33.vi). Under claim (A) in the general indorsement the plaintiffs ask for damages for breach of a particular agreement, the subject-matter agreement, in a general way, whilst under claim (B) they ask, also in a general way, for damages for "fraud and/or deceit and/or false representations on the part of the defendants ……. during the making and/or execution" of the subject-matter agreement. It is common ground that the said agreement shall be interpreted "in accordance with the laws of the commonwealth of Massachusetts". According to the statement of claim, particular enactments which provide for the payment of damages to the innocent contracting party, not only constitute part of the legal framework within which the subject-matter agreement should be construed, but have been breached by the defendants, with the result that the latter are answerable to the plaintiffs for damages. In particular, in their statement of claim, the plaintiffs impute to the defendants "unfair and/or deceptive acts and/or practices" during the period of validity of the subject-matter agreement, actions which, according to their pleading, constitute a breach of Chapter 93A of the General Laws of Massachusetts, as well

as "racketeering" and/or fraudulent "activity" in breach of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

In view of the above, I am of the opinion that the reliefs which the defendants seek to strike-out, do not constitute new causes of action different from those set-out in the general indorsement. Given that the claims in the general indorsement relate to damages for breach of the subject-matter agreement as well as damages for fraud and/or deceit and/or false representations on the part of the defendants during the making and/or execution of the said agreement, I am of the opinion that the subject-matter reliefs constitute in reality an extension of the already formulated causes of action. Of course, whether or not the plaintiffs shall succeed in their two subject-matter claims shall be decided at the end and particularly within the framework of the main trial by the Court which shall decide the disputed matters upon which their case shall be judged.

It has not escaped my attention that, according to the position of the plaintiffs as it emerges from the opposition and accompanying affidavit and as it has been advanced by their advocate in his address, the first time they and/or their lawyers knew "anything" about the subject-matter enactments was after the filing of the writ of summons and in particular at the time of collection of material for the drafting of the statement of claim, and it has also not escaped my attention that, in the accompanying affidavit it is stated that the particular enactments *"when used by a plaintiff in an action for breach of contract and/or for tort ......... constitute ......... additional remedies for the breach of private contractual rights and for tort according to the common law and the principles of equity"*. (Vd.  para.6 (ii). The emphasis is the Court's.)

I am of the view that the above position of the plaintiffs does not affect my above conclusion. In cases such as the present, the exclusive criterion is whether by the statement of claim the plaintiffs alter, modify, or extend their initial claims or introduce new causes of action different from those included in the general indorsement. For the reasons which I have explained, the reliefs which are sought to be stricken-off are covered by the general indorsement. As a result that particular aspect of the application cannot succeed.

19

As a result prayers (d) and (e) cannot succeed either and are dismissed.

In view of all the above, the application is dismissed with costs in favour of the plaintiffs and against the defendants, to be assessed by the Registrar and approved by the Court, but shall be paid at the end of the case.

(sgd) …………………………….
A. Paschalides, P.D.C.

True Copy

Registrar

20

**EXHIBIT 6**

IN THE DISTRICT COURT OF NICOSIA

Action no.7462/2002

Between:-

Kayat Trading Limited, of Nicosia.

Plaintiffs

-and-

Genzyme Corporation, of Massachussetts, U.S.A.

Defendants

DEFENCE

1.  Unless otherwise expressly admitted, the defendants deny all and each one separately the allegations of the plaintiffs as these are set out in their Statement of Claim.

2.  The defendants allege that this action cannot nor should it be tried before the Cypriot Courts and that it should be dismissed, both for reasons of jurisdiction and for reasons of appropriate forum (forum non conveniens).

3.  With regard to the issue of jurisdiction, the defendants allege that no cause of action is raised in Cyprus, according to current legislation and case law, nor is there any jurisdictional foundation for raising this action in Cyprus. Therefore, the defendants allege that the Cypriot Court has no jurisdiction to hear this case.

    Full reference to the previous interim judgements of the Court on issues of jurisdiction and forum conveniens, and to the decision of the Supreme Court in **Civil Appeal No 11995**, dated 14.6.05, will be made at the hearing of the case.

4.  The defendants allege that this action constitutes abuse of process and consequently should be dismissed.

5.  The defendants allege that the plaintiffs' Statement of Claim contains no and/or no reasonable cause of action.

6.  Without prejudice to the above, the defendants allege that the Cypriot Court has no power nor can it award damages for breach of Cap. 93A of the General Laws of Massachusetts or damages for a breach of Title 18 of the Code of the United States pursuant to section 1964 (c) (as the plaintiffs claim in their Statement of Claim).

    **Without prejudice to the above objections, the defendants put forward the following defence:**

7.  The defendants admit that the plaintiffs are a Cypriot company registered in accordance with the Companies Law, Cap.113, but do not admit the remaining allegations of paragraph 1 of the Statement of Claim.

8.  The defendants admit that they are an American biotechnological and pharmaceutical company, listed on the NASDAQ Stock Exchange in New York, with their headquarters in Cambridge, Massachusetts in the USA. Fuller reference to the activities of the defendants will be made in the course of the hearing of this case.

9.  Full reference to the facts set out in paragraphs 3 and 4 of the Statement of Claim will be made at the hearing of this case. The defendants do not deny that there was a business relationship between the parties or that on or about 25 April 1997 MelaPure was registered as a licensed medicine in the Ukraine.

    The defendants do not admit the remaining allegations of paragraphs 3 and 4 of the Statement of Claim.

10. The defendants admit that a contract was signed between the parties in July 1997 ("the contract"). The remaining allegations of paragraph 5 (and its sub-paragraphs) are denied, with the exception of the allegation that "the contract was drawn up by the defendant". In particular, it is not admitted that the contract was entered into in Nicosia. Full reference to the circumstances of how the contract was entered into will be made on the trial day.

11. Without prejudice to their remaining allegations in this present Defence, the defendants allege that the plaintiffs made a number of untrue and/or inaccurate and/or misleading representations both before the making of the contract and during it, with the result that the defendants entered into the contract and/or did not proceed to terminate it in the period under consideration.

    PARTICULARS OF MISLEADING AND INACCURATE REPRESENTATIONS

    (a)  The plaintiffs represented that they were a company with experience and knowledge in relation to trade and trading activities, and also very well established in the Eastern Countries and the Persian Gulf.

    (b)  The plaintiffs represented that they were a company with many international and other activities, and with particular experience and connections in relation to trade and other business activities.

    (c)  The plaintiffs represented that they had particular experience in various markets, on the basis of previous experience, activities and connections.

    (d)  The plaintiffs represented that the company ANIT belonged to the State and that it had particular experience and specialisation in the trading of medicines.

2

All the above representations of the plaintiffs were untrue and/or inaccurate and/or misleading.

12. The allegations of paragraph 6 of the Statement of Claim (and its sub-paragraphs) are not accepted. Full reference to the text of the contract, which does not support the plaintiffs' version, will be made at the hearing of this case.

    With regard to paragraph 6.2 of the Statement of Claim, the defendants allege that the contract was terminated and/or assigned, by common consent, on or about 1 July 1998 and/or with effect on that date. Full reference to this matter will be made both below and during the hearing of the case.

13. Full reference to the terms of the contract between the parties, the correct construction and legal meaning thereof, will be made both below and during the hearing of the case.

14. Full reference to the allegations of paragraph 8 of the Statement of Claim and to the relevant facts, documents and evidence, will be made at the hearing.

15. In any case, the defendants call on the plaintiffs to strictly prove the allegations put forward in paragraph 8 (and its sub-paragraphs) of the Statement of Claim.

16. Full reference to the "transactions" between the parties and the way that these were carried out will be made at the hearing of the case. In particular, at the hearing of the case full reference will be made to the communications between the plaintiffs and Mr. Roger Sparrow, the person mentioned in paragraph 9.1 of the Statement of Claim.

17. With regard to the allegations of paragraph 10 of the plaintiffs' Statement of Claim, the defendants do not dispute the existence of "orders" regarding the product in issue, but they reserve the right to refer to the content, the background and the circumstances surrounding the "orders" in question.

18. The allegations of the plaintiffs as set out in paragraphs 12-16 of the Statement of Claim, are not admitted, and the defendants call on the plaintiffs to strictly prove these allegations.

    Without prejudice to the above denial, the defendants allege that any deviations and differences between the dispatched products and the relevant specifications were not such as to render the products unsuitable for use.

    Without prejudice to the above, the defendants allege that the quantity of 40,000 bottles (or 8 palettes) delivered in August 1998, were delivered by the company VitaPure Ltd.

19. Without prejudice to their remaining allegations in this present Defence, the defendants allege that the plaintiffs are not entitled to raise a claim in relation to defective goods because, according to the applicable law, allegedly defective goods must be rejected within a reasonable time. In the present case, the defendants allege that the plaintiffs – even if they had received

3

defective goods – accepted and/or did not reject the said goods within a reasonable time. Consequently, the defendants allege that the plaintiffs are estopped from making a complaint and/or claim for allegedly defective goods.

20. With regard to the contents of paragraph 17 of the Statement of Claim the defendants deny that the plaintiffs were not aware of their intention (that is to say, the defendants' intention) to transfer and/or assign the business of manufacturing and marketing MelaPure to another corporate entity. On the contrary, the defendants allege that the plaintiffs had full knowledge and consented to the transfer of the business in issue to a third party, namely the company VitaPure Ltd. (VitaPure). Full reference to the relevant facts, documents and evidence from which it emerges that the plaintiffs had full knowledge of the transfer and/or assignment in question of the business in issue will be made at the hearing of the case.

21. In any case, the defendants allege that as of 1 July, 1998, the said business, including the contract in issue, was transferred and/or assigned to VitaPure, with the full knowledge, consent and co-operation of the plaintiffs.

In relation to the above, the defendants deny that the "further performance of the contract" became "impossible". On the contrary, the defendants allege that the plaintiffs consented fully and/or did not in the least dispute the transfer and/or assignment of the business by themselves (i.e. the defendants) to VitaPure with the result that the business in issue and the relevant contract were transferred and assigned to VitaPure.

Further and/or alternatively, and without prejudice to the above the defendants allege that the plaintiffs are not entitled to dispute and/or to express any complaint in relation to the transfer of the business and/or work of the defendants (in relation to the matters sub-judice) to VitaPure, because the plaintiffs cooperated fully and without any complaint with VitaPure.

Further and/or alternatively the defendants allege that the assignment of the contract in issue by themselves to VitaPure was made with the full knowledge, consent and cooperation of the plaintiffs, with the result that the contract between the parties was terminated by mutual consent and/or was replaced by the contract between the plaintiffs and VitaPure.

22. The defendants deny the contents of paragraph 18 of the Statement of Claim.

Without prejudice to the above denial, full reference to the "agreement" between the plaintiffs and ANIT will be made at the hearing. Moreover, full reference at the hearing will also be made to the "collateral" "contracts and/or agreements" between ANIT and/or the plaintiffs and the companies CERTA and MEDICAL COMMERCE

23. The defendants deny that they infringed the contract with the plaintiffs "in the ways" that are set out in paragraph 19 of the Statement of Claim. Accordingly, the defendants deny fully the contents of paragraph 19 (and of the sub-paragraphs) of the Statement of Claim.

4

24. The defendants deny the contents of paragraph 20 of the Statement of Claim and call on the plaintiffs to strictly prove their allegations.

25. In respect of the contents of paragraph 21 of the Statement of Claim, the defendants do not admit this. The defendants allege that term 15 of the contract provides as follows:

> "This Agreement shall be governed by and interpreted in accordance with the laws of the commonwealth of Massachusetts, USA".

Full reference to term 15 of the Agreement will be made at the hearing of the case. Moreover, at the hearing, full reference will be made to the phrase "the laws of the commonwealth of Massachusetts, USA", as well as to the applicable law based on the agreement between the parties.

26. With regard to paragraphs 22-23.6 of the Statement of Claim, the defendants agree that the laws of Massachusetts that are referred to contain the provisions that are mentioned in the said paragraphs of the Statement of Claim, but the defendants allege the following:

    (i)   The original language of the laws in question is English, and it is to this text that reference must be made at the hearing.

    (ii)  There are many other paragraphs in the relevant laws of Massachusetts, in addition to those mentioned in paragraphs 22-23.6 of the Statement of Claim. Full reference to all the relevant legislative and other provisions will be made at the hearing.

    (iii) In addition to the laws, there is also the case law of the competent Courts of Massachusetts with regard to the matters in issue, to which full reference will be made at the hearing of the case.

    (iv)  The defendants reserve the right to make full reference to the text of the laws and the relevant case law, with regard to their correct interpretation and legal meaning at the hearing of the case, always within the framework of the applicable law.

27. With regard to the contents of paragraph 24 of the Statement of Claim, full reference to the relevant case law of Massachusetts will be made at the hearing of the case. In particular, the defendants will make full reference to the case law with regard to the term "expectancy damages" (which is used in paragraph 24(b) of the Statement of Claim).

28. The defendants do not admit the contents of paragraph 25 of the Statement of Claim and in particular they deny the PARTICULARS of the alleged breach (by the defendants) of the obligations of the contract between the parties.

29. Without prejudice to their above allegations, i.e. that the defendants did not in the least breach the contract between the parties, the defendants allege as follows:

(i) The plaintiffs are not entitled to raise claim for any breach of contract (the existence of which they do not accept in any case) because the plaintiffs accepted same and elected on the contrary to continue with the contract, without protest and without raising any claim in relation to same.

(ii) The plaintiffs are not entitled to raise claim for any breach of contract (the existence of which they do not accept in any case) because the plaintiffs lost and/or waived and/or abandoned the right to raise any claim in relation to same. As a result the plaintiffs are estopped from raising any claim or demand in relation to the breaches of contract which they invoke (the existence of which the defendants do not in the least accept).

(iii) In any case, any breach of contract is, according to the Law of Massachusetts, statute barred, because this action has not been raised within 4 years from the raising of the alleged cause of action. Consequently, this present claim and/or action should be dismissed because it cannot be raised according to the applicable law, due to prescription.

30. The defendants deny that they committed fraud "according to the common law", as the plaintiffs allege in paragraph 26 of the Statement of Claim.

In particular, and without prejudice to the generality of the above denial, the defendants deny fully and categorically the PARTICULARS OF FRAUD as set out in paragraph 26 of the Statement of Claim.

31. Without prejudice to the above, the defendants allege that the plaintiffs cannot raise any claim in relation to alleged fraud (the commision of which they deny in any case) because according to the applicable law of Massachusetts any action for tort should be raised within 3 years from the raising of the alleged cause of action. Consequently, according to the allegations of the plaintiffs themselves, any claim for "fraud" is statute-barred and cannot be raised before the Court, according to the applicable law.

32. The defendants deny the contents of paragraph 27 (and sub-paragraphs) of the Statement of Claim. Full reference to the relevant laws and case law which apply in Massachusetts will be made at the hearing of the case.

In any case, and without prejudice to the generality of the above allegation, the defendants deny that the principle set out in paragraph 27.2 of the Statement of Claim applies to this case, as this principle has been formulated in the context of the Law of Massachusetts.

The defendants reserve the right to refer to the relevant laws and case law of Massachusetts - for their correct interpretation and legal meaning - at the hearing of the case, always in the context of applicable law.

33. The defendants deny paragraphs 28-30 (with sub-paragraphs) of the Statement of Claim. In particular and without prejudice to the generality of the above denial, the defendants allege the following:

(i)     Cap.93A of the General Laws of Massachusetts has no application in this case, both as a matter of application of that Law and as a matter of public policy of the Cyprus Republic.

(ii)    The Cypriot Court has no jurisdiction and/or capability and/or power whatsoever to apply this law in Cyprus. Cap.93A is a *sui generis* creation of the State of Massachusetts (and particularly of the public policy of that State) without any possibility of application in Cyprus.

Moreover and/or alternatively, to put forward any claim on the basis of this law before the Cypriot Court would constitute abuse of process.

(iii)   Inter alia, as Cap.93A itself provides:

"No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method or competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth".

The defendants allege that Cap.93A does not apply in this case, since the alleged blameworthy actions, methods and transactions did not occur within the State of Massachusetts, as the Law in issue itself requires.

(iv)    In relation to the claims and demands in the context of Cap.93A, there is a period of limitation of 4 years, and it is therefore not possible to raise any claim or demand on the basis of Cap.93A outside this limitation period. Consequently, without prejudice to their above allegations, the defendants allege that this present action for alleged breaches of Cap.93A (which in any case they do not admit) cannot be pursued, but ought to be dismissed due to prescription according to the applicable law.

(v)     The Cypriot Court cannot, nor does it have the right or discretion "to award double or triple damages pursuant to section 11 of Cap 93A", as the plaintiffs demand, both as a matter of private international law and as a matter of public policy of the Republic of Cyprus.

(vi)    In any case and notwithstanding the above allegations, the defendants deny that between 1997 and 1999 they applied and/or used "unfair and/or misleading practices and/or actions in the conduct of their business", with the alleged result that the defendants have committed offences and/or misdemeanors according to the provisions of Cap.93A.

(vii)    Therefore, the defendants deny the PARTICULARS OF UNFAIR AND/OR MISLEADING ACTIONS AND/OR PRACTICES, as these are set out in paragraph 30 of the Statement of Claim.

34. The defendants deny paragraphs 31-33 of the Statement of Claim.

In particular, and without prejudice to the generality of the above denial, the defendants allege the following:

(i)    Section 1962(c) of the United States Code on Racketeer Influenced and Corrupt Organisations, 18 U.S.C (RICO) has no application in this case, both as a matter of applicable law and as a matter of public policy of the Republic of Cyprus.

(ii)    Moreover, and/or alternatively, the promotion of any claim on the basis of this law before the Cypriot Court constitutes abuse of process.

(iii)    In particular, the relevant law provides, inter alia, for the following:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct, or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt".

The defendants allege that the relevant law (RICO) is an expression of American public policy, can be applied by the competent American courts only, and renders illegal activities which concern the "inter-state or foreign trade of the United States of America". The Cypriot Court has no power or jurisdiction or competence whatsoever to implement the provisions of RICO.

(iv)    In any case, notwithstanding the above and without prejudice to their above allegations, the defendants deny that they committed any act and/or action which falls within the provisions of the above Law. Full reference to the interpretation and application of the relevant provisions of RICO will be made – to the extent considered necessary – at the hearing of the case.

(v)    Without prejudice to the above, the defendants deny the PARTICULARS OF A SYSTEM OF RACKETEERING ACTIVITY, as these are set out in paragraph 33 of the Statement of Claim.

(vi)    In relation to the claims and demands in the context of RICO, there is a period of limitation of 4 years, with the result that it is not possible to raise any claim or demand on the basis of RICO outside the relevant limitation period. Consequently, without prejudice to their above allegations, the defendants allege that this present action for alleged breaches of RICO (which in any case they do not admit) cannot be

pursued, but ought to be dismissed due to prescription according to the applicable law.

(vii)   In any case, and notwithstanding the above, the defendants deny that the Cypriot Court has the right to award "three times the damages suffered (by the complainant/plaintiff)", as is the claim of the plaintiffs in paragraph 31.7 of the Statement of Claim.

(viii)  Full reference both to the above Law and to the relevant case law (of American and other Courts) with regard to the matters in issue (and particularly the background, interpretation and application of RICO) will be made at the hearing of this case.

35.  The defendants allege that the plaintiffs do not come to the Court "with clean hands". Specifically, the defendants allege that the plaintiffs misled them (i.e. the defendants) as regards their functioning and activities (both before and after the making of the contract). Furthermore, the defendants allege that the plaintiffs misled them (i.e. the defendants) as regards the status and activities of the company ANIT as well as the relations between the plaintiffs and ANIT.

PARTICULARS

(a)  The plaintiffs represented that they were a company with experience and knowledge in relation to trade and trading activities, and with many connections in the Eastern Countries and the Persian Gulf.

(b)  The plaintiffs represented that they were a company with many international and other activities, and with particular experience and connections in relation to trade and business.

(c)  The plaintiffs represented that they had particular experience in various markets, on the basis of previous experience, activities and connections.

(d)  The plaintiffs represented that the company ANIT belonged to the State and that it had particular experience and specialisation in the trading of medicines.

All the above representations of the plaintiffs were untrue and/or inaccurate and/or misleading. The defendants allege that the plaintiffs misled them and that the contract was entered into (and was not terminated) as a result of the untrue, false and misleading representations of the plaintiffs.

36.  The defendants deny the claims of the plaintiffs as these are set out in the Statement of Claim.

(i)  Without prejudice to the generality of the above denial, the defendants deny that the plaintiffs are entitled to damages "for breach of contract", as is the claim of the plaintiffs.

(ii)     Without prejudice to the generality of the above denial, the defendants deny that the plaintiffs are entitled to damages "for fraud", as is the claim of the plaintiffs.

(iii)     In particular, and without prejudice to their above allegations, the defendants deny that the plaintiffs are entitled to damages either "for infringement of Cap. 93A of the General Laws of Massachusetts pursuant to section 11 thereof", or to damages "for infringement of Title 18 of the Code of the United States pursuant to section 1964 (c)" (RICO), for the following reasons:

(a)     The two above laws cannot be implemented in Cyprus, by the Cypriot Court.

(b)     Any claim before a Cypriot Court on the basis of the above laws constitutes evident and flagrant abuse of process.

(c)     The Cypriot Court has no power to dispense remedies of a foreign court. The Cypriot Court can dispense only the remedies that come within its own jurisdiction and power, on the basis of Cypriot Law.

(d)     In any case, the substantial and real prerequisites for the awarding of damages on the basis of the above laws (namely Cap.93A and RICO) are not satisfied, even if the basic objections of principle as set out in this paragraph of the defence are dismissed.

(iv)     Further and/or alternatively, and in any case without prejudice to what is stated above, the defendants allege that the plaintiffs did not take all the necessary and/or lawful and/or reasonable under the circumstances measures for mitigation and/or limitation of the damage they supposedly suffered due to the alleged actions and/or breach of the obligations of the defendants.

(v)     Further and/or alternatively, and without prejudice to the above, if the Court should decide that the plaintiffs are entitled to the alleged or any damages and/or remedies and/or expenses, which the defendants categorically deny, the defendants allege that this occurred as a result of the acts and/or omissions and/or actions of the plaintiffs.

37.  The defendants ask for dismissal of the action, with costs against the plaintiffs.


Chrysafinis and Polyviou

**Advocates for the defendants**

Filed on………... April 2007

Registrar

To Messrs. G. & A. Ladas, advocates for the plaintiffs.

**EXHIBIT 7**

00001

Volume I
Pages 1 to 142
 Exhibits 102-118

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re the Application of                     :

KAYAT TRADING LIMITED,                       :

    Petitioner,                              :

For an Order to Take                         :

Discovery of                                 : Civil Action No.

GENZYME CORPORATION,                         : 05-MBD-10147-GAO

    Respondent,                              :

Pursuant to                                  :

28 U.S.C. Section 1782                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


     DEPOSITION OF GENZYME CORPORATION, by its
designee MARA ASPINALL, and MARA ASPINALL
individually, a witness called on behalf of the
Petitioner, taken pursuant to Rule 30(b)(6) of the
Federal Rules of Civil Procedure, before Anne H.
Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Anderson & Kreiger LLP, 43
Thorndike Street, Cambridge, Massachusetts, on
Wednesday, July 19, 2006, commencing at 9:46 a.m.
PRESENT:
    Burns & Levinson LLP (by Stephen Y. Chow,
      Esq.) 125 Summer Street, Boston, MA 02110;
          -and-
    G. & A. Ladas (by Andreas G. Ladas, Esq.)
      67 Kennedy Avenue, Athienitis Kennedy
      Park, Suite 301, CY-1076 Nicosia, Cyprus;
          -and-
    Abed & Savage (by M. Brooks Savage, Jr., Esq.)
      1101 17th Street, N.W., Suite 405,
      Washington, D.C. 20036, for the Petitioner.
(Continued on Page 2)

00002

       PRESENT (Continued):
          Anderson & Kreiger LLP
            (by Scott P. Lewis, Esq.)
            43 Thorndike Street, Cambridge, MA
            02141-1764, for the Respondent.
       ALSO PRESENT:  Thomas J. DesRosier, Esq.,
            Genzyme Corporation

00015

1    A.   To understand the current business and

2   consider how to position it for the future.

3    Q.   How many people worked on that plan?

4    A.   I can't recall how many.

5    Q.   Were you primarily responsible for the

6   plan?

7    A.   No.

8    Q.   Was there a person who was primarily

9   responsible for the plan?

10    A.   It was a team effort.

11    Q.   Who else do you recall on that team?

12    A.   I'm sorry?

13    Q.   Who else do you recall on the team?

14    A.   Frank Ollington and other members of the

15   business.

16    Q.   When you say "the business," are you

17   talking about the business unit?

18    A.   Yes.

19    Q.   So within Genzyme Pharmaceuticals?

20    A.   Yes.

21    Q.   Were there people external at the corporate

22   level who were involved in this planning?

23    A.   I don't remember everyone on the team.

24    Q.   Can you remember anyone at the corporate

00016

1  level who was involved in this process?

2    A.  Define "involvement."

3    Q.  Who ultimately made decisions with respect

4  to any recommendations of the plan?

5    A.  I'm not sure who ultimately would make the

6  decisions.

7    Q.  Was it Henri Termeer?

8    A.  He was one of the people involved.

9    Q.  Who else was involved at the corporate

10  level?

11    A.  I don't remember individuals who were

12  involved but often people at the corporate level.  I

13  do not know all of them at the time.

14    Q.  Can you name the ones that you recall?

15    MR. LEWIS:  You're asking her to name ones

16  that she can recall being involved in this

17  particular decision?

18    MR. CHOW:  That's correct.

19    A.  Geoffrey Cox.  But I was not present at

20  corporate meetings where decisions were made

21  specifically on a plan.

22    Q.  Was this a board-level decision?

23    A.  I'm not sure.

24    Q.  Did you have any understanding about who

00020

1    A.  It varied by product line.

2    Q.  Were they other pharmaceutical companies?

3    A.  Some.

4    Q.  Do you recall any of the product lines in

5  1997?

6    A.  Yes.

7    Q.  Which ones do you recall?

8    A.  Melatonin.  I can't state the individual

9  names of the other chemicals.

10    Q.  Was melatonin a large part -- do you recall

11  what share of the business of Genzyme

12  Pharmaceuticals melatonin had in 1997?

13    A.  What share of the --

14    Q.  Business.

15    A.  -- external market?

16    Q.  Internal.

17    A.  No.

18    Q.  Was it less than 10 percent?

19    A.  I don't know.

20    Q.  With respect to the melatonin line, who

21  were the customers of Genzyme Pharmaceuticals in

22  1997?

23    A.  There were varied customers.

24    Q.  Did Genzyme Pharmaceuticals sell to the

00021

1  retail market?

2  A.  At the time, yes.

3  Q.  What did they sell to the retail market?

4  A.  Melatonin pills.

5  Q.  Melatonin pills.  Were these branded under

6  MelaPure?

7  A.  Yes.  Oh, can you clarify what period of

8  time you're talking about.

9  Q.  1997.

10  A.  Okay.

11  Q.  Did Genzyme manufacture the pills

12  themselves?

13  A.  How would you define the manufacturing

14  piece?

15  Q.  Do you know the process for manufacturing

16  of these pills?

17  A.  Not in detail.

18  Q.  What did Genzyme do in the manufacturing --

19  which pieces of the manufacturing process do you

20  recall Genzyme performing in 1997?

21  A.  Bulk melatonin manufacturing.

22  Q.  So that did they take the bulk

23  manufacturing and manufacture pills from that bulk

24  melatonin?

00022

1    A.   Can you clarify "they."

2    *Q.   I'm sorry.  Did Genzyme Pharmaceuticals

3    take bulk melatonin and manufacture finished pills

4    from that bulk melatonin?

5        MR. LEWIS:  Can I hear the question back.

6        *(Question read)

7    A.   No.

8    Q.   What did it do?

9        MR. LEWIS:  Objection.

10   Q.   In terms of making -- selling melatonin

11   pills in the retail market?

12       MR. LEWIS:  Objection as to form.

13   A.   We worked with outside companies to take

14   the bulk, transform it into finished dosage.

15   Q.   Do you recall who did that, who transformed

16   it into fixed dosage?

17   A.   No.

18   Q.   Had Genzyme ever itself transformed bulk

19   pharmaceutical ingredients into finished dosage

20   form?

21       MR. LEWIS:  Objection as to foundation.

22   A.   I do not know.

23   Q.   When you began on this project, was there a

24   melatonin pill already in the market, Genzyme

00023

1  melatonin pill?

2    A.  I do not know.

3    Q.  Do you know if the Genzyme melatonin pill

4  was ever sold in the United States?

5    A.  Yes.

6    Q.  When was it sold in the United States?

7    A.  I don't know the dates.  Can we take a

8  break for a minute?

9    Q.  Sure.

10    A.  (Attorney-client conference)

11      MR. LEWIS:  Ms. Aspinall would like to

12  clarify her last answer.

13      MR. CHOW:  Please.

14    A.  Can I clarify the answer about the retail

15  business?

16    Q.  Yes, please.

17    A.  We had, as I recall, a very small retail

18  opportunity primarily for Genzyme employees and very

19  small individual orders.

20    Q.  So you're saying that for the retail

21  melatonin pills, it was just within Genzyme itself?

22    A.  Primarily.

23    Q.  What are the exceptions that you are

24  thinking of?

00024

1    A.   We had a small number of outside Genzyme

2    individual bottle orders.

3    Q.   Do you --

4    A.   There was no marketing or distribution.

5    Q.   So there was no advertising involved in

6    that?

7    A.   I do not believe so.

8    Q.   Was this under the MelaPure brand name?

9    A.   Yes.

10    Q.   Do you know if anyone within Genzyme

11    developed the MelaPure brand name?

12    A.   Can you just repeat that.

13    Q.   Do you know the history of the MelaPure

14    brand name?

15    A.   No.

16    Q.   Was it there when you started at the

17    company?

18    A.   I don't know when it started.

19    Q.   Let me just ask, since you did consult

20    during a break, did you refresh your recollection

21    about facts in some way?

22    A.   No.

23    Q.   Did you review any documents in preparation

24    for this deposition?

00044

1  any specific ones?

2      A.  The perceived high cost of our

3  manufacturing.

4      Q.  How did this consensus relate to the FDF

5  melatonin?

6      A.  I do not recall specifically.

7      *Q.  Did there come a time when it became part

8  of your responsibility to close down the melatonin

9  production at Genzyme Pharmaceuticals?

10        MR. LEWIS:  Can I have that question back,

11  please.

12        *(Question read)

13     A.  No.

14     Q.  Was melatonin production closed down at

15  Genzyme Pharmaceuticals?

16     A.  I don't know when you mean, but at some

17  point, yes.

18     Q.  When did that occur?

19     A.  I do not know the date.

20     Q.  Was any melatonin production performed

21  while you were president of Genzyme Pharmaceuticals?

22     A.  I believe so.

23     Q.  What is your recollection with respect to

24  that production?  When did it occur?

00045

1    A.   In what way?

2    Q.   When did it occur?

3    A.   I don't know the timing.

4    Q.   Do you recall any of the circumstances?

5    A.   How so?

6    Q.   What is your recollection of production

7   during your presidency of Genzyme Pharmaceuticals?

8    A.   We continued our prior operations until a

9   decision was made to stop production.

10    Q.   Who made the decision to stop production?

11    A.   I don't know exactly.

12    Q.   Did you have authority to stop production

13   while you were president of Genzyme Pharmaceuticals?

14    A.   Not entirely.

15    Q.   What additional authority did you need?

16    A.   I'm not sure it's what I needed, but it was

17   a combination of the business unit, the

18   manufacturing and corporate management.

19    Q.   Were there any particular people that you

20   recall who would be part of the decision to shut

21   down or to cease production of melatonin?

22    A.   Frank Ollington.

23    Q.   Anyone else?

24    A.   I do not recall specifically.

00084

1   melatonin?

2      A.  Every production has different stages.  The

3   last document talked about stages of production for

4   melatonin.

5      Q.  Were you aware that different stages of

6   melatonin were stored within Genzyme in different

7   locations during your presidency of Genzyme

8   Pharmaceuticals?

9         MR. LEWIS:  Object as to foundation.

10     Q.  Was it stored in different locations?

11     A.  I'm not aware of the specifics of locations

12   or stage of production.  Most manufacturing has work

13   in process.

14     Q.  Now, referring specifically to this

15   document, which is Exhibit 102, do you know, did

16   there come a time when sale of MelaPure tablets

17   within Genzyme ceased?

18     A.  Yes.

19     Q.  When did that occur?

20     A.  I do not remember.

21     Q.  While it still existed, were the melatonin

22   pills manufactured in the same place?

23     A.  The same place as?

24     Q.  Uniformly in one place?

00085

1      MR. LEWIS:  Objection as to form.

2      Q.   Where were they manufactured in finished

3   form?

4      A.   I do not know where the finished form was

5   put together.

6      Q.   Do you recall a company called Tishcon?

7      A.   I recall the name of that company, yes.

8      Q.   Do you recall if that was the company that

9   manufactured the MelaPure tablets in finished form?

10      MR. LEWIS:  Which MelaPure tablets in

11   finished form?

12      MR. CHOW:  The MelaPure tablets that were

13   sold internally within Genzyme.

14      A.   I do not recall specifically Tishcon's role

15   with respect to any individual tablets.

16      Q.   Do you recall any other tableting company

17   for MelaPure?

18      A.   No, not specifically.

19      Q.   Have you ever known of any tableting

20   company that was used by Genzyme?

21      A.   I believe Tishcon was a tableting company.

22      Q.   Is that the only one that you know of?

23      A.   I do not recall if 100 percent of our

24   tableting was done at Tishcon.

00093

1    Q.  When you first joined was Tom Slater the

2    highest management person for sales within Genzyme

3    Pharmaceuticals?

4    A.  Yes, I believe so.

5    Q.  So at that time did Roger Sparrow report to

6    him?

7    A.  I do not remember the reporting structure.

8    Q.  Subsequently did Roger Sparrow report to

9    Carol Greve-Philips?

10    A.  At some point, yes.

11    Q.  Who made the determination for the change?

12    A.  I was part of that process.

13    Q.  Let me ask you to turn in this document to

14    Page 4416.  So specifically with respect to this

15    page and the next pages through Page 4437, which is

16    a large piece of this, I ask you to flip through

17    this and see if any of this looks familiar to you

18    with respect to melatonin.

19    A.  No.  I guess I should go through.

20    Q.  Please.

21    A.  (Witness reviews document)  No, I have not

22    seen this document before.

23    Q.  Do any of these pages look familiar to you?

24    A.  No.

00094

1     Q.   When you joined as president of Genzyme

2   Pharmaceuticals, were you briefed by anyone with

3   respect to any of the financial performance of the

4   melatonin line of business?

5     A.  I learned the business as a whole.  I don't

6   remember specific conversations on any one product.

7     Q.   Do you remember if you were presented

8   anything in writing as a briefing of the various

9   product lines?

10     A.   I would get quarterly financials in

11   writing.  I don't remember anything specific to one

12   individual product line.

13         MR. CHOW:  Let me mark as Exhibit 103

14   Genzyme 3075 through 3083.

15             (Document marked as Aspinall

16             Exhibit 103 for identification)

17     Q.   Are these the kinds of -- is this document

18   representative of the types of quarterly reports you

19   were mentioning?

20         MR. LEWIS:  You're referring to a document

21   from August of 1996, Mr. Chow?

22         MR. CHOW:  Yes.

23     A.  I believe they were similar, yes.

24     Q.   Did you review any of these documents or

00095

1  reports prior to when you became president of

2  Genzyme Pharmaceuticals?

3    A.  No, I do not specifically remember doing

4  so.

5    Q.  As part of your learning the business of

6  Genzyme Pharmaceuticals, did you go over any of the

7  financial record before you became president?

8    A.  As part of the strategic planning process,

9  I had seen the overall financials.

10    Q.  Were they in less detail than this report?

11    A.  Yes.

12    Q.  Let me ask you to turn to the second page,

13  which states "July 1996 Operating Commentary."  Was

14  that typically included in -- were commentaries

15  typically included in these reports?

16    A.  I do not recall these types of

17  commentaries.

18    Q.  I'm going to show you Exhibit 36

19  previously marked and ask if you've seen that

20  document previously.

21    A.  I can go through it.  Yes, at least parts

22  of it.

23    Q.  Did you see this as paper form or as a

24  presentation?

00107

1      MR. CHOW:  I said bulk melatonin.

2      MR. LEWIS:  I missed that, I'm sorry.

3      A.  It's hard to say over the full period of

4    time I was there, so I cannot say there was never a

5    time, but I remember it selling for below cost.

6      Q.  I'm going to show you Exhibit 40.  Ms.

7    Aspinall, have you seen this document previously?

8      A.  I do not remember that.

9      Q.  Do you recall receiving any reports of

10   inventory write-offs while you were at Genzyme

11   Pharmaceuticals?

12     A.  I recall receiving inventory reports.  I do

13   not specifically recall this one.

14     Q.  Was bulk melatonin inventory written off at

15   some point during the time you were president of

16   Genzyme Pharmaceuticals?

17     A.  I do not specifically remember melatonin or

18   any particular product write-off.

19     Q.  Referring to this document on the melatonin

20   WIP, do you know what Stage I and Stage II melatonin

21   are?

22     A.  I don't know the technical differential

23   between Stage I and Stage II, no.

24     Q.  Do you know whether that is associated with

**EXHIBIT 8**

00001

Volume I
Pages 1 to 169
Exhibits 44-101

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re the Application of                        :

KAYAT TRADING LIMITED,                          :

    Petitioner,                             :

For an Order to Take                            :

Discovery of                                    :  Civil Action No.

GENZYME CORPORATION,                            :  05-MBD-10147-GAO

    Respondent,                             :

Pursuant to                                     :

28 U.S.C. Section 1782                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      DEPOSITION OF GENZYME CORPORATION, by its
designee CAROL A. GREVE-PHILIPS, and CAROL A.
GREVE-PHILIPS individually, a witness called on
behalf of the Petitioner, taken pursuant to Rule
30(b)(6) of the Federal Rules of Civil Procedure,
before Anne H. Bohan, Registered Diplomate Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Anderson & Kreiger
LLP, 43 Thorndike Street, Cambridge, Massachusetts,
on Tuesday, July 18, 2006, commencing at 9:36 a.m.
PRESENT:

    Burns & Levinson LLP (by Stephen Y. Chow,
      Esq.) 125 Summer Street, Boston, MA 02110;
          -and-
    G. & A. Ladas (by Andreas G. Ladas, Esq.)
      67 Kennedy Avenue, Athienitis Kennedy
      Park, Suite 301, CY-1076 Nicosia, Cyprus;
          -and-
    Abed & Savage (by M. Brooks Savage, Jr., Esq.)
      1101 17th Street, N.W., Suite 405,
      Washington, D.C. 20036, for the Petitioner.
(Continued on Page 2)

00002

PRESENT (Continued):
Anderson & Kreiger LLP
(by Scott P. Lewis, Esq.)
43 Thorndike Street, Cambridge, MA
02141-1764, for the Respondent.
ALSO PRESENT:  Mark R. Vernazza, Esq.,
Edwards Angell Palmer & Dodge
(p.m. only)

00018

1    A.  No.  I don't remember the date, but at some

2  point we folded into corporate development, which is

3  where I now work.  The trigger point was when Mara

4  became president of Genzyme Genetics.

5    Q.  Did that mean you no longer reported to

6  her?

7    A.  That's correct.

8    Q.  Who did you report to at that point?

9    A.  Stephen Potter.

10    Q.  Do you still report to Mr. Potter?

11    A.  I do.

12    Q.  What's your current function?

13    A.  Current function is licensing, mergers and

14  acquisitions, looking for new product opportunities

15  for our business units.

16    Q.  When you became manager in the chemical

17  section at Genzyme Pharmaceuticals, who did the

18  other functions?  Was chemicals all pharmaceuticals'

19  business?

20        MR. LEWIS:  Objection as to form.

21    A.  I'm sorry, could you rephrase the question.

22    Q.  Was pharmaceuticals -- the chemicals

23  business that you were a manager for within Genzyme

24  Pharmaceuticals, was that the only business line, or

00019

1  were there others?

2     A.  No.  Pharmaceuticals at one time was known

3  as pharmaceuticals and fine chemicals, and it's a

4  bit of a misnomer in the context of the

5  pharmaceutical industry.  It was chemicals that were

6  sold to the pharmaceutical industry.  So, yes, that

7  was its primary business.

8     Q.  Its primary business was not to do end user

9  products?

10    A.  We aspired to forward integrate, and the

11  first product that we started with was melatonin

12  tablets.

13    Q.  Was that started when you got there or

14  before you got there?

15    A.  While I was there.

16    Q.  Was there an effort to -- was this the

17  MelaPure line?

18    A.  Yes.

19    Q.  How did the MelaPure line come to be, in

20  your recollection?

21    A.  I didn't manage that piece.  As I recall,

22  we sold bulk melatonin, the active pharmaceutical

23  ingredient or the active ingredient, to

24  nutraceutical companies, who manufactured tablets.

00020

1   We then determined to manufacture melatonin tablets

2   for U.S. use.  Once we understood they were

3   regulated as pharmaceuticals in other parts of the

4   world, we began to look into what the requirements

5   would be for regulatory approval in other

6   territories.

7       Q.   So did Genzyme Pharmaceuticals ever sell

8   MelaPure tablets in the United States?

9       A.   I don't remember if we actually got

10   customers in the United States.

11      Q.   So prior to that you would be selling bulk

12   melatonin to customers like GNC and others?

13      A.   Yes.

14      Q.   And they would do the tablet formulations

15   themselves?

16      A.   Yes.

17      Q.   Were you part of the branding program for

18   MelaPure?

19      A.   No.  Oh, yes.  Yes, in that I worked with a

20   couple of my customers to encourage them to use the

21   MelaPure logo on their tablet bottles.  I think

22   there were only two.

23      Q.   Do you remember what they were?

24      A.   No.

00021

Q. So when you say the "MelaPure logo," did that include the so-called "sleeping man" logo?
A. Yes. The MelaPure logo was the sleeping man.
Q. Do you know who developed that logo?
A. Yes.
Q. Who was that?
A. That was Tony Newton.
Q. What was her position?
A. He was another manager in the chemicals group.
Q. Was that done before you joined the company?
A. No. While I was there.
Q. So sometime in the 1996 time frame?
A. Yeah, '96 feels right.
MR. LEWIS: Ms. Greve-Philips, when you take your hand and motion as you just did, as sort of plus or minus, bear in mind that the court reporter can't transcribe that, so you need to express yourself in words slowly in answering the questions that Mr. Chow is posing to you.
THE WITNESS: Thank you.
Q. Was there any marketing study done other

00022

1   than just talking to some of the customers?

2       MR. LEWIS:  By whom?

3   Q.   For the MelaPure program by Genzyme.

4   A.   I'm not aware of one.

5   Q.   Who approved the commencement of the

6   MelaPure branding program?

7   A.   There were probably a couple of levels of

8   approval.  Tom Slater and then whoever was president

9   at the time.

10      Q.   Was that Alan Walts?

11      A.   Because I don't remember the timing of the

12  campaign, I can't tell you who the president was, I

13  apologize.

14      Q.   What, to your recollection, was the

15  campaign at the start?

16      A.   The logo was to attest to the quality of

17  the melatonin in the tablets, and so the purpose of

18  the campaign was to differentiate product

19  manufactured by various nutraceutical companies as

20  having used a high-quality, pharmaceutical grade

21  melatonin.

22      Q.   What was the difference between

23  pharmaceutical grading and nonpharmaceutical

24  grading?

00023

1    A.   Pharmaceutical grade bulk active material

2   is manufactured to good manufacturing practices as

3   regulated by the FDA.  It meets the specifications

4   -- it follows a master batch record.  Batch records

5   are carefully signed off on, and then a certificate

6   of analysis is generated by the analytical group.

7   And then the material is placed on stability testing

8   for some period of time, which was different than

9   what other chemical manufacturers were required to

10  do.

11    Q.   Now, did they have to meet a different set

12  of regulations?

13    A.   We were not required to meet those

14  specifications, and so nobody else was either.  We

15  were manufacturing melatonin as a pharmaceutical

16  prior to the melatonin craze that started in 1995.

17    Q.   Were there other pharmaceutical grade

18  manufacturers?

19    A.   One developed as a result of the interest

20  in pharmaceutical grade material, yes.

21    Q.   Who were the other manufacturers?

22    A.   The other one that I'm aware of was

23  Helsinn, and that's with two Ns, in Switzerland.

24    Q.   Anyone else that you can think of on the

00038

1    Q.   Do you recall whether there was some

2  tableting of the melatonin MelaPure product in the

3  company in the U.K.?

4    A.  Yes.

5    Q.   What happened there?  Who was that

6  manufacturer?

7    A.  I think the name was Natural Options, but

8  I'm not certain.

9    Q.  How did you come to learn about that?

10    A.   It could have been from Roger Sparrow.

11    MR. LEWIS:  Mr. Chow is not asking for

12  speculation, Ms. Greve-Philips.

13    A.  I don't know for sure.

14    MR. CHOW:  We're not asking for

15  speculation, but certainly we're asking for answers.

16    MR. LEWIS:  The "could have beens" are

17  speculation.

18    MR. CHOW:  I beg to differ.  That would

19  appear from the record, in any case, and I prefer if

20  you do not do all these speaking objections and

21  testifying.

22    Q.   When you became director and had the

23  position of director, were you given a particular

24  mission at that time?

00053

1        MR. LEWIS:  Objection as to form.

2    A.   Yes.

3    Q.   Roughly when was that completed?

4    A.   1998.

5    Q.   Have you had any communication with Roger

6    Sparrow since that time?

7    A.   No.

8    Q.   Do you know of his whereabouts today?

9    A.   No.

10    Q.   I'm going to take you through some of the

11    documents in this case.

12        MR. CHOW:  Let's mark as Exhibit 44 Genzyme

13    3360 through 3365.

14            (Document marked as Greve-Philips

15            Exhibit 44 for identification)

16    Q.   Carol, it mentions at the top of this

17    document, which reads "Minutes/Actions from the

18    Program Review Meeting Held on 11th June, 1996 at

19    Kendall Square," that your name is listed in

20    parentheses "(in part)."  Can you tell me what this

21    document is?

22    A.   No.

23    Q.   Looking at the list of those who were

24    stated to be present, was this a Genzyme

00054

1   Pharmaceuticals meeting?

2       MR. LEWIS:  Objection as to foundation.

3    A.  Can you explain to me what you mean by

4   "Genzyme Pharmaceuticals meeting."

5    Q.   Does this refer to a meeting that was held

6   in June of 1996?

7    A.  It was a meeting held in June of 1996.

8    Q.  Is it a meeting that you participated in?

9    A.  I don't remember participating in it.

10    Q.   At that time, if it says you were there in

11   part, what would have been your input into this

12   meeting?

13       MR. LEWIS:  Objection.

14    A.  I don't remember this meeting at all.

15    Q.   Were there monthly meetings of program

16   review at Genzyme Pharmaceuticals?

17    A.  I don't remember.

18    Q.   Do you recall whether there was an

19   advertisement requesting distributors for the

20   melatonin fixed-dosage product?

21    A.  I don't recall.

22       MR. CHOW:  Let me just mark as Exhibit 45 a

23   document with Bates numbers 4939 through 4943.

24

00063

1    Document 4733 through 4734.  Again, your name

2    doesn't appear on this, I just wanted to explore

3    some of these issues.

4              (Document marked as Greve-Philips

5              Exhibit 48 for identification)

6    Q.  Does this document refresh your

7    recollection as to who Elisa Tang is?

8    A.  I know who Elisa Tang is.

9    Q.  Who is she?

10    A.  Oh, she worked in regulatory affairs.

11    Q.  But you never had any occasion to work with

12    her?

13    A.  I didn't work with her.

14    Q.  On the first page of this there's mention

15    of the Natural Options.  Is that the tableting

16    concern you spoke about earlier?

17    A.  Yes.

18    Q.  Now, at the time of the date of this

19    document, October 30, 1997, did you have any

20    involvement in any of these regulatory matters?

21    A.  No.

22    Q.  On the following page do you recognize any

23    of this handwriting?

24    A.  No.

00064

1    Q.   Were you aware that Natural Options did not

2   have GMP certification?

3    A.   No.

4    Q.   Were you aware that Tishcon did have GMP

5   certification?

6    A.   No.

7        MR. CHOW:  Let's mark as Exhibit 49

8   Genzyme Documents 5009 through 5014.

9            (Document marked as Greve-Philips

10           Exhibit 49 for identification)

11    Q.   Is this document or set of documents

12   something you've seen previously?  I note only

13   there's a handwritten "Carol" in the upper

14   right-hand corner.

15    A.   I see that.  (Witness reviews document)  I

16   don't remember it.

17    Q.   Can you recall whether you received these

18   at the time of the -- do you recall receiving these

19   at all?

20    A.   I don't recall.

21    Q.   Is there any other Carol that you know of

22   within the --

23    A.   No.

24    Q.   Did there ever come a time when you

00106

1    Q.  I show you Exhibit 42 marked from

2  yesterday.  We'll come back to this one again later.

3  But this is dated -- this is a number of e-mail

4  messages in the January 18 through January 24, 2000

5  time frame.  Do you recall whether Mr. Sparrow's

6  company was given a license for manufacturing

7  melatonin?

8    A.  I'm sorry, say that part again, please.

9    Q.  Do you recall whether Roger Sparrow's

10  company, after the split from Genzyme, was ever

11  given a license to manufacture melatonin?

12    A.  Genzyme would not have been able to

13  authorize Mr. Sparrow to manufacture melatonin.

14    Q.  And why is that?

15    A.  It's not a permission we have to be able to

16  grant.

17    Q.  Is it held under patent by someone else?

18    A.  No, it is not.

19    Q.  Then why --

20    A.  We could license him the process; we could

21  not give him the right to manufacture.  He could use

22  our synthetic method and that license was granted to

23  Roger Sparrow.

24    Q.  Oh, when you're speaking about

00107

1  manufacturing in terms of federal regulatory --

2    A.  Correct.

3    Q.  Country regulatory?

4    A.  Correct.

5    Q.  But you did give him whatever rights that

6  Genzyme had to use the process?

7    A.  To use that synthetic process, correct.

8      Shall I hold this to come back to that

9  later?

10      MR. CHOW:  We'll get it.

11      MR. LEWIS:  How about taking a short break?

12      (Recess)

13      MR. CHOW:  Let me mark as Exhibit 64 a

14  document with Genzyme Nos. 1323 to 1329.

15        (Document marked as Greve-Philips

16        Exhibit 64 for identification)

17  BY MR. CHOW:

18    Q.  Did you receive what appears to be a

19  Product Sales Summary on a regular basis?

20    A.  Yes, I did.

21    Q.  Let me just ask you to turn to Page 1328.

22  Now, just to help us look at some of these

23  documents, is all of melatonin-related inventory

24  under the group 2P2310 and 2P2320?

00119

1   accounting for pharmaceutical reserves?

2   A.  No, I did not.

3   Q.  Was this purely a financial group?

4   A.  Yes, this was a financial document.

5   Q.  Were you involved in any write-offs of

6   melatonin inventory?

7   A.  No, I was not.

8   Q.  Again, that was done at the financial

9   level?

10   A.  Yes.

11   Q.  Did you receive inventory movement reports?

12   A.  No, I didn't.

13      MR. CHOW:  Please mark as Exhibit 73

14   Genzyme Documents 1079 through 1080.

15          (Document marked as Greve-Philips

16          Exhibit 73 for identification)

17   Q.  Is this a document that you wrote, Ms.

18   Greve-Philips?

19   A.  Yes, it is.

20   Q.  Can you explain what this document is.

21   A.  Yes.  In this negotiation for the transfer

22   of the melatonin assets to VitaPure, there were some

23   groupings of questions that needed to be resolved,

24   and those included things of a regulatory financial

00120

1   nature.  There was a description of what the assets

2   would be; those are listed as "Inclusions."

3   "Exclusions" were those things which we did not have

4   right to transfer on the liabilities, and there was

5   some preclinical toxicology data that was also

6   available to Roger.

7       Q.   Now, on the second page on "Exclusions," it

8   states that "Tablet formulation" and "Manufacturing

9   process" were excluded.

10      A.   Yes, that's correct.

11      Q.   In fact, were they not excluded?

12      A.   Would you repeat that, please.

13      Q.   You stated earlier that you couldn't give

14   them the right to manufacture because this was a

15   regulatory issue?

16      A.   That's right.

17      Q.   Whereas you did give them the right to

18   manufacturing -- whatever rights you had in the

19   manufacturing process?

20      A.   Yes.

21      Q.   So at this time are you stating that you

22   meant manufacturing process, you meant only in terms

23   of regulatory?

24          MR. LEWIS:  Objection as to form.  The

00121

1   prior testimony was about a transaction in the year

2   2000; this is about a transaction in the year 1998.

3       MR. CHOW:  Actually, that's not true.

4     Q.   At this time in 1998, did you mean

5   something -- what did you mean by "manufacturing

6   process"?

7       A.   Manufacturing process refers to two

8   separate things:  the synthetic chemical process,

9   which is what we described earlier, and the

10  manufacturing process for tablets themselves, which

11  includes the components of a tablet.  Genzyme did

12  not develop that, it was not ours to transfer, and

13  consequently was excluded from the Heads of

14  Agreement.

15    Q.   But this would allow -- did you anticipate

16  at this time, which is still 1998, that Genzyme

17  would essentially allow Roger Sparrow to use

18  whatever rights that Genzyme had to manufacture?

19    A.   I'm sorry, could you say that again.

20    Q.   Did you basically -- again, you talked

21  about rights with respect to the regulatory side and

22  also rights perhaps in the particular formulation --

23    A.   Correct.

24    Q.   -- of a tablet.  But whatever -- did you

00122

1   intend to license whatever rights Genzyme had at

2   this point?

3      A.   Yes, we did.

4      Q.   The sentence right after the "Exclusions"

5   under "Liability" seems to suggest that you did not

6   wish to license the manufacturing process.  Do you

7   see an inconsistency?

8         MR. LEWIS:  What's your question, Mr. Chow?

9      Q.   Do you see an inconsistency with respect to

10  Genzyme's name recognition on the quality of

11  melatonin and the licensing of the manufacturing

12  process?

13     A.   Do I see an inconsistency between Genzyme's

14  name on the melatonin and the --

15     Q.   The licensing of the manufacturing process

16  to a new entity.

17     A.   Let me think about this.  I'm sorry, could

18  you explain that another way?

19     Q.   Sure.  What is the concern under the first

20  point under "Liability"?

21     A.   Oh, the concern there was that the VitaPure

22  would substitute an alternate supplier of bulk

23  melatonin for the Genzyme inventory.

24     Q.   So you would still want them to come back

00123

1  to Genzyme to get the bulk melatonin?

2    A.  We wanted to ensure that the quality of the

3  bulk active material in the tablets was of the same

4  quality as that which Genzyme had historically

5  provided.

6    Q.  Now, in the exclusion on the manufacturing

7  process, did that relate to manufacture of bulk

8  melatonin as well?

9    A.  No, it did not.  It related to

10  manufacturing of the tablets.

11    Q.  So you were not going to license the

12  manufacture of bulk melatonin; is that correct?

13    A.  We were.

14    Q.  No, the -- okay.  I see.  You're saying you

15  would license --

16    A.  We would license what we owned.

17    Q.  Then how would you meet the liability issue

18  with respect to the bulk melatonin, if Roger Sparrow

19  had licenses to use whoever he wanted to supply the

20  bulk melatonin?

21    A.  We contemplated that the labels would no

22  longer carry the Genzyme name, the MelaPure would

23  not be associated with Genzyme but would then be

24  associated going forward with VitaPure.

00124

1         MR. CHOW:  Please mark as Exhibit 74

2    Genzyme Documents 5419 through 5421.

3              (Document marked as Greve-Philips

4              Exhibit 74 for identification)

5    Q.   Do you recall this document?

6    A.   Yes, I do.

7    Q.   What is this document?

8    A.   This document was the response to the one

9    we just discussed.

10     Q.   So referring to Page 2 under "Exclusions"

11   it says "Manufacturing process remains Genzyme."

12   Again, did that mean just the tablets?

13     A.   I think -- hmm.  The manufacturing or

14   synthesis process, as it's sometimes known, remained

15   with Genzyme for that time, as there was inventory

16   that could be used for future formulation of

17   tablets, and it was of sufficient quantity to make a

18   very large number of those tablets.  And we

19   discussed the drug master file earlier.  That would

20   have been the access he was requesting and was also

21   certifying that it would not be used by a third

22   party.

23     Q.   Let me refer to -- still on the second

24   page, which is 5420, under "Liability," under the

**EXHIBIT 9**

00001

Volume I
Pages 1 to 154
Exhibits 1-43
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re the Application of                    :

KAYAT TRADING LIMITED,                      :

    Petitioner,                             :

For an Order to Take                        :

Discovery of                                : Civil Action No.

GENZYME CORPORATION,                        : 05-MBD-10147-GAO

    Respondent,                             :

Pursuant to                                 :

28 U.S.C. Section 1782                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

     DEPOSITION OF GENZYME CORPORATION, by its
designee JAMES F. OLLINGTON, Ph.D., and JAMES F.
OLLINGTON, Ph.D. individually, a witness called on
behalf of the Petitioner, taken pursuant to Rule
30(b)(6) of the Federal Rules of Civil Procedure,
before Anne H. Bohan, Registered Diplomate Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Anderson & Kreiger
LLP, 43 Thorndike Street, Cambridge, Massachusetts,
on Monday, July 17, 2006, commencing at 9:39 a.m.
PRESENT:
    Burns & Levinson LLP (by Stephen Y. Chow,
      Esq.) 125 Summer Street, Boston, MA 02110;
          -and-
    G. & A. Ladas (by Andreas G. Ladas, Esq.)
      67 Kennedy Avenue, Athienitis Kennedy
      Park, Suite 301, CY-1076 Nicosia, Cyprus;
          -and-
    Abed & Savage (by M. Brooks Savage, Jr., Esq.)
      1101 17th Street, N.W., Suite 405,
      Washington, D.C. 20036, for the Petitioner.

(Continued on Page 2)

00002

PRESENT (Continued):

Anderson & Kreiger LLP
(by Scott P. Lewis, Esq.)
43 Thorndike Street, Cambridge, MA
02141-1764, for the Respondent.


ALSO PRESENT:  Jennifer M. Goddard, Esq.,

Genzyme Corporation

00026

1   Switzerland, supported the business unit.

2      Q.  Is that different from Sygena?

3      A.  No.  Sygena was the name of the company

4   that was based in Liestal.  I believe they also had

5   an office in Cambridge before we acquired them.

6      Q.   What was done at those two facilities in

7   terms of manufacturing?

8      A.  So in -- well, at Liestal first, they were

9   involved in the manufacturing of, again, as I said

10  earlier, phospholipids, amino acid derivatives,

11  liquid crystals, other specialized peptides.  And

12  Haverhill was involved in the manufacture of the

13  products that I just mentioned earlier, the triflic

14  anhydride, Clindamycin Phosphate, specialty

15  chemicals, and on occasion contracted products.  And

16  melatonin, of course.

17     Q.   Did the Liestal facility do any

18  manufacturing as part of the melatonin manufacturing

19  process?

20     A.  As a matter of fact, they did.

21     Q.  What part of that process?

22     A.  I can't recall that.  I just can't recall

23  what intermediate step may have been involved.

24     Q.   Just generally, what are the steps in

00027

1   producing melatonin?

2     A.   I probably should have thought about that.

3   I actually can't recall, I never was that close to

4   the actual chemical manufacturing.

5     Q.   Was hydrazine one of the raw materials?

6     A.   I actually don't recall.  It's such a

7   familiar chemical name.

8     Q.   Well, do you recall the difference between

9   Stage I and Stage II melatonin?

10     A.   I don't.  I recall --

11         MR. LEWIS:  Please just answer the

12   questions that you're asked, Mr. Ollington.

13     A.   No.

14     Q.   What, to the best of your recollection, was

15   done in Switzerland in Liestal in the melatonin

16   manufacturing process?  Just to the best of your

17   recollection.

18     A.   I can't recollect the manufacturing step or

19   steps.

20     Q.   Do you recall what was done at Haverhill in

21   terms of melatonin production?

22     A.   Not the exact process.  I know they did

23   manufacturing of melatonin.

24     Q.   Did they manufacture it from the raw

00034

1    A.  I recollect an activity to register

2  melatonin in a number of countries outside the

3  United States, but I actually don't recall

4  specifically which territories generated revenue.

5    Q.  Was there a United States market for the

6  finished dosage form?

7    A.  Again, I don't recollect revenues from the

8  United States.

9    Q.  Do you know if Genzyme marketed in finished

10  dosage form in the United States?

11    A.  No, I don't.

12    Q.  Do you recall anything about supplying of

13  finished dosage form to the former Soviet republics?

14    A.  Only what I've seen in documents in the

15  last week.

16    Q.  Speaking of documents, what documents did

17  you review in preparation for this deposition?

18    A.  There were a number of documents.  I

19  recollect seeing a contract between Genzyme and

20  Kayat.

21    Q.  Any other documents you recall?

22    A.  I recollect, from last week, seeing a

23  document signed by me to I think it was Mr. Mechkov.

24      MR. LEWIS:  Is he going to be with us this

00035

1  week?  I thought he was coming.

2      MR. SAVAGE:  No, he's not.  He changed his

3  plans.  He sends his best regards.

4      MR. LEWIS:  I'm sure he does.

5      MR. CHOW:  Let me mark for Exhibit 1 a copy

6  of a document marked with Genzyme production 986.

7          (Document marked as Ollington

8          Exhibit 1 for identification)

9    Q.   Is this the document you were just

10  referring to as a document that you reviewed?

11    A.   Yes.

12    Q.   Is this your signature that shows on

13  Exhibit 1?

14    A.   Yes, it looks like my signature.

15    Q.   Do you recall why you wrote this letter?

16    A.   No.

17    Q.   Did you review the correspondence that this

18  refers to?  In the first sentence it refers to a

19  correspondence of August --

20    A.   I've seen that document recently.

21      MR. LEWIS:  Could you wait for the

22  questions to be completed as we go forward, please,

23  Mr. Ollington.

24    Q.   In your view, was Mr. Sparrow entirely

00036

1   responsible for the relationships with distributors?

2       MR. LEWIS:  Objection as to form.

3     Q.   Let me ask, then, do you agree with the

4   substance of this letter?

5       MR. LEWIS:  Objection as to form.

6     Q.   You may answer.

7     A.   I'd need you to clarify the question,

8   please.

9     Q.   Having reviewed this letter and the

10   correspondence it refers to, is there anything in

11   this letter that, in retrospect, you disagree with?

12     A.   I don't recall writing this letter.

13     Q.   Was there anyone else within Genzyme with

14   whom the addressee, Constantin Mechkov, should have

15   been dealing with other than Roger Sparrow?

16       MR. LEWIS:  Objection as to form.

17     A.   I don't recollect knowing of Mr. Mechkov,

18   so I don't know who else he may have been in touch

19   with.

20     Q.   From your understanding of Genzyme

21   Pharmaceuticals, was there any other person within

22   Genzyme that a distributor would be dealing with?

23       MR. LEWIS:  Objection as to form and

24   foundation.  He's already testified that he doesn't

00037

1  know who all the distributors dealt with, Mr. Chow.

2     MR. CHOW:  Well, he's president -- he was

3  president of the division.

4     Q.   Is there someone that you would have

5  directed a distributor to other than Mr. Sparrow?

6     A.   So I relied on Tom Slater to manage his

7  sales force.

8     Q.   Tom Slater is not mentioned here; is that

9  correct?

10    A.   He's not mentioned in this correspondence.

11    Q.   Do you know whether at the time of this

12  correspondence, which is September 1997, whether Mr.

13  Slater was still supervising Mr. Sparrow?

14    A.   To the best of my knowledge, yes, he was.

15    Q.   Now, as of September 1997, were you about

16  to leave the presidency of Genzyme Pharmaceuticals?

17    A.   Yes.

18    Q.   Did it already occur as of September 1997?

19    A.   No.

20    Q.   Do you recall when it happened?

21    A.   I think it was October or November, early

22  November.

23    Q.   During your time as president of Genzyme

24  Pharmaceuticals, was there a major rationalisation

00038

1  of the product lines?

2    A.   The business planning process took place,

3  initiated, when I was president of pharmaceuticals.

4    Q.   When was that initiated?

5    A.   Approximately in June of 1997.

6    Q.   Were any decisions made in June of 1997 in

7  terms of the product line changes?

8    A.  No.

9    Q.   Did they occur subsequently?

10      MR. LEWIS:  Did what occur subsequently?

11      MR. CHOW:  Changes, decisions on changes.

12    A.   Yes.

13    Q.   When did those occur?

14      MR. LEWIS:  Are you referring to a

15  particular decision, Mr. Chow?  It's a very broad

16  question.

17      MR. CHOW:  Well, I think decisions on

18  changes in product lines we can start -- there's a

19  limited number of product lines.

20    A.   So decisions on --

21      MR. LEWIS:  What's the question that's

22  pending before the witness?

23      MR. CHOW:  I'll just restate it again.

24    Q.   Were there subsequently decisions made

00039

1   within Genzyme Pharmaceuticals as to a change in

2   product lines?

3      A.   Yes, there were.

4      Q.   When were those decisions made?

5      A.   I find it hard to pin down the dates, and I

6   expect that there were a series of discussions and

7   decision-making conversations toward the end of '97

8   and into early '98.

9      Q.   Who was involved in those decisions?

10      A.   So during that time the new president of

11   the pharmaceuticals business, Mara Aspinall, was

12   involved in those decisions, plus the staff

13   reporting to her.

14      Q.   While you were president of Genzyme

15   Pharmaceuticals, who outside the Genzyme

16   Pharmaceuticals headquarters staff were involved in

17   those decisions?

18      A.   To --

19      MR. LEWIS:  I'm going to object.  There's

20   no testimony that there were decisions made while

21   he was president of Genzyme Pharmaceuticals, Mr.

22   Chow.

23      MR. CHOW:  Yes, but there were decisions

24   that were made afterwards, and during the time he

00041

1   aware of the planning process.

2      Q.   What was their involvement, if any, other

3   than just aware of the process?

4      A.   Geoffrey Cox as my supervisor just

5   questioned me occasionally.

6      Q.   If a decision had been made during your

7   stay, was that your decision, or was it a corporate

8   decision?

9         MR. LEWIS:  Objection as to form.  It's

10   calling for rank speculation.

11         MR. CHOW:  I don't think it's rank

12   speculation.

13         MR. LEWIS:  It's a hypothetical.  No

14   foundation.  Objection as to form.

15      Q.   Was it your responsibility to make a

16   decision on what product lines to keep?

17      A.   Not solely.

18      Q.   Who else would be involved?

19      A.   Geoffrey Cox, Henri Termeer.

20      Q.   Anyone else at that time?

21      A.   I can't recollect.

22      Q.   Was it a board-level decision?

23      A.   I don't know that.

24         MR. LEWIS:  Again, you're speaking

00044

1   continue to support the finished dosage form

2   opportunity as it may develop.

3      Q.   When you say "support," what kind of

4   support were you speaking of?

5      A.   At that time I recollect we were still

6   seeking registration of the finished dosage form in

7   some countries overseas, and in addition to that, we

8   were considering the possibility of developing a

9   therapeutic application for the finished dosage form

10   through a clinical research program.

11      Q.   How was the therapeutic form different from

12   the form that was already being supplied?

13      A.   I don't believe that I can distinguish,

14   that I can recollect a distinction now.

15      Q.   Generally, there's no -- what did Genzyme

16   have to do to get a therapeutic form developed?

17      A.   So the initiative that we were considering

18   internally would have involved designing a clinical

19   protocol in a particular patient population, in a

20   particular disease indication, and then assembling

21   the information to support initiating that clinical

22   study and moving towards a registration filing.

23      Q.   Were you aware that there had already been

24   some registrations for finished dosage melatonin?

00045

1    A.  I recollect, yes, some countries had

2   approved registration of finished dosage form.

3    Q.  Do you recall if those distinguished

4   between therapeutic or, I guess, dietary

5   supplements?

6    A.  No, I don't.  I believe the effort at that

7   point was principally a dietary supplement.

8    Q.  In the plan to do -- in considering

9   therapeutic melatonin, was there a plan on how to

10  get the raw material, that is, the melatonin

11  itself?

12   A.  I recollect -- can you just clarify the

13  time frame.

14   Q.  Yes.  When you were making the

15  recommendation, for example, to the board that in

16  that time frame you mentioned that the

17  recommendation was to cease bulk melatonin, the

18  question then is, where would you get the melatonin

19  to make the therapeutic melatonin?

20   A.  I recollect we had a large amount of

21  melatonin raw materials and various inventory stages

22  in our inventory.

23   Q.  Now, were all those intermediate materials

24  stable?

00057

1  looked at.

2      Q.   Is Genzyme currently involved in any

3  melatonin business?

4      A.   Not that I'm aware of.

5      Q.   To your knowledge, when did Genzyme cease

6  any involvement in melatonin?

7      A.   The last involvement I know of was in 1998,

8  so beyond that, I don't know what the activity has

9  been.

10      Q.   What was it in 1998 that you recall?

11      A.   I recall in '98 an effort by the business

12  unit to continue finished dosage form activities but

13  really not very much more explicitly than that.  And

14  then hearing afterwards an admission to not be

15  directly involved in the finished dosage form

16  business.

17      Q.   When you say "not directly involved," what

18  did that mean?

19      A.   What I recollect is that Genzyme would

20  continue to support Roger Sparrow in his endeavor to

21  sell, market, distribute finished dosage form.

22      Q.   When was the first time that you heard the

23  name VitaPure?

24      A.   I recollect the name; I can't remember the

00058

1  first time.

2     Q.   Is that Roger Sparrow's business?

3     A.   I recollect it as -- it could be a product

4  line or it could be the business area, I can't

5  recollect the distinction.

6     *Q.   Was that something that was suggested that

7  Genzyme start as a business line?

8        MR. LEWIS:  Objection as to form.  Can I

9  hear that question back, please.

10        *(Question read)

11     Q.   VitaPure.

12     A.   So if I recollect the name, yes, I believe

13  so.

14     Q.   Is it correct that this was generally

15  involved in nutritional supplements?

16     A.   That's VitaPure as a description, yes, I

17  think so.

18     Q.   To the best of your recollection, what was

19  considered by Genzyme in that regard?

20     A.   Just clarify the question for me, please.

21     Q.   Okay.  Did Genzyme -- did at least you

22  entertain the idea of nutritional supplements

23  through a general product area called VitaPure?

24     A.   So I recollect hearing that description or

00059

1   that general proposal that this may be a product

2   line or a product area, and I remember considering

3   that.

4       Q.   I gather correctly that Roger Sparrow

5   proposed it?

6       A.   (The witness nods)

7       Q.   Did anyone else propose it?

8       A.   Not that I'm aware of.

9       Q.   What is your recollection as to what

10  happened to that proposal?

11      A.   To the best of my recollection, that

12  proposal was still being considered through the end

13  of 1997, the period of that planning process, the

14  business planning process.

15      Q.   Are you aware of what happened to it

16  afterwards?

17      A.   I'm aware now that Genzyme, we never formed

18  that as a distinct product area.

19      Q.   Your recollection is that as of the time

20  you left the presidency that it was still being

21  considered?

22      A.   Yes.

23      Q.   Were you involved in the contract that you

24  reviewed with Kayat Trading at the time that the

00069

1   but I don't know what they are.

2      Q.   Turning to the page numbered 2885 on the

3   bottom, on the left side, I guess, this talks

4   about "FDF Finished Goods."  Do you recall what's

5   the difference -- referring you to the items for

6   3 milligram melatonin and 3 milligram melatonin

7   with 10 milligrams B6, do you have any

8   recollection on the difference between those two

9   products?

10      A.   No, I don't.

11      Q.   Tishcon, again, is the contract

12   manufacturer?

13      A.   That's what I recollect.

14      Q.   To the best of your recollection, what did

15   Tishcon do with the melatonin?

16      A.   To the best of my recollection, they are a

17   tableting company.

18      Q.   Does that mean that they also put in inert

19   and filler materials?

20      A.   I don't know what they do or did in this

21   process, but tableting may involve formulating a

22   material to be made into a tablet.

23      Q.   So typically it would not be just 3

24   milligrams of melatonin in raw form?

00072

1    period.

2       Q.   Was there any consideration that he acted

3    beyond his authority?

4          MR. LEWIS:  What time, Mr. Chow?

5       Q.   During the time that you were president.

6          MR. LEWIS:  Objection as to form.

7       Q.   Did you as president, or anyone who

8    reported to you, have any views of whether Roger

9    Sparrow exceeded his authority on behalf of Genzyme

10   during your time period there?

11         MR. LEWIS:  Objection as to form and

12   foundation.

13      Q.   You can answer.

14      A.   I don't recall such concerns.

15      Q.   Did anyone ever tell you anything good --

16   to your recollection, did Tom Slater ever say

17   anything good or bad about Roger Sparrow?

18      A.   He talked about all the staff including

19   Roger.

20      Q.   Do you recall one way or another whether

21   Tom Slater said anything about Roger Sparrow in

22   terms of his performance or his methods of sale?

23      A.   I recollect in the business planning

24   process Tom expressing concern that he wanted more

00073

1    information from Roger to participate -- to

2    contribute to the planning process, I do recollect

3    that.

4        Q.   Anything else?

5        A.   No.  I think that's a general statement of

6    the need to be diligent with Roger, to learn as much

7    information as possible.

8        Q.   So were you ever called upon to discipline

9    any employee of Genzyme Pharmaceuticals?

10       A.   No.

11          MR. CHOW:  Let me mark as Exhibit 3 a

12    document with Genzyme Nos. 5528 through 29.

13             (Document marked as Ollington

14             Exhibit 3 for identification)

15       Q.   Is this internal memo from Matthew Roe to

16    Tom Slater the kind of report that you would receive

17    as president of Genzyme Pharmaceuticals?  I note

18    Alan Walts is cc'd on this one.

19       A.   Yes, it could be.

20       Q.   Do you recall looking at this document or

21    something like this document as part of your

22    learning about Genzyme Pharmaceuticals?

23          MR. LEWIS:  Objection as to form.  You can

24    answer.

00097

1  Ollington.

2     A.  It's a report of the financial performance

3  of the pharmaceuticals business unit through

4  February 1997.

5     Q.  Are these a similar document -- were

6  similar documents created for each month at Genzyme

7  Pharmaceuticals?

8     A.  To the best of my recollection, yes.

9     Q.  Do you happen to know whose handwriting it

10  is on the second page of this document?

11     A.  This looks like mine.

12     Q.  Typically -- let me turn to the page that

13  says "Operating Commentary."  Who generally wrote

14  these operating commentaries during your tenure as

15  president?

16        MR. LEWIS:  Objection as to form.

17     Q.  Were these comments written by you?

18     A.  No.

19     Q.  Who were they written by?

20     A.  The financial controller.

21     Q.  Did this particular operating report create

22  any urgency in a new business plan?

23        MR. LEWIS:  Objection as to form.

24     Q.  You may answer.

00098

1    A.  So this operating commentary would have

2  contributed to my assessment of the need to assess

3  this business.

4    Q.  Do you recall that you had a specific

5  assessment at that time, that is, February -- March

6  1997?

7        MR. LEWIS:  Objection as to form.

8    A.  No, the answer is no.

9        MR. CHOW:  Mark as Exhibit 16 a document

10  bearing Genzyme Production Nos. 618 through 619.

11        (Document marked as Ollington

12        Exhibit 16 for identification)

13    Q.  From your experience at Genzyme generally,

14  do you know what this document is, Exhibit 16?

15    A.  Only by way of interpreting what I read

16  here.

17    Q.  Do you know who would have kept this index

18  file, Chronology Index File?

19    A.  No, I don't know.

20    Q.  There's a reference on the first page with

21  a date March 21, 1997, about a U.S. IND submission.

22  Do you recall that with respect to melatonin

23  product?

24    A.  No, I don't.

00099

1    Q.   Turning to the second page, in March of

2    1998 there is an indication of inactivation of the

3    IND submission.  Did you have any role, any decision

4    to inactivate the submission?

5    A.   Not that I can recall.

6         MR. CHOW:  Let's mark as Exhibit 17

7    Genzyme Document 3396 through 3427.

8              (Document marked as Ollington

9              Exhibit 17 for identification)

10   Q.   Can you tell me what this document is, Dr.

11   Ollington?

12   A.   Well, as it states, it's a Melatonin

13   Program Review of that date.

14   Q.   Is this a document you've seen before?

15   A.   I don't recollect it.

16   Q.   Do you recall whether during this time

17   frame, that is, March 1997, whether there was a

18   specific Melatonin Program Review?

19   A.   I don't recall.

20   Q.   As you sit here today, do you have any

21   sense of who may have written this document?

22        MR. LEWIS:  Objection as to form.

23   A.   No, I don't know who the author is.

24        MR. CHOW:  Let's mark as Exhibit 18 Genzyme

00112

1    Q.   Does she also support Mr. Cox?

2    A.   She supported Geoffrey Cox if he at any

3   time was unavailable or away.

4    Q.   There's a reference here on Page 5170 as to

5   a number of possibilities with respect to a

6   contract, the Kayat agreement, I guess is the

7   subject.  Did you know anything about these

8   possibilities?

9    A.   No, I'm not familiar with this.

10    Q.   One of the issues that is mentioned there

11  is being covered for liability in territories of the

12   agreement.  Is that an issue that you confronted at

13   any time at Genzyme Pharmaceuticals?

14       MR. LEWIS:  Objection as to form.  You can

15   answer.

16    A.   Could you repeat the question.

17    Q.   There's a reference in this letter or a

18  message at Page 5170 about "We are not covered for

19  liability in any of the territories" and it is cut

20  off.  Is the liability coverage something that you

21   encountered at Genzyme Pharmaceuticals?

22       MR. LEWIS:  Coverage for what kind of

23  liability, Mr. Chow?

24       MR. CHOW:  The liability that's mentioned

00113

1  in this letter.

2      MR. LEWIS:  Which is what kind of

3  liability?  It hasn't been established.

4    Q.  Do you understand this letter at all?

5      MR. LEWIS:  You're referring to Page

6  5170 --

7      MR. CHOW:  Yes.

8      MR. LEWIS:  -- in a packet of documents --

9      MR. CHOW:  Right.

10     MR. LEWIS:  -- marked as Exhibit 25, in

11  which some of the underlying text of the e-mail is

12  obscured; is that right?

13     MR. CHOW:  That's correct.  That's a

14  document that was produced to us.

15    A.  So I'm not familiar with this document.

16    Q.  The subject matter that you can glean from

17  this document is not something that you have had any

18  connection with; is that correct?

19    A.  No, I'm not familiar with what is being

20  referred to in this document.

21    Q.  Did you ever have any conversation about

22  passing responsibility to a distributor for any

23  liability?

24     MR. LEWIS:  Mr. Chow, I'm going to object

00114

1    as a matter of form.  Liability for what?  The

2    handwritten note that's on here talks about "product

3    liability."  We don't know whether that's the

4    subject of this e-mail.  What kind of liability are

5    you talking about here?  Liability for a defective

6    product that injures a consumer or some other kind

7    of liability?

8        MR. CHOW:  Well, I think if he doesn't know

9    the subject matter, that's the answer.

10        MR. LEWIS:  So what's the question to the

11    witness?  Does he know the subject matter?  He's

12    already testified to you that he does not.

13    Q.   So you never had any conversations about

14    liability coverage by insurance with a distributor,

15    is that correct, within Genzyme Pharmaceuticals?

16    A.   That is correct.

17    Q.   Do you know why contract review had to go

18    to Geoffrey Cox instead of to you --

19        MR. LEWIS:  Objection as to form.

20    Q.   -- in this Kayat agreement?  You mentioned

21    earlier it was because he was an officer; is that

22    correct?

23    A.   Geoffrey was an officer of the company,

24    correct.

00115

1    Q.   But you did not review this document before

2   it was signed?

3    A.   You're referring to the Kayat contract?

4    Q.   The Kayat contract, yes.

5    A.   Not that I can recall.

6    Q.   Let me show you a draft of the Kayat

7   contract which was produced to us as Genzyme 5160

8   through 5166.  That will be Exhibit 26.

9         (Document marked as Ollington

10         Exhibit 26 for identification)

11    Q.   First, do you recognize any of this

12   handwriting on this document?

13    A.   No, I don't.

14    Q.   Other than in this litigation, had you seen

15   any Genzyme Pharmaceuticals agreement that was in

16   this form, a distributor agreement?

17    A.   Not that I can recall.

18    Q.   Have you been involved in any other

19   distributor -- any distributor agreements in your

20   employment at Genzyme generally?

21    A.   Not that I can recall.

22      MR. CHOW:  Let's mark as Exhibit 27 a

23   document that's produced to us as Genzyme 973

24   through Genzyme 984.

00116

1          (Document marked as Ollington

2          Exhibit 27 for identification)

3     A.  (Witness reviews document)

4     Q.   Now, perhaps you can tell me, have you seen

5   this document before?

6     A.  Yes, I have.

7     Q.   Is this the document that you reviewed in

8   the past week or so in preparation for this

9   deposition?

10     A.   That's right, I saw it a week ago.

11     Q.   I note that on the first page it says "July

12   3, 1996."  *Do you know why -- this appears to be a

13   contract dated later --

14          MS. GODDARD:  Could you read that back for

15   me.

16          *(Question read)

17     Q.   -- comparing Page 979, or there's another G

18   number on this, 2408.  It appears to be Geoffrey

19   Cox, July 1, 1997.

20     A.   Can you help clarify -- could you clarify

21   the question.

22     Q.   What I'm asking, do you have any idea why

23   this is dated July 3, 1996, on the front page?  Is

24   it just an error?

00117

1    A.  It suggests an error, but I don't know why.

2    Q.   This is being sent by Daniela Schuster as

3   an assistant to you.  Is this something that you

4   were involved in sending to Mrs. Achkar, who is the

5   addressee?

6    A.  I have no recollection of sending this.

7    Q.   Have you ever seen a form such as this

8   short message with the checklist?

9    A.  No, I haven't.

10    Q.   I'm particularly curious about the check

11   for the trademark license agreement.  That's not

12   something you've seen?

13    A.  No.

14    Q.   Do you know anything about the negotiation

15   of this particular contract?

16    A.  No, I don't.

17    Q.   So even after reviewing it for this

18   deposition, you have no recollection of any

19   involvement in it; is that correct?

20    A.  That's correct.

21    MR. CHOW:  Exhibit 28 is a one-page

22   document with Genzyme 2588.

23    (Document marked as Ollington

24    Exhibit 28 for identification)

00119

1    document with Bates number Genzyme 910.

2             (Document marked as Ollington

3             Exhibit 29 for identification)

4    Q.   I recognize this wasn't written to you, but

5    just for background, who is Dave DeLoria?

6    A.   He was in the sales organization of the

7    pharmaceuticals business.

8    Q.   Now, there's mention here about 2.5 million

9    3 milligram tablets.

10   A.   Um-hum.

11   Q.   Do you know anything about an inventory

12   issue with respect to that number of tablets?

13   A.   Nothing that I recollect.

14   Q.   Do you recall any issue about pressing

15   tablets in England rather than in the United States?

16   A.   No, I don't.

17            MR. CHOW:  Let's mark as Exhibit 30 a

18   document bearing Genzyme Nos. 2927 through 2940.

19            (Document marked as Ollington

20            Exhibit 30 for identification)

21   Q.   Let me direct your attention to Page 3 in

22   handwriting or 2930.  Note in the "Commentary" this

23   column "halted melatonin clinical trials."  Do you

24   recall anything in this time frame about halting

00120

1   melatonin clinical trials?

2     A.  No, I don't.

3        MR. CHOW:  Let me mark as Exhibit 31 a

4   document with Genzyme Nos. 4670 through 4681.

5            (Document marked as Ollington

6            Exhibit 31 for identification)

7        MR. CHOW:  Again, I think this is just

8   because these documents are together.

9     Q.   Just referring to the first paragraph of

10  the message after "Hi Adam," do you know anything

11  about the tableting company in the U.K. called

12  Natural Options?

13    A.   No, I don't.

14    Q.   Was there any other tableting company that

15  you used while you were president of Genzyme

16  Pharmaceuticals other than Tishcon?

17    A.   Not that I can recall.

18    Q.   Were you ever involved in any discussion

19  about which tableting companies to use?

20    A.   No, not that I can recall.

21    Q.   In your work in production, is the portion

22  here -- turning to Page 4674, it says "Melatonin

23  Registration" at the top.  Have you seen this kind

24  of specification in your connection with the

00121

1   operations of Genzyme?

2       A.   I've seen this type of document describing

3   specifications, yes.

4       Q.   Were you involved in any of that for

5   melatonin at any time at Genzyme?

6           MR. LEWIS:  Objection as to form.

7           MR. CHOW:  I'll restate it.

8       Q.   Were you ever involved in developing

9   specifications for melatonin at any time?

10      A.   Not that I can recall.

11      Q.   What generally was done at Genzyme

12  Pharmaceuticals in terms of quality assurance for

13  the products that went out under its label?

14          MR. LEWIS:  Objection as to form.

15      Q.   Was there any quality control performed by

16  Genzyme Pharmaceuticals as to products on which it

17  put its labels?

18      A.   The operations function is responsible for

19  quality control and for quality assurance, and they

20  do that to support all the product lines.

21      Q.   What's the general procedure for that

22  quality assurance and quality control?

23          MR. LEWIS:  For all products?

24          MR. CHOW:  In this particular case,

00122

1  melatonin.

2      A.  So I can't speak to the specific procedure

3  for melatonin.

4      Q.  So is there a periodic testing of

5  inventory, for example?

6      A.  There was periodic testing of inventory.

7      Q.  You don't recall what the test period was?

8      A.  No, I don't.

9      Q.  In the case of tableting, was quality

10  assurance done both before and after the tableting

11  was done?

12      A.  I don't know what procedure was followed

13  for melatonin tableting.

14      Q.  Did Genzyme at that time do any other kind

15  of tableting or contract any other tableting?

16      A.  I'm not aware of any other products at that

17  time.

18          MR. CHOW:  Let's mark as Exhibit 32 a

19  document bearing Genzyme No. 2592.

20              (Document marked as Ollington

21              Exhibit 32 for identification)

22      Q.  This is a message that's addressed to you

23  from Chris Jackson; is that correct?

24      A.  Correct.

00123

1    Q.  Who was Chris Jackson?

2    A.  He's a pharmaceuticals business unit

3  employee based in Haverhill.

4    Q.  What's his function?  What was his

5  function?

6    A.  He played a role in materials management,

7  supply chain management.

8    Q.  Now, there's a reference here to Promix.

9  What is Promix?

10    A.  Promix was the software application for

11  managing inventory.

12    Q.  Do you know anything about this -- this

13  Sumitomo reference is not relevant to melatonin; is

14  that correct?

15    A.  I don't recall exactly.

16    Q.  Does Trytophan have any meaning to you?

17    A.  Trytophan does, yes.

18    Q.  That's a different product, is it?

19    A.  Correct.

20        MR. CHOW:  Let's mark as Exhibit 33

21  Genzyme Document 4383 through 4465.

22            (Document marked as Ollington

23            Exhibit 33 for identification)

24    Q.  Have you seen this document previously?

00124

1    A.  Yes, I have.

2    Q.  In what context had you seen it?

3    A.  I believe I glanced at this a week ago.

4    Q.  Had you seen it before?

5    A.  Yes, I have.

6    Q.  In what context had you seen it before?

7    A.  I can't recall the exact context.

8    Q.  Looking at the date, was this early on in

9   the planning process?  Was this at the end of the

10   planning process or in between?

11    A.  Oh, it was in between.  It's three months

12   into the process.

13    Q.  Who was J. Beaumont?

14    A.  He's a salesperson based in the U.K.

15    Q.  Cousins or Cousins?

16    A.  Simon Cousins (pronounced KUZins).  I

17   believe at this point he was still based in Liestal,

18   the general manager of Liestal.

19    Q.  Let me refer you to the part on the

20   melatonin which begins on 4416.  You mentioned you

21   had at least glanced at this document earlier.  Did

22   you have a chance to read this "Introduction and

23   Background"?

24    A.  No, I did not.

00125

1    Q.   There is mention about the Newsweek cover

2    story defining "The Melatonin Miracle."  Is that

3    something you knew about prior to reviewing this

4    document?

5    A.  I remember it, yes.

6    Q.   What was the nature of that article?

7    A.  I don't remember the article; I remember

8    the headline on the popular magazine Newsweek

9    describing potential for melatonin.

10    Q.   So you had seen it independently of this

11    litigation?

12    A.  Correct.

13        MR. CHOW:  We may as well mark it as an

14    exhibit.  Let's mark as Exhibit 34 an excerpt from

15    Newsweek.

16            (Document marked as Ollington

17            Exhibit 34 for identification)

18    Q.  Is this the article that you're speaking

19    about?

20    A.  I don't recall the exact article.

21    Q.  But it was a cover story like this?

22    A.  Yes.

23    Q.  Going back to Exhibit 33, did you have an

24    opportunity to look at the report on melatonin in

00126

1   terms of its accuracy?

2     A.   In Exhibit 33?

3     Q.   Yes.

4     A.   No, I have not examined it.

5     *Q.   Looking at Page 4418, do these charts

6   reflect your experience with the sale of melatonin,

7   at least after the period that you became president?

8         MR. LEWIS:  Can I get that question back,

9   please; I couldn't hear it.

10         *(Question read)

11     A.   Yes, they do.

12     Q.   I'd like to ask you to turn back to Page

13   4391.

14     A.   4391?

15     Q.   Yes, the same document.  There's a place

16   that says "Recommendations," one of which is "Sell

17   bulk at 'any price.'"  Did Genzyme Pharmaceuticals

18   adopt these recommendations with respect to bulk

19   product?

20     A.   I don't recall.  We adopted some of these

21   recommendations; I can't recall each one.

22     Q.   Turning to the next page, this is a

23   melatonin fixed dosage form; is that correct?

24     A.   Finished dosage form.

00127

1     Q.   Finished dosage form.  On these

2   recommendations, one recommendation is "Reduce

3   efforts from commercial and support groups."  What

4   did that mean?

5     A.   To reduce the level of effort that internal

6   Genzyme employees were allocating to this product

7   line.

8     Q.   Who did that refer to at Genzyme

9   Pharmaceuticals at this point?

10     A.   I just can't recall exact individuals.

11     Q.   Did it include Roger Sparrow?

12     A.   It would have included Roger and Matthew

13   Roe, Toni Nichols.

14     Q.   Did that also include any financial support

15   of distributors?

16     A.   I don't recall that.

17     Q.   Then it says, the next item, "Look for

18   Specialized Partner for MelaPure product."  What's

19   your recollection of what that meant?

20     A.   That meant to offset the reduction in our

21   internal effort by working with an outside partner

22   or with a specialized partner that could continue to

23   support the finished dosage form, MelaPure.

24     Q.   Were there candidates for this specialized

00128

1  partner?

2      A.  I don't recall who they were.

3      Q.  These were not distributors, I gather?

4      A.  I don't know that.

5      Q.  Did it include pharmaceutical companies?

6      A.  It could have.

7      Q.  Were you involved in such a search?

8      A.  I was involved in the internal effort to

9  consider developing melatonin, MelaPure, as a

10  therapeutic product, to design our own clinical

11  studies.

12      Q.  So did you talk to any potential partners

13  in that regard?

14      A.  We did talk to a potential partner.

15      Q.  What kinds of -- what roles in industry did

16  they play?  Were they pharmaceutical companies?

17      A.  I recollect speaking with one company that

18  was also a biotechnology kind of company that was

19  focusing on neuroscience.

20      Q.  So did anything come of those talks?

21      A.  No.

22      Q.  Do you know why?

23      A.  They just were not sufficiently convinced

24  to take this on as a research initiative.

00129

1    Q.  Did that relate to the cost of getting

2    regulatory approval?

3    A.  I don't know.  It would be conjecture on my

4    part.

5    Q.  But Genzyme Pharmaceuticals itself was not

6    planning on undertaking the regulatory cost; is that

7    correct?

8    A.  To develop this?

9    Q.  Yes.

10    MR. LEWIS:  At what time?

11    MR. CHOW:  At this time, 1997.

12    A.  I'm just trying to think of exactly the

13    time that we were working on it, but about this time

14    we were still considering.  We decided not to.

15    Q.  Jumping ahead again to 4420, which is a

16    Market Analysis of customers, is it correct to say

17    that these customers essentially took the bulk

18    melatonin and made their own tablets or capsules, as

19    the case may be?

20    MR. LEWIS:  You're referring to the

21    customers listed on 4420?

22    MR. CHOW:  Yes, and overlapping to 4421.

23    A.  I don't recollect that they did that.

24    Q.  What's your understanding of what the

00130

1  customers did with the bulk melatonin?

2     A.   My understanding is that some did that,

3  made their finished dosage form tablet, and that

4  some resold.

5     Q.   Again, to your recollection, there was

6  nothing -- Genzyme did not sell in the U.S. the

7  MelaPure brand?

8     A.   Again, I don't recollect that.

9     Q.   Jumping back again to 4394, it says

10  "melatonin it's over."  What did that mean?

11     A.   That meant that the high volume sales of

12  bulk melatonin had ceased.

13     Q.   What did it mean with respect to the

14  finished dosage form?

15     A.   Well, it doesn't state on this summary.

16     Q.   Let's go to some of the recommendations for

17  the finished dosage form, Page 4427, and carrying

18  over to 4428.  Is it true that Genzyme

19  Pharmaceuticals ultimately took Option 2?

20     A.   It looks to me as if it were some more the

21  version of No. 3.

22     Q.   Ultimately, is that third party the

23  VitaPure operation?

24     A.   It was the entity that Roger Sparrow is

00131

1    eventually setting up; I can't recall if it was

2    still VitaPure a year later.

3      Q.   At this time -- was there actually a

4    decision between the options made at any particular

5    point in time?

6      A.   I'm sorry?

7         MR. LEWIS:  Objection as to form.

8      Q.   Between the four options that were

9    presented here, was there any point in time where it

10   was decided that one of these options were taken or

11   was to be taken?

12     A.   So decisions were made moving forward in

13   the business, from that point forward.

14     Q.   But Option 1, which was to "Kill the

15   program immediately" was not done?

16     A.   Correct.

17     Q.   And by default, you stayed with the program

18   for some time, maybe not another year; is that

19   correct?

20     A.   We stayed --

21        MR. LEWIS:  Objection as to form.

22     A.   I need to hear the question again.

23     Q.   Option No. 2 was "Stay with the program for

24   another year to take advantage of the successes that

00132

1    we are beginning to realize."

2        MR. LEWIS:  What's the question?

3    Q.  Was that path taken as well?

4    A.  Yes.  The business continued to stay in the

5    finished dosage form, melatonin.

6    Q.  But then at some point the business was

7    sold, some portion of the business was sold to --

8    was transferred to Sparrow's concern; is that

9    correct?

10    A.  That is correct.

11    Q.  Do you recall at the time you first

12    received this document whether you had any questions

13    about the accuracy of the information presented with

14    respect to melatonin particularly?

15    A.  I don't recall having any specific

16    questions.

17    Q.  Would you say that this document was a

18    substantial factor in decisions that were made with

19    respect to rationalisation?

20        MR. LEWIS:  Objection as to form and

21    foundation.  Are you asking him to speculate about

22    the motives of others?

23    Q.  To your knowledge, who received this

24    document?

00133

1    A.   Beyond the folks mentioned here and myself?

2   I don't know.

3    Q.   To the extent there was a decision made on

4   rationalisation, did you communicate this to -- you

5   mentioned earlier that both Geoffrey Cox and Henri

6   Termeer had some role in the decision-making.  Is

7   this information something you transmitted to those

8   people?

9    A.   I don't recollect distributing this

10   document.

11    Q.   Did you discuss the particular options with

12   Mr. Termeer or Mr. Cox with respect to melatonin?

13       MR. LEWIS:  At what time, Mr. Chow?

14       MR. CHOW:  During this business planning

15   process, which, as I understand, went past the

16   presidency of Dr. Ollington.

17    A.   I don't recall any specific conversation.

18    Q.   Was it part of your subsequent -- was it

19   part of the board presentation that you made?

20       MR. LEWIS:  Was what part?

21    Q.   Was the information, at least some portion

22   of the information here in this report, given to the

23   board?

24       MR. LEWIS:  Objection as to form.  We're

00134

1   talking about a report that's how many pages long,

2   Mr. Chow?  About 60 or 70?  And asking the witness

3   to testify whether any portion of the 70-page

4   single-spaced report was conveyed to the board some

5   months later?  I object.

6       Q.   Was there any information here that was new

7   to you?

8       A.   Difficult to answer.  There's a level of

9   detail in here that I was not familiar with at the

10   time.

11      Q.   Would it be fair to say there were no

12   surprises in this report?

13      A.   That there were no --

14      Q.   There were no surprises for you in this

15   report?

16      A.   I don't recall being surprised.

17          MR. CHOW:  Let's mark as Exhibit 35 a

18   document bearing No. 907 which is some handwritten

19   notes.

20              (Document marked as Ollington

21              Exhibit 35 for identification)

22      Q.   I just wanted to find out whether you had

23   any idea whose writing this was and whose notes it

24   came from.

00135

1    A.  No, I don't know.

2    Q.  Again, you have no recollection of any

3  issue between Natural Options and Tishcon?

4    A.  No, I don't recall any.

5       MR. CHOW:  Again, I apologize on this one,

6  we don't seem to have copies of this one, even for

7  myself.  So it's Genzyme 4080 through 4133 that's

8  marked as Exhibit 36.

9          (Document marked as Ollington

10          Exhibit 36 for identification)

11    Q.  Can you tell me what that document is,

12  please.

13    A.  It looks like a presentation I made on the

14  status of the business planning process.

15    Q.  Who did you make that presentation to?

16    A.  I don't recall the exact audience.

17    Q.  There's a reference on the very last page

18  of that document to a September 16th presentation to

19  Mr. Termeer.  Do you recall you had that meeting?

20    A.  I don't recall it.

21    Q.  Do you recall presenting this plan at any

22  time to Mr. Termeer?

23    A.  I don't recall presenting this document to

24  Mr. Termeer.

00136

1    Q.   Did you have ongoing discussions with Mr.

2    Termeer about the business planning -- business

3    process recommendations?

4    A.   Yes, I had ongoing discussions with Henri.

5    Q.   How often would you talk to him about these

6    matters?

7    A.   I met with Henri about once every month,

8    maybe once every six weeks, during this period.

9    Q.   Was anything done in writing?

10    A.   Not that I can recall.

11    Q.   You've checked for any communications of

12    that kind?

13    A.   I've checked my files, yes.

14    MR. CHOW:  Let me mark as Exhibit 37 the

15    document with Genzyme Nos. 211 through 248.

16            (Document marked as Ollington

17            Exhibit 37 for identification)

18    Q.   Is this a document you've seen previously?

19    A.   (Witness reviews document)  I don't recall

20    this document.

21    Q.   Did you go through any budget presentations

22    while you were president of Genzyme Pharmaceuticals?

23    A.   Yes, I did.

24    Q.   There's in small numbers on the bottom,

00151

1    had exposure to the melatonin business of Genzyme

2    Pharmaceuticals other than you as a responsible

3    person?

4         MR. LEWIS:  Objection as to form.

5         Q.   Who would be most knowledgeable about that

6    within Genzyme?

7         A.   I don't know who would be most

8    knowledgeable.  There are still many employees from

9    1997 and 1998 still employed at Genzyme.

10        Q.   Who would have had any exposure to the

11   sales process --

12        MR. LEWIS:  Objection.

13        Q.   -- for melatonin?

14        MR. LEWIS:  Objection as to form.

15        Q.   Aside from Tom Slater and Roger Sparrow,

16   who are both no longer there, who else was involved

17   in the sales process for melatonin?

18        A.   There is still an employee of the

19   Pharmaceuticals Division, Dave DeLoria.  I believe

20   the customer service manager of the pharmaceuticals

21   business is the same as was back in '97, '98.

22        Q.   Who is that?

23        A.   Her name is -- her first name is Laima,

24   L-a-i-m-a, and her last name I believe is

# Newsweek

# Melatonin



Sleep, Jet Lag
and Aging:
The Selling
of a Natural
Wonder Drug

Highs & Lows of
'Herbal Ecstacy'



01134

0 706288 9

PX–34

LIFESTYLE

It's a natural substance that resets the body's clock and helps it sleep. But can it also slow the calendar of aging? Here's what we know—and don't know—about a potent hormone that millions of Americans are prescribing for themselves.     By Geoffrey Cowley

# Melatonin M

HEALTH FADS ARE NOTHING new, but rarely does one hit with the force of the great melatonin craze of 1995. Just three months ago, international travelers and alternative-medicine enthusiasts were the only ones dosing themselves with the naturally occurring hormone. A typical health-food store sold just a few jars of pills or lozenges each week, and many didn't carry the stuff at all. But the market exploded in early August, when a spate of books, articles and broadcasts started detailing new research on melatonin's possible health benefits. Rhonda Winokur, who runs a small natural-foods store in Rockledge, Pa., sold out in one day, after the appearance of a NEWSWEEK article ("Melatonin," Aug. 7). Winokur restocked her shelves and started answering her phone, "Yes, we have melatonin!" only to sell out again within a week. And when she tried to place another order, the suppliers were swamped. Small wonder. Demand has grown so fast that the huge GNC chain, which didn't even carry melatonin until early September, was moving 4,000 bottles a day by the middle of the month.

Melatonin, in case you've missed the hoopla, is the all-natural nightcap. It's secreted by the pineal gland, a pea-size structure at the center of the brain, as our eyes register the fall of darkness. Studies suggest that low-dose supplements can hasten sleep and ease jet lag, without the hazards or side effects of prescription sleeping pills (page 63). And though the evidence is still sketchy, some researchers believe that melatonin could help counter the ravages of age. In test-tube and animal experiments, researchers have found that it protects cells, strengthens the immune system and slows the growth of some tumors. Of course there are surer routes to good health—old standbys like exercising, eating right and giving up cigarettes. But to hordes of Americans, the lure of a safe, cheap, "natural" panacea is proving irresistible. "It's like a revolution," says Margarita Dubocovich, a neuropharmacologist at Northwestern University. "People

PHOTO ILLUSTRATIONS BY NOLA LO



Case 1:05-mc-10147-GAO    Document 27-13    Filed 09/07/2007    Page 52 of 53

are going crazy for this stuff.

How crazy? In Miami's fashionable Coconut Grove shopping district, the Oak Feed Natural Food Market is limiting customers to 20 bottles apiece to avoid shortages. At Sherwyn's, Chicago's largest supplement store, vitamins manager David (Rocky) Caplan says melatonin sales increased tenfold in eight weeks. "Our sales have increased *more* than 10 times," says Marvin Babin of Vitamins 4-U in San Francisco. The stuff is selling even in Seattle, where the drizzle can make waking a bigger challenge than sleeping. "It's outrageous," says Lorrie Pults, manager of a local Pilgrim's Nutritional Center. "We can hardly keep it on the shelf."

Folks who aren't scouring the health-food stores for melatonin are apparently too busy shopping for books about it. "The Melatonin Miracle," by Drs. Walter Pierpaoli and William Regelson, has sold well over 100,000 copies since Simon & Schuster brought it out in late August. In an unusual move, Walgreen's recently ordered 6,000 copies to sell in its pharmacies. The book is now No. 3 on The New York Times best-seller list (advice and how-to) and headed into its sixth printing. Meanwhile, Los Angeles family physician Ray Sahelian has ordered a fourth printing of his self-published "Melatonin: Nature's Sleeping Pill," which has sold 50,000 copies since August. "Melatonin: Your Body's Natural Wonder Drug," by veteran researcher Russel Reiter and writer Jo Robinson, is just reaching stores this month, but Bantam Books has already sold rights for eight foreign editions.



**Riding the wave:** *At Sherwyn's, Chicago's biggest health-food store, melatonin sales increased tenfold at the end of the summer*

**Lucky mice:** Clearly, the craze has been good for peddlers and publishers. But what about consumers? Should they really be taking this stuff? What do they stand to gain—or lose?

By Pierpaoli and Regelson's account, there's no question that melatonin can stave off the ravages of age. That's a stretch, for no one has ever studied the effects of long-term use in humans. But as dreams go, it's a plausible one. Like most animals, we produce a lot of melatonin early in life, but our blood levels drop sharply around puberty and decline steadily as we get older. Animal studies suggest it's no coincidence. Several years ago Pierpaoli paired 10 young mice with 10 older ones and surgically switched their pineal glands, restoring youthful melatonin levels to the elders at the youngsters' expense. The young mice grew decrepit and died in late middle age, but the older ones surpassed their life expectancies by an average of 30 percent. In human terms, the youngsters were

dying at 50 while the [...] pursued tennis and ro[...] 100. In other experimen[...] paoli found that spiki[...] animals' drinking wate[...] same effect.

It would take decad[...] whether people respon[...] matically as mice. But w[...] its effect on aging, m[...] can clearly help bring [...] In controlled clinical [...] researchers have foun[...] little as a 10th of a m[...] makes dozing off easie[...] ever the time of day. A[...] studies have shown tha[...] nightly regimen can hel[...] flight crews ward off [...] Better rest is the main [...] the people now rushin[...] melatonin, and many [...] are finding it. Sahelia[...] monitors a half-dozen [...] tive-health discussion [...] on the Internet, estima[...] 80 percent of the rece[...] ings about melatonin ha[...] cerned better sleep. "Fo[...] tried melatonin and it's[...] reads a typical comment[...] . . . restored my sleep cy[...] en me lots of energy."

**Bad dreams:** Not eve[...] so pleased. In Sahelian'[...] mal survey, 10 percent [...] users said the hormo[...] nothing for them, and an[...] percent complained of [...] fects such as nightmares[...] aches, morning groggine[...] depression and low sex d[...] past studies, researche[...] given people up to 6,00[...] grams a day—600 to 3,00[...] the usual doses—withou[...] ing any toxicity. And des[...] recent surge in use, th[...] and Drug Administrati[...] recorded only four com[...] about melatonin. Two [...] said it had disrupted the[...] patterns, one complained of genital pain and a fourth re[...] feeling nauseated. "We can't substantiate that melatonin [...] part or largely responsible for these [problems]," says[...] spokesman Brad Stone.

Even so, some experts are appalled to see so many people[...] with such a potent hormone. One concern is that high doses[...] causing no immediate harm, could have unknown lon[...] effects. "Even one milligram, the smallest commercially av[...] dose, is at least three times higher than the normal amount[...] body," says Dubocovich, the neuropharmacologist. "Do[...] body need so much melatonin? Maybe adults produce le[...] some reason." A second concern is that no one regulat[...] quality of what's sold on store shelves. The FDA monitors[...] makers' raw materials and production methods, but b[...] melatonin is sold as a "dietary supplement," it isn't subject t[...]

rutiny. Anyone wondering
bout the strength and puri-
y of what's in the bottle has
st two options: believe
hat the manufacturer says,
r hire a lab to perform a
emical analysis.

While both concerns are
rely valid, neither is
ique to melatonin. Doc-
rs prescribe countless
ugs without knowing all
eir possible long-term ef-
ts. And buying any unreg-
ated supplement—even
cium or vitamin C—re-
res a small leap of faith.
ough melatonin is by all
unts safer than a pre-
ption sleeping pill, Reiter
Robinson have identi-
several classes of people
should probably avoid
least for now. Those include women who are pregnant or
ing (since no one knows how excessive exposure to the hormone
t affect a fetus or infant); people with severe allergies or
mmune diseases (melatonin could exacerbate such conditions
imulating the immune system); people with immune-system
ers such as lymphoma or leukemia (for the same reason), and
hy children (who already produce it in abundance). Women
g to conceive should also think twice about taking the hor-
e, since high doses can act as a contraceptive.
hatever its strengths and failings, melatonin isn't the only
ral remedy capturing America's imagination. As
newcomer to the neighborhood health-food

## A Bonanza for Booksellers



The melatonin craze has been almost as good for publishers as
it has for health-food stores. Some recent books:



**The Melatonin
Miracle** by Walter
Pierpaoli and
William Regelson
with Carol Col-
man *(Simon &
Schuster, $21).* A
fascinating ac-
count of the re-
search, despite
some exaggerated claims.

**Melatonin: Your Body's Natural
Wonder Drug** by Russel J. Reiter
and Jo Robinson *(Bantam Books,
$22.95).* A brisk introduction to

melatonin by America's leading
expert (Reiter).

**Melatonin: The Anti-Aging
Hormone** by Suzanne LeVert
*(Avon Books, $5.99).* A hype-
free primer.

**Melatonin: Na-
ture's Sleeping
Pill** by Ray
Sahelian *(Be
Happier Press,
$13.95).* Guid-
ance from
a doctor.

Health Fraud, the natural-remedies boom looks more like a tri-
umph of hucksterism over sound sense. "What you have with
melatonin is a potentially useful drug that the health-food industry
is rushing ahead and selling to anyone who wants it," he says.
"The rule in medicine is, first do no harm. The rule of the health-
food industry seems to be, if it's a fad, get in there and sell it
before the FDA bans it." He's surely half right. There's no shortage
of old-fashioned Yankee salesmanship in the supplements busi-
ness. But where melatonin is concerned, there's no evidence it's
hurting anyone.

store will discover, it's just
one star in a vast and grow-
ing constellation (follow-
ing story). Last year Ameri-
cans spent nearly $1 billion
on herbs and other tonics,
more than twice what we
spent just five years earlier.
Throw in vitamins and min-
erals and the tally was
$4.6 billion.

William Watts, president
of GNC Corp., sees several
trends at work: the aging of
the baby-boom generation, a
growing preference for pre-
vention and self-care over
high-tech intervention, and
an expanding body of re-
search suggesting that natu-
ral remedies can work. But
to William Jarvis of the
National Council Against

*With* Susan Miller *in New York,* Karen Springen *in Chicago,*
Peter Katel *in Miami and* Binnie K. Fisher *in Seattle*

# How to
# Beat
# et Lag

M ELATONIN MAY
or may not retard
aging, but experts
agree that it can
ward off jet lag. There's
re than one way to tackle a
w time zone. Here are two
sible approaches:
**repare in advance.** Secret-
naturally at the fall of dark-
s, melatonin prepares the
y for a "sleep phase" that
s with the return of light.
as every traveler knows,
ting that phase takes time.
east from L.A. to New
, and when the clock in
es Square says it's mid-
t—time to sleep if you



PHOTO ILLUSTRATION BY NOLA LOPEZ

have to rise early—your body
will swear it's only 9. To ease
that conflict, Dr. Al Lewy of
the Oregon Health Sciences
University suggests starting a
melatonin regimen a day or
two before leaving the West

Coast. Rather than taking a
sleep-inducing dose of two to
five milligrams and heading
to bed early, he recommends
popping a tiny (0.5 mg) dose
in the middle of the afternoon
and getting on with the day.

The point is not to knock
yourself out, he says, but to
simulate an earlier sunset and
let your body respond ac-
cordingly. To prepare for an
east-to-west flight, he would
take the same small dose in
the morning, in effect delay-
ing the dawn.
**Wait until you arrive.**
When you're crossing nine or
10 time zones, it can be hard to
tell whether you need an earli-
er sleep phase or a later one,
let alone figure out how to
move in the right direction.
Dr. Ray Sahelian, a family
practitioner in Los Angeles,
suggests simply waiting until
you reach your destination,
then taking melatonin around
bedtime—one milligram
for every time zone you've
crossed, up to 10 or 12 mg.
Either system can help, for
melatonin works as a soporific
as well as a timekeeper. But
Sahelian's doesn't require a
calculator.
G. C.

**EXHIBIT 10**

00001

```
                                        Volume I
                                        Pages 1 to 26
                                        Exhibits 1 - 4
                   UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

      - - - - - - - - - - - - - - - -x

        In re the Application of        :

        KAYAT TRADING LIMITED,          :

                    Petitioner,         :

        For an Order to Take            :  Civil Action No.

        Discovery of                    :  05-MBD-10147-GAO

        GENZYME CORPORATION,            :

                    Respondent,         :

        Pursuant to                     :

        28 U.S.C. Section 1782          :

      - - - - - - - - - - - - - - - -x
```

        DEPOSITION OF NADEZHDA IVANOUNA PARSHINA, a
witness called on behalf of the Respondent, taken
pursuant to the Federal Rules of Civil Procedure
before Carol H. Kusinitz, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Radisson SAS
Hotel Kiev, Yaroslavov Val St. 22-24, Kiev, Ukraine,
on Wednesday, February 8, 2006, commencing at
3:00 p.m.
PRESENT:

        Abed & Savage (by M. Brooks Savage, Jr., Esq.)
            1101 17th Street, N.W., Suite 405,
            Washington, D.C. 20036   - and -
        G. & A. Ladas (by Andreas G. Ladas, Esq.)
            67 Kennedy Avenue, Athienitis Kennedy
            Park, Suite 301, CY-1076 Nicosia, Cyprus,
            for the Petitioner.
        Edwards, Angell, Palmer & Dodge LLP (by Scott P.
            Lewis, Esq., and Matthew Martel, Esq.)
            111 Huntington Avenue, Boston, MA  02199,
            for the Respondent.
        Also Present:  Konstantin Meshkov
                    Sergei M. Kalinichenko,  Interpreter
                    Benjamin Jones

00009

1    analysis.

2        Q.    Do you remember who sent you the complaint?

3        A.    A middle-aged man.   I do not remember more

4    details.

5        Q.    How do you know that he was middle aged?

6        A.    Because he physically came.   He physically

7    brought the complaint, and he left the package of

8    the medicine.

9        Q.    Can you remember when this occurred?

10       A.    It was most definitely before the year

11   2000.  So the protocols we brought dated after the

12   year 2000.

13            MR. LEWIS:  The reports that she brought

14   are dated after the year 2000?

15       A.    Correct.

16       Q.    You're referring --

17       A.    The complaint was dated before the year

18   2000.

19            MR. LEWIS:  And the papers she has brought

20   with her this afternoon are dated in or after 2000?

21       A.    Now I recollect that in the year 2000 we

22   conducted additional inspection on the basis of the

23   complaint.

24       Q.    Mrs. Parshina, as a result of your

00019

1    not -- isn't the same.  It doesn't correspond.

2        Q.   Can I clarify that, please.  Could I see

3    the box, ma'am?  Thank you.  The registration number

4    for the product that's been marked as Exhibit 1 is

5    5259, correct?

6        A.   Correct.

7        Q.   And next to the registration number it

8    says, "P.09.02," correct?

9        A.   Correct.

10       Q.   What does that mean?

11       A.   Registration number has two parts.  The

12   registration number does not look typical for -- as

13   a registration number for an American product.

14       Q.   How would an American product -- strike

15   that.

16       A.   But I may be mistaken.  I may be mistaken.

17   You should check the documents.  We have to check

18   the documents.

19       Q.   Mrs. Parshina, you brought two other

20   documents with you today.

21           MR. LEWIS:  Off the record for a second.

22           (Discussion off the record)

23       Q.   Mrs. Parshina, I'd like to show you one of

24   the other papers that you brought today and ask you

00020

1   to tell me what it is.

2       A.   A certificate of analysis, certificate of

3   analysis conducted by the laboratory of the

4   Inspection.

5       Q.   And what is the date of the certificate of

6   analysis that you have in front of you?

7       A.   March 18, 2000.

8            MR. LEWIS:  Could we have the March 18th,

9   2000, certificate of analysis marked as Deposition

10  Exhibit 3, please.

11                 (Document marked as Parshina

12                 Exhibit 3 for identification)

13      Q.   Mrs. Parshina, returning to Exhibit 3, can

14  you tell me, was this certificate of analysis sent

15  to CERTA?

16      A.   Yes.

17      Q.   And we see that where I'm pointing my

18  finger, correct?

19      A.   Correct.

20      Q.   And can you tell me who signed this

21  certificate of analysis?

22      A.   Kotenko, head of the laboratory.

23      Q.   Mrs. Parshina, I'd like to show you the

24  last of the three documents that you brought today

00021

1    and ask you if you can tell me what it is.

2         A.   Same certificate of analysis for melatonin,

3    but of other batch conducted -- an analysis was

4    conducted by our laboratory.

5         MR. LEWIS:  Can we have this last of the

6    three documents marked as Deposition Exhibit 4,

7    please.

8              (Document marked as Parshina

9              Exhibit 4 for identification)

10        Q.   Am I correct, Mrs. Parshina, that the

11   certificate of analysis that's marked as Exhibit 4

12   was also prepared on March 18th, 2000?

13        A.   Correct.

14        Q.   And, again, this certificate was sent to

15   CERTA?

16        A.   Correct.

17        Q.   Do you know -- do you have any

18   recollection, Mrs. Parshina, of the -- strike that.

19   Did you have any personal involvement in the

20   inspections that are the subject of these two

21   certificates of analysis that you've just described

22   for me?

23        A.   It is not in my job description to

24   participate in the analysis.